## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| **XINUOS, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CASE NO.: 3:21-cv-00031** |
| | ) | |
| **INTERNATIONAL BUSINESS** | ) | |
| **MACHINES CORP.** and | ) | |
| **RED HAT, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

SUMMARY OF ALLEGATIONS .............................................................................4

STANDARD OF REVIEW .......................................................................................6

ARGUMENT ...........................................................................................................7

I.    XINUOS FAILS TO PLAUSIBLY ALLEGE HARM TO COMPETITION, AS
      IT MUST TO ESTABLISH ANTITRUST STANDING ......................................7

II.   XINUOS DOES NOT PLAUSIBLY ALLEGE ANY ANTICOMPETITIVE
      CONDUCT UNDER THE SHERMAN ACT ........................................................9

      A.    Market Allocation .............................................................................11

      B.    Promoting Each Other.........................................................................13

      C.    Sharing Technical Information ............................................................14

      D.    "Jointly Taking Technical Steps to Exclude Xinuos"...............................15

      E.    IBM's Refusal to Deal With Xinuos.........................................................16

      F.    Copyright Infringement ..........................................................................17

III.  XINUOS DOES NOT PLAUSIBLY ALLEGE AN ANTICOMPETITIVE
      MERGER UNDER SECTION 7 OF THE CLAYTON ACT ..............................18

IV.   XINUOS DOES NOT PLAUSIBLY DEFINE A RELEVANT MARKET OR
      DEFENDANTS' POWER IN ANY PROPERLY-DEFINED MARKET ............21

      A.    Xinuos's "Unix/Linux Paid Server Operating System" Relevant Market
            Definition is Implausible....................................................................21

      B.    Xinuos Does Not Plausibly Support Its Conclusion That IBM and Red Hat
            Have Market or Monopoly Power ..........................................................25

V.    XINUOS' VIRGIN ISLANDS LAW CLAIMS FAIL FOR THE SAME
      REASONS AS ITS ANTITRUST CLAIMS.........................................................28

CONCLUSION...........................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen–Myland, Inc. v. International Business Machines Corp.*,
    33 F.3d 194 (3d Cir. 1994)..........................................................................23

*Alphacard Sys., LLC v. Fery LLC*,
    2021 WL 219091 (D.N.J. May 31, 2021) ....................................................9

*Andela v. Am. Ass'n For Cancer Rsch.*,
    389 F. App'x 137 (3d Cir. 2010) ................................................................19

*Appleton v. Intergraph Corp.*,
    627 F. Supp. 2d 1342 (M.D. Ga. 2008) .....................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)...................................................................................18

*Ass'n of Minority Contractors & Suppliers v. Halliday Properties, Inc.*,
    1998 WL 480835 (E.D. Pa. Aug. 13, 1998) .............................................16

*Austin v. McNamara*,
    979 F.2d 728 (9th Cir. 1992) .......................................................................8

*Barrett v. Henrys*,
    2012 WL 1622499, 56 V.I. 75 (Super. Ct. May 3, 2012) ...........................7

*Bel Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).....................................................................................7

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)................................................................26, 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)..........................8, 19

*Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*,
    61 V.I. 247 (2014)......................................................................................30

*Castro v. Sanofi Pasteur Inc.*,
    2012 WL 12516573 (D.N.J. Dec. 20, 2012)........................................26. 27

*Charych v. Siriusware, Inc.*,
    790 F. App'x 299 (2d Cir. 2019) ...............................................................14

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
    168 F. App'x 474 (2d Cir. 2006)................................................................25

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988).......................................................................12

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ................................................................. 12, 22

*Dehoog v. Inbev*,
  2016 WL 5853733 (D. Or. July 22, 2016) ................................. 20

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
  2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ........................ 27

*Dominick v. Collectors Universe, Inc.*,
  2012 WL 6618616 (C.D. Cal. Dec. 18, 2012) ........................... 28

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*,
  826 F. Supp. 2d 705 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012).......... 18

*F.T.C. v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ................................................. 20

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)....................................................... 7

*Gardiner v. St. Croix Dist. Governing Bd. of Directors*,
  2019 WL 3814427 (V.I. Super. Ct. 2019) ................................ 29

*Gok v. Roman Cath. Church*,
  2021 WL 1726650 (E.D. Pa. Apr. 30, 2021) ........................ 20, 22

*Holmes v. Gates*,
  403 Fed. Appx. 670 (3d Cir. 2010)............................................. 7

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
  90 F.3d 737 (3d Cir. 1996)....................................................... 11

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999)..................................................... 15

*In re German Auto. Manufacturers Antitrust Litig.*,
  392 F. Supp. 3d 1059 (N.D. Cal. 2019); 2020 WL 1542373.......... 10, 13, 21

*In re Ins. Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010)................................................. 14, 26

*In re Ins. Brokerage Antitrust Litig.*,
  2007 WL 1100449 (D.N.J. Apr. 5, 2007) ................................ 12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013)...................................... 22

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  No. 19-CV-07651-EMC, 2020 WL 6390499 (N.D. Cal. July 15, 2020).................... 20

*Jefferson v. Bay Isles Assocs., L.L.L.P.*,
  2011 V.I. LEXIS 7 (Super. Ct. Feb. 1, 2011) ............................. 7

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979) ..................................................... 8

*LePage's Inc. v. 3M*,
    277 F.3d 365 (3d Cir. 2002)............................................................................... 17

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
    2004 WL 5907538 (N.D. Cal. June 10, 2004) ................................................. 18

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)............................................................... 25

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................... 14

*Miles v. Twp. of Barnegat*,
    343 Fed. Appx. 841 (3d Cir. 2009).................................................................... 7

*Nat'l Soc. of Prof'l Engineers v. United States*,
    435 U.S. 679 (1978)......................................................................................... 10

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020).............................................................. 23

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)..................................................................................... 11

*Pfizer Inc. v. Johnson & Johnson*,
    333 F. Supp. 3d 494 (E.D. Pa. 2018) ................................................................ 8

*Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018)................................................................. 18, 19, 28

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    2006 WL 2786882 (E.D.N.Y. Sept. 26, 2006), *aff'd*, 507 F.3d 117 (2d Cir. 2007).... 22

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010)........................................................................ 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).................................................................. 23, 24, 25

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
    899 F.2d 951 (10th Cir. 1990) ......................................................................... 26

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................... 27

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ........................................................................... 18

*Sea Air Shuttle Corp. v. V.I. Port Auth.*,
    782 F. Supp. 1070 (D.V.I. 1991) ..................................................................... 29

*Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*,
    242 F. Supp. 315 (N.D. Ill. 1965) .............................................................. 21, 22

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
    2006 WL 5437323 (C.D. Cal. Sept. 14, 2006) ............................................... 23

*Sullivan v. Barclays PLC*,
No. 13-CV-2811(PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...................... 22

*Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Centers, Inc.*,
237 F. Supp. 2d 606 (D.V.I. 2002) ........................................................................ 29

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)................................................................................... 15

*U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*,
804 F. Supp. 2d 588 (N.D. Ohio 2011)................................................................... 25

*United States v. E. I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)............................................................................................... 20

*United States v. Microsoft*,
253 F.3d 34, 51 (D.C. Cir. 2001) ........................................................................... 27

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ............................................................................................... 17

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)............................................................................... 8, 10

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*,
516 F. Supp. 2d 270 (S.D.N.Y. 2007)................................................................... 8, 9

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
511 F. Supp. 2d 372 (S.D.N.Y. 2007)..................................................................... 23,

*Xerox Corp. v. Media Scis., Inc.*,
660 F. Supp. 2d 535 (S.D.N.Y. 2009)............................................................... 26, 28

## Statutory Authorities

15 U.S.C. § 1 ............................................................................................................. 10

15 U.S.C. § 2 ............................................................................................................. 11

15 U.S.C. § 3 ............................................................................................................. 10

FRCP Rule 12(b)(6) ............................................................................................ 16, 28

## Treatises

U.S. Dep't of Justice & FTC,
*Antitrust Guidelines for the Licensing of Intellectual Property* §5.5 (2017),
*available at* https://www.justice.gov/atr/IPguidelines/download ............................... 18

U.S. Dep't of Justice & FTC,
*Antitrust Guidelines for the Licensing of Intellectual Property*
§§ 5.1, at 24; 5.5, at 28 (Apr. 6, 1995)...................................................................... 15

## Other Authorities

https://ec.europa.eu/commission/presscorner/detail/lt/ip_19_3433................................... 4

IBM Form 8-K (May 3, 2019),
    https://www.sec.gov/Archives/edgar/data/51143/000110465919026947/a19-9325_28k.htm
    .......................................................................................................................... 21

Red Hat, 2019 Form 10-K, at 12, *available at*
    https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_
    RHT_2019.pdf ............................................................................................... 25, 28

## PRELIMINARY STATEMENT

Plaintiff Xinuos, Inc. ("Xinuos") alleges that Defendants International Business Machines Corporation ("IBM") and Red Hat, Inc. ("Red Hat") conspired to corner and "crush competition" in the "Unix/Linux paid server operating system market." According to Xinuos, IBM and Red Hat did so through a variety of means, including "dividing" the market between themselves, promoting each other, sharing technical information, "technically excluding" Xinuos (through unspecified means), refusing to deal with Xinuos, and copyright infringement. IBM and Red Hat also supposedly acted anticompetitively in 2019 via a public, heavily-scrutinized, $34 billion merger that was approved around the world by every regulatory agency that was required to review it prior to close, including the U.S. Department of Justice and the European Commission. These acts, Xinuos contends, give rise to liability under Sections 1, 2, and 3 of the Sherman Act, Section 7 of the Clayton Act, and various parallel Virgin Islands laws.[1]

The problem with Xinuos's complaint is that, although it invokes magic words from antitrust jurisprudence to tick off the various requirements for such claims and baldly concludes that Xinuos meets those requirements, it does not provide the requisite factual allegations plausibly establishing, or coming close to establishing, these points.

*First*, Xinuos does not actually describe anticompetitive conduct warranting scrutiny under the Sherman Act for the following reasons:

- "Market allocation" is a specific type of agreement in which competitors agree not to compete at all for certain customers or in certain regions. That, however, is not what Xinuos alleges; instead, it alleges that IBM and Red Hat prioritized different categories of customer (IBM in the "high end" and Red Hat in the "low end"), and promoted each other when the customer did not want one or the other's product

---

[1] Xinuos also alleges that IBM and Red Hat infringed copyrights it acquired out of bankruptcy from another company, SCO. Defendants do not seek dismissal of that single claim in this motion and will be prepared to address it on the merits and seek its dismissal at the appropriate time.

solution. Moreover, Xinuos alleges that numerous other competitors exist in the market, who also pitched the same customers as IBM and Red Hat.

- Xinuos's allegations that IBM and Red Hat promoted each other and shared technical information with each other do not include accompanying allegations that this somehow excluded competitors or in any way harmed the competitive process. Both binding and persuasive case law at every level makes clear that such business partnerships are not inherently anticompetitive, but rather require a plausible explanation for how that partnership harmed competition. Xinuos fails to provide any such explanation.

- Although Xinuos alleges that IBM and Red Hat "jointly [took] technical steps to exclude Xinuos," it does not explain how they did so -- this liability theory is wholly conclusory in nature.

- The allegation that IBM refused to deal with Xinuos does not meet any of the requirements for an antitrust claim under that doctrine, which is "at or near the outer boundary of § 2 liability." Xinuos does not allege there was a prior course of dealing between it and IBM that the latter suddenly ceased; nor does it allege that IBM acted in any way to sacrifice short-term profits to do so. Accordingly, Xinuos fails to describe anticompetitive conduct.

- Although IBM and Red Hat, of course, dispute that they infringed any copyrights, it was Xinuos's burden to explain how any such infringement harmed competition, which it did not do. In fact, copyright infringement in the software space can technically be *pro*competitive where it proliferates high quality products among multiple competitors.

Broadly overarching these issues is also the problem that Xinuos only provides facts alleging harm to itself, but does not (as it must) allege that IBM and Red Hat somehow harmed competition. Plausible allegations to this effect are necessary for Xinuos to establish its antitrust standing, but it does not provide any.

*Second*, and similarly, Xinuos does not plausibly allege that the IBM-Red Hat merger "substantially lessened" competition, which it must do to establish a basis to pursue a Clayton Act Section 7 claim. The conduct about which Xinuos complains occurred after the IBM-Red Hat merger is the same as it alleges occurred before the merger. Where a merger does not result in changed behavior or competitive conditions, a Section 7 claim does not lie.  Moreover, Xinuos fails to connect how the *merger* facilitated or caused any harm to competition beyond what IBM

2

and Red Hat supposedly agreed to before their merger. By failing to do so, Xinuos also fails to establish causation, which is another requirement for a Section 7 claim.

*Third*, Xinuos does not plausibly describe—again, as it must—either a well-defined relevant market or IBM and Red Hat's power in such a market. In limiting the market to only "Unix/Linux" server operating systems ("OSes"), Xinuos fails to address reasonable interchangeability or cross-elasticity of demand; specifically, Xinuos fails to explain why *other* server OSes (*e.g.*, Windows Server, Mac OS X Server) are not reasonable substitutes for Unix/Linux server OSes. Similarly, Xinuos does not explain why "paid" server OSes are the only reasonable substitutes here, particularly when Xinuos's *own product* is based on and derived from a free server OS, FreeBSD, and the complaint cites materials making clear that free server OSes compete with paid server OSes. As for market power, Xinuos alleges only that IBM and Red Hat have "64%" of the Unix/Linux paid server OS market; it does not offer any facts to support this contention, nor does it cite any market participants other than the parties. Moreover, it does not allege any other requirements, such as high barriers to entry or why existing competitors would be or are unable to constrain IBM and Red Hat's competitive activities. This failure is especially problematic because Xinuos alleges that it has historically been able to take away customers from IBM and Red Hat, and that other competitors also exist and have been taking away share from IBM for many years. Finally, Xinuos's bald allegation of market power ignores the public finding of the European Commission (among other regulators) when it "unconditionally approved" IBM's acquisition of Red Hat, that: the combined firm will still "face significant competition from other players"; the combined company would lack the leverage to try and advantage itself over rivals; and "the transaction would raise no competition concerns in any of the affected markets."[2]

---

[2]  https://ec.europa.eu/commission/presscorner/detail/lt/ip_19_3433.

*Fourth*, Xinuos's Virgin Islands claims are based entirely on its antitrust allegations, which fail for the same reasons.

Given these fundamental problems, Xinuos's antitrust and related claims fail, thus requiring dismissal.

## SUMMARY OF ALLEGATIONS

Xinuos is a company that develops and sells OSes for computer servers (*i.e.*, pieces of computer hardware or software that provide functionality for other programs or devices on a network). (Compl. ¶¶ 8-9, 12.) Xinuos sells the UnixWare and OpenServer OSes. (*Id.* ¶¶ 12-13, 42.) Xinuos's other server OS products are similarly based on Unix code. (*Id.* ¶¶ 12-13.)

According to Xinuos, it focuses on "business customers" and sells its UnixWare and OpenServer OSes to, *inter alia*, "a number of large enterprises, including retailers, technology services companies, banks and financial services firms, as well as small and medium businesses," all of which rely on Xinuos's OSes "for their corporate computing needs." (*Id.* ¶ 42.) Xinuos alleges that its UnixWare and OpenServer products are "popular because they were stable, reliable, and easy to manage," and are "not just highly popular, but also understood by large enterprise customers, small and medium sized businesses and developers alike as highly valuable." (*Id.* ¶ 45.) In short, Xinuos alleges that it provides high quality server OSes to business customers in the U.S. to this day.[3]

The market in which Xinuos contends that it competes is the so-called "Unix/Linux paid server operating system market." (*Id.* ¶ 36.) As noted above, Xinuos concedes that its server OSes are all Unix-based. It contends that Linux-based server OSes rely on "substantially similar"

---

[3] Although Defendants will be prepared to address Xinuos's quality claims at the appropriate time, if necessary, they recognize that the Court must take those factual allegations as true on this motion, so therefore assume their truth for the purposes of the following arguments.

architectural and programming paradigms, so are viewed as "reasonable potential substitutes" for Unix-based OSes. (*Id.* ¶ 39.) Xinuos never explains, however, why server OSes built on different programming kernels (*i.e.*, other than Unix or Linux) are not "reasonable potential substitutes," or why customers would reject non-Unix/Linux server OSes as substitutes. (*See generally id.* ¶¶ 36-41.) Nor does it explain—beyond a single sentence that the rest of its complaint contradicts, as discussed in Section IV, *infra*—why "free" server OSes are not reasonable substitutes for "paid" server OSes. (*See id.* ¶ 41.) To this point, Xinuos itself alleges that its OpenServer products are derived from FreeBSD, a *free server OS* based on Unix code. (*Id.* ¶¶ 12-13, 42.)

Among others, Xinuos counts both IBM and Red Hat as competitors; IBM with its Unix-based AIX for Power, z/OS, and i server OSes, and Red Hat with its Red Hat Enterprise Linux ("RHEL") server OS. (*Id.* ¶¶ 14-16, 52.) Xinuos also implicitly alleges there are numerous other competitors, no matter how the market is defined. For example, by its own admission, Xinuos does not sell a Linux-based server OS. Nevertheless, it alleges that RHEL represents 70% of "Linux installations in the market." (*Id.* ¶ 108.) Xinuos does not identify the other Linux-based server OS competitors, but they clearly exist. Similarly, Xinuos includes excerpts of presentations that clearly note there are multiple competitors to IBM's, Red Hat's, *and* Xinuos's respective server OS products, including Openstack, FreeBSD, Glassfish, and Mesos, among others. (*Id.* ¶ 128.)

In terms of market power, Xinuos merely alleges, without support, that IBM and Red Hat "jointly control over 64% of the Unix/Linux server market." (Compl. ¶ 137.) It does not identify any facts, including any other competitors or their respective market shares to support this contention. It does not contend that IBM or Red Hat can unilaterally raise prices or restrict output without fear of other competitors taking enough market share in response to make such actions unprofitable. Nor does Xinuos allege that competitors besides it are unable to compete on the

merits with IBM or Red Hat; indeed, Xinuos's own allegations make clear that it believes it is able to take customers and other market opportunities away from both companies. (*Id.* ¶¶ 12, 138.)

Although Xinuos's Complaint is far from a model of clarity, it essentially appears to complain that IBM and Red Hat engaged in six different kinds of anticompetitive activity, which supposedly violate Section 1-3 of the Sherman Act: (1) market allocation, (2) promoting each other, (3) sharing technical information, (4) "jointly taking technical steps to exclude Xinuos," (5) refusing to deal with Xinuos, and (6) infringing Xinuos's copyrights (which Xinuos purchased from a different company, SCO, out of bankruptcy). (Compl. ¶¶ 89–137.) Xinuos also alleges that IBM and Red Hat's $34 billion merger, which was heavily scrutinized and then cleared by the U.S. DOJ and other competition regulators worldwide, violates Section 7 of the Clayton Act. (Compl. ¶¶ 164–170.) Defendants discuss those liability theories below, but it is notable that Xinuos largely just alleges general harm to itself (without providing any appreciable details), but does not factually explain how other competitors are supposedly excluded or foreclosed from any portion of the alleged relevant market. (*See generally id.* ¶¶ 138-149.) Similarly, Xinuos does not actually define what anticompetitive effects Defendants supposedly caused; instead, it just occasionally invokes terminology regarding anticompetitive effects without providing non-conclusory, factual explanations. (*See generally id.* ¶¶ 93, 170.)

## **STANDARD OF REVIEW**

In its complaint, a plaintiff must provide sufficient facts to establish their claim is "plausible." "[A] formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bel Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007) (citations omitted). In assessing plausibility, the Court need not accept "legal conclusions couched as factual allegations." *Miles v. Twp. of Barnegat*,

343 Fed. Appx. 841 (3d Cir. 2009). Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief." *Barrett v. Henrys*, 2012 WL 1622499, 56 V.I. 75, 78 (Super. Ct. May 3, 2012) (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009)). "In essence, the [*Twombly*] pleading standard requires complaints to contain more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Jefferson v. Bay Isles Assocs., L.L.L.P.*, 2011 WL 3853332, at *4 (Super. Ct. V.I. Feb. 1, 2011); *see also Holmes v. Gates*, 403 Fed. Appx. 670, 673 (3d Cir. 2010) (rejecting plaintiff's reliance on "generalized grievances [that lacked] the requisite specificity").

## ARGUMENT

### I.    XINUOS FAILS TO PLAUSIBLY ALLEGE HARM TO COMPETITION, AS IT MUST TO ESTABLISH ANTITRUST STANDING.

"[A]n antitrust plaintiff must do more than show that it would have been better off absent the violation; the plaintiff must establish that it suffered an antitrust injury … an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'" *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). "Injury of the type that antitrust laws were intended to prevent" means harm to *competition* that then causes the plaintiff personal harm; without plausible allegations of harm to competition, dismissal is appropriate. *See*, *e.g.*, *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 296 (S.D.N.Y. 2007) (dismissing antitrust complaint where it did not "raise a plausible inference of harm to competition in the markets identified in the amended complaint"); *see also Austin v.*

*McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) ("[T]he elimination of a single competitor, standing alone, does not prove anticompetitive effect.") (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979)).

Harm to competition occurs when the purported anticompetitive conduct produces *market-wide* anticompetitive effects, such as increased prices, reduced output, or product quantity/quality restrictions. *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) (collecting cases). A plaintiff does not plausibly establish such competitive harm simply by alleging that they were unable to take customers away from a defendant, or that the defendant increased their prices; the plaintiff must explain how the monopolist or alleged cartel restrained competition such that no amount of competitive behavior from their rivals (*e.g.*, reduced prices, increased output, etc.) could have reasonably led to increased customer uptake. *See id.*; *Wellnx*, 516 F. Supp. 2d at 296.

Here, Xinuos alleges *it* was harmed by the purported scheme (*e.g.*, Compl. ¶¶ 127–134), but does not explain anywhere in the complaint how *competition* has been harmed, resulting in increased prices, reduced output, or product quantity/quality restrictions. This failure dooms Xinuos's antitrust claims. *See Alphacard Sys., LLC v. Fery LLC*, 2021 WL 219091, at *3 (D.N.J. May 31, 2021) (dismissing complaint for failure to allege antitrust standing, given plaintiff did not address how "alleged anti-competitive conduct negatively impacted the overall competitive market by, for example, increasing prices, reducing output, or otherwise affecting the quantity or quality of the products offered for sale to the market"). To this point, the allegations simply state that IBM and Red Hat worked together to create better products and provide services that customers prefer over other competitors' offerings, and that, according to Xinuos, server OS purchasers experience a certain amount of lock-in after they make the decision to proceed with a certain server OS environment. (*See* Compl. ¶¶ 97–103; 150–153.) Regarding the former, that is the very definition

of competition and not actionable under the antitrust laws, for the reasons discussed above. Regarding the latter, Xinuos does not explain why informed customer relationships of the type it describes are anything but the result of fierce competition up front, and it does not explain why such informed decisions are evidence of harm to competition—indeed, Xinuos's essential complaint is that more customers are not choosing to purchase *its* server OS.

## II.    XINUOS DOES NOT PLAUSIBLY ALLEGE ANY ANTICOMPETITIVE CONDUCT UNDER THE SHERMAN ACT.

As noted above, Xinuos alleges that IBM and Red Hat supposedly violated Sections 1, 2, and 3 of the Sherman Act by engaging in various acts, including market allocation, promoting each other, sharing technical information, "jointly taking technical steps to exclude Xinuos," refusing to deal with Xinuos, and copyright infringement. (Compl. ¶ 89.) For the reasons discussed below, none of these alleged activities plausibly constitute anticompetitive conduct.

There are two main analytical frameworks under which the Court must assess these claims: the "rule of reason" under Section 1, and monopolization/attempted monopolization under Section 2.[4]

Section 1 applies to "[e]very contract, combination…, or conspiracy" that unreasonably restrains competition. 15 U.S.C. § 1; *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("Despite its seemingly absolute language, section 1 has been construed to prohibit only unreasonable restraints of trade."). The default method to assess the reasonability of such restraints is the rule of reason. *See Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978) (noting that courts depart from the rule of reason only for "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is

---

[4]  Section 3 of the Sherman Act simply extends Section 1's provisions to U.S. territories and the District of Columbia, so is analyzed under the same framework as Xinuos's Section 1 claim. *See* 15 U.S.C. § 3.

needed to establish their illegality").[5] A plaintiff asserting a claim under the rule of reason must plausibly allege that the defendant(s) possessed market power in a well-defined relevant market, and that their agreement caused anticompetitive effects, which then directly harmed the plaintiff. *See Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2284 (2018). If the plaintiff can establish anticompetitive effects, the burden then shifts to the defendant(s) to establish procompetitive benefits from their agreement. *Id.* The burden then shifts back to the plaintiff to establish there were less restrictive alternatives to the complained-about restraints. *Id.* Finally, the fact finder must weigh any anticompetitive effects and procompetitive benefits to determine whether the agreement unreasonably restrains competition. *Id.* As discussed below, Xinuos fails to plausibly establish any of its preliminary requirements (market power in a well-defined market, anticompetitive activity, or effects).

Section 2 applies to monopolization and attempted monopolization. 15 U.S.C. § 2. A monopolization claim requires the plaintiff to establish that (1) defendant(s) "possessed monopoly power in the relevant market," and (2) defendant(s) "willfully acquired and maintained monopoly power and did not acquire its monopoly share due to 'growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 749 (3d Cir. 1996). An attempted monopolization claim requires the Plaintiffs to establish three essential elements: (1) that defendant(s) "engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability

---

[5]  Some conspiracies are *per se* illegal and are therefore analyzed under a different, more stringent standard for the defendants. However, the only potential allegation along those lines is Xinuos's contention that IBM and Red Hat engaged in a market allocation conspiracy. As discussed in Section II.A below, however, Xinuos does not describe a market allocation agreement at all, as that concept is defined by the case law. Its Section 1 claims therefore must be assessed purely under the rule of reason. *See, e.g.*, *In re German Auto. Manufacturers Antitrust Litig.*, --- F. Supp. 3d ---, 2020 WL 1542373, at *6 (N.D. Cal. Mar. 31, 2020) (applying rule of reason to claims that did not plausibly state *per se* conspiracy, and dismissing for failure to plausibly establish elements of rule of reason Section 1 claim).

of achieving monopoly power." *Id.* at 750. As with its Section 1 claim, Xinuos fails to plausibly establish any of the above elements.

Finally, it is noteworthy that Xinuos's complaint seemingly alleges antitrust claims post-dating IBM and Red Hat's 2019 merger. (*See* Compl. ¶¶ 164–170.) To the extent the alleged anticompetitive conduct centers on post-merger "agreements" between the two entities (*i.e.*, all of the alleged liability theories except for IBM's supposed copyright infringement and refusal to deal), it is not actionable under the *Copperweld* doctrine, because a parent and subsidiary cannot conspire or otherwise make anticompetitive agreements with one another. *See Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("A parent company cannot conspire with its wholly owned subsidiary for purposes of section 1 of the Sherman Act.") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). With that in mind, Defendants discuss each specific form of alleged anticompetitive conduct below.

### A.    Market Allocation

The first category of conduct Xinuos targets is the supposed market allocation scheme between IBM and Red Hat, wherein IBM supposedly targeted "high end" accounts and either promoted or "allowed" Red Hat to take over "low end" accounts. (Compl. ¶¶ 108, 109, 112.) Notably, the Complaint alleges that IBM still vied for low end accounts against Red Hat and other competitors (like Xinuos), but did not place as much emphasis on targeting those accounts. (*Id.* ¶¶ 112, 113.) On Red Hat's part, Xinuos does not allege that it had any designs or ability to service "high end" accounts in the same way as IBM. (*Id.* ¶¶ 4, 5, 75, 172 )

"The essence of a market allocation violation … is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1100449, at *10 (D.N.J. Apr. 5, 2007) ("*Ins. Brokerage*

*I*"). "[It] is necessary for Plaintiffs to adequately allege conduct which constitutes market or customer allocation ***and not just the steering of business to preferred partners***." *Id.* at *18 (emphasis added). Moreover, an antitrust plaintiff must be specific about the features of a market allocation scheme; they cannot simply allege that events in the market are consistent with an allocation scheme without alleging the "who, did what, to whom (or with whom), where, and when." *See German Auto. Manufacturers*, 2020 WL 1542373, at *10 (finding alleged market allocation implausible where allegations of static market share were equally consistent with "conscious parallelism or some other innocent explanation").

To be clear, although Xinuos repeatedly implies or concludes that IBM and Red Hat divided the market in some way, it does not actually allege any facts supporting that conclusion. Xinuos alleges that IBM and Red Hat were "getting more and more engaged … as … ***partner[s]*** in some large accounts," (Compl. ¶ 128 (emphasis added)), meaning they were serving the same customers and therefore not allocating the market. Xinuos never alleges that Red Hat services the "high end" market, so it supposedly agreeing not to approach that portion of the market says nothing about competition there. On the "low end" of the market, Xinuos primarily alleges that IBM often went after the same accounts as Red Hat, but, if it appeared the customer was not interested in IBM's solutions, then IBM promoted Red Hat as the best other solution for that customer. (*Id.* ¶¶ 112, 113.) Xinuos also alleges that IBM decided to ***prioritize*** "higher end" accounts, but otherwise still made its solutions available to "low end" accounts. (*Id.* ¶¶ 51, 92, 108, 112.) These allegations do not describe market allocation at all; they describe either competition to the point where it was clear the customer wanted a different solution than what IBM provided, or a prioritization of certain types of customers that were more appropriate for each company's respective solutions.

Another problem with Xinuos's market allocation allegations is that Xinuos contends it remains as a competitor in the same market that IBM and Red Hat allegedly split. If Xinuos is correct that IBM and Red Hat agreed not to compete in certain portions of the market, that means *Xinuos* had less competition and therefore more competitive opportunities. Where an alleged anticompetitive scheme benefits a competitor, that competitor lacks standing to sue, because they could not have plausibly suffered any anticompetitive effects. *See*, *e.g.*, *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (no antitrust standing for competitors who would benefit from an alleged conspiracy to raise prices).

In short, Xinuos's "market allocation" theory is wholly implausible, as set forth by Xinuos's own factual allegations.

### B.    Promoting Each Other

Next, Xinuos alleges that it was illegal for IBM and Red Hat to promote one another. (Compl. ¶¶ 97–103.) This theory, too, fails.

Partnering with a competitor is not actionable if "the obvious explanation for each [partner's] decision … was that each … independently calculated that it would be more profitable to be within the pool than without." *In re Ins. Brokerage Antitrust Litigation*, 618 F.3d 300, 328 (3d Cir. 2010) ("*Ins. Brokerage II*"). Likewise, allegations that two market participants made independent and reasonable business decisions to the detriment of a third competitor with whom they have no obligation are insufficient to plausibly state an antitrust claim. *See*, *e.g.*, *Charych v. Siriusware, Inc.*, 790 F. App'x 299, 302 (2d Cir. 2019) (affirming dismissal of Sherman Act claims against software manufacturer that refused to develop an interface to allow one of its exclusive partner's competitors to enter the market for ski lift technology).

13

Given this law, Xinuos's allegations that IBM and Red Hat promoted each other clearly fail to identify any anticompetitive conduct. Xinuos's frustration that IBM chose to promote Red Hat for certain accounts may be real, but it is not the basis for a legal claim under the applicable antitrust laws.

### C.    Sharing Technical Information

Xinuos next alleges that IBM and Red Hat acted anticompetitively by sharing technical information with each other, and by developing products based on that information. (Compl. ¶¶ 118–125.) Without more, however, such allegations are insufficient to plausibly state an antitrust claim.

"Collaboration for the purpose of developing and commercializing new technology can result in economies of scale and integrations of complementary capacities that reduce costs, facilitate innovation, eliminate duplication of effort and assets, and share risks that no individual member would be willing to undertake alone, thereby 'promot[ing] rather than hinder[ing] competition.'" *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010) (quoting Dep't of Justice & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* §§ 5.1, at 24; 5.5, at 28 (Apr. 6, 1995)). Accordingly, alleging that competitors shared information—particularly where the alleged information is *not* pricing information—is not enough to establish anticompetitive conduct. *See Todd v. Exxon Corp.*, 275 F.3d 191, 207 (2d Cir. 2001) ("The alleged conduct in this case—the exchange of information—is not so inherently or intuitively anticompetitive. The Supreme Court has said as much and specifically prescribed a full rule of reason."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 135-138 (3d Cir. 1999) (finding that, despite evidence of information exchanges, plaintiffs could not establish any anticompetitive effects sufficient to withstand summary judgment).

Given this, if a complaint fails to plausibly identify any anticompetitive effects flowing from alleged information exchanges, dismissal is appropriate. *See*, *e.g.*, *In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d 1059, 1071 (N.D. Cal. 2019) (dismissing complaint under Rule 12(b)(6) because allegations regarding agreements to share "competitively sensitive technical data and to use only certain technical solutions" did not plausibly identify any non-conclusory anticompetitive effects); *Ass'n of Minority Contractors & Suppliers v. Halliday Properties, Inc.*, 1998 WL 480835, at *5 (E.D. Pa. Aug. 13, 1998) (dismissing claim under Rule 12(b)(6) where plaintiff did not explain how alleged information sharing impacted their ability to compete in the market).

None of Xinuos's allegations explain how IBM's and Red Hat's alleged technical information exchanges were exclusionary or otherwise anticompetitive. Instead, Xinuos describes exchanges that improved IBM's and Red Hat's respective products, but otherwise left competition in the rest of the industry intact. (*See* Compl. ¶¶ 97–103. 136–137.) Given these allegations, the case law is clear that Xinuos fails to identify any anticompetitive conduct stemming from the alleged sharing of technical information.

### D. "Jointly Taking Technical Steps to Exclude Xinuos"

In Paragraph 89 of the Complaint, Xinuos alleges that IBM and Red Hat jointly excluded Xinuos from the market via some unspecified technical means. Although it is difficult to locate where Xinuos expands on this allegation, Xinuos's apparent meaning comes in Paragraph 126, where it complains that Xinuos gets "less support" from IBM than Red Hat in IBM's cloud environment. (*Id.* ¶ 126.) That allegation is nothing more than a restatement of the other categories of conduct discussed above, and therefore fails for the same reasons.

### E.    IBM's Refusal to Deal With Xinuos

At points (*e.g.*, Compl. ¶ 97), Xinuos's allegations stray into implying that IBM acted anticompetitively by refusing to provide Xinuos with the same level of access to IBM's technology as Red Hat or by not promoting Xinuos to customers the same way it allegedly promoted Red Hat. However, the antitrust laws strongly support a competitor's ability to deal with whomever it wants, and liability for a unilateral refusal to deal is "at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004). A claim based on a refusal to deal is therefore only plausible if the plaintiff identifies facts indicating that an alleged monopolist "act[s] contrary to its economic interests, by losing business and customers, [such that] there [i]s no other rationale for its conduct except that it wishe[s] to eliminate the plaintiff as a competitor." *LePage's Inc. v. 3M*, 277 F.3d 365, 381 (3d Cir. 2002). One of the key requirements for such proof is allegations indicating that the defendant engaged in "the unilateral termination of a voluntary (and thus presumably profitable) course of dealing" with the plaintiff, and in a way "suggesting a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409.

Here, Xinuos does not allege any of the requirements for a refusal to deal claim. It does not allege, for example, that either IBM or Red Hat had a prior course of dealing with Xinuos that suddenly ended. Similarly, it does not allege that either IBM or Red Hat acted against their short-term interests by refusing to deal with Xinuos. Where, as here, IBM and Red Hat have combined to realize synergies that allow them "to offer a service that consumers find attractive," thus allowing them to improve their market presence on the merits, their strategy does not reflect the sort of behavior that has "no other rationale" than eliminating competition, and thus fails to state a claim. *See Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 341 (3d Cir. 2018) (a refusal

to deal with a competitor only supports an inference of "anticompetitive or exclusionary conduct . . . when business conduct is 'not related to any apparent efficiency'") (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39 (1985)).

### F.    <u>Copyright Infringement</u>

Finally, Xinuos alleges that IBM acted anticompetitively by infringing copyrights that Xinuos purchased at a bankruptcy sale. (*See*, *e.g.*, Compl. ¶ 43.) The proliferation of intellectual property across multiple competitors, however, is not inherently anticompetitive; in fact, it often *enhances* competition by proliferating the state of the art among multiple market participants.[6] Indeed, courts have explicitly found that patent infringement categorically *cannot* constitute an anticompetitive act. *See*, *e.g.*, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016) ("This court long ago held that a defendant's patent infringement cannot serve as a basis for imposing antitrust liability because the patent laws and antitrust laws serve two different and incongruent purposes that 'to an extent ... conflict.'").[7] Similarly, copyright infringement is typically personal in nature and not the type of conduct that could harm competition (and thus cannot typically give rise to an antitrust claim). *See Andela v. Am. Ass'n For Cancer Rsch.*, 389 F. App'x 137, 141 (3d Cir. 2010) ("The District Court was correct that [plaintiff's] alleged injury from [allegedly plagiaristic] publication of the [journal article written by plaintiff] … is personal to him and not of the type the antitrust laws were intended to redress.").

---

[6]  *See*, *e.g.*, U.S. Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property §5.5 (2017) ("By promoting the dissemination of technology, cross-licensing and pooling arrangements are often procompetitive."), *available at* https://www.justice.gov/atr/IPguidelines/download and reprinted in Appendix C of the Supplement.

[7]  *See also Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d 705, 708–09 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) ("this Court has not found any case in which patent infringement has been considered anticompetitive conduct") (citing *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, at *12 (N.D. Cal. June 10, 2004)).

For these reasons, it is incumbent on Xinuos to explain how Defendants' alleged copyright infringement harmed competition. Xinuos does not do so. At multiple points throughout the complaint, Xinuos alleges that it was personally harmed by Defendants' supposed copyright infringement, but it never connects that personal harm to a broader harm to competition. (*See* Compl. ¶¶ 104–117.) Moreover, Xinuos claims that its copyrighted technology is of higher quality (*see id.* ¶ 151), meaning that, affording all reasonable inferences in Xinuos's favor, any IBM or Red Hat products incorporating that technology benefited consumers by proliferating the amount of high quality products in the country. Thus, far from alleging anticompetitive conduct, Xinuos describes *pro*competitive effects stemming from the alleged copyright infringement, requiring the Court to reject that as a basis for Xinuos's antitrust claims. *Cf. Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018) (noting that conduct that benefited consumers, "even if it served to eliminate competitors," is not anticompetitive and therefore does not give rise to an antitrust claim); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697, 50 L. Ed. 2d 701 (1977) (noting an antitrust plaintiff's alleged injury must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"); *Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1356 (M.D. Ga. 2008) (dismissing antitrust claims where plaintiff did not allege how anticompetitive effects arose out of the defendant's agreements).

## III.    XINUOS DOES NOT PLAUSIBLY ALLEGE AN ANTICOMPETITIVE MERGER UNDER SECTION 7 OF THE CLAYTON ACT.

In addition to alleging that IBM and Red Hat engaged in anticompetitive conduct under the Sherman Act, Xinuos also alleges that their merger itself was anticompetitive under Section 7 of the Clayton Act. (Compl. ¶¶ 164–170.)

18

Section 7 only "prohibits mergers whose effect may be substantially to lessen competition, or to tend to create a monopoly." *Gok v. Roman Cath. Church*, 2021 WL 1726650, at \*6 (E.D. Pa. Apr. 30, 2021). To demonstrate that an acquisition violates Section 7, a party must plausibly allege that "the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result ... in a significant increase in the concentration of firms in the market.'" *Dehoog v. Inbev*, 2016 WL 5853733, at \*3 (D. Or. July 22, 2016) (quoting *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001)). Actionable concentration occurs for Section 7 purposes when "there has been "such an aggregation … as to eliminate substitutes … [and] to limit *unreasonably* the technology choices in the market." *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-CV-07651-EMC, 2020 WL 6390499, at \*18 (N.D. Cal. July 15, 2020). A claimant must show a "***reasonable probability***" of violation, rather than a "mere possibility." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 598 (1957) (emphasis added).

Xinuos's allegations provide no plausible inference to this effect. First, as noted above in Section I, Xinuos fails to plausibly allege any anticompetitive effects—*e.g.*, higher prices, reduced quality, reduced choice, elimination of rivals—in the alleged relevant market. If the merger permitted such effects, it was incumbent on Xinuos to identify them. As it has not, the Section 7 claim is implausible on that basis alone.

Next, Xinuos alleges that, *before* the merger, IBM and Red Hat had different focuses in the market: IBM in the "high end"; Red Hat in the "low end." (Compl. ¶¶ 5, 83, 90–96.) According to Xinuos itself, the merger did nothing to change that; there is no allegation that the merger substantially lessened the number of competitive offerings in the marketplace. Similarly, Xinuos does not allege anywhere that the merger unreasonably limited the number of technology choices in the market—according to Xinuos, both IBM and Red Hat still each offer products in the market,

just the same as before the merger, and it is silent about the numerous other competitors still obviously in the market. All of these factual allegations make clear that the merger did nothing to the competitive landscape that existed pre-merger. Xinuos therefore fails to identify any competitive harm stemming from the merger. *See*, *e.g.*, *Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*, 242 F. Supp. 315, 320 (N.D. Ill. 1965) ("Accepting the allegations of the amended complaint as true, it does not state a claim for damages resulting from a violation of Section 7 because it does not allege facts that, if proven, would show that the lessening of competition was the result of the prior mergers or acquisitions.").[8]

To the extent Xinuos alleges that the merger allowed IBM and Red Hat to engage in some of the behavior referenced in the complaint, the Section 7 claim fails on that basis as well. Where the plaintiff's alleged injury could have resulted from normal competitive conduct, even despite the merger, a Section 7 claim cannot stand. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 690 (S.D.N.Y. 2013). Similarly, a Clayton Act Section 7 claim does not lie where the "alleged injury is no different than an injury that would have resulted from a lawful decision by a manufacturer to cease dealing with a distributor." *Port Dock & Stone Corp.*

---

[8]   Moreover, it is notable that Xinuos fails to acknowledge that the merger was subject to intense scrutiny from antitrust regulators, which cleared the merger completely. For example, in May 2019, the U.S. Department of Justice concluded its review of the proposed merger and permitted the parties to move forward without any further waiting period under U.S. law. *See* IBM Form 8-K (May 3, 2019), https://www.sec.gov/Archives/edgar/data/51143/000110465919026947/a19-9325_28k.htm. The following month, the European Commission gave its unconditional approval to the merger. While the Commission said the companies overlap in business infrastructure software markets, it concluded that the combined firm will still "face significant competition from other players." The Commission also concluded that the combined company would lack the leverage to try and advantage itself over rivals and that "the transaction would raise no competition concerns in any of the affected markets." *See* https://ec.europa.eu/commission/presscorner /detail/lt/ip_19_3433. This Court may take judicial notice of a foreign regulator's public statements on a motion to dismiss. *See, e.g.*, *In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d 1059, 1063 (N.D. Cal. 2019) (European Commission press release regarding results of preliminary investigation subject to judicial notice); *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *20 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of European Commission investigations and penalties).

*v. Oldcastle Ne., Inc.*, 2006 WL 2786882, at *9 (E.D.N.Y. Sept. 26, 2006), *aff'd,* 507 F.3d 117 (2d Cir. 2007).

Xinuos's conduct-based allegations violate these precepts. First, as previously noted, none of the agreement-based liability theories (*i.e.*, market allocation, promoting each other, sharing technical information) can lie for post-merger conduct, because the *Copperweld* doctrine holds that a parent and subsidiary cannot conspire with one another. *See supra* at Section II. Xinuos's Section 7 claim is thus confined to whether Defendants' alleged copyright infringement and refusal to deal with Xinuos (a) stems from the merger, and (b) is actionable anticompetitive conduct facilitated by the merger. Regarding the latter, Section II, *supra*, explains why Xinuos does not plausibly explain how that conduct is anticompetitive. Regarding the former, Xinuos never ties the conduct to the merger, thus dooming the Section 7 claim. *See Gok*, 2021 WL 1726650, at *6 (noting a plaintiff alleging a Section 7 claim must "allege a causative chain between their injuries which is direct rather than incidental, or which indicates their business or property was within the target area of the defendant's illegal act [*i.e.*, the challenged merger]"); *Smith-Victor*, 242 F. Supp. at 320 (dismissing Section 7 claim that failed to tie alleged lessening of competition to challenged merger).

## IV.    XINUOS DOES NOT PLAUSIBLY DEFINE A RELEVANT MARKET OR DEFENDANTS' POWER IN ANY PROPERLY-DEFINED MARKET.

### A.    Xinuos's "Unix/Linux Paid Server Operating System" Relevant Market Definition is Implausible.

Each of Xinuos's Sherman Act and Clayton Act claims require that it plausibly define a relevant product market in which IBM and Red Hat harmed competition.[9]

---

[9]  *See Queen City Pizza*, 124 F.3d at 436-437 (monopolization claims); *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 383-384 (S.D.N.Y. 2007) (same, for both Section 1 and 2 claims); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 199-200 (S.D.N.Y. 2020) (same, for Section 7 claims).

Relevant product markets are defined by "reasonable interchangeability." "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." *Allen–Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (internal quotation marks and citations omitted); *see also Streamcast Networks, Inc. v. Skype Techs., S.A.*, 2006 WL 5437323, at *10 (C.D. Cal. Sept. 14, 2006) (dismissing allegations defining market as one particular types of P2P file-sharing software and excluding all others, because it did not include all products that are capable of "performing the same essential … functions").

Xinuos contends that its relevant product market is limited to only Unix and Linux "paid" server OSes. (*See*, *e.g.*, Compl. ¶ 36.) Thus, according to Xinuos, other paid server OSes, or free Unix/Linux server OSes are not in the relevant market. Both of these limitations are belied by Xinuos's own complaint.

First, Xinuos concedes that other types of server OS do exist and provide similar functionality as Unix and Linux OSes. (Compl. ¶ 40.) Xinuos's contention is that these other server OSes are not as *similar* to each other as Unix and Linux, and so do not present as easy of a

*migration* option if corporate customers want to switch away from their current server OS environment. (*Id.* ¶¶ 40-41.) But how easy it is to switch from one product to another is not the inquiry for reasonable interchangeability; the inquiry is about what products are reasonable substitutes for one another. *Queen City Pizza*, 124 F.3d at 436. Xinuos implicitly admits that corporate customers *can* choose other types of server OSes instead of Unix or Linux OSes (*see* Compl. ¶¶ 105, 108, 136); thus, those other paid server OSes—*e.g.*, Windows Server, Mac OS X Server—*must* be included in the relevant market. Xinuos's failure to explain why they should or cannot be analyzed as reasonable substitutes is fatal to its market definition. *Queen City Pizza*, 124 F.3d at 436.

Next, Xinuos's single-sentence contention that "free" server OSes are not in the market (Compl. ¶ 41) similarly fails to address reasonable interchangeability. Xinuos does not allege that "free" server OSes lack the same functionality as paid server OSes provide; it contends only that free OSes are more often used for "testing, development efforts or minor applications," and that they do not provide "support and maintenance" services. (*Id.*) It is ironic that Xinuos makes this allegation, given that it repeatedly admits *its own OpenServer product* is based on a free server OS, FreeBSD. (*Id.* ¶¶ 75, 125.)[10] Moreover, Xinuos includes presentation materials (¶ 128) that make clear free server OSes (*e.g.*, Openstack, FreeBSD, Glassfish, and Mesos)[11] are viewed as competitive products to paid server OSes. In the face of these facts—*that Xinuos introduced itself*—Xinuos does not explain why clients would not switch between free and paid server OSes. And judicially noticeable public documents clearly indicate that Defendants believe they compete

---

[10]   "Self-contradictory" market definitions are inherently implausible. *See U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*, 804 F. Supp. 2d 588, 599 (N.D. Ohio 2011) (dismissing antitrust claims where market definition was "self-contradictory").
[11]   https://www.openstack.org/

with free server OS distributions just the same as paid options.[12] By failing to address this cross-elasticity of demand, Xinuos fails to plausibly address market definition, because it does not actually explain why certain products should be excluded from the market based on how consumers react to price changes. *See*, *e.g.*, *Queen City Pizza*, 124 F.3d at 436-437 (dismissing complaint for failing to explain why other pizza ingredients besides those sold by the defendant should be excluded from the relevant market); *Mathias v. Daily News,* L.P., 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001) (failure to plead "facts to support the conclusion that the effective area of competition [for the Defendant New York Daily News] should be drawn so narrowly" as to only include the tri-state area was grounds for dismissal where Complaint also alleged that the Daily News was distributed nationwide).

Another problem is that Xinuos seems to allege that the market is limited to enterprise (*i.e.*, large corporate) accounts, but its allegations do not explain why that is so, particularly because Xinuos complains heavily about the "low end" of the server OS market throughout its complaint. Free server OSes (*e.g.*, FreeBSD, Ubuntu, Debian, Fedora, CentOS, etc.) are often used by the "low end" of the market, yet Xinuos blithely fails to explain why such options are not included in the very portion of the market it contends that Xinuos operates. As such, the market definition fails for this reason as well, which is fatal to all of Xinuos's antitrust claims. *See* note 9, *supra* (collecting cases).

---

[12]*See*, *e.g.*, Red Hat, 2019 Form 10-K, at 12, *available at* https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_RHT_2019.pdf (noting competitors include "freely available Linux distributions, such as CentOS, Debian, Fedora, openSUSE and Ubuntu"); *see also Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006) ("Such judicial notice of a public [SEC] filing was properly within the court's discretion on a motion to dismiss.").

### B.    Xinuos Does Not Plausibly Support Its Conclusion That IBM and Red Hat Have Market or Monopoly Power.

Similar to relevant market, each of Xinuos's claims also requires it to plausibly allege that IBM and Red Hat have either monopoly or market power. *See Ins. Brokerage*, 618 F.3d at 315-16 (rule of reason claims); *Broadcom*, 501 F.3d at 308 (monopolization claims), 321 (Section 7 claims).

"Market power is 'either the power to control prices or the power to exclude competition.'" *Castro v. Sanofi Pasteur Inc.*, 2012 WL 12516573, at *8 (D.N.J. Dec. 20, 2012) (quoting *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 899 F.2d 951, 966 (10th Cir. 1990)). More particularly, it is the power "to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supercompetitive [sic] price untenable." *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 543 (S.D.N.Y. 2009).

A plaintiff can establish such power either through direct or circumstantial evidence. Direct evidence of such power (which Xinuos does not allege here) is evidence of "supracompetitive prices and restricted output" in the relevant market. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citing *United States v. Microsoft*, 253 F.3d 34, 51, (D.C. Cir. 2001) (*en banc*)). Xinuos does not allege any facts to this effect; at best, it alleges that IBM and Red Hat raised their own prices. But that is not direct evidence of market or monopoly power; it is just alleged evidence of how those two particular market participants priced their products in recent years.

"To allege … market power through indirect evidence, [the plaintiff] must allege both that [Defendants] have a dominant share in a relevant market, and the existence of entry barriers protecting that market." *Castro*, 2012 WL 12516573, at *9 (citing *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 (3d Cir. 2007)). Allegations of high market share alone are insufficient to

establish market power; without similar allegations regarding high barriers to new entry, it is not plausible that a defendant or group of defendants actually has market power. *See*, *e.g.*, *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (noting that "[a] mere showing of substantial or even dominant market share alone cannot establish market power," and therefore an antitrust plaintiff must "show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge" the anticompetitive conduct"); *see also DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, 2018 WL 10247483, at *10 (N.D. Cal. Sept. 24, 2018) (dismissing antitrust claims where plaintiff "has not sufficiently alleged that barriers to entry will prevent competitors from entering the market").[13]

Xinuos's only real allegation regarding market power is that IBM and Red Hat supposedly "jointly control over 64% of the Unix/Linux server market." (Compl. ¶ 137.) Xinuos offers no facts to support this contention, nor does it cite any market participants other than the parties. Those other market participants include several of the world's largest technology companies, including Microsoft, Amazon, Oracle, and Unisys.[14] Even crediting that market definition despite its plausibility problems (discussed previously), this allegation fails to identify any significant barriers to new entry, so therefore fails out of the gate. *See*, *e.g.*, *Uber*, 886 F.3d at 342 (finding, under Rule 12(b)(6), no probability that defendant could obtain monopoly power where "the SAC makes no allegation of current barriers to entry or weak competition from other market participants"); *Dominick v. Collectors Universe, Inc.*, 2012 WL 6618616, at *6 (C.D. Cal. Dec. 18, 2012) (dismissing antitrust complaint where plaintiff failed to plausibly allege any barriers to new entry in the market). The complaint contends there are "barriers to entry" but never explains

---

[13]  *See also Wellnx*, 516 F. Supp. 2d at 294 ("A series of agreements which hinder only plaintiff's ability to compete does not plausibly erect an entry barrier for others into the overall market.").
[14]  *See* Red Hat, 2019 Form 10-K, at 12.

what those are (*see*, *e.g.*, Compl. ¶¶ 145, 147, 148). The complaint instead explicitly states that IBM's share of this market continues to fall to other competitors (*e.g.*, Compl. ¶¶ 105, 107), indicating that, in fact, market power does not exist and both IBM and Red Hat face stiff competition.

Xinuos apparently recognizes this problem, because it makes a stray allegation in Paragraph 141 that "enterprise customer[s]" can get "locked into a server and accompanying operating system." "Lock-in" *can* be a source of market power in certain situations, but such power arises only where supposedly locked in purchasers became so due to, *inter alia*, low sophistication, inability to understand the full cost of the product (including products they must purchase in any aftermarkets) before the purchase, or both. *See Xerox*, 660 F. Supp. 2d at 546 (noting that "information costs" that prevent even knowledgeable customers from assessing a product's lifecycle costs it what defines evidence of lock-in). "Lock-in" cases also typically focus on *aftermarket* monopolization involving unexpected changes by the alleged monopolist that exert new control over such aftermarkets (none of which Xinuos alleges here). *Id.*; *see also id.* at 547 (noting that "[c]ases involving aftermarkets are sui generis").

Given Xinuos's failure to provide any details on how exactly "enterprise customer[s]" become unknowingly locked in to server OSes, as well as its failure to allege any facts indicating that a lock-in claim is even applicable here, this conclusory allegation of market power does not plausibly establish the concept in the complaint. Dismissal on this additional ground is therefore appropriate.

## V.     XINUOS' VIRGIN ISLANDS LAW CLAIMS FAIL FOR THE SAME REASONS AS ITS ANTITRUST CLAIMS.

In addition to its federal antitrust claims, Xinuos alleges claims under the Virgin Islands' antimonopoly law (Count V) and unfair competition law (Count VI). Xinuos also seeks damages for unjust enrichment (Count VII). None of these claims are plausible.

First, with respect to Count V, "the Virgin Islands Antimonopoly Law 'evidences the intention that [it] be applied in a manner consistent with the Sherman Act and other federal antitrust claims.'" *Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Centers, Inc.*, 237 F. Supp. 2d 606, 610 (D.V.I. 2002) (quoting *Sea Air Shuttle Corp. v. V.I. Port Auth.*, 782 F. Supp. 1070, 1077 (D.V.I. 1991)). Similarly, for Count VI, "[u]nfair competition is a subset of the antitrust law." *Gardiner v. St. Croix Dist. Governing Bd. of Directors*, 2019 WL 3814427, at *7 (V.I. Super. Ct. 2019). Accordingly, when a plaintiff restates a facially deficient claim under the Virgin Islands Antimonopoly Law as one for unfair competition, the latter claim is likewise deficient and must be dismissed. *Id.* By extension, because both of these claims are based on Xinuos's deficient federal antitrust claims, they each fail.

With respect to Count VII, "[b]ecause unjust enrichment is an equitable remedy, it—like all equitable remedies—is inappropriate where a legal remedy is available." *Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*, 61 V.I. 247, 252 (2014). Although Xinuos has not plausibly stated claims for relief under the antitrust and parallel Virgin Islands laws, its remedy is still clearly legal in nature (*i.e.*, is one for monetary damages). Xinuos therefore cannot bring an unjust enrichment claim.

## CONCLUSION

For the foregoing reasons, IBM and Red Hat respectfully request that this Honorable Court dismiss Xinuos's Sherman Act, Clayton Act, and Virgin Islands law claims, and award it attorney fees incurred in the defense of this case.

Respectfully submitted,

**DUDLEY NEWMAN FEUERZEIG LLP**

**DATED:** June 7, 2021                          By: /s/ Stefan B. Herpel

**STEFAN B. HERPEL** (V.I. Bar No. 1019)
1131 King Street, Suite 204
Christiansted, St. Croix
U.S. Virgin Islands  00820-4971
Telephone:     (340) 773-3200
E-Mail:           sherpel@DNFvi.com

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Adam Wolfson, Esq.
865 S. Figueroa Street – 10th Floor
Los Angeles, CA 90017
E-Mail: adamwolfson@quinnemanuel.com

Debra D. Bernstein, Esq.
2177 Tillingham Court
Atlanta, GA 30338
E-Mail: debrabernstein@quinnemanuel.com

Alexander Rudis, Esq.
51 Madison Avenue
New York, NY 10010
E-Mail: alexanderrudis@quinnemanuel.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

It is hereby certified that on this 7th day of June, 2021, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

J. Daryl Dodson, Esq.
**MOORE DODSON RUSSELL & WILHITE, P.C.**
P.O. Box 310
St. Thomas, VI 00804-0310
E-Mail: daryl@mdrvi.com

Gabriel M. Ramsey, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: GRamsey@crowell.com

Jacob S. Canter, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: JCanter@crowell.com

Kayvan Ghaffari, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: kghaffari@crowell.com

Mark A. Klaplow, Esq.
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
E-Mail: mklapow@crowell.com

Warrington S. Parker, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: WParker@crowell.com

/s/ Stefan B. Herpel

R:\DOCS\1046\12\PLDG\31T311102.DOCX

30