# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **XINUOS, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **CASE NO.: 3:21-cv-00031** |
| ) | |
| **INTERNATIONAL BUSINESS** ) | |
| **MACHINES CORP.** and ) | |
| **RED HAT, INC.,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPLY MEMORANDUM IN FURTHER
SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.     XINUOS STILL FAILS TO PLAUSIBLY EXPLAIN HOW DEFENDANTS' ALLEGED CONDUCT CAUSED HARM TO COMPETITION ..........................1

    A.     Xinuos Lacks Standing For Its "Market Allocation" / Promoting Each Other Allegations ................................................................................2

    B.     Sharing Technical Information ................................................................3

    C.     "Jointly Taking Technical Steps to Exclude Xinuos" ...............................4

    D.     IBM's Refusal to Deal With Xinuos .........................................................4

    E.     Copyright Infringement ............................................................................4

II.    XINUOS STILL DOES NOT ARTICULATE HOW THE IBM-RED HAT MERGER ESTABLISHES THE BASIS FOR A SECTION 7 CLAIM .................5

III.   XINUOS'S ARGUMENTS REGARDING MARKET DEFINITION AND POWER REMAIN IMPLAUSIBLE ...................................................................6

    A.     Market Definition......................................................................................6

    B.     Market / Monopoly Power........................................................................7

    C.     "Lock-In" ..................................................................................................8

IV.    XINUOS IDENTIFIES NO REASON WHY THE VIRGIN ISLANDS ANTIMONOPOLY LAW EXCUSES ITS FAILURES UNDER FEDERAL ANTITRUST LAW ...........................................................................................9

V.     XINUOS DOES NOT EXPLAIN HOW ITS PENDENT VIRGIN ISLANDS CLAIMS SURVIVE WHEN ITS ANTITRUST CLAIMS DO NOT....................10

CONCLUSION........................................................................................................10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours and Co.*,
 826 F.2d 1235 (3d Cir. 1987)..................................................................................... 2, 5

*BanxCorp v. Bankrate, Inc.*,
 2019 WL 2098842 (D.N.J. Mar. 21, 2019), *aff'd*, 847 F. App'x 116 (3d Cir. 2021)................ 6

*Bayer Schera Pharma AG v. Sandoz, Inc.*,
 2010 WL 1222012 (S.D.N.Y. Mar. 29, 2010) ........................................................... 7

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
 140 F.3d 494 (3d Cir. 1998)....................................................................................... 8

*Caldera, Inc. v. Microsoft Corp., F. Supp.*,
 2d 1295 (D. Utah 1999) ......................................................................................... 3, 4

*City of Anaheim v. S. Cal. Edison Co.*,
 655 F.2d 1373 (9th Cir. 1992) .................................................................................... 1

*Copperweld Corp. v. Ind. Tube Corp.*,
 467 U.S. 752 (1984).................................................................................................... 8

*Gardiner v. St. Croix Dist. Governing Bd. of Directors*,
 2019 WL 3814427 (V.I. Super. Ct. July 30, 2019)..................................................... 9

*In re Ebay Seller Antitrust Litig.*,
 2010 WL 760433 (N.D. Cal. Mar. 4, 2010)................................................................ 6

*In re Ins. Brokerage Antitrust Litigation*,
 618 F.3d 300 (3d Cir. 2010)....................................................................................... 3

*IQVIA Inc. v. Veeva Sys. Inc.*,
 2018 WL 4815547 (D.N.J. Oct. 3, 2018).................................................................... 3

*Kump v. State Farm Fire & Cas. Co.*,
 2012 WL 1123897 (M.D. Penn. Apr. 4, 2012) ......................................................... 10

*La Preferida, Inc. v. La Victoria Foods, Inc.*,
 1978 WL 1402 (N.D. Ill. Aug. 2, 1978) ..................................................................... 5

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)....................................................................................... 1

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986).................................................................................................... 2

*Mid-West Underground Storage, Inc. v. Porter*,
 717 F.2d 493 (10th Cir. 1983) .................................................................................... 3

*In re Mushroom Direct Purchaser Antitrust Litig.*,
 514 F. Supp. 2d 683 (E.D. Pa. 2007)........................................................................... 7

*National Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) .................................................................................................. 6

*Philadelphia Taxi Ass'n, Inc. v. Uber Tech., Inc.*,
    886 F.3d 332 (3d Cir. 2018) ..................................................................................... 1

*Queen City Pizza v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ..................................................................................... 8

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ........................................................... 4

*Xerox Corp. v. Media Scis., Inc.*,
    660 F. Supp. 2d 535 (S.D.N.Y. 2009) ....................................................................... 6

*Yearwood Enter., Inc. v. Antilles Gas Corp.*,
    2017 WL 2709831 (V.I. Super. Ct. June 21, 2017) ................................................. 9

**Statutory Authorities**

11 V.I.C. §§ 1503(2), (3) .................................................................................................. 9

15 U.S.C. §§ 1, 2 .............................................................................................................. 9

**Additional Authorities**

Areeda & Hovenkamp, Antitrust Law ¶ 348 .................................................................... 2

**I.   XINUOS STILL FAILS TO PLAUSIBLY EXPLAIN HOW DEFENDANTS' ALLEGED CONDUCT CAUSED HARM TO COMPETITION**

A core requirement for all of Xinuos's antitrust claims—whether Section 1 or 2, *per se* or Rule of Reason—is that it plausibly identify actionable anticompetitive conduct. (Mot. at 9-11 (collecting cases).) In order to do that, Xinuos must explain how the conduct it alleges harms the competitive process. *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). IBM's and Red Hat's critiques of these allegations are not a "chop-it-up" approach, as Xinuos alleges; rather, they focus on what Xinuos alleges each type of conduct did in the market and why Xinuos never plausibly identifies how that conduct, whether alone *or* in concert with the other alleged conduct, harmed competition itself. (Mot. at 9-18); *see also LePage's*, 324 F.3d at 162 ([t]he relevant inquiry" is "the anticompetitive *effect* of [a defendant's] exclusionary practices considered together.").[1]

Third Circuit precedent makes clear that courts must dissect anticompetitive conduct allegations in this way, because a number of perfectly legal acts are not actionable, even if their end result is to eliminate competitors or increase market share for the defendant(s). *See*, *e.g.*, *Philadelphia Taxi Ass'n, Inc. v. Uber Tech., Inc.*, 886 F.3d 332, 339-341 (3d Cir. 2018) (noting a monopolist's conduct must be analyzed as a whole, but also holding that plaintiff did not plausibly allege a single anticompetitive act in defendant's supposed multi-prong anticompetitive scheme); *see also City of Anaheim v. S. Cal. Edison Co.*, 655 F.2d 1373, 1378 (9th Cir. 1992) ("[I]f all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing.").

With this precedent in mind, it is clear that Xinuos does not plausibly allege anticompetitive conduct in its complaint.[2]

---

[1]   All emphasis is added, and all internal quotations marks and citations omitted, unless noted otherwise.
[2]   Xinuos's discussion about evidence of conspiratorial agreements (at 17-18) misses the point. Xinuos's main failings are not in whether it alleges a pre-merger agreement between IBM and Red Hat (although it does fail in that respect).

### A.     **<u>Xinuos Lacks Standing For Its "Market Allocation" / Promoting Each Other Allegations</u>**

Xinuos lacks standing to bring a claim based on a supposed market allocation because, as a matter of law, it could not have suffered an injury in fact from such a scheme. Regardless of the adequacy of its market allocation allegations, the simple fact is that Xinuos admits it competes with IBM and Red Hat. This admission disposes of its market allocation allegations because Supreme Court precedent is clear that competitors lack standing to sue for alleged market allocation, because such restrictions "actually benefit competitors by making supracompetitive pricing more attractive." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986); *see also* Areeda & Hovenkamp, Antitrust Law ¶ 348a ("[A] rival is actually benefited if its rivals ... divide markets with the result that prices in the market increase. Such rivals lack injury-in-fact and are denied standing."); ¶ 348b ("When a ... market division, or similar collaboration among competitors substantially reduces competition, consumers suffer while existing rivals benefit. As the Supreme Court recognized, a plaintiff competitor is not injured in fact when rivals restrict their output, thus allowing the plaintiff to enjoy higher prices, greater output, or both." (citing *Matsushita*, 475 U.S. at 586)).[3] Xinuos has no response. (Opp. at 16-22.)

Even if Xinuos could circumvent this prohibition, simply labeling conduct "market allocation" does not plausibly make it so. As IBM and Red Hat note in their opening brief (at 11-13), Xinuos's factual allegations—at the very best—identify a partnership in which IBM and Red Hat openly steered customers to each other when their respective offerings were not what the customer preferred. Xinuos does not cite a single case where such allegations plausibly constituted

---

The main problem is that, even assuming it adequately alleges an agreement, Xinuos does not plausibly allege ***anticompetitive*** agreements, and hence cannot establish antitrust standing.

[3]    *See also Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours and Co.*, 826 F.2d 1235, 1242 (3d Cir. 1987) ("[C]ompetitors cannot recover antitrust damages for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output[.]").

"market allocation." As Xinuos admits (*e.g.*, Opp. at 1), there were other competitors in the market that customers could have chosen, had they not wanted IBM's or Red Hat's offerings. "The essence of a market allocation violation, however, is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers," thereby essentially giving customers no real choice. *Mid-West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 (10th Cir. 1983). The portion of *Ins. Brokerage Antitrust Litig.,* 618 F.3d 300 (3d Cir. 2010) Xinuos cites to the supposed contrary (Opp. at 20) makes this very same point. There, the Third Circuit noted that allegations that horizontal competitors surreptitiously rotated bids for customers constituted a market allocation scheme because, if the allegations were true, customers only had one choice for their insurer each time they sought bids. 618 F.3d at 338. That is not at all what Xinuos alleges here.[4]

### B. Sharing Technical Information

In their opening brief (Opp. at 14-15), IBM and Red Hat cited a number of different cases making crystal clear that, in order to state an antitrust claim based on information sharing, a plaintiff must allege more than that competitors simply shared such information and did not do the same for other competitors. Xinuos does not address a single one of these cases. (*See* Opp. at 21.) Xinuos's failure to rebut this point is dispositive, because it does not explain how the alleged technical information sharing harmed competition, as opposed to helping IBM and Red Hat each make their server OS products the best they could possibly be. (*See*. Mot. at 14-15.)

Xinuos's case citations (Opp. at 21) do not hold otherwise. *Caldera, Inc. v. Microsoft*

---

[4] Xinuos's only other substantive citation (*see* Opp. at 20), *IQVIA Inc. v. Veeva Sys. Inc.*, 2018 WL 4815547 (D.N.J. Oct. 3, 2018), did not involve an alleged market allocation scheme. That case involved an alleged group boycott scheme, wherein horizontal competitors agreed to prevent the plaintiff from obtaining critical data for its competing software product. *Id.* at *6. The key was that the agreement "cut off the ability of [plaintiff] to provide [its product]" in the market at all. *Id.* Xinuos makes no allegations that the "allocation" here prevented it from offering its OS products.

*Corp.*, F. Supp. 2d 1295 (D. Utah 1999), involved an alleged clandestine campaign to actively sabotage and exclude a competing OS from the market, as well as a "technological tying" claim; *i.e.*, that the defendant integrated a product over which it did not have monopoly power into a product for which it did, with the intent of harming competition. *Id.* at 1313-1318. Xinuos does not remotely assert similar allegations here.

*TruePosition, Inc. v. LM Ericsson Tel. Co.*, 2012 WL 3584626 (E.D. Pa. Aug. 21, 2012), is even further afield. In that case, the "nub" of the plaintiff's claim was that the defendants conspired actively to exclude its technology from industry standards, thereby depriving consumers and manufacturers of choice. *Id.* at *23-*24. There are no industry standards at issue here and Xinuos does not allege that IBM or Red Hat excluded its server OS products from the market by exchanging technical information or by any other means.

### C. "Jointly Taking Technical Steps to Exclude Xinuos"

Xinuos appears to have abandoned this part of its antitrust claims, because the theory appears nowhere in the opposition brief. As such, Xinuos's allegations (Compl. ¶ 89) fail.

### D. IBM's Refusal to Deal With Xinuos

Although Xinuos disclaims a refusal to deal claim (Opp. at 22 n.12), it unquestionably implies (*e.g.*, at 21) that IBM had some kind of duty to provide the same technical information and preference to Xinuos as it allegedly did to Red Hat. Since Xinuos concedes it is not asserting this refusal to deal claim, these unsupported allegations are immaterial to any of its causes of action and fail as a matter of law.

### E. Copyright Infringement

Finally, Xinuos still offers no explanation—as it must, (*see* Mot. at 17-18)—as to how the alleged copyright infringement here harmed competition (as opposed to Xinuos personally). If

4

Xinuos's technology is as wonderful as it claims, then having more products in the market incorporating that technology is better for consumers. *Id.* Xinuos offers no substantive response to this point. (*See* Opp. at 22.)

Instead, Xinuos cites *La Preferida, Inc. v. La Victoria Foods, Inc.*, 1978 WL 1402 (N.D. Ill. Aug. 2, 1978), for the supposed proposition that multiple competitors "leveraging intellectual property infringement *may* form a Section 1 violation." (Opp. at 22 (emphasis added).) As an initial matter, *La Preferida* pre-dates *Twombly* by decades and thus did not apply the plausibility standard to what are barebones allegations regarding public injury. 1978 WL 1402, at *4. Moreover, the plaintiff in that case alleged that the defendants conspired to use plaintiff's confidential information to prevent it from introducing its competing products in the U.S. market. *Id.* Xinuos does not allege that the supposed copyright infringement caused any equivalent public harm or restricted products in the market; instead it alleges that it had to compete with IBM with its own technology, which is inherently personal and thus not a *competitive* harm. (Mot. at 17-18.)[5]

## II. XINUOS STILL DOES NOT ARTICULATE HOW THE IBM-RED HAT MERGER ESTABLISHES THE BASIS FOR A SECTION 7 CLAIM

The key point IBM and Red Hat raised in their opening brief regarding Xinuos's Section 7 claim is that Xinuos must plausibly allege that the *merger* substantially lessened competition. (Mot. at 18-21.) Because Xinuos (a) alleges that IBM and Red Hat engaged in the exact same behavior with the exact same effects both pre- and post-merger, and (b) does not allege why the other competitors remaining in the market are unable to compete because of the merger, the Section 7 claim is inherently implausible. (*Id.*)

---

[5] Xinuos has asserted a claim for copyright infringement (Count I). That claim is not the subject of this motion.

Xinuos's response is not to identify how conduct or competitive forces in the market changed after the merger; instead, Xinuos simply argues (at 23-24) that IBM raised prices and lowered its costs after the merger. Regarding the latter, lowering costs through synergies derived from a merger is exactly the type of procompetitive benefits the law encourages, because they enhance competition. *See Alberta Gas*, 826 F.2d at 1245 (lower purchasing costs following a merger were procompetitive benefits); *see also National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978) (lowering costs is a "legitimate procompetitive objective"). Xinuos identifies no reason why IBM's lowered costs are ***anti***competitive; thus, those allegations fail to establish the Section 7 claim. *Id.*

As for higher post-merger prices, Xinuos must plausibly allege that they are *supra*competitive.[6] Xinuos does not allege anywhere that IBM's post-merger price increases were unique to it (as opposed to industry-wide), were supracompetitive, or that Xinuos and its much larger competitors (Microsoft, Apple, HP, Oracle, Ubuntu, Canonical, SUSE, etc.) were unable to compete through lower prices. (*See* Compl. ¶¶ 166-170.) The Section 7 claim thus remains wholly implausible and conclusory.

### III.   XINUOS'S ARGUMENTS REGARDING MARKET DEFINITION AND POWER REMAIN IMPLAUSIBLE

#### A.   Market Definition

In their opening brief (at 23-24), IBM and Red Hat noted that Xinuos's "Unix/Linux paid server OS" market definition is implausible because (a) Xinuos concedes other types of server OS

---

[6] Supracompetitive prices are those beyond what could be sustained in a competitive market. "Proof of increased prices alone, however, is insufficient to establish supracompetitive pricing." *BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842, at *4 (D.N.J. Mar. 21, 2019), *aff'd*, 847 F. App'x 116 (3d Cir. 2021); *see also Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009) (evidence of price increases did not establish supracompetitive prices); *In re Ebay Seller Antitrust Litig.*, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("Evidence that eBay has raised prices over a period of years, and that several of its employees believe that the company may have raised them too high, proves nothing with respect to whether the prices are supracompetitive.").

provide the same essential functions and purpose as Unix/Linux server OSes (making them reasonably interchangeable with Unix/Linux OSes), and (b) Xinuos does not reconcile its conclusory statement that "free" server OSes are not in the market with its own cited materials showing that they compete with "paid" server OSes, particularly in the "low end" of the market. Courts regularly dismiss market definition allegations that are so inherently contradictory and thus implausible. (*See* Mot. at 21 n.9.)

Xinuos does not address these problems. Instead, it argues (at 13) that it can invoke the so-called *Brown Shoe* factors to allege Unix/Linux server OSes are some kind of server OS submarket. But the ***only*** *Brown Shoe* factor Xinuos alleges is supposed industry recognition that Unix/Linux server OSes are a separate product market. Xinuos does not allege any of the other factors (i.e., peculiar product characteristics and uses, unique production facilities, distinct customers, distinct prices, lack of sensitivity to price changes from other server OSes, specialized vendors) necessary to show that Unix/Linus server OSes occupy a server OS submarket. Moreover, its other allegations contradict its single submarket allegation. As such, the alleged "submarket" is just as implausible as before. *See*, *e.g.*, *Bayer Schera Pharma AG v. Sandoz, Inc.*, 2010 WL 1222012, at *4-*6 (S.D.N.Y. Mar. 29, 2010) (dismissing submarket allegations as implausible that were internally contradictory and irrational).

### B.     Market / Monopoly Power

Xinuos engages in sleight of hand with respect to Defendants' supposed power. It alleges only that IBM and Red Hat "***jointly*** control over 64%" of the alleged market, (Compl. ¶ 137), and concludes this means they enjoy market and/or monopoly power. As discussed in the opening brief, this says nothing about competition from other market participants, which, as Xinuos concedes (at 1), include several of the world's largest companies. (*See also* Mot. at 26 (identifying

7

competitors and collecting cases showing why such allegations render market power allegations implausible).)

In any event, there is a timing issue with Xinuos's market share allegations. *Pre*-merger, it is clear that neither IBM nor Red Hat possessed anything close to the necessary share to indirectly establish market power. Given there is no claim available for "concerted monopolization," *see In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007), this lack of monopoly power by either Defendant is fatal to Xinuos's pre-merger Section 2 allegations and claims.

*Post*-merger, Supreme Court precedent is clear that IBM and Red Hat cannot conspire with each other, because they are parent and wholly-owned subsidiary. *Copperweld Corp. v. Ind. Tube Corp.*, 467 U.S. 752, 771-772 (1984). Xinuos's claims thus fail entirely in the post-merger world—rendering its market share allegations irrelevant—because, as the opposition makes clear, all of its supposed anticompetitive conduct relies on the notion that IBM and Red Hat were competitors and jointly worked together to exclude competition. (*See* Opp. at 2 (summarizing IBM's and Red Hat's alleged anticompetitive acts, all of which were "joint" and/or purported "agreements").) Xinuos does not identify a single post-merger act that was supposedly actionable because it was done by a single alleged monopolist.

### C. "Lock-In"

At various points in the opposition, Xinuos invokes "lock-in" as an apparent basis for market definition and/or market power. (Opp. at 2, 5, 14.) These arguments are unavailing in several respects. First, as previously noted, "lock-in" typically only comes into play in a case alleging aftermarket monopolization; *i.e.*, it is a basis to establish monopoly power in an aftermarket over consumers who are locked into a large purchase. (Mot. at 27.) Xinuos does not

allege an aftermarket, nor aftermarket monopolization of any kind. Second, "[p]roduct market definition turns on the existence of close substitutes for a particular product, not on the ability of any particular consumer to switch effortlessly to such substitutes." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3d Cir. 1998). Xinuos's allegations about how sticky server OS choices can be thus says nothing about market definition. Third, and related, binding Third Circuit precedent is clear that a market is not defined by contractual restraints, such as purchasers' agreement to select a server OS and its ecosystem. *See Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 40, 436-437 (3d Cir. 1997) (Domino's-only ingredient market not defined by franchisees' agreement to purchase ingredients only from Domino's). Unix/Linux server OS purchasers' supposed lock-in to that type of environment therefore cannot define the ***boundaries*** of the market (*i.e.*, substitute for a reasonable interchangeability analysis). Fourth, the limited type of lock-in that confers power over aftermarkets entails high information costs before the supposed lock-in purchase and/or low sophistication by the purchaser, neither of which Xinuos alleges. (Mot. at 27.) All of this renders its lock-in arguments meritless and, in any event, irrelevant.

### IV. XINUOS IDENTIFIES NO REASON WHY THE VIRGIN ISLANDS ANTIMONOPOLY LAW EXCUSES ITS FAILURES UNDER FEDERAL ANTITRUST LAW

Obscured in Xinuos's discussion about the Virgin Islands Antimonopoly Law is that the statute's content is substantively identical to Sections 1 and 2 of the Sherman Act. *Compare* 11 V.I.C. §§ 1503(2), (3); *with* 15 U.S.C. §§ 1, 2. Although federal precedent is not ***binding*** on how to interpret the Antimonopoly Law, Xinuos's own core citation notes it is absolutely ***persuasive*** authority. *See Yearwood Enter., Inc. v. Antilles Gas Corp.*, 2017 WL 2709831, at *3 (V.I. Super. Ct. June 21, 2017). Given that Xinuos does not identify any Virgin Islands precedent suggesting the Antimonopoly Law is more expansive than the Sherman Act or renders conduct illegal that the Sherman Act does not, the same logic requiring dismissal of the federal antitrust claims applies to

9

the Antimonopoly Law claims. *See id.* at \*4-\*8 (dismissing Antimonopoly Law claim because it was inadequately pled); Mot. at 28 (collecting cases showing same).

## V. XINUOS DOES NOT EXPLAIN HOW ITS PENDENT VIRGIN ISLANDS CLAIMS SURVIVE WHEN ITS ANTITRUST CLAIMS DO NOT

Xinuos's argument on its unfair competition claim (Opp. at 27) appears to be that the Virgin Islands Supreme Court would recognize a common law unfair competition claim, notwithstanding that unfair competition is already addressed by the Antimonopoly Law. *See Gardiner v. St. Croix Dist. Governing Bd. of Directors*, 2019 WL 3814427, at \*7 (V.I. Super. Ct. July 30, 2019) (noting "[t]he Defendants are correct in their assertion that unfair competition is prohibited under § 1503 of the Virgin Islands Antimonopoly Law," and dismissing claim because the plaintiff failed to state an antitrust claim). This is not an issue concerning the common law of the Territory requiring resolution by the Virgin Island Supreme Court (and hence a prediction of how the Virgin Islands Supreme Court would rule); the people of the Virgin Islands have already spoken about this claim through legislation, and so this claim fails.

As for unjust enrichment, it is irrelevant that Xinuos asserts the claim in the alternative. Xinuos unquestionably seeks a legal remedy (money damages), rendering its unjust enrichment claim unviable under Virgin Islands law. (Mot. at 28.) Xinuos's sole citation, *Kump v. State Farm Fire & Cas. Co.*, 2012 WL 1123897 (M.D. Penn. Apr. 4, 2012), does not apply Virgin Islands law, but, in any event, dismisses an unjust enrichment claim because the plaintiff sought legal remedies in that case. *Id.* at \*3. That is the point.

## CONCLUSION

For the foregoing reasons and those articulated in its memorandum in support if its Motion to Dismiss, IBM and Red Hat respectfully request that this Honorable Court dismiss Xinuos's Sherman Act, Clayton Act, and Virgin Islands Counts set forth in Counts II-VII of the Complaint.

10

Respectfully submitted,

**DUDLEY NEWMAN FEUERZEIG LLP**

**DATED:** August 11, 2021        By: /s/ Stefan B. Herpel
**STEFAN B. HERPEL** (V.I. Bar No. 1019)
1131 King Street, Suite 204
Christiansted, St. Croix
U.S. Virgin Islands  00820-4971
Telephone:     (340) 773-3200
E-Mail:        sherpel@DNFvi.com

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Adam Wolfson, Esq. (*pro hac vice*)
865 S. Figueroa Street – 10th Floor
Los Angeles, CA 90017
E-Mail: adamwolfson@quinnemanuel.com

Debra D. Bernstein, Esq. (*pro hac vice*)
2177 Tillingham Court
Atlanta, GA 30338
E-Mail: debrabernstein@quinnemanuel.com

Alexander Rudis, Esq. (*pro hac vice*)
51 Madison Avenue
New York, NY 10010
E-Mail: alexanderrudis@quinnemanuel.com

David A. Nelson (*pro hac vice*)
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606-1881
E-Mail: davenelson@quinnemanuel.com

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

It is hereby certified that on this 11th day of August, 2021, I electronically filed the foregoing **REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS** with the clerk of the court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

J. Daryl Dodson, Esq.
**MOORE DODSON RUSSELL & WILHITE, P.C.**
P.O. Box 310
St. Thomas, VI 00804-0310
E-Mail: daryl@mdrvi.com

Jacob S. Canter, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: JCanter@crowell.com

Mark A. Klaplow, Esq.
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
E-Mail: mklapow@crowell.com

Gabriel M. Ramsey, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: GRamsey@crowell.com

Kayvan Ghaffari, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: kghaffari@crowell.com

Warrington S. Parker, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor
San Francisco, CA 94111
E-Mail: WParker@crowell.com

/s/ Stefan B. Herpel