# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| XINUOS, INC.,<br><br>                Plaintiff,<br><br>   v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORP. and RED HAT,<br>INC.,<br><br>                Defendants. | Case No.: 7:22-cv-09777-CS |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ........................................................................................................................ 2

STANDARD OF REVIEW ....................................................................................................... 4

ARGUMENT .............................................................................................................................. 4

**I.**    XINUOS FAILS TO ESTABLISH ANTITRUST STANDING ........................................ 4

**II.**   XINUOS DOES NOT PLAUSIBLY DEFINE A RELEVANT MARKET OR
         DEFENDANTS' POWER IN ANY PROPERLY-DEFINED MARKET. ....................... 6

**III.**  XINUOS FAILS TO ADEQUATELY ALLEGE ANTICOMPETITIVE CONDUCT
         UNDER THE SHERMAN ACT. ................................................................................... 13

**IV.**   XINUOS DOES NOT PLAUSIBLY ALLEGE AN ANTICOMPETITIVE
         MERGER UNDER SECTION 7 OF THE CLAYTON ACT. ..................................... 20

**V.**    XINUOS'S VIRGIN ISLANDS LAW CLAIMS FAIL FOR THE SAME REASONS
         AS ITS ANTITRUST CLAIMS. .................................................................................. 23

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Dep't of Revenue, Treasury Div. v. Manku,*
No. 20-1759-CV, 2021 WL 3027170 (2d Cir. 2021) ............................................................16

*In re Aluminum Warehousing Antitrust Litig.,*
95 F. Supp. 3d 419 (S.D.N.Y. 2015)....................................................................................5

*Anderson News, LLC v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)................................................................................................13

*Anderson News LLC v. Am. Media, Inc.,*
899 F.3d 87, (2d Cir. 2018) ..........................................................................................22, 23

*Arcesium, LLC v. Advent Software, Inc.,*
No. 1:20-cv-04389, 2021 WL 1225446, (S.D.N.Y. Mar. 31, 2021)..........................14, 17, 18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).............................................................................................................4

*BanxCorp v. Bankrate, Inc.,*
No. 07-3398, 2019 WL 2098842 (D.N.J. Mar. 21, 2019) ....................................................21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).............................................................................................................4

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,*
985 F. Supp. 2d 612 (S.D.N.Y. 2013)............................................................... *passim*

*Brown Shoe Co. v. U.S.,*
370 U.S. 294 (1962).............................................................................................................7

*Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico,*
61 V.I. 247 (2014)...............................................................................................................24

*Chapman v. New York State Div. for Youth,*
546 F.3d 230 (2d Cir. 2008)..............................................................................................7, 8

*Charych v. Siriusware, Inc.,*
790 F. App'x 299 (2d Cir. 2019) ........................................................................................15

*Citadel Equity Fund Ltd. v. Aquila, Inc.,*
168 F. App'x 474 (2d Cir. 2006) ..........................................................................................8

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984)..............................................................................................19, 20, 23

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)...................................................................................4, 5

*Dettelis v. Sharbaugh*,
    919 F.3d 161 (2d Cir. 2019)........................................................................................4

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    747 F.3d 145 (2d Cir. 2014) ......................................................................................9

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*,
    826 F. Supp. 2d 705 (S.D.N.Y. 2011) (WHP) .......................................................18

*Freeplay Music, Inc. v. Cox Radio, Inc.*,
    409 F. Supp. 2d 259 (S.D.N.Y. 2005)....................................................................18

*Gardiner v. St. Croix Dist. Governing Bd. of Directors*,
    No. SX-12-CV-084, 2019 WL 3814427 (V.I. Super. Ct. 2019)........................23, 24

*In re German Auto. Mfrs Antitrust Litig.*,
    2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)........................................................14

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*,
    106 F. Supp. 2d 406 (N.D.N.Y. 2000) .....................................................................7

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995).......................................................................................9

*Int'l Business Machines Corp. v. Platform Solutions, Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009).....................................................................17

*Lavoho, LLC v. Apple, Inc.*,
    232 F. Supp. 3d 513 (S.D.N.Y. 2016)................................................................15, 19

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001).......................................................................5

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................15

*Milan v. Wertheimer*,
    808 F.3d 961 (2d Cir. 2015)........................................................................................4

*In re Mushroom Direct Purchaser Antitrust Litig.*,
    514 F. Supp. 2d 683 (E.D. Pa. 2007) . ..................................................................11

*National Soc'y of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978)..................................................................................................22

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020)...........................................................6, 20, 22

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...............................................................................7, 13

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002).....................................................................7, 11, 13

*PharmacyChecker.com, LLC v. N.A. of Boards of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021)....................................................................19

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    No. 05 Civ. 4294, 2006 WL 2786882 (E.D.N.Y. Sept. 26, 2006)....................................22, 23

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) .........................................................................6

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)...................................................................20

*Sea Air Shuttle Corp. v. V.I. Port Auth.*,
    782 F. Supp. 1070 (D.V.I. 1991) .....................................................................23

*Sullivan v. Barclays PLC*,
    No. 13-cv-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...........................................21

*Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Centers, Inc.*,
    237 F. Supp. 2d 606 (D.V.I. 2002) ...................................................................23

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..........................................................................16

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998).......................................................................9, 10, 12

*U.S. Ring Binder L.P. v. World Wide Stationery Mfg. Co.*,
    804 F. Supp. 2d 588 (N.D. Ohio 2011)....................................................................9

*U.S. v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)...................................................................................9

*U.S. v. E. I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957)..................................................................................20

*U.S. v. Phillipsburg Nat. Bank & Tr. Co.*,
    399 U.S. 350 (1970)..................................................................................20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) .................................................................................................17

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.,*
    516 F. Supp. 2d 270 (S.D.N.Y. 2007) ...................................................................5, 6

*Xerox Corp. v. Media Sciences Int'l, Inc.,*
    511 F. Supp. 2d 372 (S.D.N.Y. 2007) ........................................................................6

*Xerox Corp. v. Media Scis., Inc.,*
    660 F. Supp. 2d 535 (S.D.N.Y. 2009) ...............................................9, 10, 12, 21

*In re Zinc Antitrust Litig.,*
    14-cv-3728, 2016 WL 3167192, (S.D.N.Y. June 6, 2016) ....................................10

*In re Zinc Antitrust Litig.,*
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...................................................................13

**Other Authorities**

Herbert Hovenkamp*, Antitrust Law* ¶ 2115a .............................................................16

U.S. Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property §5.5
    (2017) ..................................................................................................................... 18

Defendants International Business Machines Corporation ("IBM") and Red Hat, Inc. ("Red Hat") respectfully submit this memorandum in support of their motion to dismiss all of the claims of Plaintiff Xinuos, Inc. ("Xinuos" or "Plaintiff") except for its copyright claim, which is the subject of a separate motion for summary judgment.

## PRELIMINARY STATEMENT

At its core, this case involves a challenge to a joint development project called Project Monterey, which ended in 2001 and was resolved in 2021 in a court-approved settlement. Recognizing the flaws in that challenge (Count I of the Complaint), Xinuos seeks also to litigate IBM's relationship (and ultimate merger with) Red Hat.  Xinuos claims that IBM and Red Hat violated Sections 1, 2 and 3 of the Sherman Act, parallel Virgin Islands laws and Section 7 of the Clayton Act.   But nothing about IBM's relationship with, or acquisition of, Red Hat was (or is) in any way anticompetitive or otherwise unlawful.  That is why, when in 2019 the parties entered into the heavily-scrutinized merger, no regulator anywhere in the world objected to it.  In fact, some not only approved the merger but also acknowledged its pro-competitive potential.  Xinuos's belated criticism of Defendants' relationship and merger is baseless.

Xinuos's claims should be dismissed for five reasons.  *First*, Xinuos fails to allege antitrust standing because it alleges only harm to itself rather than competition.  *Second*, Xinuos fails to meet its burden of pleading Defendants have market power in a relevant antitrust market.  Among other things, Xinuos's alleged market is limited to only Unix and Linux "paid" server operating systems ("OSes") even though Xinuos appears to admit that other paid server OSes, and free Unix/Linux server OSes are reasonable substitutes for "paid" server OSes.  *Third*, Xinuos's Section 1, 2 and 3 claims fail because it does not plausibly allege conduct that harmed competition; its Complaint only identifies conduct that is entirely consistent with competitive business activities.  *Fourth*, Xinuos fails to plead actionable conduct under Section 7, as it does

not allege that the merger resulted in any changed behavior or caused the alleged harm about which Xinuos complains.  *Finally*, Xinuos's Virgin Islands law claims fail because they suffer from the same flaws as its other claims.

## BACKGROUND

Xinuos's non-copyright claims are unsupported by the facts alleged in the Complaint. This section illustrates the disconnect between Xinuos' allegations and purported conclusions.

Xinuos asserts that it competes in the so-called "Unix/Linux paid server operating system market"—the alleged relevant market for Xinuos's antitrust claims.  (Compl.  ¶ 36.)  The facts alleged in the Complaint do not support this assertion.  Although the Complaint alleges that Linux-based server OSes are "reasonable potential substitutes" for Unix-based OSes and thus part of the relevant market (*id.* ¶ 39), it does not contain any factual allegations that support the conclusion that server OSes built on different programming kernels (other than Unix or Linux) are not also "reasonable potential substitutes" for its OSes.  (*See id.* ¶¶ 3641.)  Similarly, the Complaint does not allege any facts that can be used to explain why "free" server OSes are not reasonable substitutes for "paid" server OSes.  (*See id.* ¶ 41.)

Xinuos asserts, without support, that IBM and Red Hat "jointly control over 64% of the Unix/Linux server market".  (Compl. ¶ 137.)  But again, the facts alleged in the Complaint do not support this conclusion.  The Complaint states that Xinuos considers IBM with its Unix-based AIX for Power, z/OS, and i server OSes, and Red Hat with its Red Hat Enterprise Linux ("RHEL") server OS as its competitors.  (*Id.* ¶¶ 146, 52.)  Xinuos also implicitly alleges there are numerous other competitors in its alleged market.  For example, Xinuos alleges that RHEL represents 70% of "Linux installations in the market", but fails to identify the other Linux-based server OS competitors.  (*Id.* ¶ 108.)

The Complaint does not contain any facts to support that the combined IBM and Red Hat enjoy increased influence as the alleged market share would suggest.  For instance, it does not allege facts showing that IBM or Red Hat can unilaterally raise prices or restrict output without fear of other competitors taking enough market share in response to make such actions unprofitable.  Nor does Xinuos allege facts showing that competitors besides it are unable to compete on the merits with IBM or Red Hat; indeed, Xinuos's own allegations make clear that it believes it is able to take customers and other market opportunities away from both companies.  (Compl. ¶¶ 12, 138.)

Although Xinuos's Complaint is far from a model of clarity, it alleges that IBM and Red Hat engaged in six different kinds of activity, which supposedly violate Sections 1-3 of the Sherman Act and Virgin Islands law: (1) market allocation, (2) promoting each other, (3) sharing technical information, (4) "jointly taking specific technical steps to exclude Xinuos", (5) refusing to deal with Xinuos, and (6) infringing Xinuos's copyrights (which Xinuos purchased from a different company, SCO, out of bankruptcy).  (Compl. ¶¶ 89–137.)  However, the Complaint contains no factual allegations that support the conclusion that these activities harmed competition.

Xinuos also alleges that IBM and Red Hat's $34 billion merger, which was heavily scrutinized and then cleared by the U.S. DOJ and other competition regulators worldwide, violates Section 7 of the Clayton Act.  (Compl. ¶¶ 164–170.)  The Complaint largely alleges general harm to Xinuos (without providing any details) but does not provide any facts showing that other competitors are excluded or foreclosed from any portion of the alleged relevant market.  (*See id.* ¶¶ 138–149.)  Xinuos also does not allege any facts that would support the conclusion that the merger changed the position of IBM and Red Hat in the market.  Similarly,

Xinuos does not allege the precise anticompetitive effects Defendants supposedly caused, relying instead on conclusory statements regarding anticompetitive effects completely lacking in factual support.  (*See id.* ¶¶ 93, 170.)

## STANDARD OF REVIEW

In its complaint, a plaintiff must provide sufficient facts to establish its claim is "plausible".  "[A] formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)".  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted).  In assessing plausibility, the Court need not accept "legal conclusions couched as factual allegations."  *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) (internal quotations omitted).  Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In essence, the *Twombly* pleading standard and Rule 8 of the Federal Rules of Civil Procedure require complaints to contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation".  *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019).

## ARGUMENT

## I.   XINUOS FAILS TO ESTABLISH ANTITRUST STANDING.

"Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 436–37 (2d Cir. 2005).  In order to have standing to bring an antitrust claim, a plaintiff must plead that it has suffered "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.* at 438.  "Antitrust injury is not simply the fact that a plaintiff

may be able to allege some harm; rather, the issue is whether that harm is an 'injury of the type the antitrust laws were intended to prevent.'"  *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 440 (S.D.N.Y. 2015) (citation omitted).  "Injury of the type the antitrust laws were intended to prevent" means harm to *competition* that then causes the plaintiff personal harm; without plausible allegations of harm to competition, dismissal is appropriate.  *See, e.g.*, *Daniel*, 428 F.3d at 438, 444–45 (finding failure "to demonstrate the antitrust injury necessary to support standing" and affirming the dismissal of all claims); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 296–97 (S.D.N.Y. 2007) (dismissing antitrust complaint where it did not "raise a plausible inference of harm to competition in the markets identified in the amended complaint").

Harm to competition occurs when the purported anticompetitive conduct produces *market-wide* anticompetitive effects, such as increased prices, reduced output, or product quantity/quality restrictions.  *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) ("[T]he prototypical example of antitrust injury is an allegation . . . [of] higher prices (or . . . a reduction in the quality of service) as a result of defendant's anticompetitive conduct").  A plaintiff does not plausibly establish such competitive harm simply by alleging that it was unable to take customers away from a defendant, or that the defendant increased its prices; plaintiff must explain how the monopolist or alleged cartel restrained competition such that no amount of competitive behavior from its rivals (*e.g.*, reduced prices, increased output) could have reasonably led to increased customer uptake.  *See Wellnx*, 516 F. Supp. 2d at 295–96.

Here, Xinuos alleges *it* was harmed by Defendants' purported scheme (*see, e.g.*, Compl. ¶¶ 127–135), but does not explain anywhere in the Complaint how *competition* has been harmed, resulting in increased prices, reduced output or product quantity/quality restrictions.  This failure

dooms Xinuos's antitrust claims.  *See Wellnx*, 516 F. Supp. 2d at 293, 96 (dismissing antitrust

complaint where there was no allegation that the supposedly anticompetitive agreements

"adversely effected price, output or quality of services").  Xinuos's allegations simply state that

IBM and Red Hat worked together to create better products and provide services that customers

prefer over other competitors' offerings, and that, according to Xinuos, server OS purchasers

experience a certain amount of lock-in after they make the decision to proceed with a certain

server OS environment.  (*See* Compl. ¶¶ 97–103; 150–153.)  Regarding the former, that is the

very definition of competition and not actionable under the antitrust laws, for the reasons

discussed herein.  Regarding the latter, Xinuos does not explain why informed customer

relationships of the type it describes are anything but the result of fierce competition up front,

and it does not explain why such informed decisions are evidence of harm to competition—

indeed, Xinuos's complaint is that more customers are not choosing to purchase *its* server OS.

## II.   XINUOS DOES NOT PLAUSIBLY DEFINE A RELEVANT MARKET OR DEFENDANTS' POWER IN ANY PROPERLY-DEFINED MARKET.

For its antitrust claims to survive, Xinuos must plead that Defendants have market power

in a relevant market.  Xinuos does not adequately establish either a market or that Defendants

have market power.  As such, its claims cannot survive.

### A.   Xinuos's Relevant Market Definition Is Implausible.

Each of Xinuos's Sherman Act and Clayton Act claims require that it plausibly define a

relevant product market in which IBM and Red Hat harmed competition.[1]  "Where the plaintiff

fails to define its proposed relevant market with reference to the rule of reasonable

---

[1] *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997)
(Sherman Act monopolization claims); *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp.
2d 372, 383–384 (S.D.N.Y. 2007) (same, for both Section 1 and 2 claims); *New York v. Deutsche
Telekom AG*, 439 F. Supp. 3d 179, 199–200 (S.D.N.Y. 2020) (same, for Section 7 claims).

interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008). This is because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition". *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).

A market is defined by "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put", *Chapman*, 546 F.3d at 238; "while there may be some degree of preference for the one over the other, either would work effectively", *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 106 F. Supp. 2d 406, 411 (N.D.N.Y. 2000) (citations omitted). Reasonable interchangeability is assessed using practical indicia enunciated in the Supreme Court decision in *Brown Shoe*. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106–07 (2d Cir. 2002) (explaining that the *Brown Shoe* factors are: "(1) unique production facilities; (2) specialized vendors; (3) distinct customers; (4) sensitivity to price changes; (5) industry or public recognition of the proposed submarket as a separate economic entity; and (6) peculiar characteristics and uses of the product".).

Xinuos's proposed market—only Unix and Linux "paid" server OSes—fails under the *Brown Shoe* factors. The Complaint does not include any facts supporting five of the six factors necessary to show that paid Unix/Linux server OSes constitute a server OS market. Xinuos alleges in a conclusory fashion only that "the technical and historical product similarities and the

overlapping community of developers has created widespread industry recognition that Unix and Linux operating systems encompass a unique product market." (Compl. ¶ 39.)  However, this conclusory statement is directly contradicted by the factual allegations in the Complaint, which support a market broader than the one Xinuos offers.

*First*, Xinuos alleges that other types of server OS exist and provide similar functionality as Unix and Linux OSes. (Compl. ¶ 40.)  Xinuos's contention is that these other server OSes are not as *similar* to each other as Unix and Linux, and so do not present as easy of a *migration* option if corporate customers want to switch. (*Id.* ¶¶ 40–41.)  But how easy it is to switch from one product to another is not the inquiry for reasonable interchangeability; the inquiry is about what products are reasonable substitutes for one another. *See Chapman*, 546 F.3d at 238. Xinuos implicitly admits that corporate customers *can* choose other types of server OSes instead of Unix or Linux OSes (*see* Compl. ¶¶ 105, 108, 136); thus, those other paid server OSes—*e.g.*, Windows Server, Mac OS X Server—*must* be included in the relevant market.

*Second*, Xinuos alleges that "free" server OSes exist and are competitive with Xinuos. Public documents clearly indicate that Defendants believe they compete with free server OS distributions just the same as paid options.[2]  Xinuos fails to allege any facts that show that "free" server OSes are not reasonably interchangeable with Unix and Linux paid server OSes. Xinuos does not allege that "free" server OSes lack the same functionality as paid server OSes provide; it alleges only that free OSes are more often used for "testing, development efforts or minor

---

[2] *See, e.g.*, Red Hat 2019 Form 10-K, at 12, *available at* https://www.annualreports.com/HostedData/Annual Reports/PDF/NYSE_RHT_2019.pdf (noting competitors include "freely available Linux distributions, such as CentOS, Debian, Fedora, openSUSE and Ubuntu") (Bolas Decl. Ex. A). *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006) ("judicial notice of a[n SEC] filing was . . . within the court's discretion on a motion to dismiss.").

applications", and that they do not provide "support and maintenance" services.  (Compl. ¶ 41.)

Xinuos's *own OpenServer product* is based on a free server OS, FreeBSD (*id.* ¶¶ 75, 125), and

thus, contradicts its crafted relevant market definition.  *See DPWN Holdings (USA), Inc. v.*

*United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014) ("Although factual allegations of a

complaint are normally accepted as true on a motion to dismiss . . . that principle does not apply

to general allegations that are contradicted 'by more specific allegations in the Complaint.'"

(citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).); *U.S. Ring Binder*

*L.P. v. World Wide Stationery Mfg. Co.*, 804 F. Supp. 2d 588, 599 (N.D. Ohio 2011) (dismissing

claims where market definition was "self-contradictory").

    *Third*, while Xinuos asserts that the relevant market is limited to enterprise (*i.e.*, large

corporate) accounts, this assertion is conclusory and counterintuitive.  For instance, Xinuos

alleges facts that suggest it competes with the low end of the server OS market, but then fails to

allege facts that show how its sales to the low end of the market can be in the relevant market

whereas free server OSes (*e.g.*, FreeBSD, Ubuntu, Debian, Fedora, CentOS, etc.) that are also

often used by the "low end" of the market are excluded.  As such, Xinuos's market definition

fails for this reason as well, which is fatal to all of Xinuos's antitrust claims.

    **B.**    **Xinuos Fails To Allege Market Power.**

    Each of Xinuos's claims also requires it to plausibly allege that IBM and Red Hat

together have at least market power.  *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com,*

*Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013)  (claims under Sections 1 and 2 of the Sherman

Act); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (affirming

dismissal of plaintiff's claim for monopolization for lack of market power).

    Market power is either "the power to control prices or exclude competition".  *U.S. v. E. I.*

*du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  More particularly, it is the power "to

charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supercompetitive price untenable." *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 543 (S.D.N.Y. 2009). "Market power may be proven by either direct or indirect evidence." *In re Zinc Antitrust Litig.*, 14-cv-3728, 2016 WL 3167192, at *13 (S.D.N.Y. June 6, 2016).

Xinuos has failed to allege direct evidence of market power. Direct evidence of market power is evidence of controlled prices and the exclusion of competition in the relevant market. *See Tops Markets, Inc.*, 142 F.3d at 98 (market power "may be proven directly by evidence of the control of prices or the exclusion of competition"). Importantly, direct evidence of market power requires a showing that IBM and Red Hat could raise prices above competitive levels without causing new competitors to enter or existing competitors to increase output. *See id.* at 98–99 (finding no market power where the plaintiff had not adequately shown that no competitors would enter the market if the defendant raised prices.) While Xinuos does make allegations (without support) that IBM and Red Hat raised their own prices, that is not direct evidence of market power; it is just alleged evidence of how those two particular market participants priced their products in recent years. Without more, Xinuos fails adequately to allege direct evidence of market power.

Xinuos also fails adequately to allege market power through indirect evidence. To allege market power through indirect evidence, a plaintiff must prove market characteristics indicating that the defendant is able to raise prices or exclude competition. *See Tops Markets, Inc.*, 142 F.3d at 99. Allegations of high market share alone are insufficient to establish market power without similar allegations regarding high barriers to new entry. *See, e.g.*, *id.* (affirming the dismissal of an antitrust complaint where "no other evidence—such as barriers to entry, the

elasticity of demand, or the nature of defendant's conduct—supports the conclusion that [defendant] can control prices or exclude competition".); *Bookhouse of Stuyvesant Plaza, Inc.*, 985 F. Supp. 2d at 622 (dismissing plaintiff's complaint as to market power) ("[P]laintiffs' only allegation suggesting that Amazon possesses monopoly power is that its market share is 60% . . . [But] Plaintiffs provide no additional evidence suggesting monopoly power, such as large barriers of entry or a lack of strong competition"); *PepsiCo, Inc.*, 315 F.3d at 109 ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power.").

Xinuos's only real allegation regarding market power is the conclusory (and incorrect) assertion that IBM and Red Hat supposedly "jointly control over 64% of the Unix/Linux server market". (Compl. ¶ 137.) But there is a timing issue with Xinuos's market share allegations. The 64% number is *post*-merger. *Pre*-merger, it is clear that neither IBM nor Red Hat possessed anything close to the necessary share to enable Xinuos to indirectly establish market or monopoly power. Given there is no claim available for "concerted monopolization", *see In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700 (E.D. Pa. 2007) ("[T]here is no claim for concerted monopolization under Section 2"), this lack of market power on the part of either Defendant is therefore fatal to Xinuos's pre-merger Section 2 allegations and claims.

Setting aside the timing concern, Xinuos offers no specific facts to support its contention that IBM and Red Hat possess 64% of the market; nor could they as Red Hat had no market power over Linux pre-merger and IBM did not have market power over Unix, which is likely why antitrust authorities approved the merger. Even crediting Xinuos's flawed market definition, the alleged market share is not enough to create market power, as Xinuos fails to

identify any significant barriers to new entry, and so fails out of the gate.  *See, e.g.*, *Tops Markets, Inc.*, 142 F.3d at 99; *Bookhouse*, 985 F. Supp. 2d at 622.  The Complaint contends there are "barriers to entry" but never explains what those are.  (*See, e.g.*, Compl. ¶¶ 145, 147, 148.)  The Complaint instead explicitly states that IBM's share of this market continues to fall to other competitors (*see, e.g.*, *id.* ¶¶ 105, 107), indicating that, in fact, market power does not exist, and both IBM and Red Hat face stiff competition.  Indeed, pre-merger, neither IBM nor Red Hat possessed anything close to the necessary share to enable Xinuos to indirectly establish market power.

Xinuos apparently recognizes its failure adequately to allege market power, because it makes a stray allegation that "enterprise customer[s]"  can get "locked into a server and accompanying operating system".  (Compl. ¶ 141.)  "Lock-in" *can* be a source of market power in certain situations, but such power arises only where supposedly locked in purchasers became so due to, *inter alia*, low sophistication, inability to understand the full cost of the product (including products they must purchase in any aftermarkets) before the purchase, or both.  *See Xerox*, 660 F. Supp. 2d at 546, 548 (noting that "information costs" that prevent even knowledgeable customers from assessing a product's lifecycle costs are what defines lock-in, and dismissing where the plaintiff had provided no evidence of information costs).  "Lock-in" cases also typically focus on *aftermarket* monopolization involving unexpected changes by the alleged monopolist that exert new control over such aftermarkets (none of which Xinuos alleges here).  *Id.* at 547 (noting that "[c]ases involving aftermarkets are sui generis").  Given Xinuos's failure to provide any details on how exactly "enterprise customer[s]" become unknowingly locked in to server OSes, as well as its failure to allege any facts indicating that a lock-in claim is

even applicable here, this conclusory allegation of lock-in does not plausibly establish market power.

**III.   XINUOS FAILS TO ADEQUATELY ALLEGE ANTICOMPETITIVE CONDUCT UNDER THE SHERMAN ACT.**

Xinuos alleges that IBM and Red Hat violated Sections 1, 2 and 3 of the Sherman Act by engaging in various acts, including market allocation, promoting each other, sharing technical information, "jointly taking specific technical steps to exclude Xinuos", refusing to deal with Xinuos and copyright infringement.  (Compl. ¶ 89.)  However, none of the conduct alleged is sufficient to establish a violation of the Sherman Act, which requires that the plaintiff plausibly allege anticompetitive effects.  *See Ohio*, 138 S.Ct. at 2284; *PepsiCo, Inc.* 315 F.3d at 105, 111.

**A.   Alleged Market Allocation**

The first category of conduct Xinuos targets is a supposed market allocation scheme between IBM and Red Hat, wherein IBM allegedly targeted "high end" accounts and either promoted or "allowed" Red Hat to take over "low end" accounts.  (Compl. ¶¶ 107–09, 112.)  These allegations fail to plausibly plead actionable conduct because the Complaint only alleges that IBM and Red Hat focused on different parts of the market, not that they actually agreed to divide the market.

The essence of a market allocation violation is "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition".  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012).  Plaintiffs cannot simply allege conduct that is "indicative of no more than a natural and independent desire to avoid a turf war and preserve the profits guaranteed by regional dominance" or dominance with particular customers.  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 375 (S.D.N.Y. 2016).  Moreover, an antitrust plaintiff must be specific about the features of a market allocation

scheme; it cannot simply allege that events in the market are consistent with an allocation scheme without alleging the "who, did what, to whom (or with whom), where, and when". *See In re German Auto. Mfrs. Antitrust Litig.*, No. 2796 CRB, 2020 WL 1542373, at \*8, 10 (N.D. Cal. Mar. 31, 2020) (finding alleged market allocation implausible where allegations of static market share were consistent with "conscious parallelism or some other innocent explanation"); *Arcesium, LLC v. Advent Software, Inc.*, No. 20-cv-04389, 2021 WL 1225446, at \*7, 9 (S.D.N.Y. Mar. 31, 2021).

Although Xinuos repeatedly implies or asserts that IBM and Red Hat divided the market in some way, it does not actually allege any facts supporting that conclusion. Xinuos alleges that IBM and Red Hat were "getting more and more engaged . . . as . . . ***partner[s]*** in some large accounts", (Compl. ¶ 91 (emphasis added)), meaning they were serving the same customers and therefore not allocating the market. Xinuos never alleges that Red Hat services the alleged "high end" market, so its supposedly agreeing not to approach that portion of the market says nothing about competition there. On the "low end" of the alleged market, Xinuos primarily alleges that IBM often went after the same accounts as Red Hat, but, if it appeared the customer was not interested in IBM's solutions, then IBM promoted Red Hat as the best other solution for that customer. (*Id.* ¶¶ 112, 113.) Xinuos also alleges that IBM decided to ***prioritize*** "higher-end" accounts, but otherwise still made its solutions available to "low end" accounts. (*Id.* ¶¶ 51, 92, 108, 112.) These allegations do not describe market allocation at all; they describe either competition to the point where it was clear the customer wanted a different solution than what IBM provided, or a prioritization of certain types of customers by each company.

Another problem with Xinuos's market allocation allegations is that Xinuos contends it remains as a competitor in the same market that IBM and Red Hat allegedly split. If Xinuos is

correct that IBM and Red Hat agreed not to compete in certain portions of the market, that means *Xinuos* had less competition and therefore more competitive opportunities.  Where an alleged anticompetitive scheme benefits a competitor, that competitor lacks standing to sue, because it could not have plausibly suffered any anticompetitive effects.  *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (no antitrust standing for competitors who would benefit from an alleged conspiracy to raise prices); *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016) ("Accordingly, a plaintiff cannot establish antitrust injury where it actually tended to benefit from the alleged conduct.") (citation omitted).

### B.    Promoting Each Other

Next, Xinuos alleges that it was illegal for IBM and Red Hat to promote one another. (Compl. ¶¶ 97–103.)  This theory, too, fails.  Allegations that two market participants made independent and reasonable business decisions to the detriment of a third competitor with whom they have no obligation are insufficient to plausibly state an antitrust claim.  *See, e.g.*, *Charych v. Siriusware, Inc.*, 790 F. App'x 299, 302–03 (2d Cir. 2019) (affirming dismissal of Sherman Act claims against software manufacturer that refused to develop an interface to allow one of its exclusive partner's competitors to enter the market for ski lift technology); *Bookhouse of Stuyvesant Plaza, Inc.*, 985 F. Supp. 2d at 623 ("[N]o business has a 'duty to aid competitors'") (citations omitted).  Thus, Xinuos's allegations that IBM and Red Hat promoted each other do not constitute cognizable anticompetitive conduct.  Xinuos's frustration that IBM chose to promote Red Hat for certain accounts may be real, but it is not the basis for a legal claim under the applicable antitrust laws.

### C.    Sharing Technical Information

Xinuos also alleges that Defendants acted anticompetitively by sharing technical information with each other, and by developing products based on that information.  (Compl. ¶¶ 118–25.)  Without more, such allegations are insufficient to state an antitrust claim.

"[J]oint innovation often produces significant social benefits in relation to costs." Herbert Hovenkamp, *Antitrust Law* ¶ 2115a.  Accordingly, alleging that competitors shared information—particularly where the alleged information is *not* pricing information—is not enough to establish anticompetitive conduct.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 207 (2d Cir. 2001)  ("The alleged conduct in this case—the exchange of information—is not so inherently or intuitively anticompetitive.  The Supreme Court has said as much and specifically prescribed a full rule of reason."); *Alaska Dep't of Revenue, Treasury Div. v. Manku*, No. 20-1759-cv, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) ("[P]laintiffs have cast a net so wide that the claimed antitrust conspiracy [under Sherman Act § 1] is implausible as alleged").

Thus, if a complaint fails to plausibly identify any anticompetitive effects flowing from alleged *information* exchanges, dismissal is appropriate.  *See, e.g.*, *Alaska Dep't of Revenue, Treasury Div.*, 2021 WL 3027170, at *2 (dismissing claims for failure to plead a plausible conspiracy with anticompetitive effects where "[t]he crux of plaintiffs' claims [was] that all defendants collaborated and shared information").

None of Xinuos's allegations explains how IBM's and Red Hat's alleged technical information *exchanges* were exclusionary or otherwise anticompetitive.  Instead, Xinuos alleges exchanges that improved IBM's and Red Hat's respective products, but otherwise left competition in the rest of the industry intact.  (*See* Compl. ¶¶ 97–103, 136–37.)  Given these allegations, the law is clear that Xinuos fails to plausibly allege that any sharing of technical information was anticompetitive.

16

### D.    "Jointly Taking Specific Technical Steps to Exclude Xinuos"

In Paragraph 89 of the Complaint, Xinuos alleges that IBM and Red Hat jointly excluded Xinuos from the market via some unspecified technical means.  Xinuos's apparent meaning comes in Paragraph 126, where it complains that Xinuos gets "less support" from IBM than Red Hat in IBM's cloud environment.  That allegation is merely a restatement of the other categories of conduct discussed above, and therefore fails for the same reasons.  *See, e.g.*, *Bookhouse of Stuyvesant Plaza, Inc.*, 985 F. Supp. 2d at 623 ("[N]o business has a 'duty to aid competitors'") (citations omitted).

### E.    IBM's Alleged Refusal To Deal With Xinuos

At points (*see, e.g.*, Compl. ¶ 97), Xinuos's allegations stray into implying that IBM acted anticompetitively by refusing to provide Xinuos with the same level of access to IBM's technology as Red Hat or by not *promoting* Xinuos the same way it allegedly promoted Red Hat. However, the antitrust laws support a competitor's ability to deal with whomever it wants, and liability for a unilateral refusal to deal is "at or near the outer boundary of § 2 liability".  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004).  A plaintiff must allege that the refusal to deal was supported "simply by a motivation to monopolize distribution" rather than "by a valid business reason".  *Arcesium, LLC*, 2021 WL 1225446 at *8.  One of the key requirements for plausibly alleging an anticompetitive refusal to deal is factual allegations that the defendant engaged in the unilateral termination of a "voluntary (and thus presumably profitable) course of dealing" with the plaintiff, and in a way suggesting a willingness "to forsake short-term profits to achieve an anticompetitive end".  *Int'l Bus. Machines Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 613 (S.D.N.Y. 2009).

Here, Xinuos does not allege any of the requirements for a refusal to deal claim.  It does not allege, for example, that either IBM or Red Hat had a prior course of dealing with Xinuos

that suddenly ended.  Similarly, it does not allege that either IBM or Red Hat acted against its

short-term interests by refusing to deal with Xinuos.  Where, as here, IBM and Red Hat have

combined to realize synergies that allow them to offer a service that consumers find attractive,

thus allowing them to improve their market presence on the merits, their strategy does not reflect

the sort of behavior that was done only to monopolize distribution, and thus fails to state a claim.

*See Arcesium*, 2021 WL 1225446, at *9.

### F.    Alleged Copyright Infringement

Finally, Xinuos alleges that IBM acted anticompetitively by infringing copyrights that

Xinuos purchased at a bankruptcy sale.  (*See, e.g.*, Compl. ¶ 43.)  The proliferation of intellectual

property across multiple competitors, however, is not inherently anticompetitive; in fact, it often

*enhances* competition by proliferating the state of the art among multiple market participants.[3]

Indeed, "this Court has not found any case in which patent infringement has been considered

anticompetitive conduct."  *Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d

705, 708–09 (S.D.N.Y. 2011).  Similarly, copyright infringement is typically personal in nature

and not the type of conduct that could harm competition (and thus cannot typically give rise to an

antitrust claim).  *See Freeplay Music, Inc. v. Cox Radio, Inc.*, 409 F. Supp. 2d 259, 263

(S.D.N.Y. 2005) ("The right to copy creative works, with or without attribution, is the domain of

copyright, not . . . unfair competition.").

For these reasons, it was incumbent on Xinuos to explain how Defendants' alleged

copyright infringement harmed competition.  Xinuos does not do so.  At multiple points

---

[3] *See, e.g.*, U.S. Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property §5.5 (2017) *available at* https://www.justice.gov/atr/IPguidelines/download and reprinted in Appendix C of the Supplement ("By promoting the dissemination of technology, cross-licensing and pooling arrangements are often procompetitive.")

throughout the Complaint, Xinuos alleges that it was personally harmed by Defendants'
supposed copyright infringement, but it never connects that personal harm to any broader harm
to competition.  (*See* Compl. ¶¶ 104–17.)  Moreover, Xinuos claims that its copyrighted
technology is of higher quality (*see id.* ¶ 151), meaning that, affording all reasonable inferences
in Xinuos's favor, any IBM or Red Hat products incorporating that technology benefited
consumers by proliferating the amount of high-quality products in the country.  Thus, far from
alleging anticompetitive conduct, Xinuos describes *pro*competitive effects stemming from the
alleged copyright infringement, requiring the Court to reject that as a basis for Xinuos's antitrust
claims.  *See Lavoho, LLC*, 232 F. Supp. 3d at 525 ("[A] plaintiff cannot establish antitrust injury
where it 'actually tended to benefit' from the alleged conduct.") (citation omitted);
*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 331
(S.D.N.Y. 2021) ("Courts have found no antitrust standing where the effect of the defendants'
injury-causing conduct was not anticompetitive.").[4]

G.     **Allegations Post-Dating the IBM/Red Hat Merger**

Finally, Xinuos's Complaint seemingly asserts antitrust claims post-dating IBM and Red
Hat's 2019 merger.  (*See* Compl. ¶¶ 164–70.)  To the extent the alleged anticompetitive conduct
centers on post-merger "agreements" between the two entities (*i.e.*, all of the alleged liability
theories except for IBM's supposed copyright infringement and refusal to deal), it is not
actionable under the *Copperweld* doctrine, because a parent and subsidiary cannot conspire or
otherwise make anticompetitive agreements with one another.  *See Copperweld Corp. v. Indep.*

---

[4] The copyright allegations also fail for the reasons set out in IBM's separate summary judgment
motion and because IBM has a license to the allegedly infringing code, but the Court need not
decide those issues as part of this motion.

*Tube Corp.*, 467 U.S. 752, 771 (1984) (holding a parent corporation and its wholly owned subsidiary were not legally capable of conspiring with each other).

## IV.   XINUOS DOES NOT PLAUSIBLY ALLEGE AN ANTICOMPETITIVE MERGER UNDER SECTION 7 OF THE CLAYTON ACT.

In addition to alleging that IBM and Red Hat engaged in anticompetitive conduct under the Sherman Act, Xinuos also alleges that their merger itself was anticompetitive under Section 7 of the Clayton Act.  (Compl. ¶¶ 164–170.)  However, Section 7 only prohibits mergers whose effect may be "substantially to lessen competition, or to tend to create a monopoly".  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 310 (S.D.N.Y. 2003) (quoting 15 U.S.C. § 18).  To demonstrate that an acquisition violates Section 7, a party must plausibly allege that a merger would produce "a firm controlling an undue percentage share of the relevant market, and [would] result[] in a significant increase in the concentration of firms in that market".  *U.S. v. Phillipsburg Nat. Bank & Tr. Co.*, 399 U.S. 350, 366 (1970).  A claimant must show a "***reasonable probability***" of violation, rather than a "mere possibility".  *E. I. du Pont de Nemours & Co.*, 353 U.S. at 598 (emphasis added).  Xinuos's Section 7 claims fail because the Complaint fails to identify any anticompetitive effects caused by the merger.  *See Deutsche Telekom AG*, 439 F. Supp. 3d at 206 (stating that market share "is not the end of the Section 7 analysis" because the analysis requires a "totality-of-the-circumstances approach", including review of future competitiveness.)

### A.   Xinuos Does Not Plausibly Allege Any Anticompetitive Effects.

As noted above, Xinuos fails to plausibly allege any anticompetitive effects—*e.g.*, supracompetitive prices, reduced quality, reduced choice, elimination of rivals—in the alleged relevant market.  If the merger permitted such effects, it was incumbent on Xinuos to identify them.  As it has not, the Section 7 claim is inadequate on that basis alone, which is not

surprising.  Antitrust authorities around the world, including the U.S. Department of Justice[5] and

the European Commission ("EC"), reviewed the transaction and took no action to challenge it or

in any way endorse Xinuos's claims.  On the contrary, the EC unconditionally approved the

transaction, stated it raised "no competition concerns" and acknowledged potential pro-

competitive effects, such as IBM's "intention to use the complementary capabilities of Red Hat

to further develop and offer open hybrid cloud solutions", "increas[ing] choice for enterprise

customers".[6]  Xinuos has not adequately pled that IBM and Red Hat violated antitrust law in

concluding a transaction that no regulator anywhere elected to challenge.

        While Xinuos alleges that prices went up, Xinuos must plausibly allege that they are

*supra*competitive.[7]  Xinuos does not allege anywhere that IBM's post-merger price increases

were unique to it (as opposed to industry-wide), were supracompetitive, or that Xinuos and its

much larger competitors (Microsoft, Apple, HP, Oracle, Ubuntu, Canonical, SUSE, etc.) were

unable to compete through lower prices.  (*See* Compl. ¶¶ 166–170.)  Moreover, the allegation

that the merger lowered costs through synergies is exactly the type of procompetitive benefit the

---

[5] *See* IBM Form 8-K, (May 3, 2019), *available at*
https://www.sec.gov/Archives/edgar/data/51143/000110465919026947/a19-9325_28k.htm,
(Bolas Decl. Ex. B.).

[6] *See* Mergers:  Commission approves acquisition of Red Hat by IBM, EC – Press release (June
27, 2019, *available at* https://ec.europa.eu/commission/ presscorner/detail/lt/ip_19_3433.  The
EC concluded that the combined firm will still "face significant competition from other players".
The Commission also concluded that the combined company would lack the leverage to try and
advantage itself over rivals and that "the transaction would raise no competition concerns in any
of the affected markets."  (Bolas Decl. Ex. C.).  This Court may take judicial notice of a foreign
regulator's public statements.  *See, e.g.*, *Sullivan v. Barclays PLC*, No. 13-cv-2811, 2017 WL
685570, at *20 (S.D.N.Y. Feb. 21, 2017).

[7] Supracompetitive prices are those beyond what could be sustained in a competitive market.
"Proof of increased prices alone, however, is insufficient to establish supracompetitive pricing."
*BanxCorp v. Bankrate, Inc.*, No. 07-3398, 2019 WL 2098842, at *4 (D.N.J. Mar. 21, 2019); *see
also Xerox Corp.*, 660 F. Supp. 2d at 549 (evidence of price increases did not establish
supracompetitive prices).

law encourages, because it enhances competition.  *See Deutsche Telekom AG*, 439 F. Supp. 3d at

208–09 (finding lower costs following a merger were procompetitive benefits); *see also Nat'l*

*Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 691 (1978).

Xinuos alleges that, *before* the merger, IBM and Red Hat occupied different segments in

the market:  IBM in the "high end"; Red Hat in the "low end."  (Compl. ¶¶ 5, 83, 90–96.)

According to Xinuos itself, the merger did nothing to change that; there is no allegation that the

merger substantially lessened the number of competitive offerings in the marketplace.  Similarly,

Xinuos does not allege anywhere that the merger unreasonably limited the number of technology

choices in the market—according to Xinuos, both IBM and Red Hat still each offer products in

the market, just the same as before the merger, (*id.* ¶¶ 106–109), and it is silent about the

numerous other competitors still obviously in the market.  All of these factual allegations make

clear that the merger did nothing to the competitive landscape that existed pre-merger.  Xinuos

therefore fails to identify any competitive harm stemming from the merger.  *See, e.g.*, *Anderson*

*News LLC v. Am. Media, Inc.*, 899 F.3d 87, 115–16 (2d Cir. 2018) (dismissing claim because

"[a] plaintiff suffers an antitrust injury only if it 'is adversely affected by an *anticompetitive*

aspect of the defendant's conduct.'") (citation omitted).

**B.     Xinuos Does Not Plausibly Allege Any Anticompetitive Conduct That Was**
**        Caused by the Merger.**

To the extent Xinuos alleges that the merger allowed IBM and Red Hat to engage in

some of the behavior referenced in the Complaint, the Section 7 claim fails on that basis as well.

Where a plaintiff's alleged injury could have resulted from normal competitive conduct, even

despite the merger, an antitrust claim cannot stand.  *See Anderson News*, 899 F.3d at 115.

Similarly, a Clayton Act Section 7 claim does not lie where the "alleged injury is no different

than an injury that would have resulted from a lawful decision by a manufacturer to cease

dealing with a distributor".  *Port Dock and Stone Corp. v. Oldcastle Ne., Inc.*, No. 05 Civ. 4294, 2006 WL 2786882, at *9 (E.D.N.Y. Sept. 26, 2006).

Xinuos's conduct-based allegations violate these precepts.  First, as noted, none of the agreement-based liability theories (*i.e.*, market allocation, promoting each other, sharing technical information) can lie for post-merger conduct, because the *Copperweld* doctrine holds that a parent and subsidiary cannot conspire with one another.  (*See supra* Section III.)  Xinuos's Section 7 claim is thus confined to whether Defendants' alleged copyright infringement and refusal to deal with Xinuos (a) stems from the merger, and (b) is actionable anticompetitive conduct facilitated by the merger.  Regarding the latter, Section III, *supra*, explains why Xinuos does not plausibly allege how that conduct is anticompetitive.  Regarding the former, Xinuos never ties the conduct to the merger, thus dooming its Section 7 claim.  *Port Dock & Stone Corp.*, 2006 WL 2786882, at *9 (finding no antitrust injury where alleged injury could have resulted without supposed anticompetitive conduct); *Anderson News*, 899 F.3d at 115–16 (dismissing claim because alleged harm was "unrelated" to anticompetitive conduct).

## V.     XINUOS'S VIRGIN ISLANDS LAW CLAIMS FAIL FOR THE SAME REASONS AS ITS ANTITRUST CLAIMS.

In addition to its federal antitrust claims, Xinuos alleges claims under the Virgin Islands' antimonopoly law (Count V) and unfair competition law (Count VI).  Xinuos also seeks damages for unjust enrichment (Count VII).  None of these claims survive scrutiny.

With respect to Count V, "the Virgin Islands Antimonopoly Law 'evidences the intention that [it] be applied in a manner consistent with the Sherman Act and other federal antitrust claims.'"  *Sunny Isle Shopping Ctr., Inc. v. Xtra Super Food Ctrs, Inc.*, 237 F. Supp. 2d 606, 610 (D.V.I. 2002) (quoting *Sea Air Shuttle Corp. v. V.I. Port Auth.*, 782 F. Supp. 1070, 1077 (D.V.I. 1991)).  Similarly, for Count VI, "[u]nfair competition is a subset of the antitrust law".  *Gardiner*

*v. St. Croix Dist. Governing Bd. of Dirs.*, No. SX-12-CV-084, 2019 WL 3814427, at *7 (V.I. Super. Ct. July 30, 2019).  Accordingly, when a plaintiff restates a facially deficient claim under the Virgin Islands Antimonopoly Law as one for unfair competition, the latter claim is likewise deficient and must be dismissed.  *Id.*  By extension, because both of these claims are based on Xinuos's deficient federal antitrust claims, they each fail.

With respect to Count VII, "[b]ecause unjust enrichment is an equitable remedy, it—like all equitable remedies—is inappropriate where a legal remedy is available."  *Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*, 61 V.I. 247, 252 (V.I. 2014).  Although Xinuos has not plausibly stated claims for relief under the antitrust and parallel Virgin Islands laws, its remedy is still clearly legal in nature (*i.e.*, is one for monetary damages).  It is irrelevant that Xinuos asserts the claim in the alternative.  Xinuos unquestionably seeks a legal remedy (money damages), rendering its unjust enrichment claim unviable under Virgin Islands law.

## CONCLUSION

For the foregoing reasons, IBM and Red Hat respectfully request that this Court dismiss Xinuos's Sherman Act, Clayton Act and Virgin Islands law claims, and award it attorneys' fees incurred in the defense of this case.

Dated:  January 27, 2023

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

by

_/s/ David R. Marriott_

**CRAVATH, SWAINE & MOORE LLP**
David R. Marriott
dmarriott@cravath.com
Michael J. Zaken
mzaken@cravath.com
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

_Attorneys for Defendants International Business Machines Corp. and Red Hat, Inc._

<u>**CERTIFICATE OF SERVICE**</u>

It is hereby certified that on this 27th day of January, 2023, I caused the foregoing document to be served via electronic mail on the following parties:

J. Daryl Dodson, Esq.
**MOORE DODSON RUSSELL & WILHITE, P.C.**
P.O. Box 310
St. Thomas, VI 00804-0310
E-Mail: daryl@mdrvi.com

Mark A. Klaplow, Esq.
Kyle Pham, Esq.
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
mklapow@crowell.com
kpham@crowell.com

Gabriel M. Ramsey, Esq.
Warrington S. Parker, Esq.
Molly Jones, Esq.
Jacob S. Canter, Esq.
Kimberly S Mejia-Cuellar, Esq.
Ryan Merker, Esq.
Maria N. Sokova, Esq.
Joachim Beno Steinberg, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor San
Francisco, CA 94111
gramsey@crowell.com
wparker@crowell.com
mollyjones@crowell.com
jcanter@crowell.com
kmejiacuellar@crowell.com
rmerker@crowell.com
msokova@crowell.com
jsteinberg@crowell.com

/s/ *Emma Kolesar*

26