## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

XINUOS, INC.,

         Plaintiff,

   -against-

INTERNATIONAL BUSINESS MACHINES
CORP. and RED HAT, INC.,

        Defendants.

Case No. 7:22-cv-09777-CS

## DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON <u>PLAINTIFF'S COPYRIGHT CLAIM</u>

**TABLE OF CONTENTS**

I.     The Parties To The Instant Litigation .......................................................................1

II.    Project Monterey .....................................................................................................1

III.   *SCO v. IBM* Litigation ...........................................................................................3

IV.    SCO's Bankruptcy ...................................................................................................4

V.     Xinuos Purchases SCO Assets ................................................................................5

VI.    *SCO v. IBM* Reopens ............................................................................................7

VII.   The Instant Litigation ...........................................................................................12

VIII.  *SCO v. IBM* Settlement and Release .................................................................13

IX.    Subsequent Proceedings in This Litigation .........................................................16

# CITATION CONVENTIONS

**Parties**

| | |
|---|---|
| "IBM": | International Business Machines Corporation |
| "Red Hat": | Red Hat, Inc. |
| "Defendants": | International Business Machines Corporation and Red Hat, Inc. |
| "Plaintiff", "Xinuos": | Xinuos, Inc. |

**Agreements**

| | |
|---|---|
| "JDA": | October 23, 1998 Joint Development Agreement between Santa Cruz and IBM |
| "APA": | January 19, 2011 Asset Purchase Agreement between SCO and UnXis, Inc. |
| "Settlement Agreement": | August 17, 2021 Settlement and Release Agreement between Trustee of TSG Group, Inc. and IBM |

**Prior Litigations and Related Parties**

| | |
|---|---|
| "Santa Cruz": | The Santa Cruz Operation, Inc. |
| "SCO": | The SCO Group, Inc. |
| "Novell": | Novell, Inc. |
| "*SCO v. IBM*": | *The SCO Group, Inc. v. International Business Machines Corporation*, No. 2:03-cv-00294 (D. Utah) |
| "*In re SCO*": | *In re TSG Group, Inc.*, No. 07-11337 (Bankr. D. Del.) |
| "*SCO v. Novell*": | *The SCO Group, Inc. v. Novell, Inc.*, No. 2:04-cv-00139 (D. Utah) |

Pursuant to Local Civil Rule 56.1, Defendants International Business Machines Corporation ("IBM") and Red Hat, Inc. ("Red Hat") (collectively, "Defendants") set forth in support of their motion for summary judgment (filed concurrently herewith) the following statement of material facts as to which there is no genuine issue to be tried.[1]

## I.     The Parties To The Instant Litigation

1.      IBM is a corporation organized and existing under the laws of the State of New York that, among other things, creates operating system software for servers. (Compl. ¶¶ 3, 14, 23.)  IBM sells the Unix-based server operating system called AIX for Power, among other products.  (Compl. ¶ 14.)

2.      Xinuos is a corporation organized and existing under the laws of the U.S. Virgin Islands.  (Compl. ¶ 22.)  Xinuos (then named UnXis, Inc.) was formed in 2009 (Ex. 1 ¶ 3), and claims to have acquired certain Unix-based operating systems, UnixWare and OpenServer, from SCO in 2011 (*see* ECF No. 42-7 at 1; Compl. ¶ 12; Ex. 3 at Sched. 2.1(a)).

## II.    Project Monterey

3.      Project Monterey was a joint development project between IBM and The Santa Cruz Operation, Inc. ("Santa Cruz").  (Ex. 4; Ex. 5 at 4-5.)

4.      Project Monterey was governed by a joint development agreement (the "JDA"), which IBM and Santa Cruz entered into on October 23, 1998.  (Ex. 4.)

5.      The purpose of Project Monterey was to develop and market a "family" of UNIX-like operating system products, including (i) a "Monterey/64" version for the then-forthcoming

---

[1] The exhibits referenced herein are appended to the Declaration of Emma Kolesar in Support of Defendants' Motion for Partial Summary Judgment on Plaintiff's Copyright Claim, which is submitted herewith.

IA-64 Intel processor, (ii) a version to run on IBM's proprietary "Power" processor architecture and (iii) a version to run on the IA-32 architecture.  (Ex. 6 at 2; Ex. 4; Ex. 11 at 15-16.)

6.      The IA-64 architecture had not been commercialized when Project Monterey began but was under development in a separate collaboration between Intel and Hewlett-Packard.  (Ex. 7 at 3.)

7.      Under the JDA, both Santa Cruz and IBM agreed to provide resources and technology to create a compatible family of products, and each expressly granted the other a license to use code supplied during the project.  (Ex. 4 at §§ 2.0(c)(2), 2.0(d)(2).)

8.      IBM and Santa Cruz also agreed to an accrual date (the date of any alleged breach) and a limitations period (two years) for all claims "related to" a breach of the JDA. Specifically, Section 22.3 of the JDA provided:

> This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trail [sic] by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury.  ***Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York.***

(Ex. 4 § 22.3 (emphasis added).)

9.      The JDA also stated that in the event Project Monterey was terminated, "licenses and sublicenses to end users granted by either party prior to the effective date of termination are irrevocable and shall survive the termination or expiration of this Agreement".  (Ex. 4 § 15.4(b).) Thus, any rights afforded to IBM during Project Monterey for use of UnixWare source code would not be extinguished following termination of the project or the JDA.  (*Id.*)

10.     As Santa Cruz and IBM intended from the outset, IBM incorporated the Monterey Code into IBM products.  (Ex. 5 at 12; Ex. 8 ¶ 16.)

2

11.     Santa Cruz was aware that IBM used the code as early as August 2000 (Ex. 8 ¶ 16), and in any event no later than May 2001, when IBM's AIX 5L 5.0 for Power 5.1 was released and IBM and Santa Cruz jointly announced that the software incorporated Santa Cruz's technology (Ex. 9 at 14; Ex. 10).

12.     Ultimately, Intel's IA-64 processor (Itanium) was delayed and did not end up shipping until mid-2001.  (Ex. 7 at 3.)

13.     Once the Intel processor did arrive, it performed poorly and Intel and HP re-positioned Itanium as primarily an evaluation and development platform.  (Ex. 11 at 21.)

14.     There was a substantial decrease in market interest and confidence in IA-64 and thus the Monterey/64 product under development in Project Monterey.  (*Id.*; Ex. 12.)

15.     In 2000, Santa Cruz announced that it was selling its Server Software and Professional Services divisions and its UNIX-related assets to Caldera Systems, Inc.  (Ex. 13.)

16.     As a result, IBM exercised its right to terminate the project on June 19, 2001, notifying Santa Cruz that it would not continue with Project Monterey.  (Ex. 14.)

**III.**     *SCO v. IBM* **Litigation**

17.     In March 2003, Caldera Systems, Inc. commenced litigation against IBM in the U.S. District Court for the District of Utah, alleging claims for breach of contract, copyright infringement, unfair competition, and tortious interference, among other things ("*SCO v. IBM*"). (Ex. 15 ¶¶ 104-136; Ex. 16 ¶¶ 110-214.)

18.     Shortly after filing suit against IBM, Caldera Systems, Inc. changed its name to The SCO Group, Inc. ("SCO"), suggesting (incorrectly) an affiliation with the better known The Santa Cruz Operation Inc., which continued to exist under a different name (Tarantella, Inc.). (Ex. 16 at 1; Ex. 17.)

19.     A central part of SCO's case was its allegation that IBM misappropriated source code given to it during Project Monterey, and incorporated that code into core components of IBM's operating systems.  (Ex. 16 ¶¶ 5, 181-88; *see also SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1079 n.15 (10th Cir. 2018).)

20.     SCO argued that IBM had no right to use the code outside the context of Project Monterey (Ex. 16 ¶ 88; Ex. 9 at 1-2) but did so in breach of its obligations under the JDA (Ex. 9 at 17-20).

21.     SCO sought to pursue its Project Monterey allegations as both unfair competition, which was asserted in its initial complaint, and copyright infringement, which SCO later sought leave to amend its complaint to add.  (Ex. 16 ¶¶ 181-88; Ex. 18 at Dkt. 322-23; Ex. 19 ¶¶ 216-241.)  IBM opposed SCO's motion to amend as untimely.  (Ex. 18 at Dkt. 337.)

22.     The district court allowed SCO to proceed with its unfair competition claim but denied its motion to amend to include its copyright claim.  (Ex. 18 at Dkt. 466; Ex. 16 ¶¶ 181-88.)

23.     However, SCO incorporated its copyright allegations into its unfair competition claim.  *See SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1079 n.15 (10th Cir. 2018).

24.     IBM and SCO actively litigated the principal copyright issue, *i.e.*, whether IBM stole the Monterey Code or had a license to it.  (Ex. 20 at 18-21; Ex. 21 at 3.)

25.     SCO sought hundreds of millions of dollars in damages from IBM for its unfair competition claim.  (*See* Ex. 16 ¶ 186.)

## IV.     SCO's Bankruptcy

26.     Meanwhile, in a related case, SCO and Novell disputed which party owned Unix and UnixWare copyrights SCO allegedly purchased from Santa Cruz.  (Ex. 22 at 17.)

27.     Shortly after the court in the *SCO v. Novell* case decided against SCO on certain

issues, SCO filed for bankruptcy protection in the U.S. Bankruptcy Court for the District of

Delaware on September 14, 2007.  (Ex. 22 at 40; Ex. 23.)

28.     On September 20, 2007, *SCO v. IBM* was temporarily closed administratively as a

result of the bankruptcy proceedings.  (Ex. 18 at Dkt. 1081.)

## V.     Xinuos Purchases SCO Assets

29.     In connection with SCO's bankruptcy proceeding, SCO agreed to sell its Unix

software assets to Xinuos.  (Ex. 3.)

30.     On January 19, 2011, SCO and Xinuos entered into an Asset Purchase Agreement

("APA"), which is governed by Delaware law.  (Ex. 3 § 10.13.)

31.     The "Sale and Purchase of Acquired Assets" provision of the APA granted

Xinuos rights to certain "Acquired Assets", but expressly carved out from the transfer "Excluded

Assets":

> Pursuant to the Sale Order, and subject to the terms and conditions of this
> Agreement, Seller shall sell, transfer, assign and convey to Buyer, free and clear
> of any and all Encumbrances and Retained Obligations, and Buyer shall, as of the
> Closing Date, acquire and purchase, free and clear of any and all Encumbrances
> and Retained Obligations, all of Seller's right, title and interest in and to all of the
> assets of the Business, ***except for the Excluded Assets set forth in Schedule
> 2.1(c) hereof*** (the "Acquired Assets").

(Ex. 3 § 2.1(a) (emphasis added).)

32.     In a subsection further defining the scope of Acquired Assets, the APA clarified

that the Acquired Assets do not include any rights, claims or causes of action related to Novell,

Inc., International Business Machines Corporation, Red Hat, Inc. or SUSE Linux GmbH, and

reinforces that Excluded Assets are "not part of the transactions contemplated hereunder":

All rights and claims of Seller against any third parties, directly arising from or directly related to the Acquired Assets (which, for the avoidance of doubt, ***shall not include*** any rights and claims of Seller against any third parties, directly arising from or directly related to the Excluded Assets, any rights and claims by Seller against Buyer relating to this Agreement or any agreement entered into pursuant hereto, or ***any rights, claims or causes of action related to Novell, Inc., International Business Machines Corporation, Red Hat, Inc. and SUSE Linux GmbH or other similar claims).***

(Ex. 3 § 2.1(a)(vi) (emphasis added).)

33.    Section 2.1(c) reinforced that Excluded Assets (which are listed in Schedule 2.1(c)) do not fall within the definition of Acquired Assets:

Notwithstanding anything to the contrary contained in Section 2.1(a) or elsewhere in this Agreement, the assets of Seller set forth in Schedule 2.1(c) (collectively, the "Excluded Assets") are ***not part of the transactions contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of Seller after the Closing.***

(Ex. 3 § 2.1(c) (emphasis added).)

34.    In Schedule 2.1(c) attached to the APA, the Excluded Assets are defined as including, among other things, any causes of action, rights and remedies against IBM and Red Hat relating to claims arising from Unix or UnixWare intellectual property:

all of Seller's claims, causes of action and other legal or equitable rights and remedies (A) against Buyer with respect to the transactions contemplated by this Agreement and ***(B) relating to all rights and interests in all litigation claims pending or that may be asserted in the future, against International Business Machines Corporation, Novell, Inc., SUSE Linux GmbH or others, and (C) relating to every claim of any nature whatsoever, known or unknown that has been or may be asserted against RedHat, Inc. or others relating to or arising from all licensing, covenant not to sue rights, releases or other claims relating to any allegations that Linux violates SCO's Unix or UnixWare intellectual property, contract or other rights.***

(Ex. 3 Schedule 2.1(c)(ix) (emphasis added).)  Accordingly, all claims against IBM and Red Hat were expressly carved out of the sale transaction and thus remained an asset of the bankruptcy estate.  (*Id.*)

35.     Xinuos paid $600,000 cash to obtain the Acquired Assets, which constituted almost the entirety of SCO's software business.  (Ex. 3 § 3; Ex. 2 ¶ 1.)

36.     On March 7, 2011, the Delaware bankruptcy court approved the APA following a careful review of its terms, including what SCO was selling and retaining, and what Xinous was receiving and paying.  (Ex. 24 ¶ H.)

37.     The bankruptcy court found that the "terms and conditions of the Asset Purchase Agreement . . . constitute reasonably equivalent value and fair consideration for the Acquired Assets".  (Ex. 24 ¶ H.)

38.     The bankruptcy court's approval of the APA was based on the understanding, expressly embodied in the APA, that SCO was retaining, and Xinuos was not receiving, the Monterey claim that SCO valued at hundreds of times what Xinuos paid under the agreement. (Ex. 24 ¶ H; *supra* ¶¶ 25, 31-35.)

39.     In an article published after the APA was executed, Xinuos specifically acknowledged and disclaimed the possibility of further litigation, stating:  "[Xinuos] *has no intention to pursue any litigation related to the SCO Group assets acquired by the company* . . . . There is no place for litigation in our vision or plan."  (Ex. 25 (emphasis added).)

**VI.    *SCO v. IBM* Reopens**

40.     Consistent with its reservation of rights under the APA, SCO continued to litigate its claims against IBM for nearly a decade following the APA.  (Ex. 18; Ex. 26; *see also infra* ¶¶ 41-57.)

41.     In November and December 2011, SCO urged the Utah district court to reopen the case (which had been administratively closed due to SCO's bankruptcy) so that it could proceed with litigating its claims that "IBM misappropriated SCO's valuable UNIX technologies in connection with  . . . Project Monterey."  (Ex. 27 at 3; *see also* Ex. 28 at 1.)

42.     The *SCO v. IBM* case was reopened in June 2013.  (Ex. 18 at Dkt. 1115.)

43.     On July 10, 2013, the Utah district court rejected a number of SCO's claims.
(Ex. 29.)

44.     In August 2013, SCO explained to the Utah district court that the "core
allegation" of its "remaining claims" included that "[i]n connection with Project Monterey, IBM
misappropriated into its AIX for Power operating system UnixWare source code that SCO
provided to IBM subject to strict restrictions that IBM did not follow."  (Ex. 30 at 3.)

45.     On December 15, 2014, the Utah district court entered summary judgment in
favor of IBM on several of its counterclaims.  (Ex. 31.)

46.     All that remained of SCO's case, therefore, was SCO's claim for unfair
competition concerning Project Monterey, interference with a contract not at issue in *Novell*, and
interference with business relationships.  (Ex. 21 at 2-3.)

47.     In March 2015, the parties agreed in a joint status report that SCO's claim that
IBM had misappropriated the Monterey Code was "ripe for adjudication".  (Ex. 21 at 2-3.)

48.     The parties supplemented their previously-filed motions for summary judgment,
and in July 2015, in relation to IBM's motion for summary judgment on SCO's misappropriation
claim, SCO argued to the Utah district court that it was undisputed that "IBM obtained SCO's
SVr4 code through [Project Monterey] and used it in its non-Intel AIX for Power product".
(Ex. 5 at 12.)

49.     In February 2016, the Court granted summary judgment for IBM on SCO's three
remaining claims.  (Ex. 11; Ex. 32.)

50.     SCO appealed to the Tenth Circuit (with IBM's consent as IBM still had pending
counterclaims), challenging many of the district court's rulings including its orders (i) entering

summary judgment against SCO on its unfair competition claim concerning Project Monterey and (ii) denying leave to challenge the same conduct as copyright infringement.  (Ex. 33; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062 (10th Cir. 2018).)

51.     In November 2016, SCO, in its reply brief on appeal, argued that "IBM exploited its relationship with SCO through Project Monterey to gain access to and misappropriate SCO's proprietary code, to displace SCO from the marketplace.  As part of its plot, IBM cobbled together, in its own words, a non-working 'sham release' of Project Monterey; used SCO's UnixWare code obtained through that sham release in IBM's own AIX for Power operating system; and then released SCO's UnixWare code into the hands of open-source Linux developers."  (Ex. 34 at 1.)

52.     In December 2017, SCO, in response to IBM's petition for rehearing of the Tenth Circuit's initial decision on appeal, argued that "IBM pretended to proceed with Project Monterey to induce SCO to contribute its proprietary UNIX ('SVr4') source code to the project, whereupon IBM took SCO's code and used it in its own AIX for Power operating system."  (Ex. 35 at 1.)

53.     In January 2018, the Tenth Circuit affirmed the district court's rulings in all respects, except remanded the Project Monterey unfair competition claim for trial.  *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1086 (10th Cir. 2018).

54.     IBM had argued that SCO's misappropriation claim was untimely under the JDA's contractual limitations period.  *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1079 (10th Cir. 2018).

55.     SCO had argued that the two-year limitations period should not apply to its claim because it was not a breach of contract claim.  *Id.*

9

56.     The Tenth Circuit rejected SCO's argument, holding that "[e]ven as a separate tort action, **_there is no question that SCO's misappropriation claim is 'related to' a breach of the JDA because the JDA expressly deals with the use of SCO's licensed materials_**", and applied the JDA's two-year limitations period.  *Id.* (emphasis added).

57.     In February 2018, the parties informed the Utah district court that SCO's remaining unfair competition claim, which the Tenth Circuit held presented a fact question, "concern[ed] the Project Monterey relationship" and that SCO had alleged that "IBM misappropriated  . . . source code that SCO provided to IBM subject to strict restrictions that IBM ignored".  (Ex. 36 at 2-3.)

58.     In September 2018 and April 2019, the trustee of SCO's bankruptcy estate advised the bankruptcy court that SCO's "unfair competition claim, which presented a fact question requiring trial in light of the Tenth Circuit's opinion", remained pending before the Utah district court.  (Ex. 37 at ¶¶ 9-11; Ex. 38 at ¶¶ 9-11.)

59.     During the continued course of *SCO v. IBM*, the case garnered the attention of the media, which reported on the case generally and SCO's Monterey claim in particular.  (*See* Exs. 39-43.)

60.     For example:  In 2013, Groklaw published an article regarding the effect of the *SCO v. Novell* decision on SCO's claims in *SCO v. IBM*.  (Ex. 39.)  The article noted that the court had "ordered SCO to file a list of which of its claims, if any, it believes survived SCO's massive loss to Novell".  (*Id.*)

61.     In 2016, LinkedIn published an article commenting on *SCO v. IBM*.  (Ex. 40.)  The article discussed Project Monterey and SCO's business.  (*Id.*)

62.     In 2016, Tech Insider published a detailed timeline regarding "Project Monterey." (Ex. 41.)  The timeline listed events such as Santa Cruz and IBM entering into the JDA, the "align[ment]" of AIX and UnixWare, and the termination of Project Monterey.  (*Id.*)

63.     On October 30, 2017, Ars Technica published an article regarding the SCO v. IBM appellate proceedings titled "Appeals court keeps alive the never-ending Linux case, *SCO v. IBM*".  (Ex. 42.)  The article reported that the Tenth Circuit "partially ruled in favor of the SCO Group", which "argued that IBM essentially stole, or misappropriated, its proprietary code".  (*Id.* at 2-3.)

64.     On November 2, 2017, Computing published an article regarding the SCO v. IBM appellate proceedings titled "SCO versus IBM (and Linux) springs back to life after court ruling".  (Ex. 43.)  The article reported that the Tenth Circuit "sent the case back for [SCO] to try again" on its misappropriation claim.  (*Id.* at 2.)

65.     Xinuos never raised any objection to SCO's continued assertion of its Project Monterey claim against IBM.  (Ex. 18.)

66.     Xinuos did not object when the Utah litigation re-opened.  (*Id.*)  Xinuos did not object when SCO and IBM supplemented their briefing on IBM's motion for summary judgment relating to Project Monterey.  (*Id.*)  Xinuos did not object when SCO argued on appeal that it should have been able to assert its claim for copyright infringement relating to Project Monterey. (Ex. 26.)  Xinuos did not object when SCO and IBM publicly prepared for trial as to whether IBM stole the code it used as part of Project Monterey Code or obtained a license to it from Santa Cruz—the very thing Xinuos puts at issue here.  (Ex. 18.)

67.     Xinuos said nothing about having any rights relating to Project Monterey until *after* the Tenth Circuit ruled that the Utah district court properly precluded SCO from asserting its copyright infringement claim as untimely.  (ECF No. 42-7.)

**VII.     The Instant Litigation**

68.     On March 26, 2019, Xinuos sent a letter to IBM accusing it of "unauthorized uses of [Xinuos's] copyrighted code in IBM's AIX and Linux-based operating system products, and [] unauthorized contribution of Xinuos' copyrighted code to both the Red Hat Linux and SUSE Linux operating systems."  (ECF No. 42-7.)

69.     Just over two years later, on March 31, 2021, Xinuos filed its Complaint in this action, asserting claims for copyright infringement and unfair competition.  (ECF No. 1.)

70.     Xinuos's March 26, 2019 letter and Complaint make plain that it seeks hundreds of millions of dollars in damages from Defendants.  (ECF No. 42-7; Compl. ¶¶ 81, 175-229.)

71.     Xinuos's claims in this litigation concern precisely the same underlying facts as SCO's unfair competition claim in the *SCO v. IBM* litigation.  (Compl. ¶¶ 55-73; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1071-73 (10th Cir. 2018).)

72.     For example, Xinuos alleges, among other things, that "[t]hrough Project Monterey, IBM gained confidential access to [certain source code]", and "[d]espite not having acquired any rights in the Code, IBM used the stolen Code, and incorporated it into core components of its" AIX (and other) operating systems.  (Compl. ¶¶ 56-60; 175-83.)  Similarly, in *SCO v. IBM*, SCO alleged that during Project Monterey, IBM "[m]isappropriat[ed] [] source code, methods, and confidential information of [SCO]", by including SCO's UnixWare System V Release 4 ("SVr4") code in its AIX for Power product.  (Ex. 16 ¶ 184; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1071-72, 1079 (10th Cir. 2018).)

73.     Xinuos alleges that IBM infringed copyright TX 5-787-679.  (Compl. ¶ 43.)
Similarly, in *SCO v. IBM*, SCO attempted to assert copyright TX-5-787-679.  (Ex. 19 ¶ 220.)

74.     Xinuos alleges that IBM's allegedly infringing code includes "print subsystem
code".  (Compl. ¶ 64.)  Similarly, in *SCO v. IBM*, SCO alleged that IBM copied UnixWare code
for the "Print Subsystem".  (Ex. 19 ¶¶ 232-33.)

75.     Xinuos alleges that IBM's allegedly infringing code relates to "'Multi-Path I/O'
functionality".  (Compl. ¶ 65.)  Similarly, in *SCO v. IBM*, SCO alleged that IBM copied
UnixWare code for "Multi-Path I/O" source code.  (Ex. 44 at 7-8 & Attachment 4 to Project
Supplement B at § 3 (pp. 46 of 81).)

76.     Xinuos alleges that IBM's allegedly infringing code includes "PCI Hotplug
functionality".  (Compl. ¶ 66.)  Similarly, in *SCO v. IBM*, SCO alleged that IBM copied
UnixWare code for the "Hot Plug [graphical user interface]" source code.  (Ex. 44 at 7-8 &
Attachment 4 to Project Supplement B at § 3 (pp. 46 of 81).)

77.     Xinuos alleges that IBM's allegedly infringing code includes "truss
functionality".  (Compl. ¶ 67.)  Similarly, in *SCO v. IBM*, SCO alleged that IBM copied
UnixWare code for "Truss" technology.  (Ex. 19 ¶¶ 232-33.)

**VIII.    *SCO v. IBM* Settlement and Release**

78.     On August 17, 2021, after SCO's Project Monterey claim had been remanded to
the Utah district court but before the parties were able to try the case—which was then focused
entirely on whether IBM stole code from Project Monterey or obtained a license under it, and on
numerous IBM counterclaims (Ex. 21)—SCO and IBM reached an agreement to settle the *SCO
v. IBM* litigation.  (Ex. 45 at Exhibit 1.)

79.     The Settlement Agreement stated that "[e]ach party and signatory [thereto]
represents and warrants that:  (a) such party is duly authorized to enter [the] Settlement

Agreement; and (b) the person executing [the] Settlement Agreement on behalf of such Party has

been duly authorized to execute [the] Settlement Agreement".  (Ex. 45 at Exhibit 1, § 4.10.)

80.     Under the Settlement Agreement, SCO released any and all claims against IBM,

including the Project Monterey claims it had been litigating with IBM for the preceding 18 years.

The Settlement released IBM:

> from any and all claims, rights, demands, injuries, debts, liabilities, omissions,
> accounts, contracts, agreements, causes of action, suits and damages whatsoever,
> in law or equity, and whether based on contract, tort, or otherwise, known or
> unknown, suspected or unsuspected, of every kind and nature, which [SCO] at
> any time had, now have, or hereafter can or may have against IBM for, upon or by
> reason of any matter, cause or thing whatsoever, from the beginning of the world
> to the date of this release, ***concerning, related to, arising out of, or arising from
> the Utah Litigation, the Proof of Claim or IBM's relationship with [SCO] (or
> [its] predecessors), Project Monterey, or IBM's relationship with [SCO].***

(Ex. 45 at Exhibit 1, § 3.1 (emphasis added).)

81.     The Settlement Agreement further clarified that the release includes any claims

against IBM or Red Hat belonging to SCO:

> In an avoidance of doubt, the foregoing includes causes of action and other legal
> or equitable rights and remedies relating to (1) ***all rights and interests in all
> litigation claims pending or that may be asserted in the future against IBM and
> Red Hat, and (2) any allegations that Linux violates SCO's Unix or Unixware
> intellectual property, contract or other rights, which, pursuant to the Asset
> Purchase Order and the Bankruptcy Court's order authorizing the same, the
> Trustee has the sole authority to bring against IBM, Red Hat, or others.***

(Ex. 45 at Exhibit 1, § 3.1 (emphasis added).)

82.     Although Xinuos had nothing to do with Project Monterey or SCO's litigation

with IBM and raised no objection to SCO's asserting Project Monterey claims against IBM (*see*

*supra* ¶¶ 65-67), Xinuos objected to the settlement on the grounds it could be understood to

preclude Xinuos from relitigating the same issues with IBM.  (Ex. 46 at 2.)

83.     Xinuos argued that the settlement "purport[ed] to encompass Xinuos' claims against IBM and Red Hat", including because it released "all rights and interests in all litigation claims pending or that may be asserted in the future against IBM and Red Hat".  (Ex. 46.)

84.     Both the trustee for SCO's estate and IBM filed replies in support of approval of the Settlement Agreement.  (Ex. 47; Ex. 48.)

85.     The trustee noted that the APA between SCO and Xinuos "does not expressly limit the 'Excluded Assets' to assets that existed in only a pre- or post-1995 time-period", and told the court that SCO intended to retain "the specific claim of unfair competition on remand from the Tenth Circuit that is currently pending before the Utah District Court *as well as all claims that could have been brought by the Debtors in the Utah Litigation*."  (Ex. 47 ¶ 8.)

86.     IBM made similar arguments in support of the settlement, pointing out that in October 2004, SCO had continued to pursue an amendment to its complaint in the *SCO v. IBM* litigation long after the APA that would have added a copyright claim pursuant to the same post-1995 copyright (TX 5-787-679) that Xinuos has asserted against IBM in this case.  (Ex. 48 ¶ 31.)

87.     On October 14, 2021, the bankruptcy court overruled Xinuos's objection and approved the *SCO v. IBM* settlement.  (Ex. 45 ¶¶ 1-2.)

88.     The bankruptcy court did not determine exactly what claims Xinuos might or might not be able to assert against IBM in litigation pending in another court (then the Virgin Islands).  (Ex. 45 ¶¶ 1-8.)

89.     The bankruptcy court noted that "Xinuos, Inc. reserves the right to argue that the release in the Settlement Agreement does not bar any claims it has asserted against IBM in *Xinuos, Inc. v. International Business Machines Corporation, et al.*, Case No. 3:21-cv-00031 (D.V.I.), and IBM reserves the right to argue the Settlement bars such claims."  (Ex. 45 ¶ 8.)  But

the court did not rule that the claim was reserved; on the contrary, it approved a settlement that did just the opposite.  (Ex. 45 ¶¶ 1-8.)

90.    The bankruptcy court expressly stated that it approved of the Settlement Agreement "in all respects, including, without limitation, the release of the Estates' claims against IBM, and vice versa, as set forth in paragraphs 3.1 and 3.2 of the Settlement Agreement". (Ex. 45 ¶ 2.)

91.    The bankruptcy court declined Xinuos's proposal to strike the language in paragraph 2 of its order.  (Ex. 45 ¶ 2; Ex. 49 at Exhibit B, ¶ 2.)

92.    The bankruptcy court also declined Xinuos's proposal to include language in its order stating that "neither [the] Order, nor the Settlement Agreement, resolves, releases any party, or otherwise impacts any claim, cause of action, or right of Xinuos that the Trustee or IBM does not possess the right to impact" and that "[the] Order does not bar Xinuos from asserting, in *Xinuos, Inc. v. International Business Machines Corporation, et al.*, Case No. 3:21-cv-00031, that IBM infringed and continues to infringe copyrights that it purchased from the Debtors". (Ex. 45 ¶¶ 1-8; Ex. 49 at Exhibit B, ¶¶ 8, 10.)

93.    On November 5, 2021, the Utah district court dismissed SCO's remaining claim against IBM with prejudice.  (Ex. 50.)

## IX.    Subsequent Proceedings in This Litigation

94.    On November 16, 2022, this case was transferred to the United States District Court for the Southern District of New York.  (ECF No. 77.)

95.    Between December 21 and December 23, 2022, Xinuos served on Defendants 74 discovery requests that relate in large part to Project Monterey and the *SCO v. IBM* litigation. (Ex. 51; Ex. 52; Ex. 53.)  Xinuos seeks, for example, "All Documents and Communications Referring or Relating to Project Monterey", "All Documents and Discovery Responses" and "All

Deposition transcripts" from *SCO v. IBM*, and the source code for a number of versions of IBM software dating back to 2000.  (Ex. 51 at RFP Nos. 15, 60-61.)

96.     On January 10, 2022, Xinuos served on Defendants its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), which identify more than 60 individuals associated with IBM and SCO who allegedly possess knowledge "relevant to [Xinuos's] claims" about "Project Monterey".  (Ex. 54 at 3-5.)

97.     On January 17, 2023, the Court granted Defendants' request to file their dispositive motions and stayed discovery pending their resolution.  (Jan. 17, 2023 Minute Entry.)

DATED:  January 27, 2023

                                      Respectfully submitted,

                                      /s/ David R. Marriott

                                      **CRAVATH, SWAINE & MOORE LLP**
                                      David R. Marriott
                                      Michael J. Zaken
                                      Worldwide Plaza
                                      825 Eighth Avenue
                                      New York, New York 10019
                                      Tel: (212) 474-1000
                                      Fax: (212) 474-3700
                                      dmarriott@cravath.com
                                      mzaken@cravath.com

                                      *Attorney for Defendants International Business Machines Corp. and Red Hat, Inc.*

## CERTIFICATE OF SERVICE

It is hereby certified that on this 27th day of January, 2023, I caused the foregoing document to be served via electronic mail on the following parties:

J. Daryl Dodson, Esq.
**MOORE DODSON RUSSELL & WILHITE, P.C.**
P.O. Box 310
St. Thomas, VI 00804-0310
E-Mail: daryl@mdrvi.com

Mark A. Klaplow, Esq.
Kyle Pham, Esq.
**CROWELL & MORING LLP**
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
mklapow@crowell.com
kpham@crowell.com

Gabriel M. Ramsey, Esq.
Warrington S. Parker, Esq.
Molly Jones, Esq.
Jacob S. Canter, Esq.
Kimberly S Mejia-Cuellar, Esq.
Ryan Merker, Esq.
Maria N. Sokova, Esq.
Joachim Beno Steinberg, Esq.
**CROWELL & MORING LLP**
3 Embarcadero Center – 26th Floor San
Francisco, CA 94111
gramsey@crowell.com
wparker@crowell.com
mollyjones@crowell.com
jcanter@crowell.com
kmejiacuellar@crowell.com
rmerker@crowell.com
msokova@crowell.com
jsteinberg@crowell.com

/s/ Emma Kolesar