**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
XINUOS, INC.,                                          :
                                                       :
                     Plaintiff,                        :          CASE NO. 7:22-cv-09777-CS
                                                       :
              -against-                                :
                                                       :
INTERNATIONAL BUSINESS MACHINES                        :
CORPORATION and RED HAT, INC.,                         :
                                                       :
                     Defendants.                       :
                                                       :
---------------------------------------------------------- x


**PLAINTIFF XINUOS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    FACTUAL ALLEGATIONS ................................................................... 3
       A.     The UNIX/Linux Paid Server OS Market ................................ 4
       B.     IBM's & Red Hat's Anticompetitive Conduct ........................ 5
       C.     The Present Uncompetitive UNIX/Linux Paid Server OS Market ...................... 6

III.   LEGAL STANDARD ........................................................................... 6

IV.    ARGUMENT ...................................................................................... 7
       A.     Xinuos Has Standing to Bring these Antitrust Claims.............. 7
       B.     Xinuos Alleges a Plausible Section 2 Claim........................... 9
              1.     *Xinuos Adequately Alleges Monopoly Power in the Market.* ............ 9
              2.     *Xinuos Alleges that Defendants Acquired and Maintain Their Monopoly Power Through Exclusionary Activities.* ............... 12
       C.     Xinuos Alleges a Plausible Section 1 Claim........................... 14
              1.     *Xinuos Alleges the Anticompetitive Nature of Defendants' Restraint of Trade.* ............ 14
                     a.     IBM and Red Hat Enter into Agreements to Not Compete and Thwart Rivals. ............ 15
                     b.     Defendants' Agreements to Restrain Trade Cause Substantial Harm to Competition in the Market. ............ 17
              2.     *Xinuos Also Pleads That Defendants' Restraint of Trade Violates The Rule of Reason As Well.* ............ 18
       D.     Xinuos Alleges a Plausible Section 7 Claim........................... 19
       E.     Xinuos Alleges a Plausible Virgin Islands Antimonopoly Law Claim. ............... 21
       F.     Xinuos Alleges Plausible Common Law Claims.......................... 22
              1.     *Common-Law Unfair Competition* ................................. 22
              2.     *Common-Law Unjust Enrichment*.................................... 23

V.     CONCLUSION .................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   175 F. Supp. 3d 44 (S.D.N.Y. 2016) ........................................................................9

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ........................................................................14, 18, 19

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 201 L.
   Ed. 2d 678, 138 S. Ct. 2274 (2018) ........................................................................15

*Am. Tel. & Tel. Co. v. N. Am. Indus., Inc.*,
   772 F. Supp. 777 (S.D.N.Y. 1991) ........................................................................14

*Anderson News, LLC v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ........................................................................19

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ........................................................................3, 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................6

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ........................................................................8

*Banks v. International Rental & Leasing Corp.*,
   55 V.I. 967 (2011) ........................................................................7, 22, 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................6

*Bell v. Radcliffe*,
   2015 WL 5773561 (V.I. Super. Ct. Apr. 30, 2015) ........................................................................23

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007) ........................................................................10, 12, 13

*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962) ........................................................................11

*Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*,
   61 V.I. 247 (2014) ........................................................................23

*Charych v. Siriusware, Inc.*,
    790 F. App'x 299 (2d Cir. 2019) ......................................................18

*City of Anaheim v. So. Cal. Edison*,
    955 F.2d 1373 (9th Cir. 1992) ........................................................12

*Clorox Co. v. Sterling Winthrop, Inc.*,
    117 F.3d 50 (2d Cir. 1997)................................................................9

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016)................................................................6

*Conrac Corp. v. Am. Tel. & Tel. Co.*,
    546 F. Supp. 429 (S.D.N.Y. 1982) ...................................................8

*Cont'l Ore. Co. v. Union Carbide*,
    370 U.S. 690 (1962)........................................................................12

*Copperweld v. Independence Tube*,
    467 U.S. 752 (1984)..............................................................2, 14, 21

*Dehoog v. Inbev*,
    No. 15-CV-2250, 2016 WL 5853733 (D. Or. July 22, 2016)..............21

*Donastorg v. Daily News Publ'g Co., Inc.*,
    63 V.I. 196 (2015)...........................................................................23

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957)........................................................................21

*Eastman Kodak Co. v. Image Tech. Servs.*,
    504 U.S. 451 (1992)........................................................................12

*FTC v. Facebook, Inc.*,
    581 F. Supp. 3d 34 (2022) ..............................................................13

*Fido's Fences, Inc. v. Radio Sys. Corp.*,
    999 F. Supp. 2d 442 (S.D.N.Y. 2014)............................................8, 14

*G-I Holdings v. Baron & Budd*,
    238 F. Supp. 2d 521 (S.D.N.Y. 2002)..............................................23

*Gardiner v. St. Croix District Governing B. of Directors*,
    No. 12-CV-0084, 2019 WL 3814427 (V.I. Super. Ct. July 30, 2019) ...................22

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)..............................................................8

*Gok v. Roman Cath. Chuch*,
    No. 20-CV-4968, 2021 WL 1726650 (E.D. Pa. Apr. 30, 2021) ............................................21

*Hamilton Chapter of Alpha Delta Phi v. Hamilton Coll.*,
    128 F.3d 59 (2d Cir. 1997)..............................................................................................9

*Intel Corp. v. Fortress Investment Group LLC*,
    No. 19-CV-7651, 2020 WL 6390499 (N.D. Cal. July 15, 2020)...........................................21

*Island Airlines LLC v. Bohlke*,
    No. 16-CV-0404, 2020 WL 8019119 (V.I. Super. Ct. Sept. 16, 2020) .................................22

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016)......................................................................................10, 12

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*,
    845 F.2d 404 (2d Cir. 1988).............................................................................................12

*La Preferida, Inc. v. La Victoria Foods, Inc.*,
    No. 77-CV-3926, 1978 WL 1402 (N.D. Ill. Aug. 2, 1978) ......................................................18

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003)...................................................................................3, 12, 13

*Meyer v. Kalanick*,
    174 F.Supp.3d 817 (S.D.N.Y. 2016) ...................................................................................15

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001)...........................................................................................17

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006)...................................................................................8

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988)..............................................................................................9

*Palmer v. BRG of Ga.*,
    498 U.S. 46 (1990).........................................................................................................15

*Pepsico, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)..............................................................................................9

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021)................................................................................16

*R.C. Bigelow, Inc. v. Unilever N.V.*,
    867 F.2d 102 (2d Cir. 1989)..............................................................................................8

*Radio Music License Committee, Inc. v. SESAC, Inc.*,
    29 F. Supp. 3d 487 (E.D. Pa. 2014) ....................................................................13

*Reddy v. Puma*,
    No. 06-CV-1283, 2006 WL 2711535 (E.D.N.Y. Sept. 21, 2006) ...........................9

*Serpa Corp. v. McWane, Inc.*,
    199 F.3d 6 (1st Cir. 1999).......................................................................................7

*Simon v. Joseph*,
    59 V.I. 611 (Sept. 11, 2013)...................................................................................22

*In re Term Commodities Cotton Futures Litig.*,
    No. 12-CV-5126, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).........................10

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)............................................................................11, 14

*TruePosition, Inc. v. LM Ericsson Tel. Co.*,
    2012 WL 3584626 (E.D. Pa. Aug. 21, 2012) ......................................................17

*US Airways, Inc. v. Sabre Holdings Corp*,
    No. 11-CV-2725, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ...........................10

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ................................................................................17

*Walters v. Walters*,
    60 V.I. 768 (2014)................................................................................................24

*Yearwood Enters., Inc. v. Antilles Gas Corp.*,
    No. 17-CV-0077, 2017 WL 2709831 (V.I. Super. Ct. June 21, 2017)..................22

**Statutes**

15 U.S.C. §§ 1, 3..........................................................................................................14

15 U.S.C. § 18...............................................................................................................19

Areeda & Hovenkamp, Antitrust Law ¶ 301 (2021)....................................................12

Clayton Act Section 7 ...........................................................................................3, 19, 21

Sherman Act Section 1 ............................................................................................. *passim*

Sherman Act Section 2......................................................................................2, 9, 3, 12, 14

Virgin Islands Antimonopoly Act...........................................................................21, 22

**Other Authorities**

Executive Order on Promoting Competition in the American Economy (July 9,
    2021), https://www.whitehouse.gov/briefing-room/presidential-
    actions/2021/07/09/executive-order-on-promoting-competition-in-the-
    american-economy ...................................................................................................7

https://www.latimes.com/archives/la-xpm-1991-03-13-fi-179-story.html ....................................1

Rule 8 ............................................................................................................................................7

Rule 12(b)(6) ...............................................................................................................................19

Plaintiff Xinuos respectfully submits this memorandum in opposition to the partial motion to dismiss Xinuos' complaint filed by Defendants IBM and Red Hat.

## I.    PRELIMINARY STATEMENT

Xinuos' well-pleaded allegations taken as true establish that IBM and Red Hat built a moat around their own products to obtain and secure their monopoly position and to inhibit competition. Defendants' motion parrots well-worn defense-side tropes that Xinuos fails to adequately allege market definition, anticompetitive effects, and market power in an effort to argue the merits instead of the motion to dismiss standard – *plausibility*.  In arguing the merits, Defendants slice and dice the allegations in the Complaint in an attempt to show that each of their actions standing alone is not sufficient to sustain a claim.  Not so.  Moreover, the FTC and many cases have explained that a defendant's "course of conduct" must be assessed as a whole and not just as isolated events evaluated in a vacuum.  That caselaw also holds that coordinated, multifaceted conduct to allocate the high end and the low end of a relevant market is actionable under the antitrust laws.  Of course, Defendants are well aware of this because IBM itself has been investigated for doing so before.

*First*, Xinuos pleaded a plausible relevant market.  Businesses needs operating systems ("OSs") that are stable and require little intervention to run their critical and auxiliary business functions.  There are many interchangeable paid OSs based on UNIX and Linux architecture.  OSs built on other architectures are not substitutes because of interoperability and switching costs.  Consumers recognize the pleaded market as distinct.  Beyond IBM and Red Hat OS products, Xinuos has UNIX-based OpenServer; Oracle has UNIX-based Solaris; HP has UNIX-based HP-UX; Canonical Ltd. has Linux-based Ubuntu; and SUSE has Linux-based SUSE Enterprise.  Yet, IBM dominates the high end and Red Hat dominates the low end of the market. Compl. ¶¶ 83-103.

*Second*, Xinuos pleaded plausible market power.  Defendants argue that any market power, even if gained unfairly, is not legally sanctionable because their acts *in isolation* do not give rise

to legal claims. That is wrong. And Xinuos pleaded plausible anticompetitive effects enabled by Defendants' market power – *i.e.* the relevant market does not function properly given their actions. An example of that is over 70% less of Xinuos' legacy customers cannot license Xinuos' flagship product OpenServer 10 because of Defendants' actions. *Id.* ¶ 138. This foreclosure is also felt by other market participants, and it is not an accident. This foreclosure is by design – a direct result of Defendants' efforts to exclude competitors, reduce competition, and obtain and then preserve their monopoly power. *Id.* ¶¶ 138-174.

*Third*, Defendants' motion is simply wrong, as a matter of fact and law, that Xinuos has not pleaded conduct prohibited by the antitrust laws. Defendants try to set up a straw man asserting Xinuos pleaded a single firm, unilateral "refusal to deal" because IBM and Red Hat now merged. What is alleged is that, prior to their merger, two competitors, IBM and Red Hat, engaged in a pattern of conduct to protect each other's competing products from head-to-head competition and to prevent their competitors from accessing the market. Their pre-merger anticompetitive conduct is actionable under Section 1 and Section 2 of the Sherman Act, and not absolved by the merger. Their post-merger anticompetitive conduct is also actionable, under Section 2 of the Sherman Act, as an entity that resulted from a merger is not immunized from the antitrust laws.[1]

Factually, Defendants' alleged actions, if true, are independently actionable:

- Competitors agreeing to divide the market by jointly pushing high-end consumers to IBM and low-end consumers to Red Het while refusing to compete with the other with respect to those customers is a form of unlawful market allocation.

- Competitors withdrawing technical access and priority for rivals in server hardware and in the Cloud to lock out competition is actionable under the antitrust laws.

---

[1] Defendants misstate the holding in *Copperweld v. Independence Tube,* 467 U.S. 752, 769 (1984). *Copperweld* held that a conspiracy between a subsidiary and its corporate parent is not actionable under Section 1 of the Sherman Act. That case does not absolve merged entities under Section 1 for acts before the merger, much less immunize the merged entity from Section 2 liability.

- Manipulating the Linux kernel to impede interoperability and raise switching costs is a recognized form of unlawful exclusionary conduct under the antitrust laws.

- Self-preferencing by erecting a technology barrier and using marketing tactics to lock in customers within their ecosystems, thwart downward pricing pressures, and limit consumer choice, which is actionable under the antitrust laws.

- Competitors jointly coopting copyrighted computer source code, without authority, as a mechanism to divide the market, lock in customers in their ecosystems, and lock out rivals by together leveraging the code is actionable under the antitrust laws.

Legally, Defendants' "slice and dice" approach to the Complaint is contrary to the caselaw. Courts have held that Sections 1 and 2 of the Sherman Act, and Section 7 of the Clayton Act, support legal claims based on a course of conduct through various, related activities. "In antitrust cases, the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (cleaned up); *see LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of [the] exclusionary practices considered together.").

The Complaint sets forth factual allegations which, taken as true, establish a multifaceted horizontal agreement and other anticompetitive conduct that cause antitrust injury, harm consumer welfare, and substantially lessen competition. The Complaint alleges these actions and the injuries in detail, both as to Xinuos, other rivals, and consumers. Nothing more is required at this stage. Thus, the Court should deny Defendants' motion to dismiss the federal antitrust claims.

Defendants barely address Xinuos' other claims, which also cannot be dismissed now.

## II.    FACTUAL ALLEGATIONS

As this motion is not a genuine challenge to *the plausibility of* the Complaint but an effort to argue the merits, Defendants' factual "summary" is inaccurate and reductionist, and seeks to go beyond the allegations and recast Xinuos' claims. Xinuos summarizes its relevant allegations here:

### A.    The UNIX/Linux Paid Server OS Market

Server operating systems are essential for modern businesses as they allow server hardware to "run" software applications.  Compl. ¶ 9.  When licensing an OS, businesses pay for support and maintenance to ensure the OS functions properly.  *Id*. ¶¶ 41, 42.  An OS license without support and maintenance is useless and would place the entire business in jeopardy.  *Id*.

The parties compete in the UNIX/Linux paid server OS market.  *Id*. ¶¶ 36, 38.  HP, Oracle, Canonical Ltd., and SUSE also compete in the market, but the number of competitors has declined.  *Id*. ¶ 10.  UNIX and Linux are substantially similar such that OSs built on them are substitutes.  *Id*. ¶¶ 37, 39.  Their technical architectures are similar.  *Id*. ¶ 16.  Developers writing applications for one apply the same skills and approaches, and are expected to write code allowing migration between them.  *Id*. ¶¶ 40, 41.  Consumers can switch between them, but not other OSs.  *Id*. ¶¶ 37, 39, 141, 151.  After selecting an OS, businesses are locked into that OS and substitutes.  *Id*. ¶ 37.  Consumers recognize the UNIX/Linux paid server OS market as separate.  *Id*. ¶¶ 37, 39.  Indeed, IBM itself has stated that initial OS selection is a winner-take-all competition.

The lock-in effect in this market has a cascade effect on server manufacturers and software developers.  *Id*. ¶¶ 142-49.  Due to the fixed-costs of building servers and producing applications, developers focus on the operating systems most widely used.  *Id.* The OSs with lock-in advantage, thus, can benefit from upgrades in server and application technology, which turns more consumers to those same systems.  Hence, the effect of a single anticompetitive action can be multiplied.  *Id*.

Businesses using paid UNIX/Linux server OSs can be and are grouped into "high-end" and "low-end" consumers, as in many industries.  *Id*. ¶ 83.  High-end consumers, like the largest banks, retailers, and insurers, have both simple and complex corporate computing needs and, therefore, are the most profitable.  So-called "low-end" consumer are often smaller business and more

4

straightforward computing needs.  While low-end consumers have less sophisticated needs, they are far more numerous.  *Id.*

B.   **IBM's & Red Hat's Anticompetitive Conduct**

Defendants leveraged these dynamics in a course of anticompetitive conduct to raise barriers to entry and obtain and secure a monopoly.  *Id.* ¶¶ 90-117.  That conduct has two related parts:

*First*, Defendants entered into an illicit agreement to divide the market and not compete with each other, to steer customers toward each other and away from rivals, and to provide mutually preferential technical and business treatment to support their anticompetitive strategy. *Id.* ¶¶ 89-117.  The effect of that strategy has been to foreclose Xinuos and other rivals from access to most of the consumer base, allowing Defendants to acquire and maintain their dominant position.

IBM and Red Hat implemented a "multiyear alliance" to accomplish these anticompetitive goals *well before their merger.  Id.* ¶ 90.  The Complaint details these actions.  *Id.* ¶¶ 90-110.  By way of example, Red Hat gave IBM access to key customers while IBM gave Red Hat preferential compatibility treatment – even at the expense of IBM's own AIX OS product.  *Id.* ¶¶ 91-93.  IBM even paid customers to use Red Hat instead of IBM product.  *Id.* ¶¶ 94-96.  IBM made Red Hat's product the default OS for many of its server products, instead of its own AIX OS, reconfigured its own servers to allow only Red Hat to run, and paid Red Hat to assist in doing this.  *Id.* ¶¶ 97-103.

*Second*, Defendants took deliberate, concerted steps to forestall innovation and falsely discredit rivals.  *Id.* ¶¶ 111-30.  IBM steered potential customers away from Linux products except for Red Hat and Red Hat services, and Red Hat gave IBM access to its largest accounts, thereby preventing rivals from an opportunity to approach these businesses with options at either end of the spectrum.  *Id.* ¶¶ 111-15.  Defendants also exercised undue influence over the Linux kernel by prioritizing their contributions to excluded rivals from application development opportunities and ensure that improvements and upgrades for OS growth and scale were not available to rivals.  *Id.*

¶¶ 120-23.  And Defendants targeted specific rivals to hinder their business opportunities—for example by dropping support for Xinuos' OS in the Informix database and the IBM Cloud.  *Id.* ¶¶ 24, 25.  Finally, Defendants disparaged FreeBSD – another UNIX-based architecture – causing support for it to rapidly decline, harming the ability of rival to compete.  *Id.* ¶¶ 118-19, 126-32.

### C.    The Present Uncompetitive UNIX/Linux Paid Server OS Market

These anticompetitive acts packed a vicious punch and consumers are left without a range of competitive choices.  Defendants' competitors are left with limited access to developers, cannot offer products compatible with widely used systems, must overcome improper disparagement, and are denied access to major customers.  As a result, there is an exodus of server manufacturers and application developers from building products compatible with rival OSs.  *Id.* ¶¶ 135, 154-58.

Today, the market is deeply dysfunctional because there is no incentive for innovation and no downward price pressure.  *Id.* ¶¶ 137, 151-53.  Without real competition, Defendants extract inflated rents from software and services, and at times, revenue equal to 800% of production cost.  *Id.* ¶ 131.  They have a commanding market share and the most lucrative customers.  *Id.* ¶ 137.  At the high-end, IBM runs its OSs in ten of the world's top ten banks and telecom companies, eight of the top ten retailers and insurers, and 71% of Fortune 500 companies.  *Id.* ¶¶ 105, 107.  At the low-end of the market, Red Hat makes over 70% of all Linux installations.  *Id.* ¶ 108.  This harms consumers and all market participants, including Xinuos and other UNIX/Linux OS developers.

### III.   LEGAL STANDARD

A complaint must only plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face and cannot be dismissed "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Antitrust cases do not require more.  *Concord Assocs., L.P. v. Entm't*

*Props. Tr.*, 817 F.3d 46, 63 (2d Cir. 2016) (antitrust cases have "no heightened pleading standard").

All that is required is a Rule 8 short and plain statement of facts supporting a plausible claim.

## IV.    ARGUMENT

Defendants parrot but do not really engage the motion to dismiss standard – *plausibility*. As shown below, Xinuos has standing to sue for Defendants' exclusionary acts and the allegations in the Complaint, taken as true, plausibly show a course of conduct over many years to monopolize the market and exclude competitors that is actionable under Section 1, Section 2, and Section 7.[2] By contrast, Defendants do not attack Xinuos' Virgin Islands statutory claim at all, insisting only that it is "based entirely" on the federal claims. Mot. at 11, 35. This is wrong. Defendants' motion says even less about Xinuos' common law claims, much less address the controlling *Banks* decision. As discussed in more detail below, Defendants' motion to dismiss these claims should be denied.

### A.    Xinuos Has Standing to Bring these Antitrust Claims.

Defendants dispute standing arguing that Xinuos cannot show antitrust injury. This is odd as "competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999). Defendants do not dispute that Xinuos is a competitor in the market. Compl. ¶ 36.

---

[2]    Throughout their brief, Defendants make much of the fact that their merger was not blocked by federal regulators. This is irrelevant. Most of the conduct alleged – both pre- and post-merger – has nothing to do with Defendants' merger. Even for the conduct that does, the fact the merger was not blocked does not indicate approval or mean Defendants are immunized from enforcement of the antitrust laws. Rather, regulatory decisions reflect many things beyond the merits including differences in administration policies and priorities. Notably, after IBM merged with Red Hat, a new U.S. presidential administration came into office and promptly issued an executive order emphasizing heightened scrutiny of technology mergers, given the proven ability of technology "platforms," such as Defendants' OSs, to "use their power to exclude market entrants" and "to extract monopoly profits." Executive Order on Promoting Competition in the American Economy (July 9, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy. Since then, federal regulators have targeted consolidation and exclusionary practices in the technology industries.

In any event, an antitrust plaintiff alleges antitrust injury if it alleges "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016). Standing is shown if plaintiff plausibly alleges its injury stems from "a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 777 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

Xinuos did exactly that. The Complaint alleges that Xinuos' injury – its lost opportunities in the market – stem from Defendants' successful efforts to foreclose competitors from accessing consumers. "[M]arket foreclosure is the kind of injury to competition that the antitrust laws were designed to prevent." *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 452 (S.D.N.Y. 2014); *accord Conrac Corp. v. Am. Tel. & Tel. Co.*, 546 F. Supp. 429, 431 (S.D.N.Y. 1982) (allegation that defendants "foreclose the market for its products" sufficient for antitrust injury).

The Complaint alleges that Defendants refused to compete with one another and channeled consumers towards each other and away from rivals. Compl. ¶¶ 90-92, 109, 110. Xinuos alleges Defendants built impediments to switching to rivals into the ecosystem itself. *Id.* at ¶¶ 118-125 (discussing Defendants' self-preferenced integration, exclusionary construction of the IBM Cloud, and exclusionary practices with software developers and hardware manufacturers). Xinuos also alleges Defendants made false and disparaging statements about rivals to consumers. *Id.* ¶¶ 118-32. Xinuos plausibly alleges that these acts foreclosed competition and destroyed the market by preventing new entrants and existing OS rivals from accessing consumers. *See id.* ¶¶ 154-70.

Courts in this and other circuits have held that building in technology to lock in consumers and lock out rivals is antitrust injury. *See e.g.*, *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 111 (2d Cir. 1989) (holding "antitrust injury" where plaintiff alleges that "[defendant] would be likely to eliminate competition in that market"); *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp.

2d 140, 148 (S.D.N.Y. 2006) (holding antitrust injury "by alleging that defendants' conduct has caused, *inter alia*, a decrease in the quality, price, and output" of product); *Reddy v. Puma*, No. 06-CV-1283, 2006 WL 2711535, at *5 (E.D.N.Y. Sept. 21, 2006) (holding interest of plaintiff-competitor did not diverge from consumers where "primary alleged antitrust injury" was a "decrease in the provision of" product). Courts in this and other Circuits have held that publication and dissemination of false or misleading information regarding a rival product is an antitrust injury. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 59-60 (S.D.N.Y. 2016) ("it should go without saying that most antitrust conspiracies involve misrepresentations, if not outright falsehoods") (citing, *inter alia*, *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916-17 (2d Cir. 1988) (publication of false letter as viable to support an antitrust claim)).

**B.      Xinuos Alleges a Plausible Section 2 Claim.**

Section 2 of the Sherman Act makes it unlawful to acquire or maintain a monopoly through exclusionary conduct. *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir. 1997) (citing 15 U.S.C. § 2). Liability requires "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power." *Id.* (cleaned up).

**1.      *Xinuos Adequately Alleges Monopoly Power in the Market.***

The best evidence of monopoly power is in the actions of market participants and the prices and options available. *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002) ("The core element of a monopolization claim is market power, which is defined as 'the ability to raise price by restricting output.'"); *Hamilton Chapter of Alpha Delta Phi v. Hamilton Coll.*, 128 F.3d 59, 67 (2d Cir. 1997) ("[Defendant] can restrict output and raise prices without losing any students. That is precisely the vice of a monopoly."). This can be in the form of direct evidence of market power or anticompetitive effects. *Paramount Media Group*, 929 F.3d 914, 922 (7th Cir. 2019); *Re/Max Int'l*, 173 F.3d at 1016.

9

Xinuos alleges both.  Xinuos alleged Defendants' abnormally high price-cost margin and ability to restrict output.  For example, Defendants expect anywhere between $3 and $8 in revenue for every dollar spent on applications, middleware, or services.  Compl. ¶ 131.  Xinuos alleges that IBM announced "'increases in purchase prices' up to 39% for the AIX" OS.  *Id*. ¶ 165.  Xinuos alleges Defendants, post-merger, "dramatically increased prices across the board . . . by removing prior volume discounts on support and services fees" and *increased* "service and maintenance fees by around 10%, meaning that every year customers now need to pay approximately 20% of the list price."  *Id*. ¶ 167.  Xinuos alleges that despite raising prices, Defendants have been able to create and retain their monopoly and forestall competition and eliminate price pressure.  *Id*. ¶¶ 154-70.

Courts in this District have held that such allegations are sufficient on a motion to dismiss.  *See e.g.*, *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, at *35 (S.D.N.Y. Sept. 30, 2020) (holding sufficient the allegation that "Defendants, knowing that the market for certificated cotton supply was congested, continued to acquire dominant long positions, insisted upon record ratios of deliveries, depleted certificated cotton, and refused to retender; all allowing them to dictate prices of cotton").[3]

Likewise, monopoly power "may also be inferred from the structure and composition of the relevant market."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  Thus, a plaintiff can plead market power through direct evidence that the defendant can control prices or exclude competitors from the market, or through indirect evidence, such as market share.  *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016); *see also US Airways, Inc. v. Sabre Holdings Corp*, No. 11-CV-2725, 2022 WL 874945, at *9 (S.D.N.Y. Mar. 24, 2022) ("distinction between

---

[3]    Xinuos alleges not just price increases but price increases that resulted from restricted output and other anticompetitive actions to forestall downward price pressure.  Compl. ¶¶ 154-70.

direct and indirect evidence is unimportant" if the evidence "identified combined with evidence of [Defendants'] market share … could support a jury's finding [of] monopoly power").

The Complaint more than adequately alleges through direct and circumstantial evidence that the Defendants possess monopoly power. *See supra* Section II.B. Xinuos alleges a plausible relevant market in paid server UNIX/Linux OSs. Compl. ¶¶ 36-41. This market is based on product features and limitations, and validated by market participants and outcomes. *Id.* ¶ 36.

Defendants' contrary arguments go to the merits not the plausibility of Xinuos' allegations. Factual disputes about the proper boundaries of market are not appropriate on a motion to dismiss. *See e.g.*, *Int'l Audiotext*, 893 F. Supp. at 1214 (market definition is "a question of fact which can be determined only after a factual inquiry into the commercial realities faced by consumers"); *Todd*, 275 F.3d 191 at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

Likewise, contrary to Defendants' assertion, Xinuos details real-world conditions from developer and consumer perspectives that the UNIX/Linux paid server OSs defines a discrete market of interchangeable products, distinct from other architectures. Compl. ¶¶ 36–41. The Complaint also details why free[4] OSs are outside that market: because corporate users require paid services, support, and adjacent software to maintain reliable environments. *Id.* ¶ 37. The Supreme Court made just these points in holding that market boundaries "may be determined by examining practical indicia such as industry or public recognition" of the market "as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co.*

---

[4]    Defendants riff on the word "free" in "FreeBSD" to suggest that open-source code cannot be paid. Mot. at 3, 5. This is wrong. OpenServer 10 based on open-source FreeBSD is a paradigmatic "paid" server OS that competes only with other paid OSs like Defendants'.

*v. U.S.*, 370 U.S. 294, 325 (1962); *accord Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 466 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.").[5]

Finally, Xinuos alleges that Defendants possess "a dominant share" in the market and that they use "entry barriers" to lock out rivals. *Kaufman*, 836 F.3d at 143. Xinuos alleges that IBM controls most of the large and lucrative accounts while Red Hat has a supermajority of low-end installs. *Id*. ¶¶105, 107, 108. Xinuos also alleges that high barriers to market entry – some erected by Defendants – protected Defendants' dominance: high costs to build, scale to obtain hardware and application development support, and consumer lock-in. *Id*. ¶¶ 138-49. This is more than sufficient to establish plausibility at the pleading stage. *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*, 845 F.2d 404, 409 (2d Cir. 1988) (market share of above 55% "along with other market characteristics" sufficient to support a monopolization claim).

### 2.   *Xinuos Alleges that Defendants Acquired and Maintain Their Monopoly Power Through Exclusionary Activities.*

Plaintiff must plead that "acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct." *Broadcom*, 501 F.3d at 308. Evidence of intent is not required, but such evidence can be relevant to prove anticompetitive effects.

Importantly, in antitrust cases, "the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc.*, 324 F.3d at 162.[6] Thus,

---

[5]   Defendants' argument that the term "enterprise" is necessarily limited to high-end customers mistakes allegations in the Complaint. Compl. ¶¶ 83–96.

[6]   *See also Cont'l Ore. Co. v. Union Carbide*, 370 U.S. 690, 699 (1962) (In a Sections 1 and 2 case, courts "look at the whole picture and not merely at the individual figures in it."); *City of Anaheim v. So. Cal. Edison*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."); Areeda & Hovenkamp, Antitrust Law ¶ 301 (2021) ("In a monopolization case, conduct must always be analyzed 'as a whole.'").

Defendants cannot slice and dice Xinuos' allegations to defeat its claim.  *See FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (2022) (complaint stated a claim by alleging course of conduct that included "anticompetitive acquisitions" and "anticompetitive conditional dealing practices."); *see also Radio Music License Committee, Inc. v. SESAC, Inc.*, 29 F. Supp. 3d 487, 495-502 (E.D. Pa. 2014) (refusing to dismiss monopolization claim that was "based on [a] confluence" of practices).

As pleaded, Defendants have pursued a multi-part attack on competition in the market, and this conduct "impairs the opportunities of rivals" and "does not further competition on the merits." *Broadcom*, 501 F.3d at 308.  As alleged, Defendants entered into an agreement to not compete against each other, steer customers towards each other and away from rivals, share business and technical  information, and build impediments to switching into the ecosystem to foreclose rivals. Compl.  ¶¶ 89-125.[7]  The  Complaint  details  resultant foreclosure of rivals from the consumer base to the benefit of IBM and Red Hat.  *Id.*  As alleged, Defendants also took concerted steps to discredit market rivals, forestall their product innovation, and dilute their product value. *Id*.¶¶ 111-30.[8]  The Complaint details how these bad acts foreclose rivals from access to potential customers by ensuring that their products both appear to be less useful and built constraints into the ecosystem. *Id.*  Such  an  attack  on  competition  is  actionable.  *See e.g.*, *LePage's*, 324 F.3d at 162

---

[7]   Defendants shared marketing and consumer data and refrained from competing with one another, Red Hat gave IBM access to its largest accounts, and IBM gives Red Hat preferential treatment even at its own products' expense. Compl. ¶¶ 90-93, 109, 110.  IBM paid customers $3,000 to learn how to use RHEL applications and $10,000 rebates to purchase RHEL-packaged IBM servers instead of servers packaged with its own AIX operating system.  *Id*. ¶¶ 94-103.

[8]   Defendants' representations about and exclusion of the architectural core of OpenServer 10—FreeBSD—have harmed development for OpenServer 10, and Defendants provided each other technical advantages, all to the exclusion of others.  *Id.* ¶¶ 111-32.  Defendants have targeted specific rivals, including Xinuos and others UNIX- and Linux-based operating systems, to hinder their business opportunities.  *Id.* ¶¶ 124, 125, 110, 111.

(anticompetitive conduct based on exclusive dealing arrangements and bundled rebate programs which "reinforced the exclusionary effect" of the exclusive dealings).

As alleged, the combined effect of all this is that Defendants can effectively wall-off rivals from access to both consumers, and hardware and application developers.  Compl. ¶¶ 135, 154-58. Without such access, there can be no competition.  *Id.*  Courts have repeatedly held such allegations are cognizable under the Sherman Act.  *See e.g., Am. Tel. & Tel. Co. v. N. Am. Indus., Inc.*, 772 F. Supp. 777, 785 (S.D.N.Y. 1991) (defendants' conduct "debilitating to small companies seeking to compete" and "creates a significant barrier to entry"); *Fido's Fences*, 999 F. Supp. 2d at 451-52 (defendants' conduct "erected barriers to entry and stifled competition . . . allowing defendants to charge exorbitant markups and preventing competitors from selling lower priced alternatives").

### C.    Xinuos Alleges a Plausible Section 1 Claim.

In their motion, Defendants argue their *pre*-merger conduct had no anticompetitive effect and their *post*-merger conduct is insulated from antitrust scrutiny by *Copperweld*.  Mot. at 13-19. As shown below, the Complaint plausibly alleges competitive harm.  And, as discussed above, *Copperweld* does not insulate Defendants from the antitrust laws post-merger, but those actions are not part of Xinuos' Section 1 claim – they are actionable under Section 2.

#### 1.    *Xinuos Alleges the Anticompetitive Nature of Defendants' Restraint of Trade.*

Section 1 prohibits "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce." 15 U.S.C. §§ 1, 3. "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (cleaned up). Accordingly, such cases are rarely appropriate for dismissal on the pleadings.  *See e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001).

14

To support a claim under Section 1, a plaintiff need only show that the challenged action had "actual or probable" competitive harm in a relevant market.  *See e.g., Chicago Board of Trade*, 246 U.S. at 238.  "Examples of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing."  *United States v. Am. Express Co.,* 838 F.3d 179, 194 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 201 L. Ed. 2d 678, 138 S. Ct. 2274 (2018).  In *Meyer v. Kalanick*, 174 F. Supp. 3d 817 (S.D.N.Y. 2016), for example, the complaint was upheld as sufficiently pleaded alleging that the defendant's "actions have further restrained competition by decreasing output," that defendant's "market position has already helped force [plaintiff] out of the marketplace," and that defendant's "dominant position and considerable name recognition has also made it difficult for potential competitors to enter the marketplace."  *Id.* at 828.

Importantly, this is not a situation, as Defendants suggest, where Defendants developed a "new" product together.  Mot. at 14-15.  Rather Xinuos alleges Defendants – competing businesses – preference each other (one of their rivals) and at the expense of other rivals, and consumers.

## a.   IBM and Red Hat Enter into Agreements to Not Compete and Thwart Rivals.

The Supreme Court held that a market division agreement is per se anticompetitive – *i.e.* "anticompetitive regardless of whether the parties split the market within which both do business or whether they merely reserve one market for one and another for the other."  *Palmer v. BRG of Ga.*, 498 U.S. 46, 49-50 (1990).

As alleged, IBM and Red Hat entered into a "multiyear alliance" to preference each other and took other anticompetitive actions designed to restrict competition in a market.  Compl. ¶¶ 90-130.  Xinuos pleads express statements regarding these explicitly anticompetitive agreements.  *Id.* ¶¶ 90-117.  The Complaint alleges that there is no economic or business explanation for entering into these agreements and pursuing these acts except to foreclose competitors.  *Id*. ¶¶ 91, 110.

The Complaint plausibly alleges an anticompetitive agreement between the Defendants, but it also expressly alleges supporting facts, such as the basis for IBM and Red Hat to enter into their pernicious agreements. *See e.g.*, Compl. ¶¶ 5, 91-94, 103, 112, 154, 168. This is not a case involving "conscious parallelism" where parties act independently. Mot. at 12. Quite the contrary, Xinuos pleaded specific facts expressly demonstrating communications, affirmative agreement, and joint actions between Defendants. Compl. ¶¶ 90-96, 104-117. Before the agreement, it was acknowledged that Defendants had "been competing with [each other] all the time"—revealing, contrary to their assertions, that they would otherwise be rivals with respect to *all* customers, both high-end and low-end. *Id.* ¶ 93. After the agreement, IBM *paid* customers to take the competing Red Hat OS instead of its own, *id.* ¶¶ 95, 96, and they jointly pushed IBM's OSs in the high-end of the market where Red Hat provided access to its "large accounts," *id.* ¶¶ 106, 107, and IBM pushed Red Hat's OS as the "option for SMBs" (small- and medium-sized businesses), *id.* ¶ 108.

In other words, Xinuos pleaded facts that show that there should have been and previously was rigorous competition, but now there is "shar[ing] leads and jointly approach[ing] customers," jointly promoting each other's competing products, and dividing customers between themselves. *Id*. ¶ 91. This is most unusual, and there is no innocent explanation for it. *See also United States v. Apple, Inc.*, 791 F.3d 290, 317-18 (2d Cir. 2015) ("Antitrust law has never required identical *motives* among conspirators when their independent reasons for joining together lead to collusive action … [T]he fact that [one defendant]'s conduct was in its own economic interest in no way undermines the inference that it entered an agreement to raise [product] prices.") (citation omitted).

Further, Xinuos pleads facts showing Defendants' motives to enter into the agreement, *id.* ¶¶ 90–117, and that their acts are against their own interest as competitors, *id.* ¶¶ 110–113. These are the features of an unlawful horizontal agreement. *See PharmacyChecker.com, LLC v. Nat'l*

*Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 334-37 (S.D.N.Y. 2021).  But evidence of motive is not necessary because the courts have held that competitors jointly approaching customers by itself is sufficient to infer anticompetitive motive as "[a]ntitrust law is rightly skeptical of mechanisms that permit competitors jointly to set [] terms of dealing." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 477 (7th Cir. 2020) (citation omitted).

> **b.      Defendants' Agreements to Restrain Trade Cause Substantial Harm to Competition in the Market**.

Xinuos' allegations include, for example, horizontal agreements to divide the market, tying arrangements, exclusionary conduct, and a group boycott involving concerted refusals to deal with a competitor.  *See Cont'l Orthopedic*, 40 F. Supp. 2d at 116.  The Complaint plausibly alleges that IBM's and Red Hat's anticompetitive conduct has harmed competition by foreclosing rivals, resulting in stunted innovation, higher prices, and few choices for consumers.  For example, Xinuos alleges IBM prioritized Red Hat's competing OS (at the expense of its own products) by, among other things, facilitating their interoperability with IBM's cloud, while preventing other OSs from running.  Compl. ¶¶ 120-130.

Under the case law, even a single competitor with market power intentionally introducing incompatibilities with rival products can be anticompetitive and actionable under the antitrust laws. *United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001) (holding Microsoft dealings with developers were anticompetitive as it "served to protect its monopoly of the operating system in a manner not attributable either to the superiority of the operating system or to the acumen of its makers").  The violation is even more acute when horizontal competitors wield technical power to exclude rivals, as in this case.  *See e.g., TruePosition, Inc. v. LM Ericsson Tel. Co.*, 2012 WL 3584626, at *4-24 (E.D. Pa. Aug. 21, 2012) (violation of Section 1 sufficiently pleaded where, as

here, rival telecommunications companies advanced support for a chosen location technology from which they would mutually benefit to the exclusion of other rivals).

Worse still, here Defendants have carried out their joint exclusionary activities, in part, by using stolen Xinuos code to allow applications to run between their competing operating systems to establish and cement their market allocation scheme.  Compl. ¶¶ 62-70, 171-74.  Contrary to Defendants' contentions, Mot. at 18, that competitive harm is *specifically* alleged.  Infringement of intellectual property rights is not "pro-competitive" by definition.  And courts recognize that leveraging intellectual property infringement can form the basis for a Section 1 claim.  *See e.g.*, *La Preferida, Inc. v. La Victoria Foods, Inc.*, No. 77-CV-3926, 1978 WL 1402, at *4 (N.D. Ill. Aug. 2, 1978) ("defendants misappropriated and then used" intellectual property "to prevent [] introduction of a competing line" in furtherance of "a conspiracy to unreasonably restrain trade").  Defendants' cases do not deal with horizontal competitors leveraging a rival's intellectual property to exclude that rival, but unremarkably state that infringement alone is not an antitrust violation.[9]

### 2.    *Xinuos Also Pleads That Defendants' Restraint of Trade Violates The Rule of Reason As Well.*

"Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'"  *Am. Express Co.*, 138 S. Ct. at 2284.  Under the "rule of reason," a plaintiff must ultimately show that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market," meaning "the plaintiff must allege a relevant geographic and product market in which

---

[9]    As discussed, Defendants misstate Xinuos' claim as a single-firm "refusal to deal."  Plainly, Xinuos pleaded a Section 1 claim based on Defendants' actions as horizontal competitors to restrain trade <u>before they merged</u>.  Other cases cited by Defendants are inapposite for this reason. For example, *Charych v. Siriusware, Inc.*, 790 F. App'x 299 (2d Cir. 2019), involved a single firm refusal to deal and, also, vertical relationships and not competitors as alleged here.  *See id.* at 302.

trade was unreasonably restrained or monopolized." *Cont'l Orthopedic*, 40 F. Supp. 2d at 117 (citation omitted).

"The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Am. Express Co.*, 138 S. Ct. at 2284. (cleaned up).  Therefore, it is rarely appropriate on a motion to dismiss.  *See e.g.*, *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012) ("[T]he question is whether there are sufficient factual allegations to make the complaint's claim plausible … [O]n a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives.").

Above, Xinuos has explained how the Complaint alleges that Defendants have obtained and preserve their power in the market by pursuing a two-part attack on competition and how this attack includes agreements to not compete head-to-head and to steer customers towards each other and away from everyone else.  *Supra* Sections IV.B & IV.C.1.  Taking those allegations as true, Defendants cannot prompt dismissal of Xinuos' Section 1 claims by pointing to the rule of reason.

**D.      Xinuos Alleges a Plausible Section 7 Claim.**

Section 7 is violated where a merger "substantially lessen[s]" competition.  15 U.S.C. § 18. Defendants challenge Xinuos' claim by pointing out that the merger was not blocked by regulators and asserting that Xinuos fails to allege anticompetitive effects caused by the merger as opposed to their other unlawful activity.  Mot. at 25-28.

*First*, the fact that the government did not block this merger at the time is not relevant here. Government action or inaction is a result of numerous factors beyond the merits of a legal claim. And the lack of government challenge is not equivalent to approval.  Consummated mergers can and have been successfully challenged as agreements in restraint of trade by private parties even when the government did not block the merger.  Indeed, in *Steves and Sons Inc. v. JELD-WEN*

*Inc.*, the Fourth Circuit recently held that a divestiture order can be an appropriate remedy in a private party lawsuit even after a completed transaction that was not blocked by regulators. 988 F.3d 690, 703, 720-24 (4th Cir. 2021). Xinuos, therefore, is not without a remedy just because the merger between the Defendants has already gone through.

*Second*, Xinuos has pleaded that the merger itself was anticompetitive and facilitates post-merger exclusion strategies. Defendants ignore well-pled allegations that IBM and Red Hat were able to extract even higher prices for their software and services *post-merger* than before. "Since the merger, IBM has ... dramatically increased prices across the board on over five-thousand of its on-premise server software products," and this change impacts "millions of existing IBM customers." Compl. ¶ 167. Indeed, since the merger, Defendants now price services at up to 800% of the costs of production. *Id*. ¶ 131. Xinuos pleaded these price changes would not have occurred without the merger. *See id*. ¶¶ 166, 167. Xinuos also alleges specific post-merger anticompetitive conduct and that there is less product innovation due to the merger. The post-merger exclusion by Defendants of OpenServer 10 (based on FreeBSD) from IBM's cloud denies consumers the high level of stability, reliability, superior network performance, excellent I/O and memory management, ease of upgrade and maintenance, and compact kernel architecture that this OS affords. *Id*. ¶ 132. And while the market power going into the merger is based on the prior agreements, the facts alleged demonstrate that the whole point of the merger is the distinct anticompetitive conduct of extending the Defendants' joint market power into adjacent "applications," "middleware," and "services" markets to the exclusion of rivals. *Id*. ¶¶ 131, 128. More generally, the Complaint notes that IBM's capital expenditures have declined by 25% since the merger and that $1 billion of such expenditures has been eliminated in the last year. *Id*. ¶ 168.

Defendants have also entrenched their control over the market and the unfair benefits they incurred through their merger, making it harder for rivals to build competitive products. *Id.* ¶ 169.

Xinuos' pleading is more than sufficient in this regard. Defendants point to decisions that are inapposite. *Gok v. Roman Cath. Chuch*, No. 20-CV-4968, 2021 WL 1726650 (E.D. Pa. Apr. 30, 2021), is an employment dispute. *Id.* at *6. The Section 7 claim in *Dehoog v. Inbev*, No. 15-CV-2250, 2016 WL 5853733 (D. Or. July 22, 2016), was dismissed because the Complaint itself "contradicted [] that the proposed acquisition" increased the defendants' market power. *Id.* at *3. And, the quote cited from *Intel Corp. v. Fortress Investment Group LLC*, No. 19-CV-7651, 2020 WL 6390499 (N.D. Cal. July 15, 2020), is from movant's brief not the court's holding. *Id.* at *18.

Defendants cite to other cases that only reinforce Xinuos' position. In *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), the Supreme Court held that DuPont violated Section 7 by acquiring "a sizable block of General Motors stock" "to pry open the General Motors market to entrench itself as the primary supplier of General Motors' requirements." *Id.* at 599, 606. The Court so ruled because the acquisition placed DuPont in the "commanding position as General Motors' supplier of automotive finishes and fabrics" on a non-competition basis, and the "acquisition of [] stock, and the consequent intercompany relationship, led to the insulation of most of General Motors' market from free competition." *Id.* at 588-89. Xinuos alleges the same here—IBM agreed with Red Hat to monopolize the market and insulate themselves from competition.

Finally, as discussed above, Defendants are simply wrong on what *Copperweld* means. The merger does not insulate pre- or post-merger conduct from antitrust scrutiny.

E.    **Xinuos Alleges a Plausible Virgin Islands Antimonopoly Law Claim.**

Defendants argue Xinuos' statutory local law claim should be dismissed because the Virgin Islands Antimonopoly Law is the same as federal antitrust statutes. Mot. at 35. But this not correct because 11 V.I.C. § 1518, on which Defendants' argument is based, is no longer controlling:

21

> § 1518 was enacted in 1973 … prior to the existence of the Superior Court or its forerunner, the Territorial Court, and moreover, prior to the directive that the Superior Court is no longer bound by federal precedent, [thus] federal precedent constructing provisions of federal antitrust law that are similar to provisions of the Virgin Islands Antimonopoly Act is merely persuasive authority . . .

*Yearwood Enters., Inc. v. Antilles Gas Corp.*, No. 17-CV-0077, 2017 WL 2709831, at *3 (V.I. Super. Ct. June 21, 2017) (internal citations omitted).

Moreover, Xinuos alleged that Defendants combined to unreasonably restrain trade by foreclosing rivals from access to customers and the levers of growth and by aggrandizing each other for no valid procompetitive purpose.  Compl. ¶¶ 90-130.  This is precisely the type of restraint that Section 1503(2) seeks to address, whether or not the same conduct is actionable under federal law.  *See Island Airlines LLC v. Bohlke*, No. 16-CV-0404, 2020 WL 8019119, at *7-8 (V.I. Super. Ct. Sept. 16, 2020) (Antimonopoly Law claim upheld where defendants conspired "to exclude Eagle Aviation from selling jet fuel in the St. Croix market" and exclude competition generally).

**F.      Xinuos Alleges Plausible Common Law Claims.**

**1.      *Common-Law Unfair Competition***

Defendants again assert that Xinuos' claim depends entirely on its federal antitrust claims.  Their sole case for this, *Gardiner v. St. Croix District Governing B. of Directors*, No. 12-CV-0084, 2019 WL 3814427 (V.I. Super. Ct. July 30, 2019), suggests nothing of the sort.  *Gardiner* dismissed a *statutory* claim for unfair competition on immunity grounds and has no relevance here.  *Id.* at *7.

The Virgin Islands Supreme Court has not identified the elements of a common-law unfair competition claim.  In *Banks v. International Rental & Leasing Corp.*, 55 V.I. 967 (2011), that Court set forth the standard to determine the elements of a claim that it had not yet articulated.  *Id.* at 974–80.  Under a *Banks* analysis, the courts must "determine which common law rule to adopt" by looking at the decisions of prior Virgin Islands courts; the position taken by a majority of courts

22

from other jurisdictions; and which approach represents the soundest rule for the Virgin Islands. *Simon v. Joseph*, 59 V.I. 611, 623 (Sept. 11, 2013).  Defendants simply ignore that standard.

This Court must conduct a *Banks* analysis to "determine which common law rule to adopt" here.  Most courts in other jurisdictions adopt two different approaches:  the first approach treats common law unfair competition claims as a subspecies of trademark law that must arise out of an advertising or similar context, while the  second  approach embraces a far broader and not strictly defined set of unfair competitive activities.  While no Virgin Islands court has adopted a rule, at least one has articulated a preference for the broader approach.  In *Bell v. Radcliffe*, 2015 WL 5773561, at *7 (V.I. Super. Ct. Apr. 30, 2015), the court noted that "[a]dopting a broad definition [of a common law claim] will allow Virgin Islands courts to develop their own body of law." Likewise, Virgin Islands courts and the legislature itself have expressed the need for robust and flexible enforcement to secure fair competition, which favors the broader approach.  *See, e.g.*, *Donastorg v. Daily News Publ'g Co., Inc.*, 63 V.I. 196, 286–88 (2015) (emphasizing "the important objective of distinguishing legitimate competition from unlawful activity" in the common law, and the related objective that "the law should not incentivize unlawful behavior"); Antimonopoly Law (advancing a strong local policy in favor of aggressive defense of competition). Xinuos found no contrary decisions.  Under the *Banks* analysis, this Court should adopt the broader approach to common-law unfair competition claims under which Xinuos' claim plainly survives.

### 2.    *Common-Law Unjust Enrichment*

Defendants' sole theory to dismiss the unjust-enrichment claim is that it seeks an equitable remedy that is not available where a legal remedy is.  But Xinuos raises this claim *in the alternative* to its legal claims.  *G-I Holdings v. Baron & Budd*, 238 F. Supp. 2d 521, 535 (S.D.N.Y. 2002) (recognizing that a well-pleaded equitable claim in the alternative should not be dismissed at the pleading stage if the parties disagree as to whether the pleading presents a legal claim).  Defendants

cite *Cacciamani & Rover Corp. v. Banco Popular De Puerto Rico*, 61 V.I. 247 (2014), but that decision does not contradict this principle.  *See id.* at 252.

> The V.I. Supreme Court has articulated the elements of common-law unjust enrichment:
>
> > (1) that the defendant was enriched, (2) that such enrichment was at the plaintiff's expense, (3) that the defendant had appreciation or knowledge of the benefit, and (4) that the circumstances were such that in equity or good conscience the defendant should return the money or property to the plaintiff.

*Walters v. Walters*, 60 V.I. 768 (2014).

Xinuos alleged each element.  Because of their unlawful acts, Defendants were enriched through higher revenue and profits.  Compl. ¶¶ 5, 81, 131, 157.  That enrichment was at the expense of rivals because Defendants' acts foreclosed Xinuos, and others, from access to consumers and developers.  *Id*. ¶¶ 90–130.  And, Defendants were aware of the wrongful acts taken, yet nonetheless continued to pursue them.  *Id*. ¶ 117.  The equities do not favor Defendants keeping the unjust gains.

## V.      CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.  If the Court concludes Xinuos has failed to plead any of the challenged claims in the Complaint, it can replead.

Dated:  February 17, 2023

/s/ *Gabriel M. Ramsey*
Gabriel M. Ramsey

Gabriel M. Ramsey*
   gramsey@crowell.com
Warrington S. Parker*
   wparker@crowell.com
Molly A. Jones
   mojones@crowell.com
Joachim B. Steinberg
   jsteinberg@crowell.com
Jacob S. Canter*
   jcanter@crowell.com
Ryan Merker
   rmerker@crowell.com

24

Maria Sokova*
    msokova@crowell.com
Kimberly S. Mejía-Cuéllar*
    kmejiacuellar@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: 415-986-2800

Mark A. Klapow
    mklapow@crowell.com
Kyle N. Pham*
    kpham@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Telephone: 202-624-2500

(*Admitted pro hac vice)

Attorneys for Plaintiff Xinuos, Inc.

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on this 17th day of February, 2023, I caused the foregoing document to be served via electronic mail on the following parties:


Stefan B. Herpel
sherpel@dnfvi.com
**DUDLEY NEWMAN FEUERZEIG LLP**
1131 King Street
Ste 204
St. Croix, VI 00820
(340) 773-3200

David R Marriott
dmarriott@cravath.com
Emma Kolesar
ekolesar@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
(212) 474-1000




_____*/s/ Kaman Chow*_____
Kaman Chow