# EXHIBIT RR

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
XINUOS, INC.,                                            :
                                                         :
              Plaintiff,                               :   CASE NO. 7:22-cv-09777-CS
                                                         :
      -against-                                        :
                                                         :
INTERNATIONAL BUSINESS MACHINES                          :
CORPORATION and RED HAT, INC.,                           :
                                                         :
              Defendants.                              :
                                                         :
---------------------------------------------------------- x

**DECLARATION OF SEAN SNYDER**

I, Sean Snyder, declare:

1. I am the CEO of Xinuos, Inc. ("Xinuos"), a role that I have held since 2013. I make this declaration in support of Xinuos' Opposition to Defendants' Motion for Partial Summary Judgment. Except as otherwise stated, I base this declaration on facts within my personal knowledge and, if called upon to do so, could and would testify competently to these facts.

2. Xinuos develops, maintains and licenses UNIX-based server operating systems. Xinuos owns the copyrights to the source code for the OpenServer 5 operating system, the post-95 source code for the UnixWare operating system, and much of the source code of the OpenServer 6 operating system, as it is a combination of both previously mention systems.

3. On or about September 19, 1995, SCO entered into an asset purchase agreement with Novell relating to the UNIX business, products and source code that Novell had purchased from AT&T or which Novell had otherwise developed (the "Novell Agreement").  SCO believed that it obtained the copyrights that Novell had purchased from AT&T and which Novell had

1

otherwise created prior to the date of the September 19, 1995, through the Novell Agreement.

4. It is my understanding that after September 19, 1995, SCO devoted a great deal of effort to bug fixing the code in order to stabilize the UnixWare 2 operating system and make it commercially viable. Additionally, SCO continued to develop UnixWare 2, adding improvements and functionality, and contributing significant code from OpenServer 5, which led to the UnixWare 7 operating system.

5. IBM and Xinuos' predecessor, SCO, entered into a joint venture called Project Monterey. The purpose of Project Monterey was to develop a completely new operating system for the upcoming IA-64 architecture of the Itanium family of 64-bit Intel microprocessors, that would allow applications originally created for 32-bit architectures to continue to function, and to include modern features for complex enterprise applications. This included "cross-architecture" functionality which makes it much easier for enterprise users to transition software applications from 32-bit environments to higher-powered 64-bit environments. Through Project Monterey, IBM gained confidential access to the SCO's copyrighted code.

6. IBM withdrew from Project Monterey in 2001 before it completed work on the IA-64 product. Under the Joint Development Agreement ("JDA") which governed the project, the code SCO shared with IBM was supposed to be used solely for development of IA-64, the 64-bit operating system, and the ultimate goal was for the IA-64 product to reach a general availability release.

7. A general availability release is a term commonly used in the software industry to refer to the marketing phase in the software release life cycle when all commercialization activities pertaining to the software product have been completed and the product is available for purchase. IBM did not put IA-64 on its price lists, did not charge anyone for its purchase, did not

offer any support to customers, and did not otherwise market the product in the United States or internationally. As a CEO with experience running a server operating systems technology company, IBM's conduct indicates to me that IBM had not completed a "general availability release."

8. Also, the IA-64 product IBM released, named AIX 5L, was of little use because it did not have a compiler. A compiler is a program that turns human-readable code into machine readable code, or zeros and ones. It is what converts a software application, written by a developer, into code that can then be interpreted by the server. However, compilation makes the code platform-dependent since compiled code results in a machine-readable but also machine-specific executable file that only will only run on the operating system for which it was compiled. In the real world this means that an application compiled for a windows machine will not run on a Mac nor vice-a-versa. Therefore, without a compiler specifically written to compile code for an operating system, the operating system will not have any applications that can run on it and is therefore of little value.

9. In or around 2007, SCO filed for bankruptcy. In or around 2009 and subsequently in 2011, SCO decided to sell via auction its assets. It is my understanding as Xinuos' CEO that UnXis, Inc. (which later changed its name to Xinuos) was interested in bidding, and did bid, on the SCO assets, which included SCO's full intellectual property portfolio and operating business. At auction, Xinuos submitted a bid for $600,000 and demonstrated its willingness and ability to continue to operate the UnixWare business. I understand, having reviewed documents from that time, that Xinuos' bid was the highest bid for the assets, and accordingly, the Trustee chose Xinuos to be the purchaser of SCO's assets.

10. The scope and terms of the asset sale were set forth in the January 19, 2011 Asset

Purchase Agreement by and between The SCO Group, Inc., SCO Operations, Inc., and Xinuos (the "APA"). Xinuos also entered into a separate Intellectual Property Rights Assignment that formally assigned all exclusive rights under the Copyright Act related to the assets purchased to Xinuos.

11. The background against which the Trustee and Xinuos negotiated the APA is important to understanding its material terms, and to understanding the parties' intent in drafting and agreeing to those terms. When the parties negotiated and ultimately signed the APA, the jury verdict and judgment had been entered in litigation between SCO and Novell, but SCO had not yet exhausted its appeal of the issues in that case, namely, whether SCO had acquired the pre-September 19, 1995 copyrights from Novell. The Tenth Circuit did not fully resolve that question until August 2011, after the parties executed the APA. In addition, at that time, SCO had pending litigation against IBM in the United States District Court for the District of Utah.

12. In my capacity as CEO and through my review of SCO documents Xinuos obtained under the APA, I understand that it was extremely important for the Trustee and for the SCO estate to preserve its ability to pursue its pending litigation against Novell, in addition to its pending litigation against IBM, Red Hat, and SUSE relating to the pre-1995 code and intellectual property it obtained from Novell. I also understand that the Trustee had an obligation to the SCO creditors to continue to pursue litigations that may result in a recovery that could satisfy the creditors. However, because SCO had sold to Xinuos all right, title, and interest in its entire intellectual property portfolio and its entire operating business, there was no possibility that SCO would have been able to continue to operate as a business. Accordingly, I refer to the post-APA shell entity as "TSG." TSG also did not have the ability to grant any licenses, since Xinuos had acquired the entire interest in SCO's intellectual property.

13. The parties drafted the APA in order to ensure that TSG could continue to pursue then-existing claims related to SCO's prior ownership of the code it had acquired from Novell. In all other respects, the parties intended that Xinuos would stand entirely in the shoes of SCO for the purposes of running the server operating system business and controlling all of SCO's other intellectual property, including the right to defend the acquired copyrights for future acts of infringement if necessary.

14. The parties' intent is reflected in how the assets were identified. The intent of drafting these provisions was to ensure that SCO could continue to pursue its various legal actions regarding the pre-September 19, 1995 code and copyrights, and to otherwise to transfer all other business, operating assets and intellectual property to Xinuos. The assets sold to Xinuos through the APA do not include the pre-September 19, 1995 code and copyrights that SCO needed to pursue its disputes against Novell, IBM, Red Hat, and SUSE. Consistent with the parties' understanding at the time of entering the APA, TSG would only retain the assets needed to pursue its then-pending litigation claims.

15. And this is also why the APA expressly states that the assets acquired by Xinuos include all copyrights developed after 1995. This was specifically included in the agreement because the intent of the parties was for Xinuos to completely take over the server operating system business. Xinuos received complete ownership of the post-1995 copyrights, including all rights under the Copyright Act, and including all rights to assert those copyrights. Xinuos understood that TSG did not retain ownership of any of the exclusive rights relating to the post-1995 code and copyrights.

16. This was done because the parties did not want to risk another legal battle like the one between Novell and SCO. The Novell dispute arose because the parties could not agree on

what was actually transferred in that APA. The parties drafted the APA to ensure that no such similar dispute would arise.

17. Finally, it must be stressed that a lot was at stake with this asset sale, and with SCO's fall into bankruptcy. SCO was very successful throughout most of its history, and by the time of the bankruptcy, it had server operating system customers around the globe. Many of these customers, in fact, were large governmental, business, and educational institutions. If these SCO customers could not receive server operating system support, their ongoing operations would be hampered. The parties understood that this could have dire consequences for the global economy.

18. Accordingly, a motivating factor in drafting the APA was to make sure that Xinuos could fully and completely take over SCO's business so that it could provide support for SCO's then-existing customers. This was reinforced on several occasions during the bankruptcy court hearing to approve the APA. It was Xinuos' intent and understanding that in order to carry the business forward, it would need to own all intellectual property and commercial and legal rights in the business assets that it had acquired, including the right to control the post-1995 copyrights, as well as the right to vindicate Xinuos' competitive interests in and relating to the acquired business and products, going forward.

19. I took over as Xinuos' CEO approximately 18 months after Xinuos acquired SCO's business and intellectual property. There was no point as CEO in which I believed that Xinuos did not have the right to sue infringers of Xinuos' copyrights. In fact, my ability to carry out a business licensing the UnixWare operating system depended on my ability to do so. In addition, although I was aware that the bankruptcy Trustee, through TSG, was continuing to pursue its claims against IBM, TSG was not doing so for Xinuos' benefit. Rather, it was clear to me that the Trustee was attempting to recover whatever it could from the defunct SCO's old

6

claims to satisfy creditors. At no point did anyone at Xinuos grant TSG permission or authority to assert any claims on Xinuos' behalf, nor could they, since Xinuos owned the copyrights outright.

20. IBM does not have a license to incorporate any of Xinuos' copyrighted code in its products or to use Xinuos' copyrights for any other purpose. IBM has never paid Xinuos any licensing fees or royalties, and, based on my understanding of the SCO business that Xinuos acquired and continues to operate, I am not aware that IBM ever paid SCO any licensing fees or royalties.

21. Today, Xinuos continues to develop the SCO OpenServer 5, SCO OpenServer 6, and UnixWare 7 operating systems and licenses those products to Xinuos' customers around the world. For example, a number of large enterprises, including retailers, technology services companies, banks, and financial services firms, as well as small and medium sized businesses, rely on Xinuos server operating systems for their corporate computing needs (e.g., inventory, human resources, billing, and many other applications).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 17th day of February, 2023, in St. Thomas, U.S. Virgin Islands.



_____
Sean Snyder