**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
XINUOS, INC.,                                          :
                                                       :
                          Plaintiff,                   :        CASE NO. 7:22-cv-09777-CS
                                                       :
             -against-                                 :
                                                       :
INTERNATIONAL BUSINESS MACHINES                        :
CORPORATION and RED HAT, INC.,                         :
                                                       :
                          Defendants.                  :
                                                       :
------------------------------------------------------------ x
```

**PLAINTIFF XINUOS, INC.'S RESPONSES TO DEFENDANTS' CIVIL LOCAL RULE 56.1
STATEMENT OF FACTS; AND
XINUOS' ADDITIONAL STATEMENT OF FACTS IN SUPPORT OF ITS OPPOSITION
<u>TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## CITATION CONVENTIONS

**Parties**

| | |
|---|---|
| "Plaintiff", "Xinuos": | Xinuos, Inc. |
| "IBM": | International Business Machines Corporation |
| "Red Hat": | Red Hat, Inc. |
| "Defendants": | International Business Machines Corporation and Red Hat, Inc. |

**Agreements**

| | |
|---|---|
| "JDA": | October 23, 1998 Joint Development Agreement between Santa Cruz and IBM |
| "APA": | January 19, 2011 Asset Purchase Agreement between SCO and UnXis, Inc. |

**Prior Litigations and Related Parties**

| | |
|---|---|
| "Santa Cruz": | The Santa Cruz Operation, Inc. |
| "SCO": | The SCO Group, Inc. (formerly Caldera Systems, Inc.) |
| "Caldera" | Caldera Systems, Inc. (before d/b/a The SCO Group) |
| "Novell": | Novell, Inc. |
| "SUSE": | SUSE Linux GmbH |
| "Utah Litigation": | *The SCO Group, Inc. v. International Business Machines Corporation*, No. 2:03-cv-00294 (D. Utah) |
| "Novell Litigation": | *The SCO Group, Inc. v. Novell, Inc.*, No. 2:04-cv-00139 (D. Utah) |
| "Bankruptcy Proceeding": | *In re SCO Group, Inc., et al.*, 7-bk-11337-BLS (D. Del. Bank. Sept. 28, 2007) |

## I.      The Parties to the Instant Litigation

1.      IBM is a corporation organized and existing under the laws of the State of New York that, among other things, creates operating system software for servers. (Compl. ¶¶ 3, 14, 23.) IBM sells the Unix-based server operating system called AIX for Power, among other products. (Compl. ¶ 14.)

> **Response:** Xinuos does not dispute this Statement of Fact.

2.      Xinuos is a corporation organized and existing under the laws of the U.S. Virgin Islands. (Compl. ¶ 22.) Xinuos (then named UnXis, Inc.) was formed in 2009 (Ex. 1 ¶ 3), and claims to have acquired certain Unix-based operating systems, UnixWare and OpenServer, from SCO in 2011 (*see* ECF No. 42-7 at 1; Compl. ¶ 12; Ex. 3 at Sched. 2.1(a)).

> **Response:** Xinuos does not dispute that it was formed in 2009; however, Xinuos objects to IBM's Exhibit 1 as incomplete. Xinuos disputes the remainder of this Statement of Fact because it fails to include relevant information and is therefore misleading. As reflected in the documents IBM cites, in 2011, Xinuos in fact acquired from The TSG Group, Inc. ("SCO") all right, title and interest in the UnixWare and OpenServer products through the Asset Purchase Agreement ("APA"). (Ex. 3[1] at Sched. 2.1(a); *see infra* Xinuos' Additional Statement of Facts, §§ XI-XIII.)

## II.     Project Monterey

3.      Project Monterey was a joint development project between IBM and The Santa Cruz Operation, Inc. ("Santa Cruz"). (Ex. 4; Ex. 5 at 4-5.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. In addition to IBM and Santa Cruz, Project Monterey also included Sequent and Intel. (Ex. F) Moreover, to support this fact, IBM has relied on an incomplete copy of the SCO Statement of Reconciled and Disputed Facts as to IBM's Motion for Summary Judgment on

---

[1] Exhibits 1-54 refer to exhibits attached to the Declaration of Emma Kolesar in Support of Defendants' Motion for Partial Summary Judgment, and Exhibits A-TT refer to exhibits attached to the Declaration of Molly A. Jones in Support of Xinuos Inc.'s Opposition to Defendants' Motion for Partial Summary Judgment.

SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), which is not evidence. (*Compare* Ex. B *to* Ex. 5.)[2]

Also, the Joint Development Agreement ("JDA") reflects only the initial written agreement between IBM and SCO with respect to Project Monterey. IBM and SCO also entered into supplements and amendments to the JDA, each of which also reflect the understanding of the parties. (*See* Exs. C, D.) Other documents, including agreements that IBM sought from SCO, but which SCO rejected, are also material to the parties' understanding and agreements with respect to Project Monterey. (*See* Ex. E; *see infra* Xinuos' Additional Statements of Fact, § III.)

4.      Project Monterey was governed by a joint development agreement (the "JDA"), which IBM and Santa Cruz entered into on October 23, 1998. (Ex. 4.)

**Response:** Xinuos disputes this Statement of Fact because it is inaccurate. As reflected in IBM's exhibit, the parties signed the JDA on October 26, 1998. (Ex. 4 at 37.) The JDA's effective date was October 23, 1998. (Ex. C at 1.).)

Also, the Joint Development Agreement ("JDA") reflects only the initial written agreement between IBM and SCO with respect to Project Monterey. IBM and SCO also entered into supplements and amendments to the JDA, each of which also reflect the understanding of the parties. (*See* Exs. C, D.) Other documents, including agreements that IBM sought from SCO, but which SCO rejected, are also material to the parties' understanding and agreements with respect to Project Monterey. (*See* Ex. E; *see infra* Xinuos' Additional Statements of Fact, § III.)

5.      The purpose of Project Monterey was to develop and market a "family" of UNIX-like operating system products, including (i) a "Monterey/64" version for the then-forthcoming IA-64 Intel processor, (ii) a version to run on IBM's proprietary "Power" processor architecture and (iii) a version to run on the IA-32 architecture. (Ex. 6 at 2; Ex. 4; Ex. 11 at 15-16.)

**Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. The parties to Project Monterey intended to develop a UNIX operating system for Intel's IA-64 processor using IBM's AIX operating system capabilities complemented with technology from

---

[2] Xinuos refers to Exhibit E as probative of the fact that the evidence discussed therein exists. However, Xinuos has not seen much of the underlying evidence, which SCO filed under seal in the Utah Litigation. IBM's reliance on Exhibit E in full view and with knowledge of the source materials for the statements therein highlights the inherent inequity of information and undue prejudice to Xinuos in opposing IBM's motion. Xinuos requests an opportunity to conduct discovery concerning the matters discussed in Exhibit E.

4

SCO's UnixWare and Sequent's PTX operating systems. The project also contemplated that IBM would allow SCO to incorporate aspects of IBM's AIX technology in SCO's UnixWare product and promote the offering in the UNIX IA-32 market, resulting in a single UNIX operating system product line that runs on IA-32, IA-64, and IBM microprocessors in computers which range from entry-level to large enterprise servers. (*See* Ex. F); *see infra* Xinuos' Additional Statements of Fact, § III.)

Xinuos also disputes IBM's reliance on Exhibit 6 to support this fact, which is a nonpublic document that Xinuos had no access to prior to IBM's filing. (*See infra* Xinuos' Additional Statement of Facts, § XVII.)

6.      The IA-64 architecture had not been commercialized when Project Monterey began but was under development in a separate collaboration between Intel and Hewlett-Packard. (Ex. 7 at 3.)

**Response:** Xinuos does not dispute this Statement of Fact.

7.      Under the JDA, both Santa Cruz and IBM agreed to provide resources and technology to create a compatible family of products, and each expressly granted the other a license to use code supplied during the project. (Ex. 4 at §§ 2.0(c)(2), 2.0(d)(2).)

**Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. The parties signed Supplement B to the JDA on February 19, 1999. It provides that any license between the parties would *only* be tied to the development of a IA-64 Product. (Ex. C at p. 1 of Project Suppl. B.) Specifically, Supplement B "defines the joint development efforts between IBM and SCO in the creation of Release 1 of the IA-64 Product." (*Id*.) It states in Section 4 that "[t]he Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product." (*Id*.) Supplement B also states that "[i]n the event of termination of the [JDA] or Supplement B," the parties may only "continue to use the Licensed Materials detailed in Attachments 3 and 4 for the development of the IA-64 Product Release 1." (*Id*.) It also states that to the extent any additional materials are added to the Licensed Materials beyond what is listed in Attachments 3 and 4, those additions "will be made via amendments to this Project Supplement." (*Id*.) Supplement B states that Attachment 4 includes the "Licensed SCO Materials." (*Id*.; *see also id*. at p. 4 of Project Suppl. B, Attach. 4 to Project Supp. B.) Attachment 4 specifically identifies the licensed materials in Section 1, those materials that would *not* be licensed in Section 2, and the restrictions on sublicensing in Section 3. (*Id.* at Attach. 4 to Project Supp. B.) After February 19, 1999, there were no additional supplements to the JDA. However, IBM sought to include a Supplement C to the JDA to be able

to use the Licensed SCO Materials in IBM's other products which were not under development in Project Monterey. (Ex. E.) SCO never signed IBM's draft Supplement C. (*Id.*) No other amendment or agreement allowed IBM to use any SCO code for any product outside of Project Monterey. (Ex. D; *see infra* Xinuos' Additional Statement of Facts, § III).

8.    IBM and Santa Cruz also agreed to an accrual date (the date of any alleged breach) and a limitations period (two years) for all claims "related to" a breach of the JDA. Specifically, Section 22.3 of the JDA provided:

> This Agreement shall be governed by, and the legal relations between the parties hereto shall be determined in accordance with, the substantive laws of the State of New York, without regard to the conflict of law principles of such State, as if this Agreement was executed and fully performed within the State of New York. Each party hereby waives any right to a trail [sic] by jury in any dispute arising under or in connection with this Agreement, and agrees that any dispute hereunder shall be tried by a judge without a jury. ***Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York.***

(Ex. 4 § 22.3 (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact because it is false and misleading. As reflected in the quote IBM includes, section 22.3 does not govern "any alleged breach," but rather, only actual breaches that relate to the JDA. (*See* Ex. 4 at § 22.3; *see also* Xinuos' Additional Statement of Facts, § III.) Further, the parties did not agree to an "accrual date," which is a legal term of art not defined or otherwise referenced in the agreement. *Id.*

9.    The JDA also stated that in the event Project Monterey was terminated, "licenses and sublicenses to end users granted by either party prior to the effective date of termination are irrevocable and shall survive the termination or expiration of this Agreement". (Ex. 4 § 15.4(b).) Thus, any rights afforded to IBM during Project Monterey for use of UnixWare source code would not be extinguished following termination of the project or the JDA. (*Id.*)

> **Response:** Xinuos disputes this Statement of Fact because it is false and misleading. IBM was not an "end user" of any licenses of sublicenses related to source code accessed through Project Monterey.
>
> Additionally, any alleged IBM license would *only* have applied to the development of an IA-64 product or in the event of a "general availability release" of a functional

6

IA-64 product. Supplement B to the JDA states that "[t]he Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product" and that "[i]n the event of termination of the [JDA] or Supplement B," the parties may only "continue to use the Licensed Materials detailed in Attachments 3 and 4 for the development of the IA-64 Product Release 1." (Ex. C at p. 1 of Project Suppl. B.) Attachment 4 to Supplement B states that the "Licensed Material" includes "UnixWare." (*Id.* at Attach. 4 to Project Suppl. B.) Instead, any rights that IBM had to "UnixWare" source code was "solely for development of the IA-64 Product." (Ex. C at Attach. 4 to Project Suppl. B.) Thus, IBM's contention that "any rights afforded to IBM during Project Monterey for use of UnixWare source code would not be extinguished following termination of the project or the JDA" (IBM's Statement of Fact ¶ 9) is false. There was never a usable, general availability released IA-64 product, and accordingly, there is no evidence that IBM even attempted to license or sublicense UnixWare to any end users. IBM would not have been an end user in any case.

10.    As Santa Cruz and IBM intended from the outset, IBM incorporated the Monterey

Code into IBM products. (Ex. 5 at 12; Ex. 8 ¶ 16.)

> **Response:** Xinuos disputes this Statement of Fact because the term "Monterey Code" is vague and misleading. Xinuos also disputes this Statement of Fact because the term "IBM products" is vague and misleading, particularly within the context of this case.
>
> Xinuos also disputes this Statement of Fact because it is false and misleading. IBM's permitted use of Santa Cruz's code was expressly limited to the joint development of an IA-64 product, as Supplement B to the JDA states that "[t]he Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product" and that "[i]n the event of termination of the [JDA] or Supplement B," the parties may only "continue to use the Licensed Materials detailed in Attachments 3 and 4 for the development of the IA-64 Product Release 1." (Ex. C at p. 1 of Project Suppl. B.) Attachment 4 to Supplement B states that the "Licensed Material" includes UnixWare, Gemini, and additional materials. (*Id.* at 19-21.) Thus, if the term "Monterey Code" refers to the Licensed Materials identified in Attachment 4 to Supplement B, then this statement is false because the "IA-64 Product Release 1" was not an IBM product, but a product that was intended to be jointly developed by IBM and SCO. (*See supra* Response to Statement of Fact ¶ 5.) If the term "Monterey Code" refers to something else, then it is also false because SCO never granted IBM a right to incorporate other code into any IBM products or jointly-developed products. (*See* Ex. C at p. 1 of Project Suppl. B.)
>
> Xinuos also disputes this Statement of Fact because it misstates IBM's Exhibit 5. Page 12 to Exhibit 5 includes paragraphs 49-55 from the SCO Statement of Reconciled and Disputed Facts as to IBM's Motion for Summary Judgment on SCO's Unfair Competition Claim (SCO's Sixth Cause of Action), filed in the Utah Litigation. None of these paragraphs state that SCO "intended from the outset" for

IBM to incorporate "Monterey Code" into "IBM products." Instead, the paragraphs only reflect that IBM did in fact incorporate SCO's System V release 4 ("SVr4") code into two IBM products: (1) a beta-testing version of AIX for Power, which could be used on an IA-64 architecture, that was "not intended for general production use"; and (2) a version of AIX for Power, which could be used on an IA-64 architecture, that was released in May 2001. (*Id*. ¶¶ 49-55.) However, IBM's statement is misleading because IBM does not mention that the May 2001 release of AIX for Power did not include a compiler and thus was not usable or subject to a general availability release. (*See* Ex. B at ¶¶ 64-65; Snyder Decl., Ex. RR ¶¶ 6-8.) These additional facts are reflected in the full version of the SCO Statement of Reconciled and Disputed Facts, which IBM did not include as part of its Exhibit 5. (*See* Ex. B; *see infra*, Xinuos' Additional Statement of Facts, § IV.)[3]

In any event, paragraph 16 in Exhibit 8 is entirely consistent with Xinuos' contention that IBM obtained permission to incorporate SVr4 code into a non-development version of AIX for Power *only if* the parties completed a general availability release of the jointly developed IA-64 product; this never occurred. (*See* Ex. C at p. 1 of Project Suppl. B; Ex. RR ¶¶ 6-8; *see also* Xinuos' Additional Statement of Facts, §§ III-IV.) At the very least, the fact is disputed, as the Tenth Circuit has stated "a reasonable jury could find that this PRPQ version was not a generally available release of the product and thus did not entitle IBM to a royalty-free license to the SVr4 code included therein." *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1072 (10th Cir. 2018); *id.* at 1072 n.4 ("On summary judgment we adopt the version of the facts most favorable to SCO, which suggests that IBM's May 4, 2001 [beta test release] of the Monterey product was not equivalent to a generally available release.").

11.    Santa Cruz was aware that IBM used the code as early as August 2000 (Ex. 8 ¶ 16),

and in any event no later than May 2001, when IBM's AIX 5L 5.0 for Power 5.1 was released and

IBM and Santa Cruz jointly announced that the software incorporated Santa Cruz's technology

(Ex. 9 at 14; Ex. 10).

       **Response:** Xinuos disputes this Statement of Fact as misleading because it misstates paragraph 16 of Exhibit 8, which at best shows that Mr. McCrabb was aware in August 2000 that IBM used SCO code, not that SCO was aware of any copyright infringement or that IBM was using SCO code outside the scope of Project Monterey. (*See* Ex. 8 at ¶ 16.)

---

[3] Xinuos also objects to this Statement of Fact because it includes reference to Exhibit 8, which appears to be a nonpublic excerpted declaration that Xinuos searched for but could not find and was not aware of until IBM filed its Motion for Summary Judgment and accompanying documents. IBM produced the full document only when requested by Xinuos' counsel. (*See* Ex. EE.)

Xinuos also disputes this Statement of Fact because it fails to include all relevant information and is therefore misleading. To the extent anyone at SCO had any knowledge of IBM's use of its code in August 2000, SCO only knew that IBM was using the code in the developmental versions of AIX for Power which were "not intended for general production use," consistent with the purpose of Project Monterey. (*See* Ex. 5 at ¶¶ 50-51) Furthermore, the version of AIX for Power which IBM released in May 2001 did not include a compiler and thus was not available for general use by consumers in the public. (*See* Ex. B at ¶¶ 64-65) Amendment 5 to the JDA reflects that IBM had no right to use any SCO code for any reason prior a "general availability release" of the IA-64 product. (*See* Ex. DD at 1710013964.) The JDA provided IBM "limited third party access" to SCO code before the product was generally available to the public for the limited purpose of "facilitating timely market availability." (*Id.*) Thus, this Statement of Fact is misleading because it does not state that IBM failed to do any of the things necessary to complete a "general availability release" of the IA-64 product in May 2001. (*See infra* Xinuos' Additional Statement of Facts, § IV.) At the very least, the fact is disputed, as the Tenth Circuit has stated "a reasonable jury could find that this PRPQ version was not a generally available release of the product and thus did not entitle IBM to a royalty-free license to the SVr4 code included therein." *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1072 (10th Cir. 2018); *id.* at 1072 n.4 ("On summary judgment we adopt the version of the facts most favorable to SCO, which suggests that IBM's May 4, 2001 [beta test release] of the Monterey product was not equivalent to a generally available release.").

Xinuos also disputes this Statement of Fact because it is inaccurate. SCO and IBM did not jointly announce the release of a version of AIX for Power in May 2001. IBM, not SCO, announced and released AIX for Power, as is reflected in IBM's exhibits. (*See* Ex. 9 at 14; Ex. 10.)[4]

12.    Ultimately, Intel's IA-64 processor (Itanium) was delayed and did not end up shipping until mid-2001. (Ex. 7 at 3.)

**Response:** Xinuos does not dispute this Statement of Fact; however, it is not material. (*See* Xinuos' Additional Statements of Fact, § IV.)

13.    Once the Intel processor did arrive, it performed poorly and Intel and HP re-positioned Itanium as primarily an evaluation and development platform. (Ex. 11 at 21.)

**Response:** Xinuos disputes this Statement of Fact because the term "performed poorly" is undefined and it is unclear whether IBM refers to technical performance

---

[4] Exhibit 9 contains excerpts from a heavily-redacted "public" version of a memorandum of law, which SCO filed in December 2006 in the Utah Litigation. (Ex. 9.) Xinuos objects to Exhibit 9 on the basis that Xinuos is unduly prejudiced by IBM's unilateral access to and withholding of certain nonpublic information relevant to Xinuos' claims.

(and, if so, how it technically performed poorly) or performance in the market (and, if so, how it performed poorly in the market).

14.     There was a substantial decrease in market interest and confidence in IA-64 and thus the Monterey/64 product under development in Project Monterey. (*Id.*; Ex. 12.)

>   **Response:** Xinuos disputes this Statement of Fact because the phrases "substantial decrease" and "market interest and confidence" are undefined and it is unclear what type of market effect and the degree of market effect that IBM refers to here.

15.     In 2000, Santa Cruz announced that it was selling its Server Software and Professional Services divisions and its UNIX-related assets to Caldera Systems, Inc. (Ex. 13.)

>   **Response:** Xinuos does not dispute this Statement of Fact.

16.     As a result, IBM exercised its right to terminate the project on June 19, 2001, notifying Santa Cruz that it would not continue with Project Monterey. (Ex. 14.)

>   **Response:** Xinuos does not dispute that IBM terminated Project Monterey on June 19, 2001. Xinuos disputes the remainder of this Statement of Fact as inaccurate and misleading because the evidence shows that IBM terminated Project Monterey to eliminate SCO and focus on Linux development while also benefitting from the improper use of SCO's technology. (*See infra* Xinuos' Additional Statement of Facts, § IV.) Moreover, IBM does not explain why its termination occurred over a year after the asset transfer to Caldera. *Id.*

## III.     *SCO v. IBM* Litigation

17.     In March 2003, Caldera Systems, Inc. commenced litigation against IBM in the U.S. District Court for the District of Utah, alleging claims for breach of contract, copyright infringement, unfair competition, and tortious interference, among other things ("*SCO v. IBM*"). (Ex. 15 ¶¶ 104-136; Ex. 16 ¶¶ 110-214.)

>   **Response:** Xinuos disputes this Statement of Fact only to the extent it omits the procedural history of the Utah Litigation, which is set forth in detail below. (*See infra* Xinuos' Additional Statements of Fact, § V.)

18.     Shortly after filing suit against IBM, Caldera Systems, Inc. changed its name to The SCO Group, Inc. ("SCO"), suggesting (incorrectly) an affiliation with the better known The Santa

Cruz Operation Inc., which continued to exist under a different name (Tarantella, Inc.) (Ex. 16 at

1; Ex. 17.)

> **Response:** Xinuos does not dispute that Caldera Systems, Inc. changed its name to
> The SCO Group around this time. Xinuos otherwise disputes this Statement of Fact
> as false and misleading because, as reflected in IBM's own documents, there was a
> strong affiliation between Santa Cruz Operations and The SCO Group because
> Santa Cruz's "highly skilled workforce, products and channel services" moved to
> Caldera, Caldera had "exclusive distribution rights for the SCO OpenServer
> product line, and [Caldera was] fully committed to servicing and supporting the
> SCO OpenServer customer base." (Ex. 13.) Also, as reflected in IBM's own
> documents, Tarantella did not keep the UNIX-based operating system business and
> only kept its business related to "web-enabling software for network computing,"
> which is not what Santa Cruz was best known for. (Exs. 13, Ex. 17; *see infra*
> Xinuos' Additional Statement of Facts, § I.)

19.     A central part of SCO's case was its allegation that IBM misappropriated source

code given to it during Project Monterey, and incorporated that code into core components of

IBM's operating systems. (Ex. 16 ¶¶ 5, 181-88; *see also SCO Grp., Inc. v. Int'l Bus. Machs. Corp*,

879 F.3d 1062, 1079 n.15 (10th Cir. 2018).)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include
> relevant information and is therefore misleading. SCO's claims against IBM in the
> Utah Litigation related *only* to code that was developed before September 19, 1995.
> (*See infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) This is consistent
> with footnote 15 in the Tenth Circuit opinion, which IBM cites in support of this
> Statement, that "SCO specifically asserts that it only learned of IBM's improper
> use of the SVr4 code during discovery in this case, at which point its theory shifted
> to focus on the improper use of that code, rather than the Linux disclosures." *SCO
> Grp., Inc.*, 879 F.3d at 1079 n.15. This is also consistent with SCO's Second
> Amended Complaint, which does not refer to any code developed after September
> 19, 1995. (*See* Ex. 16 at ¶¶ 5, 181-88.)
>
> Xinuos also disputes this Statement of Fact because SCO had no
> "misappropriation" claim. Instead, SCO brought a claim for the "tort of unfair
> competition by means of misappropriation" under New York law. *See SCO Grp.*,
> 879 F.3d at 1068. The Tenth Circuit agreed that SCO's unfair competition claim
> was not the same as a claim for copyright infringement. (*Id*. at 1080-81; *see infra*
> Xinuos' Additional Statements of Fact, § VIII.)

20.    SCO argued that IBM had no right to use the code outside the context of Project

Monterey (Ex. 16 ¶ 88; Ex. 9 at 1-2) but did so in breach of its obligations under the JDA (Ex. 9

at 17-20).

> **Response:** Xinuos disputes this Statement of Facts because it fails to include relevant information and is therefore misleading. SCO's initial claims against IBM in the Utah Litigation related *only* to code that was developed before September 19, 1995. (*See infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) This is consistent with paragraph 88 to the Second Amended Complaint, which does not refer to any code developed after September 19, 1995. (*See* Ex. 16 at ¶ 88.)
>
> IBM cites Exhibit 9, which is a brief that IBM filed in 2006 and after SCO had obtained discovery and learned that its tort of unfair competition cause of action could also be supported by evidence of IBM's improper use of post-1995 code. (*See infra* Xinuos' Additional Statements of Fact, §§ V-VII.) IBM's Statement of Fact also lacks relevant information and is misleading because conflates code developed at different times (before and after September 19, 1995). (*See* Ex. FF.)

21.    SCO sought to pursue its Project Monterey allegations as both unfair competition,

which was asserted in its initial complaint, and copyright infringement, which SCO later sought

leave to amend its complaint to add. (Ex. 16 ¶¶ 181-88; Ex. 18 at Dkt. 322-23; Ex. 19 ¶¶ 216-241.)

IBM opposed SCO's motion to amend as untimely. (Ex. 18 at Dkt. 337.)

> **Response:** Xinuos disputes this Statement of Fact because IBM does not cite to the initial complaint filed in State court in Utah and thus has no factual basis to provide factual statements about that complaint.
>
> Xinuos further disputes this Statement of Fact as misleading because the "Project Monterey allegations" changed over time, as acknowledged by the Tenth Circuit in footnote 15, which IBM cites. *See SCO Grp.*, 879 F.3d at 1079 n.15. In particular, the unfair competition theory that SCO raised initially raised in the Second Amended Complaint related to the misuse of pre-September 19, 1995, code. (*Id.*); (*see also* Xinuos' Additional Statement of Facts, § V.) Then, after completing discovery, SCO discovered that IBM had also misused code that was developed post-1995 and chose to rely on this new information as evidence in support of its unfair competition claim. (*Id.* § VII.) At around the same time, SCO sought to file a Third Amended Complaint which included a new cause of action for copyright infringement regarding the post-1995 code, but the Court rejected SCO's request

as untimely in light of the scheduling order and the court's need to manage the docket. (*See* Ex. FF; *see infra* Xinuos' Additional Statement of Facts, § VIII.)[5]

22.  The district court allowed SCO to proceed with its unfair competition claim but

denied its motion to amend to include its copyright claim. (Ex. 18 at Dkt. 466; Ex. 16 ¶¶ 181-88.)

>  **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. IBM's opposition to the Third Amended Complaint did not relate to SCO's unfair competition claim, as that claim was filed as part of the Second Amended Complaint. (*See* Ex. 16 at ¶¶ 181-88; *see infra* Xinuos' Additional Statement of Facts, §§ V-VII.) Moreover, the district court did not deny the request to bring the copyright claim based at all on the merits of that claim, but instead based on the fact that SCO's request to amend was untimely. (*See* Ex. FF.) The Tenth Circuit confirmed that the sole basis for refusing to allow SCO to bring the copyright claim was that the Third Amended Complaint was untimely. *See SCO Grp.*, 879 F.3d at 1085-86.

23.  However, SCO incorporated its copyright allegations into its unfair competition

claim. *See SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1079 n.15 (10th Cir. 2018).

>  **Response:** Xinuos disputes this Statement of Fact because it includes false information. SCO did not incorporate copyright allegations into an unfair competition claim and the Tenth Circuit did not say SCO did this either. Instead, SCO used the fact that IBM misused the code which it had access to as evidence to support its tort of unfair competition cause of action. This is what the Tenth Circuit stated. *See SCO Grp.*, 879 F.3d at 1079 n.15. Moreover, the Tenth Circuit stated that the tort of unfair competition claim was not the same as a copyright claim. (*Id*. at 1080-81; *see infra* Xinuos' Additional Statement of Facts, § VIII.)

24.  IBM and SCO actively litigated the principal copyright issue, *i.e.*, whether IBM

stole the Monterey Code or had a license to it. (Ex. 20 at 18-21; Ex. 21 at 3.)

>  **Response:** Xinuos disputes this Statement of Fact because it includes false information. After the decision in the Novell litigation, SCO's copyright infringement claims from the Second Amended Complaint were dropped. (*See infra* Xinuos' Additional Statements of Fact, §§ V-VII.) And while SCO attempted to add a new copyright infringement claim which related to certain code developed

---

[5] SCO also objects to IBM's use of Exhibit 18. This exhibit is a print out of the Utah litigation docket and references docket nos. 323 and 327, which are sealed memoranda by SCO and IBM. While IBM has access to these documents and their contents, Xinuos has no access to these documents or their contents and thus has no way to review them as part of this litigation. This is prejudicial to Xinuos' rights to litigate on equal terms with IBM.

post-1995, the district court refused to allow SCO to amend its complaint. (*See* Ex., FF.) Thus, SCO and IBM did not actively litigate any copyright issue at all as there was no copyright claim. Rather, IBM's misuse of code which it accessed through Project Monterey was just evidence that SCO relied on in support of its tort cause of action. (*See infra* Xinuos' Additional Statement of Facts, § VII.) This tort cause of action, moreover, was not the same as a copyright claim. *See SCO Grp.*, 879 F.3d at 1080-81; *see infra* Xinuos' Additional Statement of Facts, § VIII.

Xinuos also disputes this Statement of Fact because the documents do not support it. Exhibit 20 is excerpts from the unredacted version of IBM's brief in support of a motion for summary judgment in its litigation against SCO. (*See* Ex. 20.) In this brief, IBM states that "SCO's Monterey-related allegations fundamentally allege a breach of contract," which is not the same as a copyright claim. (*See id.* at 18.) IBM states on the next page that "SCO is in fact asserting a quintessential claim for breach of contract," which again is not a copyright claim. (*See id.* at 19.) Thus, IBM admits at Exhibit 20 that SCO and IBM were not litigating a copyright issue, but a complex issue related to the commercial tort of unfair competition.

Exhibit 21 similarly confirms that IBM and SCO were litigating an "unfair competition" cause of action which related to SCO seeking to prove that "IBM engaged in a ruse to gain access to SCO's source code to effect the misappropriation," which is not an element of copyright infringement. (Ex. 21.)

25.     SCO sought hundreds of millions of dollars in damages from IBM for its unfair competition claim. (*See* Ex. 16 ¶ 186.)

> **Response:** Xinuos disputes that paragraph 186 of Exhibit 16 provides any information related to the specific amount of damages which SCO sought from IBM for the unfair competition claim, and on this basis disputes the Statement of Fact.

## IV.    SCO's Bankruptcy

26.     Meanwhile, in a related case, SCO and Novell disputed which party owned Unix and UnixWare copyrights SCO allegedly purchased from Santa Cruz. (Ex. 22 at 17.)

> **Response:** Xinuos disputes this Statement of Fact because it includes false and misleading information. As reflected in the document which IBM cites, the dispute was not whether SCO had properly acquired the pre-1995 copyrights from Santa Cruz, but rather whether Santa Cruz had properly acquired the pre-1995 copyrights from Novell. (*See* Ex. 22.) There was not a dispute about whether the transfer between Santa Cruz and SCO was valid. (*See infra* Xinuos' Additional Statement of Facts, §§ I-II, VI.) Moreover, the term "related" is vague and ambiguous, and therefore Xinuos disputes this Statement of Fact as false and misleading.

27.     Shortly after the court in the *SCO v. Novell* case decided against SCO on certain issues, SCO filed for bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware on September 14, 2007. (Ex. 22 at 40; Ex. 23.)

**Response:** Xinuos does not dispute this Statement of Fact.

28.     On September 20, 2007, *SCO v. IBM* was temporarily closed administratively as a result of the bankruptcy proceedings. (Ex. 18 at Dkt. 1081.)

**Response:** Xinuos does not dispute this Statement of Fact.

**V.     Xinuos Purchases SCO Assets**

29.     In connection with SCO's bankruptcy proceeding, SCO agreed to sell its Unix software assets to Xinuos. (Ex. 3.)

**Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. SCO did not just sell "its Unix software assets to Xinuos" but actually sold all of its business and operational assets to Xinuos except for specific "Excluded Assets." (*See* Ex. 3; Ex. QQ ¶¶ 2-6; *see* Xinuos' Additional Statement of Facts, §§ X-XIV.) Additionally, SCO's sale of its assets to Xinuos occurred after an auction and there was an "arm's length" negotiation before the asset purchase was completed. (*See* Ex. A at ¶ 8.)

30.     On January 19, 2011, SCO and Xinuos entered into an Asset Purchase Agreement ("APA"), which is governed by Delaware law. (Ex. 3 § 10.13.)

**Response:** Xinuos does not dispute this Statement of Fact.

31.     The "Sale and Purchase of Acquired Assets" provision of the APA granted Xinuos rights to certain "Acquired Assets", but expressly carved out from the transfer "Excluded Assets":

Pursuant to the Sale Order, and subject to the terms and conditions of this Agreement, Seller shall sell, transfer, assign and convey to Buyer, free and clear of any and all Encumbrances and Retained Obligations, and Buyer shall, as of the Closing Date, acquire and purchase, free and clear of any and all Encumbrances and Retained Obligations, all of Seller's right, title and interest in and to all of the assets of the Business, ***except for the Excluded Assets set forth in Schedule 2.1(c) hereof*** (the "Acquired Assets").

(Ex. 3 § 2.1(a) (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact as misleading to the extent that it implies that the Acquired Assets are cabined to "certain" limited assets from SCO when in fact SCO transferred to Xinuos all of its business and operational assets and only excludes those assets identified as the Excluded Assets. (*See* Ex. 3; Ex. QQ ¶¶ 2-6; *see* Xinuos' Additional Statement of Facts, §§ IX-XIV.)

32.     In a subsection further defining the scope of Acquired Assets, the APA clarified that the Acquired Assets do not include any rights, claims or causes of action related to Novell, Inc., International Business Machines Corporation, Red Hat, Inc. or SUSE Linux GmbH, and reinforces that Excluded Assets are "not part of the transactions contemplated hereunder":

> All rights and claims of Seller against any third parties, directly arising from or directly related to the Acquired Assets (which, for the avoidance of doubt, ***shall not include*** any rights and claims of Seller against any third parties, directly arising from or directly related to the Excluded Assets, any rights and claims by Seller against Buyer relating to this Agreement or any agreement entered into pursuant hereto, or ***any rights, claims or causes of action related to Novell, Inc., International Business Machines Corporation, Red Hat, Inc. and SUSE Linux GmbH or other similar claims).***

(Ex. 3 § 2.1(a)(vi) (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact as failing to include relevant information and as therefore misleading. At the time of the APA, SCO had pending litigation against Novell, IBM, Red Hat, and SUSE, and thus by the terms of the agreement, these carve-outs from the Acquired Assets were done solely to allow SCO (which would go by TSG after the asset sale because the SCO branding was also sold to Xinuos) to continue to pursue these litigations and for no other purposes. (*See* Ex. 3; Ex. QQ ¶¶ 2-6; *see* Xinuos' Additional Statement of Facts, §§ X-XIV.)

33.     Section 2.1(c) reinforced that Excluded Assets (which are listed in Schedule 2.1(c)) do not fall within the definition of Acquired Assets:

> Notwithstanding anything to the contrary contained in Section 2.1(a) or elsewhere in this Agreement, the assets of Seller set forth in Schedule 2.1(c) (collectively, the "Excluded Assets") are ***not part of the transactions contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of Seller after the Closing.***

(Ex. 3 § 2.1(c) (emphasis added).)

> **Response:** Xinuos does not dispute this Statement of Fact.

34.     In Schedule 2.1(c) attached to the APA, the Excluded Assets are defined as including, among other things, any causes of action, rights and remedies against IBM and Red Hat relating to claims arising from Unix or UnixWare intellectual property:

> all of Seller's claims, causes of action and other legal or equitable rights and remedies (A) against Buyer with respect to the transactions contemplated by this Agreement and **(B) relating to all rights and interests in all litigation claims pending or that may be asserted in the future, against International Business Machines Corporation, Novell, Inc., SUSE Linux GmbH or others, and (C) relating to every claim of any nature whatsoever, known or unknown that has been or may be asserted against RedHat, Inc. or others relating to or arising from all licensing, covenant not to sue rights, releases or other claims relating to any allegations that Linux violates SCO's Unix or UnixWare intellectual property, contract or other rights.**

(Ex. 3 Schedule 2.1(c)(ix) (emphasis added).) Accordingly, all claims against IBM and Red Hat were expressly carved out of the sale transaction and thus remained an asset of the bankruptcy estate. (*Id.*)

> **Response:** Xinuos disputes this Statement of Fact because it includes false information. As expressly stated in the terms of the APA, and also as was the intent of the parties to the APA, the Excluded Assets solely excluded from the asset sale those assets which the bankrupt-entity would need to continue to pursue its litigation against IBM and any other litigations that were still active. Based on the express terms of the APA and the intent of the parties, all business and operational assets were transferred to Xinuos, including any interests in the right to bring claims related to the purchased assets which accrue after the transaction has occurred. (*See* Ex. 3; Ex. QQ ¶¶ 2-6; *see* Xinuos' Additional Statement of Facts, §§ IX-XIV.)

35.     Xinuos paid $600,000 cash to obtain the Acquired Assets, which constituted almost the entirety of SCO's software business. (Ex. 3 § 3; Ex. 2 ¶ 1.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. As consideration, Xinuos promised to pay not just $600,000, but to also purchase two-year warrants to purchase outstanding Xinuos common stock and a promise to raise $4,000,000 of equity financing. (*See* Ex. 3 at § 3.)

Xinuos also disputes this Statement of Fact as false because the Acquired Assets constituted *all* of SCO's business and operational assets – including all of SCO's software and copyrights – so Defendants' assertion that the Acquired Assets included "almost the entirety of SCO's software business" is false.

36.     On March 7, 2011, the Delaware bankruptcy court approved the APA following a careful review of its terms, including what SCO was selling and retaining, and what Xinuos was receiving and paying. (Ex. 24 ¶ H.)

**Response:** Xinuos solely disputes the use of "careful" in the Statement of Facts as speculative, since the Delaware court's internal processes for reviewing the terms is its own and not for the parties to characterize one way or another. Xinuos does not otherwise dispute this Statement of Fact.

37.     The bankruptcy court found that the "terms and conditions of the Asset Purchase Agreement . . . constitute reasonably equivalent value and fair consideration for the Acquired Assets". (Ex. 24 ¶ H.)

**Response:** Xinuos does not dispute this Statement of Fact

38.     The bankruptcy court's approval of the APA was based on the understanding, expressly embodied in the APA, that SCO was retaining, and Xinuos was not receiving, the Monterey claim that SCO valued at hundreds of times what Xinuos paid under the agreement. (Ex. 24 ¶ H; *supra* ¶¶ 25, 31-35.)

**Response:** Xinuos disputes this Statement of Fact because it fails to define the scope of the "Monterey claim" and to include relevant information and is therefore misleading. The Excluded Assets to the APA do include the unfair competition claim that was first alleged by SCO in the Second Amended Complaint and which, at the time of the APA, was still pending. However, the Excluded Assets do not include any other unenumerated claims – including copyright infringement claims that had yet to accrue – because no other claims pending at that time and SCO was transferring all of its operational and business assets to Xinuos, which included the right to bring claims that accrue to Xinuos after the APA sale had completed. (*See infra* Xinuos' Additional Statement of Facts, §§ V-XIV; Ex. QQ ¶¶ 2-6.)

39.     In an article published after the APA was executed, Xinuos specifically acknowledged and disclaimed the possibility of further litigation, stating: "[Xinuos] ***has no***

***intention to pursue any litigation related to the SCO Group assets acquired by the company*** . . .

. There is no place for litigation in our vision or plan." (Ex. 25 (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact because it misstates the underlying document, which does not provide that Xinuos has disclaimed any rights or interests and instead merely reflects the impression at that time of Xinuos' then-CEO. Xinuos also disputes this Statement of Fact because it is neither relevant nor material.

## VI.   *SCO v. IBM* **Reopens**

40.    Consistent with its reservation of rights under the APA, SCO continued to litigate its claims against IBM for nearly a decade following the APA. (Ex. 18; Ex. 26; *see also infra* ¶¶ 41-57.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. After the APA was accepted by both parties in April 2011, the litigation in Utah was not reopened until over two-years later, in June 2013. (Ex. GG.) At that point, no further discovery occurred, and IBM filed a summary judgment brief in July 2013. (Ex. HH.) There was no action in the Utah litigation for over a year, until the district court ruled on IBM's motion for summary judgment in December 2014. (Ex. N.) Additional memoranda were filed in 2015 but still no discovery occurred, and orders on those motions were filed in February 2016. (Exs. II, JJ.) The notice of appeal was filed in March 2016. (Ex. KK.) Nothing else occurred in the litigations until the Tenth Circuit ruled in January 2018, remanding to district court with instructions that the unfair competition claim should move forward to trial. (Ex. LL.) Then, despite the survival of the unfair competition claim, still nothing happened in the case at all until November 2021, when the parties suddenly settled and the case was dismissed. (Ex. MM.) Thus, the SCO-IBM litigation was not actively litigated for the entirety of the decade after the APA was signed.

41.    In November and December 2011, SCO urged the Utah district court to reopen the case (which had been administratively closed due to SCO's bankruptcy) so that it could proceed with litigating its claims that "IBM misappropriated SCO's valuable UNIX technologies in connection with . . . Project Monterey." (Ex. 27 at 3; *see also* Ex. 28 at 1.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. The sole claims that were available to SCO at this time were the unfair competition and tortious interference

claims that were raised in the Second Amended Complaint. This Statement is misleading because it conflates the copyright infringement claim from the Third Amended Complaint, which was never addressed on the merits, with the tort claim from the Second Amended Complaint. (*See infra* Xinuos' Additional Statement of Facts, §§ V-VII.)

42.     The *SCO v. IBM* case was reopened in June 2013. (Ex. 18 at Dkt. 1115.)

        **Response:** Xinuos does not dispute this Statement of Fact.

43.     On July 10, 2013, the Utah district court rejected a number of SCO's claims. (Ex. 29.)

        **Response:** Xinuos does not dispute that the Utah district court's dismissed certain of SCO's claims, the details of which are stated fully herein at Xinuos' Additional Statement of Facts, § V-VII.

44.     In August 2013, SCO explained to the Utah district court that the "core allegation" of its "remaining claims" included that "[i]n connection with Project Monterey, IBM misappropriated into its AIX for Power operating system UnixWare source code that SCO provided to IBM subject to strict restrictions that IBM did not follow." (Ex. 30 at 3.)

        **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. The sole claims that were available to SCO at this time were the unfair competition and tortious interference claims that were raised in the Second Amended Complaint and the copyright infringement claim related to post-1995 code was not being litigated at this time. (*See infra* Xinuos' Additional Statements of Fact, §§ V-VII.) Moreover, the document which IBM cites to support this Statement of Fact reflects that the "remaining claims" include much more than just a theory of unfair competition that relies on evidence of the misuse of code, as the document also shows that SCO's theory was based on "IBM perpetuat[ing] this misappropriation through an elaborate ruse." (Ex. 30 at 3.)

45.     On December 15, 2014, the Utah district court entered summary judgment in favor of IBM on several of its counterclaims. (Ex. 31.)

        **Response:** Xinuos does not dispute this Statement of Fact.

46.     All that remained of SCO's case, therefore, was SCO's claim for unfair competition concerning Project Monterey, interference with a contract not at issue in *Novell*, and interference with business relationships. (Ex. 21 at 2-3.)

> **Response:** Xinuos does not dispute this Statement of Fact.

47.     In March 2015, the parties agreed in a joint status report that SCO's claim that IBM had misappropriated the Monterey Code was "ripe for adjudication". (Ex. 21 at 2-3.)

> **Response:** Xinuos disputes this Statement of Fact as false and misleading because it misstates the document upon which it relies. The document refers to the relevant claim as a claim for "unfair competition" that "concerns" Project Monterey. (Ex. 21 at 3.) Xinuos further disputes this Statement of Fact because it includes false and misleading information, as "Monterey Code" is vague and undefined, and it is unclear what IBM refers to with this term.

48.     The parties supplemented their previously-filed motions for summary judgment, and in July 2015, in relation to IBM's motion for summary judgment on SCO's misappropriation claim, SCO argued to the Utah district court that it was undisputed that "IBM obtained SCO's SVr4 code through [Project Monterey] and used it in its non-Intel AIX for Power product". (Ex. 5 at 12.)

> **Response:** Xinuos disputes this Statement of Fact because it includes false information. SCO did not have a "misappropriation claim" but rather had a claim for the "tort of unfair competition by means of misappropriation." *SCO Grp.*, 879 F.3d at 1068. As part of its factual basis for showing that IBM violated the New York unfair competition law, SCO pointed to evidence that IBM had misused the code from post-1995 which it had accessed to via Project Monterey. (*See infra* Xinuos' Additional Statement of Facts, § V-VII.)

49.     In February 2016, the Court granted summary judgment for IBM on SCO's remaining claims. (Ex. 11; Ex. 32.)

> **Response:** Xinuos does not dispute this Statement of Fact.

50.     SCO appealed to the Tenth Circuit (with IBM's consent as IBM still had pending counterclaims), challenging many of the district court's rulings including its orders (i) entering

summary judgment against SCO on its unfair competition claim concerning Project Monterey and (ii) denying leave to challenge the same conduct as copyright infringement. (Ex. 33; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062 (10th Cir. 2018).

> **Response:** Xinuos disputes this Statement of Fact as failing to include relevant information and as therefore misleading. SCO requested to appeal to the Tenth Circuit the unfair competition claim that was first brought in the Second Amended Complaint, *see SCO Grp.*, 879 F.3d at 1075-81, and also, as a separate matter, requested to appeal to the Tenth Circuit the district court's denial of the request to file the Third Amended Complaint. *See id.*, at 1085-86. The former request related to the district court's ruling on the merits of the unfair competition claim and the latter request related to the district court's threshold decision that the Third Amended Complaint should be dismissed as untimely. *Id.* at 1075-81, 1085-86.
>
> Xinuos disputes this Statement of Fact as false because there is no allegation by SCO or statement by the Tenth Circuit that that the unfair competition arises out of the "same conduct" as the copyright infringement claim. Ex. 33; *SCO Grp., Inc.*, 879 F.3d 1062. In fact, the only reference to "same conduct" in the Tenth Circuit's opinion is that "[t]he district court held that the independent tort doctrine barred SCO's claim, but in doing so the district court focused too narrowly on IBM's allegedly wrongful conduct, observing that the *same conduct* would constitute both an unfair-competition claim and a breach of the JDA." *SCO Group, Inc.*, 879 F.3d at 1076-77 (emphasis added). Thus, as the Tenth Circuit acknowledged, the copyright and unfair competition claims were distinct claims. *Id.* at 1080-81, 1086-87.

51.    In November 2016, SCO, in its reply brief on appeal, argued that "IBM exploited its relationship with SCO through Project Monterey to gain access to and misappropriate SCO's proprietary code, to displace SCO from the marketplace. As part of its plot, IBM cobbled together, in its own words, a non-working 'sham release' of Project Monterey; used SCO's UnixWare code obtained through that sham release in IBM's own AIX for Power operating system; and then released SCO's UnixWare code into the hands of open-source Linux developers." (Ex. 34 at 1.)

> **Response:** Xinuos disputes that this Statement of Fact is material or relevant because it relates to an unfair competition tort claim where the fact that IBM used the post-1995 code it had access to through Project Monterey was evidence that SCO could use in support of that claim. (*See infra* Xinuos' Additional Statement of Facts, § V-VII.)

52.     In December 2017, SCO, in response to IBM's petition for rehearing of the Tenth

Circuit's initial decision on appeal, argued that "IBM pretended to proceed with Project Monterey

to induce SCO to contribute its proprietary UNIX ('SVr4') source code to the project, whereupon

IBM took SCO's code and used it in its own AIX for Power operating system." (Ex. 35 at 1.)

> **Response:** Xinuos disputes that this Statement of Fact is material or relevant
> because it relates to an unfair competition tort claim where the fact that IBM used
> the post-1995 code it had access to through Project Monterey was evidence that
> SCO could use in support of that claim. (*See infra* Xinuos' Additional Statement of
> Facts, § V-VII.)

53.     In January 2018, the Tenth Circuit affirmed the district court's rulings in all

respects, except remanded the Project Monterey unfair competition claim for trial. *SCO Grp., Inc.*

*v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1086 (10th Cir. 2018).

> **Response:** Xinuos disputes this Statement of Fact to the extent it mischaracterizes
> the Tenth Circuit's ruling. The Tenth Circuit's ruling speaks for itself.

54.     IBM had argued that SCO's misappropriation claim was untimely under the JDA's

contractual limitations period. *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1079

(10th Cir. 2018).

> **Response:** Xinuos disputes this Statement of Fact because it includes false
> information. SCO did not have a "misappropriation claim," but rather it had a tort
> claim under New York law for unfair competition. *See SCO Grp.*, 879 F.3d at 1068.
> Also, Xinuos disputes this Statement of Fact because it is not material or relevant.

55.     SCO had argued that the two-year limitations period should not apply to its claim

because it was not a breach of contract claim. *Id.*

> **Response:** Xinuos disputes this Statement of Fact because it includes false
> information. SCO did not have a "misappropriation claim," but rather it had a tort
> claim under New York law for unfair competition. *See SCO Grp.*, 879 F.3d at 1068.
> Also, Xinuos disputes this Statement of Fact because it is not material or relevant.

56.     The Tenth Circuit rejected SCO's argument, holding that "[e]ven as a separate tort

action, ***there is no question that SCO's misappropriation claim is 'related to' a breach of the***

***JDA because the JDA expressly deals with the use of SCO's licensed materials***", and applied the

JDA's two-year limitations period. *Id.* (emphasis added).

> **Response:** Xinuos disputes this Statement of Fact because it is not material or
> relevant.

57.    In February 2018, the parties informed the Utah district court that SCO's remaining

unfair competition claim, which the Tenth Circuit held presented a fact question, "concern[ed] the

Project Monterey relationship" and that SCO had alleged that "IBM misappropriated . . . source

code that SCO provided to IBM subject to strict restrictions that IBM ignored". (Ex. 36 at 2-3.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include
> relevant information and is therefore misleading. And according to the Tenth
> Circuit, the specific "fact question" presented was whether "a reasonable jury could
> find here that regardless of whether IBM performed to the letter of the JDA, IBM
> nonetheless misappropriated SCO's labor, skills, expenditures or good will through
> fraud or deception." (*Id.* at 1078.) With this language, too, the Tenth Circuit further
> clarified that referring to this cause of action as the misappropriation theory of
> unfair competition was never meant to suggest or indicate that SCO could only
> succeed on the cause of action if the bad faith actions necessarily related to the use
> of code from Project Monterey as opposed to other sorts of misappropriating acts.
> (*See infra* Xinuos' Additional Statements of Fact, § V-VII.)

58.    In September 2018 and April 2019, the trustee of SCO's bankruptcy estate advised

the bankruptcy court that SCO's "unfair competition claim, which presented a fact question

requiring trial in light of the Tenth Circuit's opinion", remained pending before the Utah district

court. (Ex. 37 at ¶¶ 9-11; Ex. 38 at ¶¶ 9-11.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this
> Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement
> of Facts, §§ X-XV.)

59.    During the continued course of *SCO v. IBM*, the case garnered the attention of the

media, which reported on the case generally and SCO's Monterey claim in particular. (*See* Exs.

39-43.)

> **Response:** Xinuos disputes this fact as false and misleading, as the phrase "SCO's
> Monterey claim" is vague and undefined and it is unclear what IBM refers to with

this term. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

60.     For example: In 2013, Groklaw published an article regarding the effect of the *SCO v. Novell* decision on SCO's claims in *SCO v. IBM*. (Ex. 39.) The article noted that the court had "ordered SCO to file a list of which of its claims, if any, it believes survived SCO's massive loss to Novell". (*Id.*)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

61.     In 2016, LinkedIn published an article commenting on *SCO v. IBM*. (Ex. 40.) The article discussed Project Monterey and SCO's business. (*Id.*)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

62.     In 2016, Tech Insider published a detailed timeline regarding "Project Monterey." (Ex. 41.) The timeline listed events such as Santa Cruz and IBM entering into the JDA, the "align[ment]" of AIX and UnixWare, and the termination of Project Monterey. (*Id.*)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

63.     On October 30, 2017, Ars Technica published an article regarding the SCO v. IBM appellate proceedings titled "Appeals court keeps alive the never-ending Linux case, *SCO v. IBM*". (Ex. 42.) The article reported that the Tenth Circuit "partially ruled in favor of the SCO Group", which "argued that IBM essentially stole, or misappropriated, its proprietary code". (*Id.* at 2-3.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

64. On November 2, 2017, Computing published an article regarding the SCO v. IBM appellate proceedings titled "SCO versus IBM (and Linux) springs back to life after court ruling". (Ex. 43.) The article reported that the Tenth Circuit "sent the case back for [SCO] to try again" on its misappropriation claim. (*Id.* at 2.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

65. Xinuos never raised any objection to SCO's continued assertion of its Project Monterey claim against IBM. (Ex. 18.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material, relevant, or inconsistent with any of Xinuos' rights or claims in this litigation. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

66. Xinuos did not object when the Utah litigation re-opened. (*Id.*) Xinuos did not object when SCO and IBM supplemented their briefing on IBM's motion for summary judgment relating to Project Monterey. (*Id.*) Xinuos did not object when SCO argued on appeal that it should have been able to assert its claim for copyright infringement relating to Project Monterey. (Ex. 26.) Xinuos did not object when SCO and IBM publicly prepared for trial as to whether IBM stole the code it used as part of Project Monterey Code or obtained a license to it from Santa Cruz—the very thing Xinuos puts at issue here. (Ex. 18.)

> **Response:** Xinuos disputes this Statement of Fact as false because whether IBM obtained a license to certain code *is not* "the very thing Xinuos puts at issue here" – rather, IBM has raised this in briefing (notably, not an answer or in its defenses because IBM has not served any). Indeed, Xinuos' position is that the terms of the JDA are clear, and IBM failed to obtain any continuing license under that agreement that survived termination and, regardless, such a license would only be for the IA-64 product, which are not the accused products in this case. (Ex. C at p. 1 of Project Suppl. B.) Xinuos further disputes this Statement of Fact because it includes false and misleading information, as "Monterey Code" is vague and undefined and it is unclear what IBM refers to with this term.

Xinuos further disputes that this Statement of Fact is material, relevant, or inconsistent with any of Xinuos' rights or claims in this litigation. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

67.    Xinuos said nothing about having any rights relating to Project Monterey until *after* the Tenth Circuit ruled that the Utah district court properly precluded SCO from asserting its copyright infringement claim as untimely. (ECF No. 42-7.)

**Response:** Xinuos disputes this Statement of Fact as misleading because the use of the term "untimely" is vague and unclear in this context. The Tenth Circuit found the claim was untimely in light of the scheduling order and the need for the court to manage its docket. *SCO Grp.*, 879 F.3d at 1085-86. Xinuos disputes this Statement of Fact is material, relevant, or inconsistent with any of Xinuos' rights or claims in this litigation. (*See infra* Xinuos' Additional Statement of Facts, §§ X-XV.)

**VII.    The Instant Litigation**

68.    On March 26, 2019, Xinuos sent a letter to IBM accusing it of "unauthorized uses of [Xinuos's] copyrighted code in IBM's AIX and Linux-based operating system products, and [] unauthorized contribution of Xinuos' copyrighted code to both the Red Hat Linux and SUSE Linux operating systems." (ECF No. 42-7.)

**Response:** Xinuos does not dispute this Statement of Fact.

69.    Just over two years later, on March 31, 2021, Xinuos filed its Complaint in this action, asserting claims for copyright infringement and unfair competition. (ECF No. 1.)

**Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. Between March 26, 2019, and March 31, 2021, Xinuos contacted IBM in an effort to resolve the dispute, but IBM refused to cooperate. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

70.    Xinuos's March 26, 2019 letter and Complaint make plain that it seeks hundreds of millions of dollars in damages from Defendants. (ECF No. 42-7; Compl. ¶¶ 81, 175-229.)

**Response:** Xinuos disputes that the documents upon which IBM relies to support this Statement of Fact provides any basis for IBM to determine with specificity the amount of recovery Xinuos seeks in this litigation.

71.     Xinuos's claims in this litigation concern precisely the same underlying facts as SCO's unfair competition claim in the *SCO v. IBM* litigation. (Compl. ¶¶ 55-73; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1071-73 (10th Cir. 2018).)

> **Response:** Xinuos disputes this Statement of Fact because it is false and misleading. The Tenth Circuit recognized that the unfair competition claim is not the same as a copyright claim. *See SCO Grp.*, 879 F.3d at 1080-81, 1085-86. In any event, Xinuos' claims here relate to copyright infringement claims that have accrued to Xinuos, not SCO, which no longer has any right or interest in the copyrights at issue. (*See infra* Xinuos' Additional Statement of Facts, §§ II-VIII.) Xinuos further disputes that this litigation concerns "precisely the same underlying facts," since Xinuos' claims concern copyright infringement that occurred after SCO sold all assets to Xinuos, and Xinuos' copyright infringement claims relate to post-1995 code, which was not litigated on the merits in the Utah Litigation. *See id.*; D.I., at ¶¶ 175-183.

72.     For example, Xinuos alleges, among other things, that "[t]hrough Project Monterey, IBM gained confidential access to [certain source code]", and "[d]espite not having acquired any rights in the Code, IBM used the stolen Code, and incorporated it into core components of its" AIX (and other) operating systems. (Compl. ¶¶ 56-60; 175-83.) Similarly, in *SCO v. IBM*, SCO alleged that during Project Monterey, IBM "[m]isappropriat[ed] [] source code, methods, and confidential information of [SCO]", by including SCO's UnixWare System V Release 4 ("SVr4") code in its AIX for Power product. (Ex. 16 ¶ 184; *SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1071-72, 1079 (10th Cir. 2018).)

> **Response:** Xinuos disputes this Statement of Fact because it includes false information. The Tenth Circuit recognized that the unfair competition claim is not the same as a copyright claim. *See SCO Grp.*, 879 F.3d at 1080-81, 1085-86. The facts are thus not the same. (*See infra* Xinuos' Additional Statement of Facts, §§ II-VIII.) Moreover, Xinuos further disputes that this litigation concerns "precisely the same underlying facts" and that Defendants' "examples" demonstrate this. Xinuos' claims are for copyright infringement of copyrights developed by SCO post-1995 and owned by Xinuos. *See* D.I. 1, at ¶¶ 175-183. Xinuos' reference to Project Monterey may, for example, explain how IBM obtained the infringed code and provide evidence of willfulness, but these references do not automatically link Xinuos' claims in this dispute to SCO's previous claims against IBM.

73.    Xinuos alleges that IBM infringed copyright TX 5-787-679. (Compl. ¶ 43.)

Similarly, in *SCO v. IBM*, SCO attempted to assert copyright TX-5-787-679. (Ex. 19 ¶ 220.)

>    **Response:** Xinuos disputes this Statement of Fact because it fails to include
>    relevant information and is therefore misleading. The Third Amended Complaint
>    which SCO attempted to raise in the litigation in Utah was rejected as untimely due
>    to the scheduling order and the need for the district court to manage its docket and
>    neither the district court nor the Tenth Circuit ruled in any way on the merits of that
>    claim. (*See SCO Grp.*, 879 F.3d at 1085-86; *infra* Xinuos' Additional Statement of
>    Facts, §§ V-VIII.) Moreover, there are copyrights in this dispute that were not
>    previously asserted by SCO (D.I. 1), so alleged overlap of only one copyright is not
>    material to Defendants' motion for summary judgment.

74.    Xinuos alleges that IBM's allegedly infringing code includes "print subsystem

code". (Compl. ¶ 64.) Similarly, in *SCO v. IBM*, SCO alleged that IBM copied UnixWare code for

the "Print Subsystem". (Ex. 19 ¶¶ 232-33.)

>    **Response:** Xinuos disputes this Statement of Fact because it includes false
>    information and because it fails to include relevant information and is therefore
>    misleading. The Third Amended Complaint which SCO attempted to raise in the
>    litigation in Utah was rejected as untimely due to the scheduling order and the need
>    for the district court to manage its docket and neither the district court nor the Tenth
>    Circuit ruled in any way on the merits of that claim. (*See SCO Grp.*, 879 F.3d at
>    1085-86; *infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) Moreover, there
>    are copyrights in this dispute that were not previously asserted by SCO (D.I. 1), so
>    any alleged overlap of a single copyright will not extinguish is not material to
>    Defendants' motion.

75.    Xinuos alleges that IBM's allegedly infringing code relates to "'Multi-Path I/O'

functionality". (Compl. ¶ 65.) Similarly, in *SCO v. IBM*, SCO alleged that IBM copied UnixWare

code for "Multi-Path I/O" source code. (Ex. 44 at 7-8 & Attachment 4 to Project Supplement B at

§ 3 (pp. 46 of 81).)

>    **Response:** Xinuos disputes this Statement of Fact because it includes false
>    information and because it fails to include relevant information and is therefore
>    misleading. The court in the Utah Litigation rejected as untimely SCO's attempt to
>    bring a Third Amended Complaint due to the scheduling order and the need for the
>    district court to manage its docket—neither the district court nor the Tenth Circuit
>    ruled in any way on the merits of that claim. (*See SCO Grp.*, 879 F.3d at 1085-86;

*infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) Moreover, there are copyrights in this dispute that SCO did not previously assert (D.I. 1), so alleged overlap of only one copyright is not material to Defendants' motion and would not extinguish Xinuos' claim in any event.

76.    Xinuos alleges that IBM's allegedly infringing code includes "PCI Hotplug functionality". (Compl. ¶ 66.) Similarly, in *SCO v. IBM*, SCO alleged that IBM copied UnixWare code for the "Hot Plug [graphical user interface]" source code. (Ex. 44 at 7-8 & Attachment 4 to Project Supplement B at § 3 (pp. 46 of 81).)

> **Response:** Xinuos disputes this Statement of Fact because it includes false information and because it fails to include relevant information and is therefore misleading. The court in the Utah Litigation rejected as untimely SCO's attempt to bring a Third Amended Complaint due to the scheduling order and the need for the district court to manage its docket—neither the district court nor the Tenth Circuit ruled in any way on the merits of that claim. (*See SCO Grp.*, 879 F.3d at 1085-86; *infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) Moreover, there are copyrights in this dispute that SCO did not previously assert (D.I. 1), so alleged overlap of only one copyright is not material to Defendants' motion and would not extinguish Xinuos' claim in any event.

77.    Xinuos alleges that IBM's allegedly infringing code includes "truss functionality". (Compl. ¶ 67.) Similarly, in *SCO v. IBM*, SCO alleged that IBM copied UnixWare code for "Truss" technology. (Ex. 19 ¶¶ 232-33.)

> **Response:** Xinuos disputes this Statement of Fact because it includes false information and because it fails to include relevant information and is therefore misleading. The court in the Utah Litigation rejected as untimely SCO's attempt to bring a Third Amended Complaint due to the scheduling order and the need for the district court to manage its docket—neither the district court nor the Tenth Circuit ruled in any way on the merits of that claim. (*See SCO Grp.*, 879 F.3d at 1085-86; *infra* Xinuos' Additional Statement of Facts, §§ V-VIII.) Moreover, there are copyrights in this dispute that SCO did not previously assert (D.I. 1), so alleged overlap of only one copyright is not material to Defendants' motion and would not extinguish Xinuos' claim in any event.

## VIII.   *SCO v. IBM* Settlement and Release

78.    On August 17, 2021, after SCO's Project Monterey claim had been remanded to the Utah district court but before the parties were able to try the case—which was then focused

entirely on whether IBM stole code from Project Monterey or obtained a license under it, and on

numerous IBM counterclaims (Ex. 21)—SCO and IBM reached an agreement to settle the *SCO v.*

*IBM* litigation. (Ex. 45 at Exhibit 1.)

> **Response:** Xinuos disputes this Statement of Fact as misleading in its
> characterization of the remanded causes of action to the extent that Defendants seek
> to shoehorn SCO's unfair competition claim into a copyright framework. As
> discussed herein (*infra* at Xinuos' Additional Statement of Facts, § VIII, the Tenth
> Circuit did not determine that SCO's unfair competition claim was coextensive with
> a copyright claim. Xinuos further notes that the bankruptcy estate was no longer
> "SCO", having sold all of its intellectual property assets to Xinuos, including its
> "SCO" brand. The resulting bankruptcy estate was known as TSG Group, Inc.
> ("TSG") (*See e.g.*, Ex. 45 at 1 (caption).)

79.    The Settlement Agreement stated that "[e]ach party and signatory [thereto]

represents and warrants that: (a) such party is duly authorized to enter [the] Settlement Agreement;

and (b) the person executing [the] Settlement Agreement on behalf of such Party has been duly

authorized to execute [the] Settlement Agreement". (Ex. 45 at Exhibit 1, § 4.10.)

> **Response:** Xinuos does not dispute this Statement of Fact insofar as that is an
> accurate quote of the Settlement Agreement.

80.    Under the Settlement Agreement, SCO released any and all claims against IBM,

including the Project Monterey claims it had been litigating with IBM for the preceding 18 years.

The Settlement released IBM:

> from any and all claims, rights, demands, injuries, debts, liabilities, omissions,
> accounts, contracts, agreements, causes of action, suits and damages whatsoever,
> in law or equity, and whether based on contract, tort, or otherwise, known or
> unknown, suspected or unsuspected, of every kind and nature, which [SCO] at any
> time had, now have, or hereafter can or may have against IBM for, upon or by
> reason of any matter, cause or thing whatsoever, from the beginning of the world
> to the date of this release, ***concerning, related to, arising out of, or arising from
> the Utah Litigation, the Proof of Claim or IBM's relationship with [SCO] (or [its]
> predecessors), Project Monterey, or IBM's relationship with [SCO].***

(Ex. 45 at Exhibit 1, § 3.1 (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact and the excerpt from the
> Settlement Agreement as immaterial and irrelevant because Xinuos was not a party

to this agreement and because whether SCO released IBM "for the Utah Litigation, the Proof of Claim or IBM's relationship with [SCO] (or [its] predecessors), Project Monterey, or IBM's relationship with [SCO]" has nothing to do with Xinuos' claims, which are for infringement of copyrights that it purchased a full decade before this settlement between SCO and IBM. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

81.     The Settlement Agreement further clarified that the release includes any claims against IBM or Red Hat belonging to SCO:

> In an avoidance of doubt, the foregoing includes causes of action and other legal or equitable rights and remedies relating to (1) ***all rights and interests in all litigation claims pending or that may be asserted in the future against IBM and Red Hat, and (2) any allegations that Linux violates SCO's Unix or Unixware intellectual property, contract or other rights, which, pursuant to the Asset Purchase Order and the Bankruptcy Court's order authorizing the same, the Trustee has the sole authority to bring against IBM, Red Hat, or others.***

(Ex. 45 at Exhibit 1, § 3.1 (emphasis added).)

> **Response:** Xinuos disputes this Statement of Fact and the excerpt from the Settlement Agreement as immaterial and irrelevant because Xinuos was not a party to this agreement and because whether SCO released IBM for certain actions has nothing to do with Xinuos' claims has nothing to do with Xinuos' claims, which are for infringement of copyrights that it purchased a full decade before this settlement between SCO and IBM.

82.     Although Xinuos had nothing to do with Project Monterey or SCO's litigation with IBM and raised no objection to SCO's asserting Project Monterey claims against IBM (*see supra* ¶¶ 65-67), Xinuos objected to the settlement on the grounds it could be understood to preclude Xinuos from relitigating the same issues with IBM. (Ex. 46 at 2.)

> **Response:** Xinuos disputes this Statement of Fact because it misleadingly suggests Xinuos had an affirmative obligation to participate in SCO's litigation in order to be entitled to protect the copyright interest Xinuos acquired and the copyright infringement claims that accrued to Xinuos through its intervention in the bankruptcy proceedings. That makes no sense and there is no factual basis for Defendants' characterization of Xinuos' actions. The facts regarding Xinuos' efforts to protect copyright infringement claims that had accrued to it are set forth below. (*See infra* Xinuos' Additional Statements of Fact, §§ I-VII.)

83.     Xinuos argued that the settlement "purport[ed] to encompass Xinuos' claims against IBM and Red Hat", including because it released "all rights and interests in all litigation claims pending or that may be asserted in the future against IBM and Red Hat". (Ex. 46.)

>       **Response:** Xinuos disputes this Statement of Fact to the extent it mischaracterizes Xinuos' in its objections filed in the bankruptcy court. Xinuos' objections speak for themselves. (Ex. OO; *see infra* Xinuos' Additional Statements of Fact, § XVI.)

84.     Both the trustee for SCO's estate and IBM filed replies in support of approval of the Settlement Agreement. (Ex. 47; Ex. 48.)

>       **Response:** Xinuos does not dispute this Statement of Fact.

85.     The trustee noted that the APA between SCO and Xinuos "does not expressly limit the 'Excluded Assets' to assets that existed in only a pre- or post-1995 time-period", and told the court that SCO intended to retain "the specific claim of unfair competition on remand from the Tenth Circuit that is currently pending before the Utah District Court *as well as all claims that could have been brought by the Debtors in the Utah Litigation*." (Ex. 47 ¶ 8.)

>       **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. While IBM disputed Xinuos' arguments about the construction of the settlement agreement and its relation to the APA, other evidence in this case suggests the Trustee's view of the APA's terms was consistent with Xinuos' understanding. (*See infra* Xinuos' Additional Statements of Fact, § XVI.) Xinuos disputes that this Statement is material or relevant, as claims which accrued after Xinuos purchased the assets could not have been brought by SCO in the Utah litigation.

86.     IBM made similar arguments in support of the settlement, pointing out that in October 2004, SCO had continued to pursue an amendment to its complaint in the *SCO v. IBM* litigation long after the APA that would have added a copyright claim pursuant to the same post-1995 copyright (TX 5-787-679) that Xinuos has asserted against IBM in this case. (Ex. 48 ¶ 31.)

>       **Response:** Xinuos does not dispute this Statement of Fact except to the extent that the document upon which IBM relies does not state that SCO took any action in October 2004. Xinuos expressly reserves its rights to argue that these IBM

statements and TSG's conduct run counter to well established copyright law on standing, among other things.

87.    On October 14, 2021, the bankruptcy court overruled Xinuos' objection and approved the *SCO v. IBM* settlement. (Ex. 45 ¶¶ 1-2.)

> **Response:** Xinuos disputes this Statement of Fact because it mischaracterizes the bankruptcy judge's order. The bankruptcy judge did not overrule Xinuos' objection, but rather, merely approved this settlement agreement after an extensive hearing on its scope and terms where he expressly stated that his approval of the agreement would have no impact on how the terms of the APA should be understood. (*See infra* Xinuos' Additional Statement of Facts, § XVI.) The bankruptcy judge stated that "if there are claims or causes of action arising from them, another Court of competent jurisdiction will decide that. That's an issue involving two separate non-debtors." (Ex. PP at 24:8-24:11). Accordingly, the bankruptcy judge's order states: "Xinuos, Inc. reserves the right to argue that the release in the Settlement Agreement does not bar any claims it has asserted against IBM…." (Ex. 45 at 3.)

88.    The bankruptcy court did not determine exactly what claims Xinuos might or might not be able to assert against IBM in litigation pending in another court (then the U.S. Virgin Islands). (Ex. 45 ¶¶ 1-8.)

> **Response:** Xinuos does not dispute this Statement of Fact.

89.    The bankruptcy court noted that "Xinuos, Inc. reserves the right to argue that the release in the Settlement Agreement does not bar any claims it has asserted against IBM in *Xinuos, Inc. v. International Business Machines Corporation, et al.*, Case No. 3:21-cv-00031 (D.V.I.), and IBM reserves the right to argue the Settlement bars such claims." (Ex. 45 ¶ 8.) But the court did not rule that the claim was reserved; on the contrary, it approved a settlement that did just the opposite. (Ex. 45 ¶¶ 1-8.)

> **Response:** Xinuos disputes this Statement of Fact because it mischaracterizes the bankruptcy court's order. The bankruptcy court did not rule on what claims were reserved and who owns which claims as expressly stated in its order. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

90.     The bankruptcy court expressly stated that it approved of the Settlement Agreement "in all respects, including, without limitation, the release of the Estates' claims against IBM, and vice versa, as set forth in paragraphs 3.1 and 3.2 of the Settlement Agreement". (Ex. 45 ¶ 2.)

> **Response:** Xinuos disputes this Statement of Fact to the extent it mischaracterizes the bankruptcy court's order. The bankruptcy court's order speaks for itself. Xinuos further disputes this Statement of Fact is material or relevant because Xinuos was not a party to the settlement agreement and therefore it does not affect Xinuos' ability to pursue its claims against IBM. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

91.     The bankruptcy court declined Xinuos's proposal to strike the language in paragraph 2 of its order. (Ex. 45 ¶ 2; Ex. 49 at Exhibit B, ¶ 2.)

> **Response:** Xinuos disputes this Statement of Fact because it fails to include relevant information and is therefore misleading. The bankruptcy judge only approved this settlement agreement after an extensive hearing on its scope and terms where he expressly stated that his approval of the agreement would have no impact on how the terms of the APA should be understood. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

92.     The bankruptcy court also declined Xinuos's proposal to include language in its order stating that "neither [the] Order, nor the Settlement Agreement, resolves, releases any party, or otherwise impacts any claim, cause of action, or right of Xinuos that the Trustee or IBM does not possess the right to impact" and that "[the] Order does not bar Xinuos from asserting, in *Xinuos, Inc. v. International Business Machines Corporation, et al.*, Case No. 3:21-cv-00031, that IBM infringed and continues to infringe copyrights that it purchased from the Debtors". (Ex. 45 ¶¶ 1-8; Ex. 49 at Exhibit B, ¶¶ 8, 10.)

> **Response:** Xinuos disputes this Statement of Fact to the extent that Defendants suggest that the bankruptcy court expressly overruled Xinuos' objections. To the contrary, the bankruptcy judge approved this settlement agreement after an extensive hearing on its scope and terms where he expressly stated that his approval of the agreement would have no impact on how the terms of the APA should be understood. (*See infra* Xinuos' Additional Statement of Facts, § XVI.)

93.     On November 5, 2021, the Utah district court dismissed SCO's remaining claim against IBM with prejudice. (Ex. 50.)

> **Response:** Xinuos does not dispute this Statement of Fact.

## IX.    Subsequent Proceedings in This Litigation

94.     On November 16, 2022, this case was transferred to the United States District Court for the Southern District of New York. (D.I. 77.)

> **Response:** Xinuos does not dispute this Statement of Fact.

95.     Between December 21 and December 23, 2022, Xinuos served on Defendants 74 discovery requests that relate in large part to Project Monterey and the *SCO v. IBM* litigation. (Ex. 51; Ex. 52; Ex. 53.) Xinuos seeks, for example, "All Documents and Communications Referring or Relating to Project Monterey", "All Documents and Discovery Responses" and "All Deposition transcripts" from *SCO v. IBM*, and the source code for a number of versions of IBM software dating back to 2000. (Ex. 51 at RFP Nos. 15, 60-61.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant.

96.     On January 10, 2022, Xinuos served on Defendants its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), which identify more than 60 individuals associated with IBM and SCO who allegedly possess knowledge "relevant to [Xinuos's] claims" about "Project Monterey". (Ex. 54 at 3-5.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant.

97.     On January 17, 2023, the Court granted Defendants' request to file their dispositive motions and stayed discovery pending their resolution. (Jan. 17, 2023 Minute Entry.)

> **Response:** Xinuos does not dispute this Statement of Fact. Xinuos disputes that this Statement of Fact is material or relevant.

## XINUOS' ADDITIONAL STATEMENT OF FACTS

### I. The Plaintiff and Its Predecessors-In-Interest

98.     Founded in 1979, Santa Cruz developed a UNIX-based operating system ("OS") product called OpenServer. (*See* Ex. B ¶ 19; Snyder Decl., Ex. RR ¶ 3.) In 1998, Santa Cruz and IBM, among others, entered into a joint development project, called Project Monterey. (*See* Ex. RR ¶ 4.)

99.     In 2000, Santa Cruz sold its operating system business and assets to Caldera Systems, Inc. ("Caldera"), which later changed its name to The SCO Group, Inc. ("SCO"). (*See* Ex. 13, Ex. 16 at 1.)

100.    In 2007, SCO filed for bankruptcy. (*See* Ex. RR ¶ 8.) While in bankruptcy, SCO sold its entire business, including the "SCO" brand and related trademarks—except for certain "Excluded Assets" (to be defined later). (*See* Ex. 3 § 2.1(a); Ex. RR ¶ 9.) After selling all of its operating and intellectual property assets, the bankrupt estate changed its name to TSG Group, Inc. ("TSG"). (*See* Ex. RR ¶ 11.)

101.    The purchaser of SCO's operating business and intellectual property was UnXis, Inc., which later changed its name to Xinuos. (*See* Ex. RR ¶ 8.)

### II. The UNIX Operating System and Distinct Copyrights

102.    In or around the 1970s, AT&T developed the computer operating system known as UNIX. (*See SCO Grp., Inc. v. Int'l Bus. Machs. Corp*, 879 F.3d 1062, 1068-69 (10th Cir. 2018).) UNIX was (and remains) highly valuable to large enterprise customers due to its reliability and scalability. (*Id.*)

103.    Many software distribution vendors entered into licensing agreements with AT&T to use UNIX in their own proprietary operating systems. (*See SCO Grp., Inc. v. Int'l Bus. Machs.*

*Corp*, 879 F.3d 1062, 1068-69 (10th Cir. 2018).) For example, IBM licensed UNIX from AT&T and used it to write UNIX code for its AIX operating system. (*See id*.)

104.    In or around 1993, AT&T sold all right, title, and interest in UNIX to Novell, Inc. (*See* Ex. L) This sale included all right, title, and interest in any UNIX licensing agreements. (*Id*.) Novell developed a UNIX operating system product known as UnixWare. (*See id*.)

105.    On or about September 19, 1995, SCO entered into an asset purchase agreement with Novell, acquiring UNIX and UnixWare products, source code, and business. (*See* Ex. RR ¶ 2.) SCO believe that it also obtained the copyrights that Novell purchased from AT&T and which Novell otherwise created prior to the date of the September 19, 1995, agreement. (*Id*.) As further discussed below, SCO did not in fact acquire any copyrights to the Novell code that existed prior to September 19, 1995, however, SCO nonetheless owned and had a valid and enforceable copyright interest in any developments that it made to the code after the September 19, 1995, agreement. (*See infra* § VI "The Novell Litigation.")

106.    After September 19, 1995, SCO continuously wrote new source code adding improvements and functionality to the UnixWare product. (*See* Ex. RR ¶ 3.) SCO's post- 1995 developments to were incorporated into the company's proprietary UnixWare products. (*See Id*.) SCO also further developed and improved the OpenServer operating system after 1995. (*See Id*.)

107.    Due in large part to SCO's high-quality operating system products, including the post-1995 developments to the UnixWare and OpenServer source code, these products were highly valuable and made SCO very successful in the server operating system market. (*See* Ex. RR ¶ 16.)

108.    SCO had copyrights in the post-1995 source code, which Xinuos now owns and has registered with the U.S. Copyright Office: Registration No. TX 5-787-679 (UnixWare 7.1.3) and Registration No. TXu 2-214-732 (Gemini 64), and Registration No. TXu 2-214-620 (Project

Monterey). (*See* Exs. G, H, I.)

109.    Some, but not all, of SCO's post-1995 developments to its UNIX-based source code occurred in connection with a joint initiative between SCO and IBM known as "Project Monterey," which began in October 1998. The purpose of Project Monterey was to develop and release a fully-functional IA_64 OS unlike any prior IBM product. (*See* Ex. RR ¶ 4; Ex. 4.)

110.    For example, and without limitation, SCO developed "cross-architecture" functionality in connection with Project Monterey. (*See* Ex. RR ¶ 4.) The cross-architecture functionality makes it much easier for enterprise users to transition software applications from 32-bit environments to higher-powered 64-bit environments. (*See Id*.)

111.    Code developed as part of Project Monterey has been registered with the U.S. Copyright Office at Registration No. TXu 2-214-620 (Project Monterey). (*See* Ex. I.)

### III.    The Terms and Scope of Project Monterey

112.    The Joint Development Agreement ("JDA"), including its amendments and supplements, governed Project Monterey. (*See* Ex. 4.) The purpose of the JDA was to "extend and evolve existing UNIX operating systems designed to operate on the 32-bit and 64-bit Intel architecture platforms" and to "undertake specific development projects to design and further develop an IA-32 Product and an IA-64 Product as further defined below." (*See* Ex. 4 at 1.)

113.    The JDA established a framework and working business relationship for identifying, performing, funding, and managing specific development projects to design and further develop the "IA-32 Product" (a UNIX-based OS consisting of SCO's UnixWare 7, and the addition of "Licensed IBM Materials" and any additional "Project Work" developed under the JDA), and the "IA-64 Product" (a UNIX-based OS consisting of IBM's AIX OS with the addition of "Licensed SCO Materials" and any additional "Project Work" developed under the JDA). (*See*

Ex. 4 at §§ 1.9 and 1.10.)

114.    IBM and SCO shared code under the strict terms of the JDA, which included "that each party is entitled to full free and continuous access to all Licensed Materials and Project Work, both *at the time of completion* and *while under development* pursuant to a Project Supplement." (*See* Ex. 4 at § 6.2 (emphasis added).) This permitted IBM to use the code during development and work on the project, but IBM could only obtain continuing rights to use the code after Project Monterey if it completed a "general availability release" of a functional IA-64 product. (*See* Ex. D at Amendment 5, p. 3.)

115.    The February 19, 1999 Supplement B to the JDA made clear that IBM only gained or retained a license to use SCO's code after an IA-64 product was actually completed and marketed. (*See* Ex. C at Project Suppl.) Specifically, Supplement B states at Section 4: "The Licensed Materials detailed in Attachments 3 and 4 are to be used solely for development of the IA-64 Product. Notwithstanding the foregoing, any such Licensed Material included in the IA-64 Product Release 1 shall be licensed pursuant to the terms and conditions set forth in the [JDA]." (*See* Ex. C at p. 1 of Project Suppl. B.)

116.    Attachment 4 to Supplement B expressly identifies UnixWare and Gemini 64. (*See* Ex. C at pp. 14-15 of Project Suppl. B.)

117.    The express intent of Supplement B was to allocate resources and work "required to produce [an] IA-64 Product Release 1." (*See* Ex. C at p. 1 of Project Suppl. B.)

118.    Supplement B also specifies that the licensed materials "are to be used solely for development of the IA-64 Product." (*Id*.)

119.    Supplement B also states that the "Licensed Material included in the IA-64 Product Release [ ] shall be licensed pursuant to the" JDA. (*Id*.)

120.    Supplement B also states that any code contained in an IA-64 Product Release 1 is subject to specific license terms. (*See* Ex. C at p. 1 of Project Suppl. B.)

121.    Amendment 5 to the JDA indicates that the IA-64 Release 1 had to be generally available, specifically limiting the use of the pre-release version of IA-64 to the time period before the "general availability of the IA-64 Product Release 1." (*See* Ex. D at p. 1 of Amendment 5.) Amendment 5 provided an exception for royalty payments under the JDA for any distribution of a "Pre-Release IA-64 Product," which is defined as any version of the IA-64 product made available to the public prior to "general availability of the IA-64 Product Release 1." (*See* Ex. D at p. 1 of Amendment 5.)

122.    Section 22.3 of the JDA contains a contractual limitations provision, a choice of law provision, and a venue provision. (*See* Ex. 4 at § 22.3.) The contractual limitations provision states: "Any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date of the breach in a court sited in the State of New York." (*See* Ex. 4 at § 22.3.)

123.    Section 22.15 of the JDA contains a survival clause, which states: "Any provisions of this Agreement that by their nature extend beyond termination or expiration will survive in accordance with their terms. These include 2.0 (only as set forth in 15.4), 9.0, 10.0, 11.0 12.0, 15.4, 17.0, 18.0, 19.0, 20.0, 21.0. These terms shall apply to either party's successors and assigns." (*See* Ex. 4 at § 22.3.)

## IV.    IBM's Termination of Project Monterey

124.    IBM withdrew from Project Monterey in 2001 before the work was completed. (*See* Ex. 14, Ex. RR ¶ 5). Even before terminating its involvement in Project Monterey IBM began cutting the Project Monterey budget. (*See* Ex. B at ¶ 43.) This purportedly caused IBM employees

to question Project Monterey's viability. (*Id.*)

125.    In early 1999, an IBM executive stated that the "SCO/Monterey plans should not be stopped until we have a better plan to move to." (*See id.* at ¶ 42 (citing Ex. 234 to SCO's Statement of Reconciled and Disputed Facts Utah Litigation ("SCO's Facts"),[6] at 181349130.)

126.    Also, an undated IBM memorandum describes five options, one of which was the "elimination of SCO" and "[r]eplac[ing] UnixWare with Linux" as IBM's vehicle for entry into the "low end" segment of the UNIX-on-Intel market. (*See id.* at ¶ 42 (citing Ex. 371 to SCO's Facts,[7] at 181526163.)) However, the memorandum cautioned that, under this option, IBM would not attain the right to use the System V release 4 ("SVr4") code, and therefore, continued involvement by SCO "should be retained in order to have access to SCO's SVR4/5 and other technologies." (*See id.* at ¶ 42 (citing Ex. 371 to SCO's Facts,[8] at 181526164).)

127.    Internally, IBM made plans to focus on Linux and was deciding whether to proceed with Project Monterey. (*See id.* at ¶¶ 48, 58-61.)[9] However, IBM was concerned that it would not

---

[6] Xinuos does not have access to this document, and therefore relies on SCO's representations. The existence of the document both contradicts IBM's Statement of Facts and illustrates the need for discovery.

[7] Xinuos does not have access to this document, and therefore relies on SCO's representations. The existence of the document both contradicts IBM's Statement of Facts and illustrates the need for discovery.

[8] Xinuos does not have access to this document, and therefore relies on SCO's representations. The existence of the document both contradicts IBM's Statement of Facts and illustrates the need for discovery.

[9] These paragraphs from the 2015 Statement of Reconciled and Disputed Facts as to IBM's Motion for Summary Judgment on SCO's unfair competition claim include quotes and references to a number of exhibits from documents IBM produced in the Utah Litigation. For example, paragraph 60(b) states "[]in July 2000, IBM programmer Kaena Freitas informed his colleagues that IBM would not have the right to include SVr4 code in AIX for Power unless and until there was a "generally available" release of the Project Monterey Operating System: "I believe the SCO agreement states that if we don't ship the code when we GA Monterey, we will lose the rights to the code." (Ex. 198 at 1710057885) (emphasis added).) Xinuos does not have access to these documents, but their existence both contradicts IBM's Statement of Facts and illustrates the need for discovery.

retain the right to license SCO's code if it backed out of Project Monterey. (*See id.* at ¶ 42.)

128.    Thus, IBM proposed to add a Project Supplement C to the JDA which would have allowed IBM to access more SCO code and to use SCO code in a broader array of AIX and IBM products such as AIX and other IBM operating systems, without any restrictions. (*See* Ex. E.) However, SCO did not agree to execute Supplement C. (*See* Ex. E.)

129.    Supplement C was IBM's attempt to extend the license from SCO to IBM, purportedly "in support of a 'UnixWare Compatible AIX Operating System Product." (*See* Ex. E.) The draft "Licensing of deliverables" attempted to extend SCO's license as follows:

> Unless specifically noted otherwise in Attachment 1, all Deliverables are licensed solely for IBM's use in adding UnixWare compatible functionality to its AIX operating system where 'AIX' shall mean the UNIX-based operating system for the Power PC architecture, currently marketed by IBM under the name 'AIX,' and all current and/or future Enhancements, marketed, licensed or otherwise distributed by IBM to third parties, with or without IBM's names or logos. Such Deliverables may also be incorporated in IBM's OS/400 and OS/390 operating systems and any IBM middleware or applications that operate on AIX. OS/400, OS/390, or UnixWare 7.

SCO did not accept this extension of the license. (*See* Ex. E.)

130.    As stated *supra*, under the JDA SCO's code was "to be used solely for development of the IA-64 Product." (*See* Ex. C at p. 1 of Project Suppl. B.) However, the AIX 5L product IBM released was so spurious it did not even have a compiler to make it work and there was "no confirmed compiler plan." (*See* Ex. B at ¶ 64; Ex. RR ¶ 7.)

131.    IBM's own expert's and witnesses have apparently admitted that software not containing a compiler—i.e., the AIX product which IBM released out of Project Monterey—cannot legitimately be called an "operating system." (*See* Ex. B at ¶ 66.; *see also infra* at ¶ 151.)

132.    IBM never released a usable commercial IA-64 product because, among other issues, IBM's product lacked a compiler, a critical program required to run applications and make the product valuable. (*See* Ex. RR ¶ 7.)

## V.        The Utah Litigation – Pre-Novell Litigation Resolution

133.    In 2003, SCO sued IBM. *See SCO Grp. v. Int'l Bus. Machines Corp.*, Case No. 2:03-cv-00294 (D. Utah) (the "Utah Litigation".) Four groups of allegations from the operative complaint (the Second Amended Complaint, Ex. J   ) are relevant for present purposes.

134.    First, SCO alleged that IBM breached UNIX licenses that it owned. (*See* Ex. J at ¶¶ 110-172.) SCO alleged that it had purchased all right, title, and interest in UNIX from Novell, including all right, title, and interest in any UNIX licenses. (*Id.* ¶¶ 2, 48, 59, 110-172.) SCO alleged that IBM had improperly and secretly used the pre-September 19, 1995, UNIX code in an open source operating system called Linux, and therefore had breached the UNIX licenses that IBM had entered into with AT&T. (*Id.,* ¶¶ 110-172.)

135.    Second, SCO alleged that IBM infringed UNIX copyrights which it believed that it had acquired from Novell, namely the copyrights in the pre-September 19, 1995, code obtained from Novell. (*Id.* ¶¶ 173-180.) This copyright infringement theory was based on the exact same facts as the license breach theory. (*See e.g. id.* ¶ 179 ("IBM's breaches of the [AT&T UNIX licenses] and its post-termination actions have infringed, have induced infringement of, and have contributed to the infringement of, copyright registrations of SCO and its predecessors".))

136.    Third, SCO alleged that IBM unfairly competed with SCO by misrepresenting its intentions to SCO regarding Project Monterey and through infringement of the pre-September 19, 1995 code, engaging in a course of conduct designed to destroy SCO's ability to commercialize the UNIX products and business that it acquired from Novell. (*Id.* ¶¶ 53-57, 181-188.) SCO argued here that IBM coaxed and persuaded SCO to enter Project Monterey without any actual intention to complete the work, and solely to stall SCO's own operating system development efforts, to harm SCO's ability to further the UNIX products and business acquired from Novell, to harm SCO's

products that were doing much better in the market than IBM's products, and to secretly benefit the Linux operating system ecosystem generally. (*Id*.)

137.    Fourth, SCO alleged that IBM tortuously interfered with its contracts and business relationships. (*Id*. ¶¶ 187-214.)

## VI.    The Novell Litigation

138.    While the Utah Litigation was still underway, in 2004, SCO initiated a separate suit against Novell. (*See SCO Group v. Novell, Inc.*, Case No. 2:04-cv-00139 (D. Utah) (the "Novell Litigation").)

139.    For SCO, the object of this suit was to establish, by judicial decree, that, through the agreement with Novell that it entered into on September 19, 1995, it received all right, title, and interest in all of the UNIX and UnixWare code and copyrights that had been developed prior to September 19, 1995, by Novell or AT&T. (*See* Ex. K (Novell Litigation, Second Amended Complaint at ¶¶ 89-95).)

140.    After six years of litigation, it turns out that SCO was mistaken about whether the copyrights in the pre-September 19, 1995, UNIX and UnixWare code was actually conveyed to SCO. In March 2010, after a two-week trial, the jury returned a verdict that SCO did not obtain any ownership interest in the pre-September 19, 1995, UNIX and UnixWare copyrights through the September 19, 1995, Novell agreement, and instead only obtained a license to use UNIX and develop its own proprietary UNIX-based technology going forward. (*See* Ex. L (Memo Decision and Order Denying Mot. for J. as a Matter of Law); Ex. M (Final Judgment).)

141.    But this did not mean SCO owned no assets. Indeed, the Court in the Novell Litigation expressly noted after the trial that "it was undisputed that SCO would own any newly developed code and could obtain copyrights to protect that code." (*See* Ex. L.)

142.    In sum, the Court in the Novell Litigation recognized in 2010 that SCO owned the post-1995 code developments in UnixWare and associated copyrights, despite the otherwise negative result for SCO. (*See* Ex. L.)

## VII.    The Utah Litigation – Post-Novell Litigation Resolution

143.    The outcome in the Novell Litigation substantially impacted the Utah Litigation. Once final judgment in the Novell Litigation was entered, the Court in the Utah Litigation held that "SCO is bound by, and may not here re-litigate, the rulings in the *Novell* Judgment that Novell (not SCO) owns the copyrights to the pre-1996 UNIX source code, and that Novell waived SCO's contract claims against IBM for alleged breaches of the licensing agreements pursuant to which IBM licensed such source code." (Ex. N at 2.)

144.    SCO admitted the same about the Novell Litigation's impact on the Utah Litigation. On June 24, 2013, it stated that its "copyright infringement claim against IBM . . . is foreclosed and may be dismissed on the basis of the <u>Novell</u> judgment that Novell owns the copyrights to pre-1996 UNIX source code." (*See* Ex. O at 3.) Notably, in the same filing, SCO lists "[c]laims unaffected by the Novell Judgment," and the list does not mention a copyright or contract breach claim, or any part of such claim. (*See i.d.*)

145.    IBM also agreed that the scope of the copyright infringement claim in the Utah Litigation was exactly the same as the scope of the copyright ownership question in the Novell Litigation – *i.e.*, covering only the code from prior to September 19, 1995, which was the date of the SCO-Novell agreement. Earlier on in the Utah Litigation, IBM moved to make clear that its counterclaim for a declaration of non-infringement only covered the UNIX code that was at issue in the Novell Agreement and not any additional code. (*See* Ex. P (IBM's Motion for Entry of Order Limiting Scope of IBM's Ninth Counterclaim, stating that "[i]n asserting its Ninth Counterclaim, IBM intended to seek only a declaration that because IBM has not breached IBM's license

agreements with AT&T and SCO's purported termination of those licenses is invalid, IBM's continued distribution of AIX . . . does not infringe SCO's alleged copyrights").) The district court affirmed this ruling, which by necessity was also an affirmation that the SCO copyright claim had the same scope. (*See* Ex. Q (Order Limiting Scope of IBM's Ninth Counterclaim "to seeking a declaration that IBM has not infringed SCO's alleged copyrights based on alleged breaches of license agreements with AT&T and SCO's purported termination of these licenses.").)

146.    Because – based on the outcome in the Novell Litigation – SCO did not own the copyrights in the UNIX and UnixWare code acquired from Novell, or the accompanying UNIX licenses, SCO lacked a basis to bring a contract breach claim or a copyright infringement claim. The Court in the Utah Litigation, SCO, and IBM all recognized this. (*See* Exs. O, P, Q) The copyrights at issue in the Novell Litigation were co-extensive with the copyrights at issue in the Utah Litigation, so the dispositive outcome against SCO in the Novell Litigation left nothing left to litigate in the Utah Litigation concerning the contract breach and copyright infringement claims. Those two sets of allegations (i.e., groups 1 and 2 of the SCO allegations described in section V) were completely gone. (*See id.*)

147.    But the third and fourth groups of allegations remained – the unfair competition claim and the tortious interference claim. On summary judgment, the district court held that SCO failed to state either of these claims as a matter of law. (*See SCO Grp.*, 879 F.3d at 1075.) On appeal, the Tenth Circuit affirmed the lower court's ruling that the tortious interference claim fails as a matter of law. (See *SCO Grp.*, 879 F.3d at 1081-84).)

148.    To recap, the unfair competition claim was originally based on the allegation that IBM misled SCO and unfairly impeded the value of the UNIX business that SCO acquired from Novell by contributing the pre-September 19, 1995, code to Linux. (Ex. J (Utah Litigation, Second

Amended Complaint) at ¶¶ 53-57, 181-188.)

149.    But through discovery, SCO learned that IBM had also improperly used SCO code

which it accessed through Project Monterey. (*SCO Grp.*, 879 F.3d at 1079 n.15; Ex. B at ¶¶ 52-

54.) SCO thus included this use of certain post-1995 code as evidence of IBM's fraudulent conduct

underlying its unfair competition cause of action. (Ex. Z.)

## VIII.   The Tenth Circuit's Decision Regarding the Utah Litigation

150.    In 2018, the Tenth Circuit reversed the district court's determination that SCO

failed to state the "tort of unfair competition by means of misappropriation" as a matter of New

York law. (*See* Ex. Z at 1068.) The unfair competition claim was thus set for trial, though no trial

date was set while SCO remained in bankruptcy proceedings. (*Id.* at 1075-81.)

151.    The Tenth Circuit explained that the unfair competition claim survived dismissal in

part because it was not the same as a copyright claim and not preempted by Federal Copyright

Law. (*Id.* at 1075-81.) In particular, the Tenth Circuit stated that this tort has "a separate element

of bad faith business dealings" and therefore is not preempted. (*Id.* at 1081.) The Tenth Circuit

also stated that "a reasonable jury could find that this PRPQ version was not a *generally available*

release of the product and thus did not entitle IBM to a royalty-free license to the SVr4 code

included therein." (*Id.* at 1072.)

152.    The Tenth Circuit also reviewed the district court's determination to deny SCO's

request to file a Third Amended Complaint to include a copyright infringement cause of action

that related to specific *post-1995* code which IBM accessed through Project Monterey. (*Id.* at

1085-86; Ex. 19 at ¶¶ 216-241.)

153.    IBM did not argue that SCO had no basis to bring this copyright infringement claim

on the theory that Novell still owned the copyrights to this code and SCO never acquired those

copyrights through the September 19, 1995, agreement. Instead, the parties understood that this

claim related to code which was developed after September 19, 1995, which was undisputedly owned by SCO. (Ex. 19 at ¶¶ 216-241.)

154.    The district court never addressed or ruled on the merits of the copyright infringement claim that was included in the Third Amended Complaint. (Ex. FF.)

155.    The district court instead rejected the Third Amended Complaint which contained this claim because "SCO has unduly delayed seeking leave to assert the proposed cause of action." (Ex. FF at 4.)

156.    The Tenth Circuit affirmed the district court's decision on this ground only. (Ex. Z at 1085-86.)

## IX.    Ancillary Actions Involving Red Hat and SUSE

157.    In 2003, contemporaneously with the Utah Litigation, Red Hat filed a lawsuit against SCO, seeking a declaration that Red Hat's Linux products had not violated the pre-September 19, 1995, copyrights at issue in the Utah Litigation. (*See Red Hat, Inc. v. The SCO Group, Inc.*, Case No. 1:03-cv-00772 (D. Del.)); (Ex. R.)

158.    In 2004, the District of Delaware Bankruptcy Court stayed the Red Hat case pending resolution of Utah Litigation (the "Red Hat Litigation"). (Ex. R.)

159.    The Red Hat case was closed in 2007 pending resolution of SCO's bankruptcy petition filed on September 14, 2007, with Notice of Bankruptcy filed on September 17, 2007 in *In re SCO Group, Inc., et al*, 7-bk-11337-BLS (D. Del. Bank. Sept. 28, 2007) (the "Bankruptcy Proceeding"). (Ex. S.)

160.    In 2006, Novell's SUSE division filed a request for arbitration with the Secretariat of the International Chamber of Commerce's International Court of Arbitration in Paris, France. (ICC Case No. 14320/FM, Styled *SUSE Linux GmbH (Germany) v. The SCO Group, Inc. (USA.*).)

161.    This arbitration was in response to SCO's allegation in the Novell Litigation that

Novell's SUSE Linux products violated the pre-September 19, 1995, copyrights at issue in both the Novell Litigation and the Utah Litigation. (*See* Ex. T (describing substance of the arbitration).) The arbitration sought a declaration that SUSE's Linux products had not violated those copyrights. (*Id.*)

162.   In 2007, the bankruptcy court in the bankruptcy proceedings issued an order enforcing the automatic stay of the SUSE arbitration pending resolution of SCO's bankruptcy petition. (*See* Ex. U.)

## X.   The Bankruptcy Proceeding – Introduction

163.   While both the Utah Litigation and Novell Litigation were still underway, SCO filed for Chapter 11 bankruptcy in September 2007. (*See* Ex. V.)

164.   As evidence by its filing, SCO apparently thought that, if there were favorable outcomes in the Novell Litigation and then the Utah Litigation, SCO could again become solvent and operational on the same terms as before filing for Chapter 11 bankruptcy. (*See e.g.*, Ex. W (Hearing to Approve the Asset Purchase Agreement at 16:18-20.) Furthermore, counsel for the Trustee stated that "[t]he Trustee and his professionals were aware that the outcome of a jury trial would have a material effect on the valuation of the debtors' software business assets." (*Id.* at 16:18-20.)

165.   However, after the jury verdict in the Novell Litigation, counsel for the Trustee stated to the bankruptcy court that an asset purchase sale was "really the next logical step for these estates." (Ex. X (Hearing on Request to Auction Office Substantially All of SCO's Assets) at 6:14-15.)

166.   A process took place to identify the best offer. (*See* Ex. W at 17:5-18:21 (Counsel for Trustee describing the bid process).) In particular, there was a period in which third parties had

opportunity to seek information and enter into discussions or negotiations with SCO and the trustee

and an auction was conducted on January 19, 2011. (Ex. 24, at 4-5; *see also* Ex. QQ ¶¶ 2-3).

167.    Xinuos' offer to purchase SCO's assets at $600,000 was "the highest and best offer

received by [SCO] and the Chapter 11 Trustee" and was selected and approved by the bankruptcy

court. (Ex. 24, at 4-5; *see also* Ex. QQ ¶¶ 2-3).

## XI.    The Bankruptcy Proceeding – The Asset Purchase Agreement's Terms

168.    The meeting of the minds between the Trustee and Xinuos on the scope and effect

of the asset sale was memorialized in the Asset Purchase Agreement. (*See* Ex. 3.) For present

purposes there are three material parts:

169.    *First*, the APA defines the "Acquired Assets" sold from SCO to Xinuos in section

2.1 and makes clear that "Acquired Assets" include all post-1995 copyrights and the entire

business, products, and operations of SCO, the right to all royalties and revenue from those assets,

and the right to all claims arising from those assets. (*See id.*, § 2.1.) In relevant part, the Asset

Purchase Agreement states that Xinuos:

> shall, as of the Closing Date, acquire and purchase, free and clear of any
> and all Encumbrances and Retained Obligations, all of Seller's right, title,
> and interest in and to any and all of the assets of the Business[10], except for
> the Excluded Assets set forth in Schedule 2.1(c) hereof (the "Acquired
> Assets"), including but not limited to, the following:
>
> (i) All of Seller's assets (tangible or intangible), including those assets set
> forth on Schedule 2.1(a), all Intellectual Property[11], including all copyrights

---

[10] The APA defines Business follows: "Seller provides UNIX® system software products and related services (together with the business and operations of Seller relating thereto and the goodwill appurtenant to such business and assets, and the furnishing of services in connection therewith, the "Business")" (Ex. 3 at § A (recitals).)

[11] The APA defines Intellectual Property to include "all . . . registered and unregistered . . . copyrights . . . proprietary information, technology, original works of authorship (including computer software) and similar rights to any of the foregoing around the world, all applications for any of the foregoing, and the right to prosecute, enforce, obtain damages relating to, settle or release any past, present, or future infringement thereof." (Ex. 3 at § 1.34.)

developed after 1995 . . .

(vi) All rights and claims of Seller against any third parties, directly arising
from or directly relating to the Acquired Assets (which, for the avoidance
of doubt, shall not include any rights and claims of Seller against any third
parties, directly arising from or directly related to the Excluded Assets, any
rights and claims by Seller against Buyer relating to this Agreement or any
agreement entered into pursuant hereto, or any rights, claims or causes of
action related to Novell, Inc., International Business Machines Corporation,
Red Hat, Inc. and SUSE Linux GmbH or other similar claims.)

(*Id.* § 2.1(a)(i), (vi).)

170.    The Acquired Assets unambiguously include all of the post-1995 proprietary
developments that SCO made to the UNIX operating system technology and any other intellectual
property created by SCO. (*Id.* § 2.1(a)(i), (vi)) This includes numerous releases of the UnixWare
and OpenServer products, and all post-1995 code developments whether embodied in a released
product or not, and all registered and unregistered copyrights and exclusive rights associated with
the foregoing. (Ex. 3 at § 2.1 and Schedule 2.1(a).)

171.    The parties further executed a separate Intellectual Property Rights Assignment
formally assigning all such exclusive rights under the Copyright Act to Xinuos. (*See* Ex. RR ¶ 10;
Ex. 3 at 31-32; Ex. QQ.)

172.    Xinuos also acquired the sole right to receive royalties and licensing fees flowing
from those exclusive rights under the Copyright Act. (Ex. 3 at § 1.34 (assigning to Xinuos sole
and exclusive rights to "prosecute, enforce, obtain damages relating to, settle or release any past,
present, or future infringement" of the post-1995 copyrights, as part of the assigned intellectual
property).)

173.    The parties understood this language to mean that (1) Xinuos was purchasing all of
the Acquired Assets but none of the Excluded Assets; (2) the Acquired Assets include all of SCO's
intellectual property, which expressly encompasses "all copyrights developed after 1995" and the

sole and exclusive right to receive royalties and licensing fees from those copyrights; (3) the Acquired Assets include any legal or equitable claims "against any third parties, directly arising from or directly relating to the Acquired Assets"; and (4) these claims do not include "for the avoidance of doubt" certain claims of SCO against third parties and Xinuos, and certain claims against Novell, IBM, Red Hat, Inc., and SUSE (herein, the "Avoidance of Doubt" provision.) (*See* Ex. QQ)

174.   *Second*, the APA identifies what are the "Excluded Assets" in Schedule 2.1(c), which are limited to SCO's (at that time) active claims against IBM and others, and do not include claims to assert the post-1995 copyrights or claims that accrued to Xinuos after the transaction. (Ex. 3 at Schedule 2.1(c).)

175.   For present purposes, only sub-provisions (viii) and (ix) matter. Sub-provision (viii) states that the Excluded Assets include "all rights of Seller in the Licensed Properties" (discussed more fully below.) (*Id*.) Sub-provision (ix) states that the Excluded Assets include the following:

> all of Seller's claims, causes of action and other legal or equitable rights and remedies (A) against Buyer with respect to the transactions contemplated by this Agreement and (B) relating to all rights and interests in all litigation claims pending or that may be asserted in the future, against International Business Machines Corporation, Novell, Inc., SUSE Linux GmbH or others, and (C) relating to every claim of any nature whatsoever, known or unknown that has been or may be asserted against RedHat, Inc. or others relating to or arising from all licensing, covenant not to sue rights, releases or other claims relating to any allegations that Linux violates SCO's Unix or UnixWare intellectual property, contract or other rights;

(*Id*.) The parties understood this sub-provision to protect SCO's ability to seek vindication for any breach of the APA by Xinuos in part (A), to permit SCO to continue to litigate the operative complaints in the Utah Litigation, the Novell Litigation and the ancillary Red Hat and SUSE actions in part (B), and to permit SCO to pursue any claims that Linux violates SCO's intellectual property, contract or other rights in part (C.) (*See* Ex. RR ¶ 11, 14; Ex. QQ ¶¶ 3-6.)

176.    The parties also understood that the Avoidance of Doubt provision was framed as "*for avoidance of doubt*" (as opposed to as a wholly separate and distinct section of the APA) intentionally to reflect the foregoing Excluded Assets. (*See* Ex. RR ¶ 11-14; Ex. QQ ¶ 4.)

177.    The Avoidance of Doubt provision is only meant to clarify what the legal and equitable claims that Xinuos purchased do not encompass based on preexisting understandings about the asset sale and the provisions in the APA governing the Excluded Assets. (*See* Ex. RR ¶ 11-14; Ex. QQ ¶ 4.) Consistent with the Excluded Assets definition, the Avoidance of Doubt provision clarifies that the claims Xinuos purchased do not encompass any claims that SCO has against third-parties related to the Excluded Assets or the particular claims of SCO against Novell, IBM, Red Hat, and SUSE, all involving the pre-September 19, 1995, copyrights, which SCO was in the process of litigating against such parties at that very time in the Utah Litigation, the Novell Litigation and the Red Hat and SUSE actions. (*See* Ex. RR ¶ 11-14; Ex. PP at 24:7-11; 25:2-5; Ex. QQ ¶ 4.)

178.    The APA was entered into as of January 19, 2011 and the Court of Appeals did not finally conclude that Novell owned that material until August 30, 2011. *See SCO Group, Inc. v. Novell, Inc.*, 439 F. App'x 688, 691 (10th Cir. 2011.) In other words, the entire purpose and meaning of these provisions was that SCO would retain the right to pursue its claims regarding the pre-September 19, 1995, code and copyrights should it be successful on appeal and retained those claims and rights as "Excluded Assets." (*See* Ex. RR ¶ 10-14; Ex. QQ.)

179.    Importantly, the Excluded Assets do not include any of the Post-1995 copyrights, any exclusive right under the Copyright Act in such copyrights or any exclusive right to receive royalties or licensing fees under any such constituent rights under the Copyright Act. (*See* Ex. 3 at Schedule 2.1(c).) This is consistent with the fact that, at the same time and through the same legal

instrument, SCO transferred the post-1995 code and copyrights to Xinuos, as the "Acquired Assets," and all rights to assert those copyrights. The parties understood this, and this was Xinuos' and the Trustee's intent in framing the agreement in this way. (*See* Ex. RR ¶¶ 13-15; *see also* Ex. QQ ¶¶ 2-6.)

180.    *Third*, the APA establishes, in section 2.2, a sublicense by SCO to Xinuos to use the pre-September 19, 1995, copyrighted code owned by Novell and a mere non-exclusive license back from Xinuos to SCO to "use" the post-1995 copyrighted code that was transferred to Xinuos. (Ex. 3 at § 2.2.)

181.    The first part of section 2.2 states that SCO grants Xinuos "a perpetual, non-exclusive, royalty-free sublicense to use the Licensed Properties." (Ex. 3 at § 2.2.) The Licensed Properties are defined in § 1.40 to explicitly refer to the UNIX code that SCO mistakenly thought it owned but that—as a result of the jury verdict in the Novell Litigation—it turns out SCO only had a license to use. (*Id*. at § 1.40.)[12] Accordingly, while SCO had no entitlement or ability to sell these Novell assets to Xinuos, SCO did have the right to sublicense the Novell assets to Xinuos.

182.    The second part of section 2.2 states that Xinuos grants SCO "a perpetual, non-exclusive, royalty-free license to **use** the Intellectual Property transferred under this Agreement solely in connection with the exercise of its rights and performance of its obligations with respect to the Excluded Assets." (*Id*. at § 2.2 (emphasis added).) Accordingly, this license granted SCO a "non-exclusive . . . license to use" the Post-1995 developments that it had just assigned to Xinuos

---

[12] Section 1.40 states: "'Licensed Properties' means all copyrights and other Intellectual Property used by Seller in the Business as currently conducted that Seller does not own, including the copyrights owned by Novell, Inc., as determined in the Memorandum Decision and Order Denying SCO's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial and by the Findings of Fact and Conclusions of Law of the United States District Court of Utah on June 10, 2010."

"solely in connection with" its rights regarding the Excluded Assets. (*Id*. at § 2.2.) In other words, while Xinuos was willing to permit SCO to "use" the post-September 19, 1995 copyrighted code in the context of the Utah Litigation, Novell Litigation and ancillary Red Hat and SUSE actions— for example, as evidence in those cases of SCO's market success—no further rights were extended by Xinuos. (*Id*. at § 2.2.)[13] The Debtors were not granted and do not possess any right to license or sublicense the post-September 19, 1995 copyrights or code.

183.    The APA also contains a severability provision which provided that "[i]f any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions hereof shall not be affected thereby and shall be enforceable without regard thereto." (*Id*. at § 10.9.)

## XII.    SCO Intended to Sell Xinuos Everything Xinuos Needed to Operate the Business and to Retain Solely what was Necessary for the Existing Litigation

184.    In January 2011, SCO and Xinuos had already reached a tentative determination that Xinuos would purchase the assets from SCO. (Exs. A, AA.)

185.    SCO and IBM had an "arm's length" negotiation over the terms of the APA. *See* (Ex. A at ¶ 8.)

186.    As part of these negotiations, SCO's attorney provided the following explanation to SCO leadership about what was being transferred as part of the APA:

> The way it works now, all assets of SCO are being transferred [to Xinuos] except for those that are excluded. We can add things to the excluded schedule if you believe necessary for the litigation with the caveat that we have to give them [*i.e.*, Xinuos] everything they need to operate the business.

(Ex. AA at 3.)

---

[13] Notably, a vestigial footnote to the Xinuos-to-SCO License indicates that SCO's purpose was to support maintenance of the pending claims: "Seller [i.e., SCO] to confirm with litigation counsel that license-back of copyright is sufficient to maintain litigation." (Ex. 3 at § 2.2, n.1.)

187.    SCO understood that this was the effect of the APA. (*Id.*) SCO's assent to this

understanding of the APA reflects their assent to it as well. (*Id.*)

**XIII.   The Bankruptcy Proceeding – The Hearing on the Asset Purchase Agreement**

188.    On March 2, 2011, the bankruptcy court held a hearing on whether to approve the

Asset Purchase Agreement. (*See* Ex. W.) Statement made during that hearing are relevant here.

189.    One witness at the hearing was Bruce Comer. Bruce Comer was the founder and

managing director of Ocean Park Advisors, LLC, which was retained by the trustee as a financial

advisor. (*See id.* at 19:6-13.) Counsel for the trustee stated that Mr. Comer was "familiar with

debtors' day-to-day operations, business and financial affairs." (*Id*. at 19:14-15.)

190.    During the cross-examination of Bruce Comer, the scope of the asset sale was made

clear:

> Q. Now, I'm just curious. Well, let me ask you this question a little bit
> differently. On a kind of general level, you're intimately familiar with
> the transaction, right?
> A. Yes.
> Q. Okay, what's the debtor going to be left with, in general, once this
> transaction is done?
> A. We're going to be le – the purchase price, the 600,000 dollars, the
> accounts receivable, which will be collected by the buyer. That value,
> as of today, is about 680,000 dollars, actually. The cash balance in the
> company after the cure amounts – the net amounts of the cure are paid,
> and so that's the – that's what will be left over.
> Q. Any intellectual property?
> A. No. That's going to the buyer.
> Q. Any employees?
> A. No, because the buyer's taking all the employees.
> Q. So, in essence, the debtors will be out of business when this
> transactions closes, except for the purposes of winding up their estates?
> A. That is correct. The operating software business, that is correct. There
> will be no operating assets left.

(*Id*. at 34:5-25.) In other words, for purposes of the operating system business, the intent of the

APA was to place Xinuos completely and wholly in SCO's shoes. For SCO, after the APA "there

will be no operating assets left." (*Id*. at 34:24-25.)

191.     Another witness at the hearing was William Broderick. William Broderick was a SCO contractor who had been an employee at AT&T since 1991, working on UNIX, and was an employee working on UNIX at Novell as well. (*See id*. at 54:6-56:18.)

192.     During Mr. Broderick's direct examination, he explained the urgency and importance of the APA being approved:

> Q. Okay, if SCO is unable to transfer these assets to [Xinuos], what impact will there be on its customers?
> A. If SCO goes out of business, the impact is going to be pretty disastrous worldwide. This is an operating system that's used worldwide. We're not selling a lot of product right now, but we have a lot of support relationships in place. The people – the installed base that's using UNIX needs us to support them. The distributors that distribute our product do a lot of support of their customers, but we have support agreements, we support those distributors. If those distributors can no longer support their customers, then all those people I described before, small, medium, large corporations, retail outlets, government agencies, they're up a creek for support. If something happens to their operating system, they've got nobody to turn to.

(*Id*. at 65:11-25.)

193.     Thus, Mr. Broderick made clear that unless the entire business, products, assets, and associated intellectual property and rights were transferred to Xinuos, there would be a deleterious impact on a substantial ecosystem of customers and partners and their operations. (*Id*. at 65:13-25.)

194.     Indeed, the intent of the parties to the agreement was consistent with this position—that after the APA, Xinuos would take over all SCO operations and for all intents and purposes stand in the shoes of SCO for worldwide business activities. (Ex. 3; Ex. AA at 3; Ex. RR ¶ 13.)

195.     Thus, Xinuos acquired all rights, including intellectual property rights and rights to pursue its own commercial interests, sufficient to protect and defend that server operating system ecosystem and the entirety of the business that it was acquiring. (Ex. 3; Ex. AA at 3; Ex. RR ¶ 13,

15.)

196.    And third, during the redirect examination of Mr. Comer by counsel for the Trustee,

the relationship between the Acquired Assets and Excluded Assets was placed into sharper focus:

> Q. There was a question about whether the debtor would be left with any assets, and you very specifically said there would be no operating assets. You are familiar with the litigation that's been going on with Novell, correct?
> A. That's correct.
> Q. And that's on appeal right now?
> A. Um-hum.
> Q. So the debtor continues to have some interest in that litigation?
> A. Absolutely. And there may be some holding companies and other assets, but the operations – I guess what I was referring to was the customer-facing operations and assets will go to the buyer.
> Q. Okay, and are you aware –
> A. The litigation claims – or, the claims were all – were one of the excluded assets in the transaction.

(Ex. W at 38:17-39:7.) In other words, though SCO would be functionally a shell company for

operational purposes, it did retain sufficient assets to pursue the pending litigations, in particular

the Utah Litigation as framed in the Second Amended Complaint.

197.    In light of this and similar testimony, the Court approved the APA. (*See* Ex. BB.)

## XIV.    Conversion of Chapter 7 After the Asset Purchase Agreement

198.    After the APA was approved, almost no substantive activity took place in the

Bankruptcy Proceeding for a number of years, with the exception of August 16, 2012, when the

trustee filed a motion to convert the proceeding from a Chapter 11 case to a case under Chapter 7.

(*See* Ex. CC.)

199.    As noted at the hearing to approve the APA, SCO was no longer operational and

had no intellectual property assets. (*See* Ex. W at 34:5-25; 38:17-39:10.) So formally converting

to Chapter 7 was the appropriate step. (*See e.g.*, Ex. CC at ¶ 9 (noting that conversion from Chapter

11 to 7 is appropriate where there is a "substantial or continuous loss to or diminution of the estate

and absence of a reasonable likelihood of rehabilitation") (citing 11 U.S.C. § 1112(b)(4)(A).))

200.    As part of the motion, the Trustee stated as follows:

On April 11, 2011, the Debtors sold and conveyed to [Xinuos] the UNIX® system software product and related services business. There are no other assets in the Debtors' estates other than certain unfair competition and tortious interference claims asserted by the Debtors' estates against International Business Machines Corporation ("IBM") in an action [ ] currently pending in the District Court for the District of Utah [ ].

(Ex. CC at 1-2.)

201.    On August 24, 2012, the bankruptcy court granted the Motion to covert the proceeding from Chapter 11 to Chapter 7. (Ex. DD.)

## XV.    Xinuos' Use of the Assets Purchased Under the Asset Purchase Agreement

202.    After purchasing the assets from SCO, Xinuos put them to use, including in the OpenServer 5, OpenServer 6, and UnixWare 7 products. (Ex. RR ¶ 21.)

203.    Xinuos actively develops OS products using the copyrighted material that it obtained through the APA, and licenses those products to third parties. (Ex. RR ¶ 21.)

204.    This makes sense, as a driving motivating factor in selling the SCO assets to Xinuos was to ensure that Xinuos could take over SCO's business. (Ex. RR ¶ 18; *see supra* § XIII "The Bankruptcy Proceeding – The Hearing on the Asset Purchase Agreement.".)

205.    Xinuos' intent in purchasing the SCO assets was to carry the business forward, and Xinuos' understanding of the APA was that it granted Xinuos all intellectual property and commercial rights that were needed to proceed with the business, which included the right to vindicate its own competitive interests in and related to the acquired assets. (Ex. RR ¶ 18.)

## XVI.    After Almost a Decade IBM Chooses to Settle with SCO After Xinuos Files Suit

206.    On March 31, 2021, Xinuos filed suit against IBM and Red Hat. (D.I. 1.) The suit was filed in the United States District Court in the U.S. Virgin Islands. (*Id.*)

207.    The suit alleged copyright infringement against IBM related solely to post-1995 code. (*Id.* at ¶¶ 42-48, 58-73, 175-183.)

208.    The suit also alleged federal and U.S. Virgin Islands anticompetition claims against both IBM and Red Hat. (*Id.* at ¶¶ 74-174, 184-229.)

209.    Between August 2012 (the date when the Bankruptcy proceeding was converted to Chapter 7) and March 2021 (the date when Xinuos filed suit against IBM), very little occurred in the bankruptcy proceedings. (Ex. TT.)

210.    Then, on August 26, 2021, the Trustee in the Bankruptcy proceeding filed a motion and associated proposed settlement agreement with IBM. (Ex. NN.) The settlement related to the Utah Litigation. (Ex. 45.)

211.    In order to ensure that any settlement and release in the bankruptcy court did not impact Xinuos' rights, Xinuos filed an opposition to the motion and settlement. (Ex. OO.) The opposition focused on preventing the bankruptcy court from improperly reading in language into the APA between SCO and Xinuos, and broadening what was allegedly retained by TSG, such that IBM could avoid litigating this case on the merits. (*See, e.g.*, *id.* at 1-3, 20-39.)

212.    A hearing was held in the bankruptcy court on Xinuos' opposition to the proposed motion. (Ex. PP.) Counsel for Xinuos and counsel for IBM attended the hearing. (Ex. PP.) At the hearing, IBM's counsel stated that it is "my impression that [Xinuos is] seeking to assert rights that we do not believe that they have." (Ex. PP at 16:14-16.)

213.    In response, the bankruptcy court stated that the settlement and release would have no bearing whatsoever on the construction of the APA:

> THE COURT: So, here's the thing, unless I'm mistaken, it -- it does -- and -- and I -- I don't mean this disparagingly, but this does seem to me to be word smithing. And, the fear is the maligned intent on each side. So, each of you, Mr. Marriott and Mr. Ramsey, again, meaning no -- no dis --

disrespect, but each of you is concerned the other is planting a landmine. That either somehow this Court will bless and recognize causes of action that presumably IBM will seek to dismiss as -- as being non-existent, or IBM will use this to say in fact you know Judge Shannon found that -- that any and all claims and causes and action that relate to these assets were the subject of the Utah litigation and therefore there's no basis for the Virginia -- for the Virgin Islands lawsuit.

So, that's -- to me, if I were to walk this down -- I'm not going to say that Xinuos has any claims or causes of action. Xinuos bought assets. And, if there are claims or causes of action arising from them, another Court of competent jurisdiction will decide that. That's an issue involving two separate non-debtors.

(Ex. PP at 23:17-24:11.)

214.     The bankruptcy court reinforced this by stating that "to the extent that there are any

claims or causes of action that belong to other parties, that may be legitimately presented, this

settlement does not affect them." (Ex. PP at 25:3-5.)

215.     The bankruptcy court further stated:

And -- and, again, I'm -- I'm being -- I'm speaking in -- in rather loose terms to lawyers that are going to carefully phrase and -- and articulate this. But, I understand the point about protecting your flank, but it's -- it seems to me to have an -- an extensive discussion about this proposition seems -- this would be a fine fight to have if Xinuos said Mr. Cahn does not own any causes of action relating to this stuff. We own it. We bought. That's a fight -- that's a lawsuit that I would -- or that's a motion that I would conduct and that I've heard many times. . . .

This fight is the Trustee says I'm am emphatically only settling what I have. IBM is receiving a release from Trust and no other party. And, if there's other litigation pending elsewhere as to that, we make no comment. I don't -- I -- I'm trying to figure out why that is not sufficient. I'm not going to put the rabbit in the hat, and I'm not going to -- I'm really stretching some metaphors, but I'm not going to put the rabbit in the hat for the -- for one litigant. And, I'm not going to tolerate the -- the planting of landmine to go off in the Virgin Islands.

(Ex. PP at 25:6-15, 25:24-26:8.)

216.     Moreover, the bankruptcy judge stated directly to IBM's counsel: "I have every

confidence that your client is -- is in or is going to be in the Virgin Islands saying there are no --

you have no cause of action. What I think I want is to ensure that you're going into the Virgin Islands saying you have no cause of action by virtue of a settlement that Judge Shannon approved. And, I don't think you're looking for that today. But, I'd like -- I'd like your thoughts, if I can?" (Ex. PP at 27:13-20.)

217.    In response to this, counsel for IBM responded: "I don't think Your Honor today should -- as I'm sure each of us would like you to do this and -- and weigh in our favor in some -- in some respect. I don't think the advisable thing to do is for the Court to dig into that in the abstract." (Ex. PP at 31:12-16.)

218.    After the hearing and with it as a backdrop to its decision, the bankruptcy court blessed the settlement and release. (Ex. at 52:21-53:8.)

## XVII.  As Part of its Summary Judgment Briefing, IBM Uses Factual Information Despite Telling the Court that it Would Not

219.    This Court held a hearing on January 17, 2023, regarding, among other topics, IBM's request to file a motion for summary judgment on Xinuos' copyright infringement claim. (Ex. SS.)

220.    At the hearing, counsel for IBM stated: "I don't think Your Honor is going to require a lot of information outside the complaint. It will require some outside the complaint. But that really is just the joint development agreement that governs this." (Ex. SS at PDF pp. 6-7.) He also stated that the Court may need to consider "the Asset Purchase Agreement pursuant to which SCO sold certain assets to a company now known as Xinuos in 2011." (Ex. SS at PDF p. 7.) And he stated that the Tenth Circuit's decision may need to be considered. (Ex. SS at PDF p. 7.)

221.    Counsel for IBM stated that "it's really about fundamentally what those documents say. And we submit that on their face, they are as plain as day. . ." (Ex. SS at PDF p. 7.) The documents referred to here are the APA and JDA. (Ex. SS at PDF pp. 6-7.)

222.    Nonetheless, the summary judgement motion which IBM filed includes a Statement of Facts that has 97 paragraphs and cites to 54 exhibits. *See supra* ¶¶ 1-97.

223.    Many of the 54 exhibits which IBM cites to are nonpublic or refer to nonpublic documents and Xinuos has no access to many of the exhibits prior to IBM filing its motion. (*See e.g.* Exs. 5, 8, 14, 27.)

224.    Xinuos was unable to find one exhibit that IBM included in its briefing, which appeared to be both nonpublic and excerpted. Xinuos therefore had to request that IBM provide a complete copy of that document. (*See* Ex. 8.)

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on this 17th day of February, 2023, I caused the foregoing document to be served via electronic mail on the following parties:

Stefan B. Herpel
sherpel@dnfvi.com
**DUDLEY NEWMAN FEUERZEIG LLP**
1131 King Street
Ste 204
St. Croix, VI 00820
(340)773-3200

David R Marriott
dmarriott@cravath.com
Emma Kolesar
ekolesar@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
(212) 474-1000


_/s/ Kaman Chow_
Kaman Chow