```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     XINUOS, INC.,
 3
                             Plaintiff,
 4
             -against-                          22-cv-09777
 5                                              BENCH RULING

 6   INTERNATIONAL BUSINESS MACHINES CORPORATION et al.,

 7                      Defendant.
     ------------------------------------x
 8
                                         United States Courthouse
 9                                       White Plains, New York

10                                       January 22, 2024

11   B e f o r e :

12                                       HONORABLE JUDGE CATHY SEIBEL,
                                         United States District Judge
13
     A P P E A R A N C E S :
14
     CROWELL & MORING LLP
15           Attorneys for Plaintiff
             3 Embarcadero Center - 26th Floor
16           San Francisco, CA  94111
     BY:  WARRINGTON PARKER
17        MARK MICHAEL SUPKO

18   CROWELL & MORING LLP
             Attorneys for Plaintiff
19           1001 Pennsylvania Avenue, NW
             Washington, DC  20004
20   BY:  MARK ANDREW KLAPOW

21   CRAVATH, SWAINE & MOORE LLP
             Attorney for Defendant
22           825 Eighth Avenue
             New York NY  10019
23   BY:  DAVID R. MARRIOTT

24   ALSO PRESENT:  Thomas Kemmery
                     Franklin Li
25                   Sean Snyder
```

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1                        PROCEEDINGS

2            THE DEPUTY CLERK:  All rise.  The Honorable Cathy

3   Seibel presiding.  Xinuos v. IBM.

4            THE COURT:  Good morning, everyone.  Let me figure

5   out who is who.  Mr. Supko.

6            MR. SUPKO:  Yes, your Honor.  Good morning.

7            THE COURT:  Mr. Parker.

8            MR. PARKER:  Yes, ma'am.

9            THE COURT:  Mr. Klapow.  Am I saying it right?

10           MR. KLAPOW:  You are.

11           THE COURT:  And Mr. Snyder.

12           MR. SNYDER:  Uh-huh.

13           THE COURT:  And Mr. Marriott.

14           MR. MARRIOTT:  (Nodding.)

15           THE COURT:  And Mr. Kemmery and Mr. Li.  Okay.

16   Great.  Everyone can have a seat.

17           Anybody have anything to add on the pending motions

18   that wasn't covered by the papers?

19           MR. SUPKO:  Not for plaintiff, your Honor.

20           MR. MARRIOTT:  Not for defendants, your Honor.  Thank

21   you.

22           THE COURT:  Mr. Supko, what's the correct

23   pronunciation of your client?

24           MR. SUPKO:  Xinuos.

25           THE COURT:  Xinuos.  Never would have guessed.

1          MR. SNYDER:  I have a habit of creating names you

2     can't pronounce.

3          THE COURT:  Well, let me tell you where we come out.

4     You're going to want to order the transcript because I'm going

5     to lead with the punch line.  The motion is going to be granted

6     in part and denied in part -- or motions I should say.  So

7     there's a partial motion for summary judgment and a motion to

8     dismiss by defendants IBM and Red Hat.  The motion for summary

9     judgment relates to Xinuos's copyright infringement claim

10    against IBM, and the motion to dismiss relates to Xinuos's

11    claims against IBM and Red Hat for violation of Sections 1

12    and 2 of the Sherman Act, Section 7 of the Clayton Act and the

13    Virgina Islands Antimonopoly Law and unfair competition and

14    unjust enrichment under Virgin Islands' common law.

15         Let me start with the facts related to defendant's

16    motion for summary judgment.  I base these facts on defendant's

17    Local Civil Rule 56.1 statement, which is ECF Number 123, the

18    plaintiff's responsive statement, which is ECF Number 128, and

19    the supporting materials.

20         Plaintiff's responsive 56.1 statement also includes a

21    126-paragraph additional statement of facts.  That's at page 37

22    to 64, ECF128.  Local Rule 56.1 allows for a counterstatement

23    of, quote, additional material facts as to which it is

24    contended that there exists a genuine issue to be tried,

25    unquote.  That's Rule 56.1(b), but there's no provision for a

1    responsive 56.1 statement to include additional facts that are

2    not in dispute but that a party opposing summary judgment

3    simply thinks are important.  Any additional facts have to be

4    confined to the material facts in dispute.

5         Because plaintiff's so-called additional statement

6    consists of facts that plaintiff regards as undisputed and

7    helpful, it is not authorized, and I do not consider it.  I

8    also do not consider defendant's response to it, which is ECF

9    131 at 68 to 119.

10         Defendants, for their part, filed a reply to

11    plaintiff's response to defendant's 56.1, and that was pages 1

12    through 67 of ECF 131, supporting anew their original 56.1

13    statement by addressing each of plaintiff's responses and

14    opining on whether he created a genuine issue of fact.  Local

15    Rule 56.1 does not permit the filing of reply 56.1 statements.

16    See, for example, *Capital Records against Vimeo*, 2018 Westlaw

17    4659475 at page 1, Southern District, September 10, 2018.

18         A reply 56.1 statement is, quote, a procedurally

19    improper attempt to have the last word in a manner that is not

20    contemplated by the local rules, unquote.  *Killis v. Cabela's*,

21    2015 Westlaw 128098 at page 1, Northern District of Illinois,

22    January 8, 2015.  That's a district with rules substantively

23    similar to ours.  See also *Pape v. Dirkson*, 2019 Westlaw

24    1435882 at pages 2 to 3, Eastern District, February 1, 2019,

25    report and recommendation adopted, 2019 Westlaw 1441125,

1    March 31, 2019.

2            So I don't consider the reply 56.1 statement either.

3    See *Lincoln National v. TCF*, 875 F. Supp. 2d 817 at 820, Note

4    1, Northern District of Illinois, 2012.  Both sides overreaches

5    appear to be efforts to get around the Court's page limitations

6    for briefs by making arguments in 56.1 statements, which are

7    supposed to be limited to facts.  Those page limitations exist

8    for a reason, and I expect both sides to abide by them going

9    forward.

10           So the following disputes -- the following facts are

11   undisputed unless otherwise noted.  IBM is a New York

12   corporation that creates operating system software for servers

13   and sells a Unix-based server operating system called AIX for

14   Power among other products.  Xinuos, formerly named -- I'm

15   going to spell it.  U-N, capital X, I-S, Inc. -- is a Virgin

16   Islands corporation -- a U.S. Virgin Islands corporation formed

17   in 2009.

18           Project Monterey, which I may abbreviate PM at times,

19   was a joint development project between IBM and The Santa Cruz

20   Operation, Inc.  That's in defendant's 56.1, paragraph 3.

21   Plaintiff attempts to dispute it by saying it fails to include

22   relevant information and is misleading because Project Monterey

23   also included Sequent and Intel.  This purported dispute and

24   many of plaintiff's others, quote, improperly interjects

25   argument and/or immaterial facts in response to facts asserted

1    by defendants, often speaking past defendants' asserted facts

2    without specifically controverting those facts, unquote. *Baity*

3    *v. Kralik*, 51 F. Supp. 3d 414 and 418, Southern District, 2014.

4    See, for example, plaintiff's response to paragraphs 5, 7, 19

5    through 21, 26, 32, and 50 to 57.  Plaintiff's response

6    contains several similar purported denials that do not actually

7    deny or refute the facts asserted by defendants but instead

8    quibble with phraseology.  See, for example, paragraphs 13, 14,

9    16, 17, 22, 31, 36, 40, 87, and 90 through 92.

10          In these circumstance where the record supports

11   defendants contentions, I deem defendant's facts admitted.  See

12   *Warren v. Ewanciw*, 2019 Westlaw 589488 at page 2, Note 4,

13   Southern District, February 13, 2019.

14          So I accept that IBM and Santa Cruz worked together

15   on Project Monterey.  It was governed -- Project Monterey was

16   joined -- sorry.  Project Monterey was governed by a joint

17   development agreement, which I'll call the JDA, into which IBM

18   and Santa Cruz entered on October 23, 1998.  Plaintiff points

19   out that it was signed on October 26, although dated

20   October 23.  This dispute is immaterial.

21          The purpose of Project Monterey was to develop and

22   market Unix-like operating system products, including a

23   Monterey/64 version for the then forthcoming IA-64 Intel

24   processor, a version to run on IBM's proprietary Power

25   processor architecture and a version to run on the IA-32

1    architecture.  When Project Monterey began, the IA-64

2    architecture had not been commercialized but was under

3    development in a separate collaboration between Intel and

4    Hewlett-Packard.  Under the JDA, Santa Cruz and IBM agreed to

5    provide resources and technology to create a compatible family

6    of products and agreed to grant each other licenses to use code

7    supplied during the project.  They also agreed under Section

8    22.3 of the JDA that any legal action related to a breach of

9    the JDA had to be commenced no later than two years from the

10   date of the breach.

11        The JDA also provided that if Project Monterey was

12   terminated, quote, licenses and sublicenses to end users

13   granted by either party prior to the effective date of

14   termination are irrevocable and shall survive the termination

15   or expiration of the agreement, unquote.  See paragraph 9 of

16   the 56.1.

17        The defendant contends that that provision means that

18   any rights afforded to IBM during Project Monterey for use of

19   UnixWare source code would not end after the termination of the

20   project or the JDA.  Plaintiff disputes this fact as false and

21   misleading because IBM was not an end user.  IBM incorporated

22   code for Project Monterey into IBM products, which IBM contends

23   it and Santa Cruz intended from the beginning.  See paragraph

24   10.  Plaintiff disputes this fact as false and misleading

25   because Supplement B to the JDA limited the license such that

1    IBM was permitted to use Santa Cruz's code only for joint

2    development of an IA-64 product, and if the JDA was terminated,

3    the parties could only continue to use licensed materials for

4    the development of the, quote, IA-64 product release run,

5    unquote, which plaintiff contends never occurred.

6         Plaintiff also points to a related litigation in Utah

7    where the Tenth Circuit found a question of fact as to whether

8    the release entitled IBM to a royalty-free license of Santa

9    Cruz's code.  See plaintiff's paragraph 10 citing *SCO Group v.*

10   *IBM*, 879 F.3d 1062 at 1072, Tenth Circuit, 2018.

11        Santa Cruz was aware that IBM used the code as early

12   as August 2000 and no later than May of 2001 when IBM released

13   software, and IBM and Santa Cruz jointly announced that the

14   software incorporated Santa Cruz's technology.  Paragraph 11.

15   Plaintiff disputes this fact as misleading to the extent it

16   suggests that the company was aware of any copyright

17   infringement or that IBM was using the code outside the scope

18   of Project Monterey.

19        Ultimately, Intel's IA-64 processor did not ship

20   until mid-2001, and once it arrived, it performed poorly.  And

21   as a result, Intel and Hewlett-Packard repositioned it

22   primarily as an evaluation and development platform.  There was

23   a substantial decrease in market interest and confidence in

24   IA-64, and, therefore, in the Monterey 64 product under

25   development in Project Monterey.

1          In 2000 Santa Cruz announced that it was selling its

2    server software and professional services divisions and its

3    Unix-related assets to Caldera Systems, Inc.  As a result IBM

4    exercised its right to terminate Project Monterey on June 19,

5    2001.  In March 2003 Caldera sued IBM in the District of Utah

6    for a breach of contract, copyright infringement, unfair

7    competition, and tortious interference among other things.

8    Shortly after filing the suit, Caldera changed its name to the

9    SCO Group.

10         The initial complaint filed on March 6 by Caldera

11   brought claims for misappropriation of trade secrets, unfair

12   competition, interference of contract, and breach of contract.

13   See ECF Number 124-15 at pages 27 to 34.  The second amended

14   complaint brought under the name SCO added more claims,

15   including copyright infringement.  See 124-16 at pages 32 to

16   61.

17         In the second amended complaint or SAC, SCO alleged

18   that IBM had infringed copyrighted code that SCO's predecessor

19   had obtained from Novell, Inc., in 1995.  See 124-16 at pages

20   11 to 12 and 50 to 52.  In a proposed third amended complaint

21   dated October 14, 2004, SCO sought permission to add a

22   copyright infringement claim arising from IBM's alleged

23   misappropriation of different code to which IBM had been given

24   access during Project Monterey, which code IBM allegedly

25   incorporated into IBM's operating systems in breach of the JDA.

1    See paragraph 21.  SCO claimed to have learned about this

2    alleged theft by IBM only during discovery in the Utah case.

3    IBM opposed the motion to amend as untimely, and the District

4    Court denied the motion.  See paragraphs 21 and 22.

5         In the same time frame SCO was litigating with Novell

6    over which party owned the Unix and UnixWare copyrights that

7    SCO's predecessor had allegedly purchased from Novell in 1995.

8    Shortly after an adverse ruling on August 10, 2007, SCO filed

9    for bankruptcy in the District of Delaware, and on

10   September 20, 2007, the *SCO v. IBM* case in Utah was temporarily

11   closed administratively.  See paragraphs 26 through 28.

12        In connection with SCO's bankruptcy proceeding, SCO

13   and Xinuos entered into an asset purchase agreement or APA on

14   January 19, 2011.  The APA granted Xinuos certain, quote,

15   acquired assets, unquote, but carved out, quote, excluded

16   assets, unquote, from the transfer.  The APA clarified that the

17   acquired assets did not include, quote, any rights, claims, or

18   causes of action related to Novell, Inc., IBM, Red Hat, Inc.,

19   and SUSE Linux GmbH or other similar claims, unquote, belonging

20   to SCO, and Section 2.1(c) reinforced that the excluded assets

21   did not fall within the definition of acquired assets.  See

22   paragraphs 32 to 33.

23        The excluded assets included any of SCO's causes of

24   action, rights, and remedies against IBM and Red Hat in

25   relation to claims arising from the Unix or UnixWare

1    intellectual property, and, therefore, all of SCO's claims

2    against IBM and Red Hat remained an asset of the bankruptcy

3    estate.  Paragraph 34.  Plaintiff disputes this fact by

4    asserting that the excluded assets solely excluded the assets

5    that the bankruptcy estate would need to continue to pursue its

6    existing litigation against IBM and any other litigations that

7    were still active.  That's in plaintiff's paragraph 34.

8         But the plain language of the APA excludes, quote,

9    all rights and interests in all litigation claims pending or

10   that may be associated in the future, unquote, against IBM by

11   SCO and, quote, every claim of any nature whatsoever known or

12   unknown that has been or may be asserted by SCO against Red

13   Hat, Inc., unquote.

14        Xinuos paid 600,000 cash for the acquired assets.

15   Defendants assert that these assets constituted almost the

16   entirety of SCO's software business.  Paragraph 35.  Plaintiff

17   asserts that the assets included all of SCO's software and

18   copyrights but without citing to evidence to support this

19   assertion.  The only evidence cited in plaintiff's paragraph 35

20   supports the first statement of plaintiff's response, and there

21   is no evidence cited to support the second part.

22        Federal Rules of Civil Procedure 56 requires a party

23   asserting that a fact is genuinely disputed to support that

24   assertion with citations to particular parts of materials in

25   the record.  That's Rule 56(c)(1)(A), and Local Rule 56(d) says

1    that each statement by the movant or opponent ... including

2    each statement controverting any statement of material fact

3    must be followed by citation to evidence which would be

4    admissible.

5            So plaintiff has failed to properly address

6    defendant's assertion of fact in the second part of the

7    statement in paragraph 35, and that fact is considered

8    undisputed for purposes of the motion.  See *Cruz v. Wyckoff*

9    *Heights*, 2016 Westlaw 4533568 at page 1, Southern District,

10   July 19, 2016.  See also *Amnesty America v. Town of West*

11   *Hartford*, 288 F.3d 467 at 470, which noted that Rule 56 does

12   not impose an obligation on a district court to perform an

13   independent review of the record to find proof of a factual

14   dispute.

15           On March 7, 2011, the Delaware bankruptcy court

16   approved the APA, finding that the terms and conditions

17   constituted fair consideration for the acquired assets.  The

18   bankruptcy court's approval was based on the understanding that

19   SCO was retaining SCO's Project Monterey claim, and indeed SCO

20   pursued that claim in the Utah litigation for years thereafter.

21   Plaintiff disputes this fact by asserting that the excluded

22   assets included the then pending unfair competition claim but

23   did not include any other claims, including copyright

24   infringement claims that were yet to accrue because no other

25   claims were pending at the time, and SCO was transferring all

1    assets, including the right to bring claims that accrued to

2    Xinuos after the APA sale was completed.  This is all in

3    paragraphs 36 through 40.  Plaintiff does not address copyright

4    claims that had accrued but not yet been brought.

5         In November and December of 2011, SCO urged the

6    District Court in the District of Utah to reopen *SCO v. IBM*.

7    That occurred in June of 2013.  SCO conceded that the rule

8    obtained by Novell meant that SCO could no longer pursue in the

9    Utah case the copyright claims it had originally brought which

10   were based on code that the court in the SCO-Novell litigation

11   found belonged to Novell.  See ECF 127-15 at page 3.

12        While SCO's attempt to amend to include an

13   infringement claim relating to the code IBM allegedly stole

14   from Project Monterey had been denied -- paragraphs 21 and

15   22 -- SCO included the alleged misuse of the Project Monterey

16   code as evidence for its unfair competition claim, and IBM and

17   SCO thus litigated whether IBM stole the PM code or had a

18   license to it.  Paragraphs 23 and 24.

19        In August 2013 after the Utah District Court in July

20   dismissed several of SCO's claims, SCO explained that the core

21   of its remaining claims included that in connection with

22   Project Monterey, IBM misappropriated UnixWare source code into

23   its AIX for Power products in violation of the JDA.

24   Paragraphs 43 to 44.  Plaintiff attempts to dispute this

25   statement by asserting the copyright infringement related to

1   the post-1995 code was not being litigated at that time --

2   plaintiff's paragraph 44 -- but whether IBM had misappropriated

3   Project Monterey code was at issue as part of the unfair

4   competition claim.  See ECF Number 124-30 at page 3.

5          On December 15, 2014, the Utah District Court entered

6   summary judgment in favor of IBM on several counterclaims.  One

7   of the claims that remained was SCO's claim for unfair

8   competition concerning Project Monterey.  In March 2015 the

9   parties agreed in a status report that SCO's claim against IBM

10  was ripe for adjudication.  The parties supplemented their

11  previously filed motions for summary judgment, and SCO argued

12  that it was undisputed that IBM obtained SCO's code through

13  Project Monterey and used it in its AIX for Power product.  See

14  paragraphs 43 through 48.

15         In February 2016 the court granted summary judgment

16  for IBM on SCO's remaining claims, and SCO appealed to the

17  Tenth Circuit, challenging several of the District Court's

18  rulings, including its order granting summary judgment against

19  SCO on the unfair competition claim concerning Project Monterey

20  and its order denying leave to amend to add a copyright

21  infringement claim concerning Project Monterey.

22         In papers submitted to the Circuit Court, SCO argued

23  that IBM exploited its relationship with SCO through Project

24  Monterey by misappropriating SCO's code and using it for its

25  own operating system.  Paragraphs 49 through 52.  In

```
 1    January 2018 the Tenth Circuit affirmed the District Court's

 2    rulings except it remanded for trial the unfair competition

 3    claim based on misappropriation of SCO's code.  IBM had argued

 4    that that claim was untimely under the JDA, and SCO argued that

 5    the two-year limitation in the JDA should not apply to the

 6    misappropriation claim because it was not a breach of contract

 7    claim.

 8          The Tenth Circuit held that the misappropriation

 9    claim was related to a breach of the JDA and, therefore,

10    applied the JDA's two-year limitation's period but found the

11    claim timely.  It found that there were fact issues as to

12    whether, as SCO alleged, IBM misappropriated the code and did

13    so in bad faith by pretending to support Project Monterey and

14    issuing a sham IA-64 product to legitimize its theft.

15          The Tenth Circuit also noted that a claim for unfair

16    competition required SCO to prove not just copyright

17    infringement but also bad faith.  So in that sense, the

18    copyright infringement was a lesser included claim of the

19    unfair competition claim.  SCO sought hundreds of millions of

20    dollars in damages from IBM through the unfair competition

21    claim.  See paragraphs 53 through 56 and 25 as well as the

22    Tenth Circuit's SCO decision at 1078 -- sorry -- 1075 through

23    1081.

24          In February of 2018, SCO and IBM, in a joint status

25    report, informed the Utah District Court that SCO's remaining
```

1    unfair competition claim concerned the allegation that IBM

2    misappropriated into its AIX for Power operating system

3    UnixWare source code that SCO provided to IBM through Project

4    Monterey.  Paragraph 57 and ECF Number 124-36 at pages 2 to 3.

5    *SCO v. IBM* garnered media attention, including regarding the

6    Project Monterey claim.  Paragraphs 59 through 64.

7           Xinuos never raised any objection to SCO's continued

8    assertion of its Project Monterey claim against IBM and did not

9    lay claim to any relating to Project Monterey until after the

10   Tenth Circuit affirmed the Utah District Court's decision that

11   precluded SCO from asserting the copyright infringement claim

12   as untimely.  Paragraphs 65 to 67.

13          On March 26, 2019, Xinuos sent a letter to IBM

14   accusing IBM of unauthorized uses of Xinuos's copyrighted code

15   in IBM's AIX and Linux-based operating systems and unauthorized

16   contribution of Xinuos's copyrighted code to both the Red Hat

17   Linux and SUSE Linux operating systems.  On March 31, 2021,

18   plaintiff filed its complaint in this action.  Paragraphs 68

19   and 69.

20          On August 17, 2021, SCO and IBM settled the Utah

21   litigation.  Under the agreement SCO released any and all

22   claims against IBM, including claims, quote, concerning,

23   related to, arising out of, or arising from the Utah

24   litigation, the proof of claim for IBM's relationship with (SCO

25   or its predecessors), Project Monterey, or IBM's relationship

1    with SCO.  That's in paragraph 80.  The settlement further

2    clarified that the release included any claims against IBM or

3    Red Hat, belonging to SCO.  See paragraphs 78 through 81.

4            Plaintiff disputes these statements by asserting that

5    the terms of the settlement had nothing to do with its claims

6    for copyrights it purchased a full decade before the

7    settlement.  Plaintiff's paragraphs 80 to 81.  Plaintiff also

8    objected to the settlement itself in the bankruptcy court, but

9    on October 14, 2021, the bankruptcy court overruled that

10   objection and approved the settlement.  The bankruptcy court

11   did not determine exactly what claims Xinuos might or might not

12   be able to assert against IBM in this litigation, which was

13   then pending in the U.S. Virgin Islands, but noted that, quote,

14   Xinuos, Inc., reserves the right to argue that the release in

15   the settlement agreement does not bar any claims it has

16   asserted against IBM in *Xinuos, Inc., v. IBM*, 21-cv-31, DVI,

17   and IBM reserves the right to argue that the settlement bars

18   such claims, unquote.

19           The bankruptcy court expressly stated that it

20   approved of the settlement agreement, including the release of

21   the bankruptcy estate's claims against IBM.  The bankruptcy

22   court also declined Xinuos's proposal to include language in

23   its order that the settlement did not bar Xinuos from asserting

24   that IBM infringed and continues to infringe copyrights that it

25   had purchased.  On November 5, 2021, the Utah District Court

1    dismissed SCO's remaining claims against IBM with prejudice.

2    This is all in paragraphs 80 through 93.

3            On November 16, 2022, this case was transferred here

4    to the Southern District of New York.  Between December 21 and

5    23, 2022, Xinuos served 74 discovery requests on defendants

6    that relate in large part to Project Monterey and the *SCO v.*

7    *IBM* litigation, including all documents and communications

8    referring or relating to Project Monterey, all discovery

9    responses, and all deposition transcripts from *SCO v. IBM*, and

10   the source code for a number of versions of IBM software dating

11   back to 2000.

12           On January 10, 2022, Xinuos served its initial

13   disclosures under Rule 26, which identified more than 60

14   individuals identified with -- excuse me -- associated with IBM

15   and SCO, who allegedly possessed knowledge relative to Xinuos's

16   claims.  On January 17, 2023, I granted defendant's request to

17   file their dispositive motions, and I stayed discovery pending

18   their resolution.  See paragraphs 94 and 97.

19           Now I'll summarize the facts as they relate to the

20   motion to dismiss the antitrust claims, and for purposes of

21   that motion, I accept as true the facts, although not the

22   conclusions, set forth in the plaintiff's complaint, which is

23   ECF Number 1.

24           IBM and Xinuos's predecessor entered into a joint

25   venture, Project Monterey, through which IBM gained

1    confidential access to code to which plaintiff says it has

2    copyright rights.  See paragraphs 43 and 55 through 56.

3    According to the complaint, IBM then terminated Project

4    Monterey without gaining any rights to the code under the

5    applicable agreement but nevertheless used the code by

6    incorporating it into several of AIX products.  Paragraph 57 to

7    60.  With the benefit of the code, IBM software became more

8    competitive, but IBM still had competitors, including Xinuos

9    and Red Hat.  Paragraph 74 to 75.

10           IBM approached Red Hat, and they agreed to dominate

11   the Unix and Linux paid server operating system market by

12   dividing that market, promoting each other's products, and

13   granting each other technical information that was not made

14   widely available and from which Xinuos and others were

15   excluded.  Paragraphs 78 to 79.  Red Hat and IBM agreed that

16   Red Hat would take control of the low end of the relevant

17   Unix/Linux paid server operating system market, and IBM would

18   maintain the high end.  Red Hat and IBM established a multiyear

19   alliance to package each other's services and target clients

20   based on their location in the market.  They agreed to do joint

21   marketing, jointly approach customers, and refrain from

22   competing for the same customers.

23           Rather than competing with Red Hat, IBM drove its

24   low-end customers to Red Hat's services, drove its high-end

25   customers to IBM's services, and also integrated Red Hat

1    technology into IBM's software.  IBM offered rebates of up to

2    $10,000 to customers that bought IBM servers packaged with Red

3    Hat's Linux-based operating system RHEL but refused to offer

4    similar rebates for other competing operating systems.  IBM

5    also reimbursed server business partners as much as $3,000 to

6    get certified to use Red Hat software and provided courses on

7    RHEL applications.  Xinuos submits that these actions excluded

8    rivals from the low- and high-end markets, locked customers in,

9    and deprived Xinuos of substantial benefits.  See paragraphs 5,

10   7, 15, and 85 through 96.

11          IBM ultimately made RHEL the default operating system

12   across its server products instead of making its own operating

13   system the default and extended RHEL's capabilities on its

14   servers, causing large enterprises to leave competing servers

15   and move to IBM servers running RHEL.  IBM enabled RHEL

16   installations in larger enterprise data centers instead of

17   installing its own operating systems.  When IBM entered the

18   cloud market, it made RHEL the default choice for the operating

19   system in IBM's hybrid cloud and promoted RHEL instead of its

20   own operating systems.  Paragraphs 97 through 103.

21          Installation of IBM's operating systems have

22   decreased, but they are dominant in the high-end market.

23   Paragraphs 105 and 107.  Meanwhile, installations of RHEL have

24   grown because of IBM's backing, and support for Xinuos's

25   equally featured product has decreased.  Paragraphs 108 through

112 and 118.  To the extent that any of IBM's customers were moving to Linux, IBM transitioned that business to Red Hat.  Paragraph 113.  This prevented Xinuos and others from competing because in some of IBM's customers, RHEL would be installed as a matter of course.  Paragraph 115.

IBM's arrangement with Red Hat caused consumers to migrate to RHEL to the detriment of other competitors, and defendants have become the world's two largest commercial Linux developers.  Paragraphs 119 to 120.  IBM did not offer to Xinuos the same technical advantages and opportunities that it provided to Red Hat and stopped supporting Xinuos's operating system on its cloud computing platform for no legitimate procompetitive reason.  See paragraphs 123 to 126 and 132.  In doing so, IBM has made extraordinary money from its collusion with Red Hat, denied consumers the benefit of Xinuos's program, and caused developers and manufacturers who would otherwise support Xinuos to believe that getting Xinuos's program is not worth it.  Paragraphs 131 to 135.

Defendants control over 64 percent of the Unix/Linux server market and control the most lucrative licenses to the exclusion of any competitors.  Paragraph 137.  Xinuos alleges that this conduct has harmed market competition because defendants have extraordinary access to and control over the high- and low-end markets, causing rivals to compete at a disadvantage or making it impossible for them to compete at

1    all.  This disadvantage is reinforced by the fact that existing

2    customers are unlikely to migrate to new products due to time,

3    switching cost, and risk and developers and manufacturers are

4    disproportionally willing to work on products created by

5    defendants given their controlling share of the market.  This

6    makes it difficult for competitors to lure customers away from

7    IBM and Red Hat despite their high prices, and it's expensive

8    for Xinuos and others to develop similar scale and network

9    effects competitive with IBM and Red Hat.  Paragraphs 140

10   through 146 and 149.

11           Xinuos also alleges that this conduct harms customers

12   because those who would otherwise move to Xinuos's systems are

13   locked in.  The high-end customers face significant costs to

14   migrate to other services, and the low-end customers are locked

15   in because of their investment in RHEL and Red Hat's and IBM's

16   inordinate scale and control.  Paragraphs 151, 152 and 161.

17   Xinuos is specifically damaged because the expansion of

18   existing server operating system products like its own has been

19   thwarted by IBM's and Red Hat's dominance, and application

20   developers, hardware manufacturers, and partners only want to

21   support IBM and Red Hat and do not support new entrants or the

22   growth of competing systems.  Paragraph 160.

23           IBM and Red Hat are now merged, and since the merger

24   IBM has sought to control Linux and eliminated a free version

25   of Red Hat Linux called CentOS.  Paragraphs 163 to 164.  Within

1    three months of the merger, IBM increased prices for its

2    on-premises server software products and increased service and

3    maintenance fees by around 10 percent.  Paragraphs 166 to 67.

4    Plaintiff alleges that all of defendant's bad acts were enabled

5    by IBM infringing the copyrighted code -- paragraphs 171 to

6    74 -- and posed the threat that defendants can increase prices

7    and provide low quality products due to high switching costs

8    and customer lock-in while also reducing customer choice.

9    Paragraph 168.

10          The procedural history is as follows.  The initial

11   complaint was filed by plaintiff against IBM and Red Hat in the

12   Virgin Islands on March 31, 2021.  On June 7 of that year,

13   defendants filed a motion to dismiss and to transfer the case

14   here.  Plaintiff opposed both motions on August 11 of that

15   year.  On November 1 of that year, defendants moved to stay

16   discovery pending resolution on the motion to transfer.

17   Plaintiff opposed and defendants replied in November 2021.

18          The parties filed supplemental briefing on the motion

19   to transfer on January 7 and 12, 2022.  On April 26, 2022, the

20   court granted defendant's motion to stay discovery pending

21   resolution of the transfer motion, and on November 14, 2022,

22   the court granted defendant's motion to transfer, and the case

23   arrived here on November 16.  On December 22 defendants filed

24   before me a premotion letter in anticipation of its motions.

25   At the pre-motion conference, I terminated defendant's

1    previously filed motion and authorized them to file a renewed

2    motion, and the instant motions followed.  The papers can be

3    found at ECF Numbers 118 through 124.

4           I won't take the time to summarize the standards that

5    govern a motion to dismiss.  We should all be familiar with

6    *Bell Atlantic v. Twombly*, 550 U.S. 544, and Ashcroft *against*

7    *Iqbal*, 556 U.S. 662.  I will note that in deciding a motion to

8    dismiss under Rule 12(b)(6), I may consider obviously the facts

9    alleged in the complaint and any documents attached to the

10   complaint as exhibits or incorporated in it by reference.  Even

11   if a document is not incorporated by reference, I can still

12   consider it where the complaint relies heavily on its terms and

13   effect, rendering the document integral to the complaint.

14          But the plaintiff has to rely on the document.  Mere

15   notice or possession is not enough, and even if a document is

16   integral, there must be no dispute regarding authenticity,

17   accuracy, or relevance.  *U.S. against AECOM*, 19 F.4th 85 at

18   106.  I can also consider matters of which I can take judicial

19   notice under Evidence Rule 201.  *Kramer versus Time Warner*, 937

20   F.2d 767 at 773, and this includes information on a party's

21   public website as long as the authenticity of the site is not

22   in dispute, but such information can be considered only for the

23   fact it was said, not for its truth.  *Cotiviti versus McDonald,*

24   2021 Westlaw 2784529 at page 6, Southern District, July 2,

25   2021.  And by the way, to the extent I quote cases today, I

1    omit internal citations, quotation marks, footnotes, and

2    alterations.

3            As part of its motion to dismiss, defendants filed

4    the declaration of Kathyrn E. Bolas, which is ECF Number 120,

5    to which they attached three exhibits.  Exhibit A was a copy of

6    Red Hat's 2019 10-K, Exhibit B was a copy of IBM's May 3rd 219

7    8-K, and Exhibit C was a copy of the European commissions press

8    release titled "Mergers:  Commission Approves Acquisition of

9    Red Hat by IBM" dated June 27, 2019.  I can take judicial

10   notice of the 10-K and the 8-K as legally required public

11   disclosure documents filed with the SEC but only for the fact

12   that the matters in them were publicly asserted, not for their

13   truth.  *Sec. versus Fiore*, 416 F. Supp. 3d 306 at 328 to 29,

14   Southern District 2019.  See *Kavowras v. New York Times*, 328

15   F.3d 58 at 57.

16           I also take judicial notice of the EC press release,

17   but for the fact that the information exists, not for the truth

18   of the matters asserted.  See *Staehr v. Hartford*, 547 F.3d 406

19   at 425, and *In re Merrill Lynch*, 851 F. Supp. 2d 512 at 526,

20   Note 4, Southern District 2012, affirmed 571 F. App'x 8.  I

21   also won't take the time to familiarize the law governing

22   motions for summary judgment.  We should all be familiar with

23   it.

24           I'll start with the motion for summary judgment.  IBM

25   argues that the copyright cause of action in this case was

1    retained by SCO in the APA, that IBM litigated that issue with

2    SCO and settled it, and that Xinuos has no basis to revive it

3    now.  Plaintiff argues that it is not bringing the same claim

4    that SCO settled but rather is suing for new infringements that

5    occurred when it, not SCO, was the owner of the code.

6              This dispute first requires me to determine what code

7    is at issue.  Plaintiff alleges that the code at issue was all

8    created after September 19, 1995.  That's in the complaint,

9    paragraph 43.  To make clear that it is not the same code that

10   Novell actually owns, it also argues that it is suing on,

11   quote, code developed outside of the JDA and Project Monterey,

12   unquote.  That's in plaintiff's opposition at page 2 and also

13   pages 15 to 16.  But there's no support cited for that

14   proposition, perhaps not surprisingly as the complaint is clear

15   that the code on which plaintiff is suing is the code to which

16   defendant got confidential access during Project Monterey and

17   which plaintiffs says defendant continued to use even though it

18   had no rights to do so under the JDA.  See paragraphs 56 and 57

19   of the complaint.

20             Plaintiff repeatedly notes that there are copyrights

21   at issue in this dispute that were not previously asserted by

22   SCO.  See plaintiff's 56.1 response, paragraph 73 to 74.  But

23   this assertion is unsurprising as two of the copyrights on

24   which it is suing were not registered until 2020 and likely in

25   preparation for this lawsuit.  The question is not when the

1    copyrights were registered but what code is at issue, and

2    plaintiff has identified no code on which it is suing other

3    than that which IBM allegedly stole during Project Monterey,

4    which ended in 2001.  The APA, into which plaintiff and SCO

5    entered in 2011, excluded any claims SCO had against IBM or Red

6    Hat.  See the 56.1 paragraphs 30 through 34.

7            Defendant goes too far if it needs to argue that the

8    APA carved out any conceivable claim SCO or its successor could

9    ever have against IBM or Red Hat.  Excluded claims are only

10   those belonging to SCO at the time of the APA.  The plaintiff

11   goes too far if it means to argue that the APA carved out only

12   claims SCO had already brought.  The excluded claims include

13   those that had accrued to SCO that it would have the right to

14   assert in the future.

15           So the operative question here is when the claim at

16   issue accrued.  If it was before the APA was signed, the claim

17   belongs to SCO, and SCO retained and eventually released it,

18   and plaintiff cannot sue on it now.  If it accrued after the

19   APA, the plaintiff is free to sue on it.  Quote, civil actions

20   under the Copyright Act must be brought within three years

21   after the claim has accrued, unquote.  *Kwan v. Schlein*, 634

22   F.3d 224 at 228.  Quote, an ownership claim accrues only once

23   when a reasonably diligent plaintiff would have put on inquiry

24   as to the existence of a right, unquote.  *Walker v. Carter*, 210

25   F. Supp. 3d 487 at 504, Southern District, 2016.

1          In other words, quote, copyright ownership claims

2   accrue when a plaintiff knows or has reason to know of the

3   injury upon which the claim is premised, unquote.  *Big E.*

4   *Entertainment v. Zomba Enterprises*, 453 F. Supp. 2d 788 at 794,

5   Southern District, 2006, affirmed 259 F. App'x 413.  Quote, if

6   a party who believed that she was the rightful owner of a

7   statutory copyright became aware that someone else was claiming

8   to own her copyright, she will have three years to bring an

9   action asserting her ownership.  In essence an action to quiet

10  title to the copyright pursuant to 17 U.S. Code Section 507(b),

11  unquote.  *Flo & Eddie, Inc., v. Sirius XM Radio*, 80 F. Supp 3d

12  535 at 542, Southern District, 2015.

13          Quote, a copyright infringement claim is an ownership

14  claim when it does not involve the nature, extent, or scope of

15  copying but instead focuses on competing assertions of

16  ownership or rights in the work at issue, unquote.  *Roberts*

17  *versus BroadwayHD*, 518 F. Supp. 3d 719 at 730 to 31, Southern

18  District, 2021.  I'm going to call that case *Roberts I*.  Quote,

19  by contrast, an infringement action may be commenced within

20  three years of any infringing act regardless of any prior acts

21  of infringement, unquote.  *Kwan* at 228.  But, quote, the Second

22  Circuit has held that when ownership is the dispositive issue

23  in an infringement claim and the ownership claim is time

24  barred, the infringement claim itself is time barred even if

25  there had been infringing activity in the three years preceding

1    the lawsuit, unquote.  *Charles v. Seinfeld*, 410 F. Supp. 3d 656

2    at 659, Southern District, 2019, affirmed 803 F. App'x 550.

3            Quote, thus the question of how to classify a claim

4    is of great consequence, unquote.  *Walker* at 504.  Quote, as

5    the Second Circuit has explained, infringement claims requires

6    a plaintiff to establish ownership of a valid copyright and

7    copying of the constituent elements of the work, unquote.

8    *Walker* at 50405.  Quote, in many infringement cases, the first

9    element (ownership) is not at issue, and the issue is instead

10   whether the defendant impermissibly copied the work.  In

11   contrast, where a dispute does not involve the nature, extent,

12   or scope of copying, ownership forms the backbone of the

13   infringement claim at issue, and if an ownership claim would be

14   time barred, any infringement claim is likewise time barred.

15           The question then is whether the plaintiff's claims

16   are rooted in the contested assertion of ownership interest in

17   the copyright, unquote.  That's all *Walker* at 104 to 105, which

18   goes on to say, quote, to answer that question, courts must

19   examine the substance of the claim rather that how plaintiffs

20   label the cause of action.  Courts should consider such factors

21   as whether the plaintiff concedes in any filings that questions

22   of ownership and authorship are at the heart of the claim,

23   whether the plaintiffs copyright ownership is conceded by the

24   defendant, whether the plaintiff alleges anything specific

25   about the means of infringement, and whether the lawsuit is

1   between two parties who claim ownership of the copyrights.

2   Again, *Walker* at 504 to 05.

3         If this case presents an ownership claim, it occurred

4   only once when the code's owner was on notice that defendant

5   was exercising the right incompatible with its ownership, which

6   would be when defendant started using the code it allegedly

7   stole in 2001.  In that event the claim belongs to SCO, which

8   owned the copyright, then retained the claim by carving it out

9   of the APA, and tried to assert the claim in 2004 in the Utah

10  litigation.  If this is an infringement claim, plaintiff can

11  sue for any product defendant released going back three years

12  from when it filed suit.

13        I conclude that plaintiff is asserting an ownership

14  claim.  As a preliminary matter, I recognize that,

15  quote/unquote, ownership is not precisely what is at issue

16  here, but rather the question is whether defendant obtained a

17  license that gave it the right to use the code.  But it seems

18  to me that the analysis ought to be the same.  Is the dispute

19  about whether the defendant had the legal right to use the

20  code, or is it about whether or not the defendant, in fact,

21  used it?

22        Thus the first two factors ought to be reframed here

23  as whether plaintiff concedes that the right to use is at the

24  heart of the dispute and whether defendant concedes it lacks

25  the right to use.  On those two factors, the claim here as

framed by plaintiff is that defendant exploited the access it
had to the code during Project Monterey by using the code after
Project Monterey ended without having the right to do so under
the JDA.  The complaint squarely raises the issue of whether
defendant got rights under the JDA to use the code -- see
complaint paragraph 57 -- and the crux of the dispute as it has
progressed is clearly whether defendant has had rights to the
code.  Defendant says yes because the JDA so provides, and
plaintiff says no because the supplements limited defendants
rights to an IA-64 product, which it never generally released.

        Thus it seems to me the question is defendant's
rights, if any, are at the heart of the copyright claims in
this case.  Plaintiff does not explicitly concede this, but
there's really to other reasonable inference from its arguments
that defendant did not gain a license because it never produced
an IA-64 product with general availability.  See plaintiff's 56
response, paragraphs 9 and 11, and plaintiff's opposition brief
at 3, 4 and 16, Note 13.  Defendant has not conceded that it
lacked the right to use the code.

        With respect to the third factor, not only does
plaintiff not allege any specific about the means of
infringement beyond saying defendant incorporated into its
products code that it stole, but defendant does not seem to
dispute that the code is, in fact, incorporated in its product.
See defendants 56.1, paragraphs 10 and 11, and defendants

1    summary judgment brief at 15 and 23.  Defendant does not claim

2    it is not using the code.  It is arguing that it had a right to

3    do so and that in any event it settled the matter with SCO.

4    See defendant's brief at 15 through 17.

5           Quote, a copyright infringement claim is an ownership

6    claim when it does not involve the nature, extent, or scope of

7    copying but instead focuses on competing assertions of

8    ownership or rights in the work at issue, unquote.  *Roberts I*

9    at 730 to 31.  See *Kwan* at 229, which found that ownership

10   formed the backbone of the, quote/unquote, infringement claim

11   at issue in that case because the dispute did not involve the

12   nature, extent, or scope of copying.  In the *Robert's* case, the

13   court initially found the dispute to be an ownership claim but

14   later found that an amended claimant stated an infringement

15   claim.  See *Roberts v. BroadwayHD*, 2022 Westlaw 976872 at

16   page 9, Southern District, March 31, 2022, which I'm going to

17   call *Roberts II*.

18          The initial complaint focused on allegations that one

19   set of defendants reassigned rights to the work among

20   themselves and granted another defendant a license to use the

21   works, and the court found this suggested an assertion of

22   ownership by those defendants.  See *Roberts I* at 731 to 32.

23   The amended complaint alleged that defendants, knowing that

24   plaintiff was a copyright owner of the work at issue, received

25   a limited license to use the work and exceeded the scope of the

1   license by sublicensing the work.  See *Roberts II* at 9.

2          While the facts here bear superficial similarity to

3   *Roberts II*, there the plaintiff acknowledged that the defendant

4   had a legitimate license and alleged that defendant went beyond

5   what the license allowed.  *Roberts II* at 9.  Here plaintiffs

6   argue not only that any license defendant could have obtained

7   under the JDA was limited to use in an IA-64 application but

8   that because defendant never launched such an application it

9   had and has no right to use the code at all.  I thus find this

10  case differs significantly from *Roberts*.  Whether IBM had a

11  right to use the code at all strikes me as an ownership claim,

12  not an infringement claim.

13         On the fourth factor, the dispute is between two

14  parties, who both claim the right to use the code.  So I

15  conclude that the claim here is, for accrual purposes, an

16  ownership claim.  Quote, accrual of such a claim can be

17  triggered by another party's expressed assertion of sole

18  authorship or ownership, by implicit repudiation by consciously

19  exploiting the copyright without paying royalties, or when

20  alleged co-owners learn they are entitled to royalties that

21  they are not receiving, unquote.  *Roberts I* at 731.

22         Here the claim accrued well before Xinuos acquired

23  its interest in the code in 2011.  Indeed, SCO attempted to

24  assert the claim in the Utah litigation in 2004.  Plaintiff

25  alleges that it only became aware of the code's theft and

1    infringement in March 2019 in the complaint, paragraph 73, an

2    allegation that is hard to believe given that plaintiff must

3    have done its due diligence before entering into the APA and

4    familiarized itself with the Utah litigation and because the

5    dispute was the subject of coverage in industry publications.

6    But even if it is true, it is irrelevant because the claim

7    accrued only months when the code and the claim belonged to

8    SCO, and SCO has released defendants from it.  See paragraphs

9    78 through 81 of 56.1.

10         Defendants are therefore entitled to summary judgment

11   on the copyright claim.

12         Before I move on antitrust, let's take a little

13   break, and I'll come back in five minutes.

14         (Recess)

15         THE DEPUTY CLERK:  All rise.

16         THE COURT:  Everyone can have a seat.  All right.

17   Turning now to the motion to dismiss.  The first issue is

18   antitrust standing.  Quote, to survive the pleading stage, an

19   antitrust plaintiff must demonstrate that it has antitrust

20   standing, unquote.  *IQ Dental Supply v. Henry Schein, Inc.*, 924

21   F.3d 57 at 62.  To demonstrate antitrust standing, a plaintiff

22   must plausibly allege, quote, one, that it suffered a special

23   kind of antitrust injury, and, two, that is a suitable

24   plaintiff to pursue the alleged antitrust violations and thus

25   is an efficient enforcer of the antitrust laws, unquote.  *IQ*

1    *Dental* at 62.  Defendants argue the plaintiff fails this test.

2         I will take each prong in turn.  The Second Circuit

3    uses a three-part test established in *Gatt Communications v.*

4    *PMC*, 711 F.3d 68, to determine whether a plaintiff has

5    sufficiently alleged antitrust injury.  Quote, one, the court

6    must identify the practice complained of and the reasons such a

7    practice is or might be anticompetitive; two, the court must

8    identify the actual injury the plaintiff alleges which requires

9    it to look at the ways in which the plaintiff claims it is in a

10   worse position as a consequence of defendant's conduct; and,

11   three, the court compares the anticompetitive effect of the

12   specific practice at issue to actual injury the plaintiff

13   alleges, unquote.  *IQ Dental* at 62 to 63.

14        For the first step, the plaintiff need only allege

15   that the defendants have engaged in unlawful anticompetitive

16   conduct, and the bar for such a showing is low.  *IQ Dental* at

17   63.  Here plaintiff alleges that defendants agreed to dominate

18   the relevant market by dividing the market, not competing with

19   each other, promoting each other's products, sharing technical

20   information with each other, and excluding Xinuos and other

21   competitors.  That's in the complaint, paragraphs 83 to 103.

22        Plaintiff also alleges that as a result of

23   defendant's market control, customers are locked into

24   defendant's product and forced to pay supracompetitive

25   prices -- paragraph 88 and 150 to 157 -- and the defendants

1    have foreclosed market opportunities from competitors.

2    Paragraph 136.  Plaintiff has met its low burden because,

3    quote, it well-settled law that horizontal market allocation

4    agreements, concerted refusals to deal with price-fixing

5    agreements, or boycotts are per se violations of the antitrust

6    laws.  *Eon Labs v. Watson Pharmaceuticals*, 164 F. Supp. 2d 350

7    at 355, Southern District, 2001.  See *Leegin Creative Leather*

8    *v. PSKS*, 551 U.S. 877 at 886, which said, quote, restraints

9    that are per se unlawful include horizontal agreements among

10   competitors to fix prices or divide markets, unquote.  See also

11   U.S. v. American Express, 838 F.3d 179 at 194, which defined

12   horizontal agreements as agreements between competitors at the

13   same level of the market structure.  Affirmed 138 Supreme Court

14   2274.

15        As to the second factor, plaintiff must allege an

16   actual injury, showing that it's in a worse position because of

17   defendant's conduct.  Plaintiff claims that a result -- as a

18   result of defendant's agreement and conduct, it was denied

19   opportunities to compete for customers and squeezed out of the

20   market and faced a decline in support of its competitive

21   software due to defendant's control over the market.

22   Paragraphs 118, 138, and 143 to 48.  These allegations satisfy

23   the second factor.  In *IQ Dental Supply*, the court found that

24   the plaintiff adequately alleged an actual injury where the

25   plaintiff alleged that defendant's anticompetitive conduct

1    affected the market, and plaintiff's sales suffered as a

2    result.   924 F.3d at 64.

3            For the third factor, plaintiffs have to allege that

4    defendant's antitrust competitive conduct caused its actual

5    injury.  Plaintiff alleges it has faced a decline in its

6    software sales and that its growth has been thwarted because of

7    defendant's antitrust competitive conduct.  See paragraphs 154

8    to 60.  Thus plaintiff has plausibly alleged that its injury,

9    quote, flows from that which makes defendant's act unlawful,

10   unquote, because it is, quote, the type of loss that the

11   claimed violations would be likely to cause, unquote.

12   *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477 at 489.  *Accord IQ*

13   *Dental* at 64 to 65.

14           So based on the three factors, I find that plaintiff

15   has plausibly alleged an antitrust injury.

16           Defendants argue plaintiff has not done so because

17   the complaint does not explain how competition has been harmed

18   and simply states that defendants worked together to, quote,

19   create better products and provide services, unquote.  That's

20   in defendant's brief.  The argument is at pages 4 to 6.  First,

21   the complaint plainly alleges more than defendants improving

22   their product.  It alleges that because of defendant's

23   collusion, plaintiff's, quote, equally featured, unquote,

24   product has been excluded from the market, and defendants have

25   unfairly gained market power because of consumer lock-in and

1    the disproportionate willingness of application developers and

2    hardware manufacturers to work with defendants given their

3    controlling share of the market.  Paragraphs 138 to 49.

4            It may well turn out that all that is at work here is

5    the defendant's products and service are superior, but that is

6    not what the complaint alleges.  And at this stage, I must

7    accept the allegations in the complaint as true.

8            Second, the complaint alleges more than just harm to

9    plaintiff.  It explains how not just plaintiff but other

10   competitors have been harmed in that they are locked out of the

11   market even though their products are competitive, and they are

12   forced to compete at a disadvantage.  See paragraphs 20, 85,

13   140, and 145.  Turning to the second factor of the *Gatt* test,

14   the plaintiff that has suffered an antitrust injury must also

15   demonstrate that it's a suitable plaintiff.  In other words, an

16   efficient enforcer of the antitrust laws.  *In re Aluminum*

17   *Warehousing Antitrust Ligation* 823, F.3d 151 at 157 to 58.  See

18   *IQ Dental* at 65.

19           Quote, the efficient enforcer criteria must be

20   established irrespective of whether the plaintiff is a consumer

21   or a competitor, unquote, because, quote, not every victim of

22   an antitrust violation needs to be compensated under the

23   antitrust laws in order for the antitrust laws to be officially

24   enforced, unquote.  *Gelboim v. Bank of America*, 823 F.3d 759 at

25   779.

1          Quote, to determine whether a plaintiff is an

2    efficient enforcer of the antitrust laws, the Second Circuit

3    directs courts to the following factors:  One, the directness

4    or indirectness of the asserted injury; two, the existence of

5    an identifiable class of persons whose self-interest would

6    normally motivate them to vindicate the public interest in

7    antitrust enforcement; three, the speculativeness of the

8    alleged injury; and, four, the difficulty of identifying

9    damages and apportioning them among direct and indirect victims

10   so as to avoid duplicative recoveries, unquote.  *In re*

11   *Amazon.com, Inc., eBook Antitrust Litigation*, 2023 Westlaw

12   6006525 at page 14, Southern District, July 31, 2023.

13         The weight given to each factor varies depending on

14   the case.  See *Daniel v. American Board of Emergency Medicine*,

15   428 F.3d 408 at 443.  Quote, consumers -- sorry.  Competitors

16   and consumers in the market where trade is allegedly restrained

17   are presumptively the proper plaintiffs to allege antitrust

18   injury, unquote.  That's *In Re Aluminum Warehousing* at 158,

19   collecting cases.  Defendants do not dispute that plaintiff is

20   a competitor in the market, nor do they address this prong of

21   the test in their papers.  And in any event, I find the test is

22   met.

23         The first factor, whether the violation was based --

24   was a direct or remote cause of the injury is based on

25   principles of approximate cause.  In the context of antitrust

1  standing, approximate cause generally follows the first step

2  rule, which requires some direct relation between the injury

3  asserted and the injurious conduct alleged.  *In re Platinum and*

4  *Palladium Antitrust Litigation*, 61 F.4th 252 [sic] at 259.

5  Here plaintiff has alleged that defendants hindered its

6  business opportunities by dropping support for plaintiff's

7  operating systems and that defendants excluded plaintiff's

8  software program in the context of cloud computing and worked

9  together to exclude plaintiff from the market, including by not

10  providing certain upgrade services to plaintiff and others.

11  Paragraphs 123 through 126.  These are direct injuries flowing

12  from the alleged conduct.  See *Schulman v. Burlington*, 255

13  F. Supp. 847 at 851, Southern District, 1966.

14      The second efficient enforcer factor considers

15  whether there are plaintiffs that are better situated to

16  vindicate the claims, which would, quote, diminish the

17  justification for allowing a more remote party to perform the

18  office of private attorney general, unquote.  *In re American*

19  *Express Anti-Steering Rules Antitrust Litigation*, 19 F.4th 127

20  at 141.  Plaintiff is a sufficiently motivated plaintiff as it

21  is an immediate victim of any direct boycott and has suffered a

22  direct loss of sales.  *IQ Dental* at 68.

23      The third factor looks at whether plaintiff can

24  produce a just and reasonable estimate of damages.  *In re*

25  *Platinum* at 262.  Here plaintiff's damages could be its, quote,

1  potentially ascertainable business losses ... calculated based

2  on its historical sales data without undue speculation,

3  unquote.  *IQ Dental* at 68.  Even if that damages calculation

4  were complicated, this factor carries less weight because the

5  Supreme Court has warned that antitrust standing should not get

6  the defendant out of court every time the damages calculation

7  is contemplated.  See *Apple v. Pepper*, 139 Supreme Court 1514

8  at 1524 and *In re Platinum* at 262.

9        The fourth factor considers the risk of duplicative

10  recoveries or complex reapportionment of damages such that the

11  damages to which the plaintiff lays claim are the same damages

12  that other parties could have claimed.  See *American Express*

13  *Anti-Steering*, 19 F.4th at 142.  This factor favors plaintiff

14  because there was no intermediary between plaintiff and

15  defendants who could sue for the anticompetitive conduct, and

16  recognizing antitrust standing would not require the court to

17  divide damages from the same violation among multiple

18  plaintiffs.  *In re Platinum* at 265 to 66.

19        Further, quote, while there may be other parties

20  property positioned to bring monopolization claims against

21  defendants, their damages would be wholly distinct from those

22  allegedly suffered by plaintiff, unquote, and quote, therefore,

23  there's no risk that different groups of plaintiffs would be

24  attempting to recover for the same exact injury, unquote.  *In*

25  *re Amazon eBook* at 16.

1          So on balance the four factors favor a finding that

2    plaintiff is an efficient enforcer, and having found antitrust

3    injury and that plaintiff is a proper plaintiff, I find

4    plaintiff has an antitrust standing, and now address whether

5    the Sherman Act and claimant -- preenact claims state a claim

6    on which relief could be granted.

7          Let's start with the Sherman Act, Section 2, which

8    alleges that defendants unlawfully maintained monopoly power.

9    Section 2 of the Sherman Act makes it unlawful for any person

10   to, quote, monopolize any part of the trade or commerce among

11   the federal states or with foreign nations.  15 U.S. Code

12   Section 2.  Quote, to state a Section 2 claim of

13   monopolization, a plaintiff must allege, one, the possession of

14   monopoly power in the relevant market and, two, the willful

15   acquisition or maintenance of that power as distinguished from

16   growth or development as a consequence of a superior product,

17   business acumen, or historic accident, unquote.  *In re Keurig*

18   *Green Mountain Single-Serve Coffee Antitrust Litigation,* 383 F.

19   Supp. 3d 187 at 219, Southern District, 2019.  See *In re Tether*

20   *& Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d 55 at 94,

21   Southern District, 2021.

22          Turning to the first prong, quote, a plaintiff must

23   allege a relevant product market in which the anticompetitive

24   effects of the challenged activity can be assessed, unquote.

25   *In re Keurig* at 224 to 25.  Quote, for purposes of Section 2,

1    the relevant market is the area of effective competition within

2    which the defendant operates, unquote.  *LLM Bar Exam v. Barbri*,

3    271 F. Supp. 3d 547 at 582, Southern District, 2017, affirmed

4    922 F.3d 136.  A relevant product market consists of products

5    that have reasonable interchangeability for the purposes for

6    which they are produced, price, use, and qualities considered.

7    Products are reasonably interchangeable if consumers treat them

8    as acceptable substitutes.  *LLM* at 582.

9         The, quote, outer boundaries, unquote, of the

10   relevant market, quote, are determined by the reasonable

11   interchangeability of use or the cross-elasticity of demand

12   between the product itself and substitutes for it, unquote.

13   *US Airways v. Sabre Holdings*, 938 F.3d 43 at 64.  To define the

14   relevant market, the Second Circuit often also applies the,

15   quote, hypothetical monopolist test, unquote, or HMT, which

16   asks, quote, whether a hypothetical monopolist asking within

17   the proposed market would be substantially constrained from

18   increasing prices by the ability of the customers to switch to

19   other producers.  *American Express*, 838 F.3d at 198.

20        Under this test, the market is, quote, any grouping

21   of sales whose sellers, if unified by a hypothetical cartel or

22   merger, could profitably raise prices significantly above the

23   competitive level.  *American Express* at 198 to 99.  Quote, if

24   the sales of other producers substantially constrain the

25   price-increasing ability of the hypothetical cartel, those

others are part of the market. Same case at 199. While, quote, reasonable interchangeability sketches the boundaries of the market ... there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis, unquote. *Geneva Pharmaceuticals v. Barr Labs*, 386 F.3d 485 at 496.

Quote, the boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors, unquote. *Brown Shoe v. the United States*, 370 U.S. 294 at 325. Quote, the term "submarket" is somewhat of a misnomer since the submarket analysis simply clarifies whether the two products are, in fact, reasonable substitutes and therefore a part of the same market, unquote. *Geneva* at 496. The emphasis is always -- sorry. The emphasis always is on the actual dynamics of the market rather than rote application of any formula. Same case at 496.

Quote, where the plaintiff fails to define its proposed relevant market with reference to the rules of reasonable interchangeability and cross-elasticity of demand or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all

1    factual inferences are granted in the plaintiff's favor, the

2    relevant market is legally insufficient, and a motion to

3    dismiss may be granted, unquote.  *LLM* at 582.  Quote, it is

4    important to recognize that because market definition is a

5    deeply fact intensive inquiry, courts hesitate to grant motions

6    to dismiss for failure to plead a relevant product market,

7    unquote.  *Keurig* at 225.

8         Plaintiff alleges here that the relevant market is

9    the Unix/Linux paid server operating system market.  Complaint,

10   paragraph 36.  Defendants argue that this market fails under

11   the *Brown Shoe* factors because it does not include facts

12   supporting five of the six factors.  See defendants motion to

13   dismiss brief at 6 through 9.  *Brown Shoe*, however, is not a

14   checklist of required factors.  Quote, the indicia in *Brown*

15   *Shoe* are instructive in determining the existence of a

16   submarket, but the presence of some and the absence of others

17   is not dispositive, unquote.  *Southeast Missouri Hospital v.*

18   *C.R. Bard*, 642 F.3d 608 at 614, Eighth Circuit, 2011.

19        See *C.E. Services v. Control Data*, 759 F.2d 1241 at

20   1246, a 1985 case where the Fifth Circuit said, quote, the

21   existence of one or more of these *Brown Shoe* indices does not

22   necessarily preclude a summary determination that certain

23   products or services either are reasonably interchangeable or

24   demonstrate a high cross-elasticity of demand, unquote.  *IT&T*

25   *v. General Telephone & Electric*, 518 F.2d 913 at 932, Ninth

1    Circuit, 1975, which said the presence or absence of *Brown Shoe*

2    factors does not, quote, dispose in talismanic fashion of the

3    submarket issue, unquote.  *Overruled on other grounds*, 495 U.S.

4    271, *California v. American Stores* and *Brown v. Amazon*, 2023

5    Westlaw 5793303 at page 6, Western District of Washington,

6    September 7, 2023.  That said *Brown Shoes* practical indicia are

7    not a litmus test, and courts have held that submarkets exist

8    even when only some factors are present.

9         The ultimate test to define a relevant market is,

10   quote, the reasonable interchangeability of use or the

11   cross-elasticity of demand between the product itself and

12   substitutes for it, unquote.  *US Airways*, 938 F.3d at 64.

13   Along these lines, defendant argues that other paid operating

14   systems such as Windows Server and Mac OS X Server must be

15   included in the relevant market, that plaintiff has failed to

16   allege facts showing that free server operating systems are not

17   reasonably interchangeable with paid systems, and that

18   plaintiff has failed to allege facts that show that if the

19   market is limited to enterprise customers, plaintiff sales to

20   the lower end of the market can be in the relevant market while

21   free server operating systems are not.  That's in defendant's

22   brief at pages 8 to 9.

23        I find that plaintiff has adequately alleged a

24   relevant market.  First, plaintiff has adequately alleged that

25   users of the Unix/Linux paid server operating system market

1    understand Unix/Linux products to be reasonable potential

2    substitutes for each other -- paragraph 39 -- and that other

3    dissimilar operating system environments are not part of the

4    relevant market because they are not interchangeable with

5    Unix/Linux systems, and customers, therefore, do not view other

6    operating systems as substitutes.  Paragraphs 40 through 41.

7    It is reasonable for customers to view as distinct products

8    that run only on their servers.

9           See *Xerox v. Media*, 511 F. Supp. 2d 372 at 385,

10   Southern District, 2007, a case in which plaintiff reasonably

11   alleged that the relevant market from the perspective of owners

12   of Xerox phase change color printers is composed only of

13   consumables that are compatible with their printers.

14   Furthermore, plaintiff has plausibly alleged that free server

15   operating systems are not adequate substitutes because they are

16   mainly used in testing and development and lack the business

17   critical support and maintenance that corporate clients need.

18   Paragraph 41.

19           Lastly, defendants seem to suggest that because

20   plaintiff limits the relevant market to enterprise or large

21   customer accounts, plaintiff sales to the low end of the market

22   cannot be in the relevant market.  No such limitation appears

23   in the complaint's description of the relevant market.

24   Paragraphs 36 to 41.  Defendants does not -- do not explain why

25   low-end customers which consist of small- and medium-sized

1    companies -- see paragraph 83 -- cannot be considered part of

2    the paid Linux operating system market.  Discovery may reveal

3    the plaintiff's factual allegations regarding the market are

4    incorrect, but at this early stage, in taking them as true as I

5    must, they suffice.

6        Plaintiff must also allege that defendants possessed

7    monopoly power in this relevant market, meaning, quote, the

8    power to control prices or exclude competition in a given

9    market which, unquote -- which, quote, can be pled directly

10   through allegations of control over prices or the exclusion of

11   competition or may be inferred from a defendant's large share

12   of the relevant market, unquote.  *In re Keurig* at 225.

13       Plaintiff has directly pleaded that IBM excluded

14   competition by giving up its low-end customers only to Red

15   Hat -- paragraph 85 -- giving preferential support to RHEL

16   installed on IBM's servers -- paragraph 93 -- and reimbursing

17   its server business partners to get certified to use Linux

18   through Red Hat.  Paragraph 96.  Plaintiff further alleges that

19   IBM and Red Hat excluded plaintiff by agreeing that Red Hat

20   would adopt RHEL for IBM systems in a way that competitors

21   could not achieve -- paragraph 121 -- and by insuring that

22   plaintiff's systems are supported on the IBM cloud.  Paragraph

23   126.  Plaintiff also alleges that customers are forced to pay

24   higher prices because high-end customers face significant

25   migration costs, and low-end customers are locked into their

1    investments in RHEL and that post-merger and even premerger to

2    an extent defendants have significantly raised their prices.

3    Paragraphs 151 to 52 and 165 to 67.

4              Defendants argue plaintiff has failed to allege

5    direct evidence of market power because while plaintiff has

6    alleged that IBM and Red Hat raised their prices, that is not

7    evidence of market power and just evidence of how they priced

8    their products in recent years.  That's in their brief at page

9    10.  That may turn out to be the case, but at this stage I find

10   the plaintiff's direct allegations are sufficient to plausibly

11   suggest that defendant possesses market power, and because I so

12   find, I need not consider the parties' arguments regarding

13   indirect allegations of market power.

14             Plaintiff must also allege the willful acquisition or

15   maintenance of monopoly power as distinguished from just having

16   a better product, business acumen, or luck.  *Keurig* at 229.  As

17   I've already explained, plaintiff alleges that IBM willfully

18   partnered with Red Hat to shield itself from established and

19   growing competitors.  Paragraphs 75.  To this end, it forsook

20   its own interests by giving Red Hat more access to its clients

21   and supporting Red Hat's operating system over its own, even

22   providing rebates to server customers that purchased servers

23   packaged with RHEL while not permitting any other competitors

24   to run their operating systems on IBM's servers.

25   Paragraphs 91, 95, 96, and 98.

1          Defendant argues in its reply at pages 5 to 6 that

2    plaintiff fails to adequately allege this factor because each

3    allegation of anticompetitive behavior alone is not actionable,

4    and they cannot together make an antitrust claim.  This

5    argument fails because plaintiff has alleged at least one type

6    of actionable conduct, a horizontal agreement to divide the

7    market.  Furthermore, antitrust cases are assessed by

8    considering the conduct as a whole, and taking the alleged

9    allegations together, I find that plaintiff has sufficiently

10   alleged the willful acquisition or maintenance of market power

11   at this stage.

12          See *U.S. against Apple*, 791, F.3d 290 at 319, which

13   said, quote, in antitrust cases, the character and effect of a

14   conspiracy are not to be judged by dismembering it and viewing

15   its separate parts but only by looking at it as a whole,

16   unquote.  See also *U.S. against AT&T*, 524 F. Supp. 1336 at

17   1344, District of Columbia, 1981, which cited a Supreme Court

18   proposition -- Supreme Court cases for the proposition that,

19   quote, otherwise innocent or ambiguous behavior may violate the

20   Sherman Act when considered together with the remainder of the

21   conduct, unquote.  To the extent defendants argue that

22   plaintiff's allegations are not specific enough, there's no

23   heightened pleading standard in antitrust cases, and a

24   plaintiff need only state a plausible claim.  *Wacker versus JP*

25   *Morgan Chase*, 678 F. App'x 27 at 29.

1          Defendants also argue that to the extent the alleged

2     anticompetitive conduct centers on post-merger agreements, it

3     is not actionable because a parent and subsidiary cannot

4     conspire or make anticompetitive agreements, but the merger

5     does not absolve IBM and Red Hat from anticompetitive conduct

6     taken before the merger, and defendant's reliance on *Copperweld*

7     *v. Independent Tube*, 467 U.S. 752, fails because there the

8     Supreme Court held that a conspiracy between a parent and

9     subsidiary was not legally possible under Section 1 of the

10    Sherman Act, not that companies now merged could not be

11    penalized for anticompetitive conduct before the merger or that

12    merged companies could not be penalized for monopolization

13    under Section 2 after the merger.  See *Copperweld* at 767, Note

14    13.

15         Lastly, defendant's argument that plaintiff was not

16    harmed by the alleged market allocation because

17    supracompetitive pricing would make plaintiff more attractive

18    fails because plaintiff has plausibly explained the lock-in

19    effect of the products on customers, which hinder customers'

20    ability to switch to other competitive operating systems like

21    plaintiff's.

22         At this stage, taking all of plaintiff's well pled

23    allegations as true, I find plaintiffs have alleged facts

24    sufficient to state a claim under Section 2.

25         Defendants also move to dismiss plaintiff's

1    allegations that defendants conspired to restrain trade in the

2    relevant market in violation of Section 1 of the Sherman Act.

3    As an initial matter, as with the Section 2 claim, a Section 1

4    claim must define the relevant market, which I've already -- a

5    requirement I've already found to be satisfied.  See *New York*

6    *Medscan v. NYU*, 430 F. Supp. 2d 140 at 145, Southern District,

7    2006.

8            Section 1 of the Sherman Act prohibits restraints on

9    trade effected by a contract combination or conspiracy.  The

10   critical question is whether the challenged anticompetitive

11   conduct stems from independent decision or from agreement,

12   tacit or expressed.  To state a claim under Section 1 of the

13   Sherman Act, the plaintiff must show a combination or some form

14   of concerted action between at least two legally distinct

15   economic entities that unreasonably restrains trade.  *In re*

16   *Tether and Bitfinex*, 576 F. Supp. 3d at 101.

17           With respect to the first element, to allege an

18   unlawful agreement, plaintiff must assert either direct

19   evidence of a conspiracy or circumstantial facts supporting an

20   inference that a conspiracy existed.  Conspiracies are rarely

21   evidenced by explicit agreements and usually must be proven

22   through inferences drawn from the behavior of the alleged

23   conspirators.  The line separating conspiracy from parallelism

24   is indistinct but may be crossed with allegations of

25   interdependent conduct accompanied by circumstantial evidence

1   and plus factors.  Illustrative nonexhaustive plus factors

2   include a common motive to conspire, evidence showing that the

3   parallel acts were against the apparent individual economic

4   self-interest of the alleged conspirators, and evidence of a

5   high level of interfirm communications.  At the motion to

6   dismiss stage, a plaintiff must only provide sufficient factual

7   matter to plausibly suggest an inference of conspiracy even if

8   the facts are susceptible to an equally likely interpretation.

9   All of that is from *In re Tether* at 101 through 102.

10          Quote, if a plaintiff establishes the existence of an

11  illegal contract or combination, it must then proceed to

12  demonstrate that the agreement constituted an unreasonable

13  restraint of trade either per se or under the rule of reason,

14  unquote.  *In re Keurig* at 241.  Conduct considered illegal per

15  se is invoked where a defendant's actions are so plainly

16  harmful to competition and so obviously lacking in any

17  redeeming pro-competitive values that they are conclusively

18  presumed illegal without further examination, but most

19  antitrust claims are analyzed under rule of reason, according

20  to which the finder of fact must decide whether the questioned

21  practice imposes an unreasonable restraint on competition,

22  taking into account a variety of factors, including specific

23  information about the relevant business, its condition before

24  and after the restraint was imposed, and the restraint's

25  history, nature, and effect.  *Keurig* at 241.

1              Agreements within the scope of Section 1 may be

2    either horizontal, in other words, between competitors at the

3    same level of the market structure, or vertical, in other

4    words, combinations of persons at different levels of the

5    market structure such as manufacturers and distributors.

6    *American Express*, 838 F.3d at 194.  Restraints imposed by

7    agreement between competitors are traditionally called

8    horizontal, and those by agreements between firms at different

9    levels are called vertical.  The same case at 194.  Vertical

10   restraints are generally judged under the rule of reason.  Same

11   case at 194.  Restraints that are per se unlawful include

12   horizontal agreements among competitors to fix prices or divide

13   markets.  *Leegin Creative*, 551 U.S. at 886.

14              Plaintiff has alleged that before the merger, IBM and

15   Red Hat established an, quote, alliance, unquote, to divide the

16   relevant market and restrain trade by suppressing competing

17   operating systems and preventing plaintiff from competing for

18   customers.  Paragraphs 90 and 154.  There are plain allegations

19   of a horizontal agreement to divide markets, which is per se

20   unlawful.  Further, plaintiff has adequately alleged at least

21   two of the three plus factors distinguishing parallel conduct

22   from a conspiracy, a common motive to conspire, and evidence

23   that parallel acts were against the apparent individual

24   self-interest of the alleged conspirators.  See paragraphs 78

25   to 79 on the first and paragraphs 95, 97, 98, 100, and 110 on

1    the latter.

2          Defendant's arguments to the contrary are the same

3    described within Section 2.  Taking the acts separately,

4    defendants argue that none of the conduct alleged is

5    sufficient, but considering the conduct together, plaintiff has

6    adequately alleged concerted action between IBM and Red Hat

7    that unreasonably restrained trade and thus has stated a claim

8    under Section 1.

9          Defendant also moves to dismiss plaintiff's claims

10   under Section 7 of the Clayton Act, which, quote, prohibits the

11   acquisition of a business's assets where the effect of such an

12   acquisition is to substantially lessen competition, unquote.

13   *St. Francis Hospital v. Hartford Healthcare*, 655 F. Supp. 3d 52

14   at 78, District of Connecticut, 2023.  Quote, one type of

15   acquisition which is frequently challenged as a violation of

16   Section 7 is the horizontal merger, unquote.  *Remington v.*

17   *North America Philips*, 717 F. Supp. 36 at 42, District of

18   Connecticut, 1989.  *On reconsideration* at 755 F. Supp. 52.

19          Quote, this type of merger involves the acquisition

20   of the stocks or assets of one competitor by another.  When

21   analyzing a horizontal merger under Section 7, the court must

22   describe the companies involved, analyze the product in the

23   geographic market in which they compete, and explore the

24   structure of the industry affected by the merger to ...

25   properly assess the probable effects of the merger on

1    competition. *Remington* at 42.  Quoting *Stanley v. FTC*, 469 F.2d

2    498 at 499.  When evaluating, quote, the likely competitive

3    effects of a prospective business merger ... the court weighs

4    what actions taken by the parties to the merger and other

5    proponents could substantially influence consumer choices and

6    thus affect competition and product pricing in the relevant

7    markets, unquote.  *New York v. Deutsche Telekom,* 439 F. Supp.

8    3d 179 at 188, Southern District, 2020.

9         In *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, the Second

10   Circuit listed, quote, several factual considerations relative

11   to predicting the probable effects of a merger, including ...

12   the nature and economic purpose of the arrangement, the

13   likelihood and size of any market foreclosure, the extent of

14   concentration of sellers and buyers in the industry, the

15   capital cost required to enter the market, the degree of market

16   power possessed by the merged enterprise, the number and

17   strength of competing suppliers and purchasers, and the

18   existence of a trend towards vertical concentration or

19   oligopoly in the industry, unquote.  *In re Zinc Antitrust*

20   *Litigation*, 2016 Westlaw 3167192 at page 23, Southern District,

21   June 6, 2016.

22        Quote, as is the case with the claim brought under

23   Section 2 of the Sherman Act, a Section 7 claim requires that

24   the plaintiff allege a plausible relevant market in which

25   competition will be impaired, unquote.  *Zinc* at 22.

1          I find that plaintiff has met this requirement for

2     the reasons already discussed.  As for the likely

3     anticompetitive effects, I find that plaintiff's allegations

4     are sufficient at this stage considering the relevant factors.

5          Regarding the nature and economic purpose of the

6     merger, plaintiff alleges that it was to continue the premerger

7     anticompetitive conduct, raised prices even more, and reduced

8     consumer choice.  In *U.S. v. E. I. du Pont*, 353 U.S. 586 at

9     607, the court explained that, quote, the test of a violation

10    of Section 7 is whether at the time of the suit there is a

11    reasonable probability that the acquisition is likely to result

12    in the condemned restraints, unquote.  Plaintiff has plausibly

13    described the price increases, choice decreases, concentration

14    of market power, and the weakening of competition as a result

15    of the merger.

16         Specifically, plaintiff alleges that within three

17    months of the merger, IBM announced increases in purchase

18    prices up to 39 percent for the AIX for Power operating system.

19    Paragraph 166.  Plaintiff also alleges that since the merger,

20    IBM has dramatically increased prices across the board on over

21    5,000 of its on-premise server software products, including the

22    AIX operating system, by removing prior volume discounts on

23    support and service fees for the millions of existing IBM

24    customers that had discounts.  Paragraph 167.

25         Plaintiffs further allege in the same paragraph that

1    IBM increased service and maintenance fees by around

2    10 percent, meaning that every year customers now pay

3    approximately 20 percent of the list price.  Plaintiffs further

4    allege that since the merger, IBM eliminated a free version of

5    Red Hat Linux called CentOS, reducing consumer choice.

6    Paragraph 164 and 168.  And plaintiff further alleges that,

7    quote, most recently, unquote, which -- construing the facts in

8    the light most favorable to plaintiff I construe as referring

9    to a time post-merger, quote, IBM and Red Hat have constructed

10   the IBM cloud such that Xinuos's OpenServer 10 based on open

11   source FreeBSD Unix is substantially excluded from working as

12   efficiently or effectively, unquote.  Paragraph 125.

13          Plaintiff also alleges that, quote, contrary to

14   spurring more innovation after the merger, capital expenditure

15   outlays declined by 25 percent, unquote, when companies usually

16   report an increase in such expenditures following a major

17   business combination.  Paragraph 168.  The complaint also

18   describes a high degree of market power and high capital costs

19   to enter the market, alleging that, quote, the agreements

20   between Red Hat and IBM have caused the two companies to

21   sufficiently scale and have sufficient control in the market

22   and to make it economically unfeasible for new companies to

23   enter the market, unquote, and that they are still benefiting

24   from these anticompetitive acts post-merger.  Paragraph 169.

25          Plaintiff further alleges that the merger has

1    eliminated actual and potential competition in the market --
2    paragraph 206 -- and that there is an ongoing threat that IBM
3    and Red Hat will be able to increase the prices of RHEL, AIX
4    for Power, z/OS mainframe, and i midrange server operating
5    systems and provide lower quality products through their
6    combination and in view of very high switching costs and
7    customer lock-in.  Paragraph 168.  At this stage, these
8    allegations suffice to plausibly allege anticompetitive effects
9    of the merger.
10        Plaintiff suggests -- excuse me.  Defendants -- one
11   more try.  Defendants suggest that plaintiff's claim is
12   weakened because the U.S. Department of Justice and the
13   European Commission reviewed the transaction and did not take
14   issue with it, but defendant presents no authority suggesting
15   that regulatory approval per se precludes a viable Section 7
16   claim.  It may well turn out that the reasons the regulators
17   approved the merger will make it impossible for plaintiff to
18   prove its case, but the approval itself is not a ground for
19   dismissal of an otherwise plausible claim.  So the Section 7
20   claim survives.
21        Defendants also move to dismiss plaintiff's claim
22   that defendant violated the Virgin Islands Antimonopoly Law,
23   which is found in the Virgin Islands Statutes Title 11 at
24   Section 1501 *et seq.*  For this claim, plaintiff alleges that
25   defendants conspired to restrain trade and gain monopoly power.

1    See paragraphs 212 and 213.  Defendants argue that insofar as

2    the federal monopolization claim fails, the corresponding

3    Virgin Islands claim fails as well.

4           The Virgin Islands Antimonopoly Law is generally

5    interpreted in accordance with federal antitrust law.  See, for

6    example, *Sea Air Shuttle Corp. v. Virgin Islands Port*

7    *Authority*, 782 F.Supp. 1070 at 1077, D.V.I. 1991.  See also

8    Xinuos v. IBM and Red Hat, 2022 Westlaw 16921760 at page 12.

9    From this case D.V.I, November 14, 2022, *Yearwood Enterprise*

10   *against Antilles Gas*, 2017 Westlaw 2709831 at page 3, Virgin

11   Islands Superior Court, June 21, 2017.

12          Because I found the federal monopolization claim

13   survives, so does the Virgin Islands claim.

14          Turning now to the Virgin Islands common law unfair

15   competition claim.  Quote, the antimonopoly law also covers ...

16   unfair competition, unquote.  *Mamouzette v. Jerome*, 2022

17   Westlaw 1026868 at page 5, D.V.I April 5, 2022.  And the unfair

18   competition claim should, quote, follow the construction given

19   to similar federal antitrust law provisions.  That's a quote

20   from this case, *Xinuos*, 2022 Westlaw 16921760 from the Virgin

21   Islands at page 12.  Defendants argue only that if plaintiff's

22   claim is insufficient under the Virgin Islands Antimonopoly

23   Law, it cannot be restated as one for unfair competition and

24   that that is the claim here because the federal claims are

25   deficient.  That's in defendant's brief at 24.

1          Because I found neither the federal nor the Virgin

2     Islands Antimonopoly claims to be deficient, this precise

3     argument fails, but the larger point remains.  The case

4     defendants cite *Gardiner versus Saint Croix*, 2019 Westlaw

5     3814427 at page 7, Virgin Islands Superior Court, July 30,

6     2019.  It seems to say that a claim for unfair competition

7     should be dismissed where it merely restates an antitrust

8     claim.  That is the case here.  Indeed, plaintiff concedes that

9     the Virgin Islands have not developed a common law unfair

10    competition claim.  See plaintiff's opposition brief ECF 125 at

11    page 22.

12         The district court in the Virgin Islands in this case

13    indicated the same, that unfair competition claims fall under

14    the antimonopoly statute in its decision transferring the case

15    to this court.  See ECF Number 75 at pages 20 to 21.

16         Because plaintiff attempts to bring the common law

17    unfair competition claim and such a claim, if it exists at all,

18    is duplicative of the Virgin Islands statutory claim, it is

19    dismissed.

20         Turning now to Virgin Islands common law unjust

21    enrichment.  First, because this is a diversity action, I apply

22    the choice-of-law principles of New York.  See, for example,

23    *AEI v. Lincoln Benefit*, 892 F.3d 126 at 132.  In New York

24    courts dispense with choice of law and apply New York law if

25    it's among the relevant choices and there's no actual conflict,

1    meaning that any differences in the relevant substantive rules

2    from each jurisdiction will not have a significant possible

3    effect on the outcome.  See *Valenzuela v. Putnam County*, 2020

4    Westlaw 5370195 at page 5, Southern District, September 8,

5    2020.  Here the law governing unjust enrichment in New York and

6    the Virgin Islands does not appear to conflict.  See *Walters v.*

7    *Walters*, 60 Virgin Islands Supreme Court 768 at 779 to 80 and

8    *Cooper v. Anheuser-Busch*, 553 F. Supp. 3d 83 at 1150, Southern

9    District, 2021.

10           So I will apply New York law to the unjust enrichment

11    claim.  See *Lomax v. Aegis Funding*, 2010 Westlaw 1633440 at

12    page 3, Eastern District, April 19, 2010.  The basic elements

13    of an unjust enrichment claim in New York would require proof

14    that the defendant was enriched at the plaintiff's expense, and

15    equity and good conscience militate against permitting

16    defendant to retain that which the plaintiff is seeking to

17    recover.  *Cooper* at 115.  But New York's highest court has made

18    clear that unjust enrichment is not a catchall cause of action

19    to be used when others fail, and an unjust enrichment claim is

20    not available where it simply duplicates or replaces a

21    conventional contract or tort claim.  *Cooper* at 115.

22           Defendants argue plaintiff's claim must be dismissed

23    because unjust enrichment is an equitable remedy that is

24    unavailable, whereas here a legal remedy exists.  Plaintiff

25    does not dispute this but argues it's allowed to plead an

1    equitable claim in the alternative, but I disagree because even

2    pleaded in the alternative, claims for unjust enrichment will

3    not survive a motion to dismiss where plaintiffs fail to

4    explain how their unjust enrichment claim is not merely

5    duplicative of their other causes of action.  *Bermudez v.*

6    *Colgate-Palmolive*, 2022 Westlaw 2751044 at page 15, Southern

7    District, March 31, 2023.  Virgin Islands courts appear to

8    apply the same rule.  See *Matthews v. R&M*, 2020 Westlaw 1650825

9    at page 6, Virgin Islands Superior Court, 2020, and *Pourzal v.*

10   *Marriott*, 2006 Westlaw 2471695 at page 3, D.V.I. August 17,

11   2006.

12           Plaintiffs unjust enrichment claims here rely on the

13   same set of facts as its other claims, and accordingly the

14   unjust enrichment claim is dismissed.

15           Finally, as to leave to amend, it should be freely

16   given when justice so requires under Rule 15, but it's within

17   the sound discretion of the Court to grant or deny leave to

18   amend.  *Kim v. Kim*m, 884 F.3d 98 at 105.  Though liberally

19   granted, leave may properly be denied for repeated failure to

20   cure deficiencies by amendments previously allowed or futility

21   of amendment among other reasons.  *Ruotolo v. City of New York*,

22   514 F.3d 184 at 191.

23           At the end of its motion to dismiss the opposition

24   brief, plaintiff says that if the Court concludes it's failed

25   to plead any of the challenged claims in the complaint, it can

1    replead.  Plaintiff has not suggested that it is in possession

2    of facts that would cure the deficiencies in the unfair

3    competition for unjust enrichment claims, and accordingly I

4    decline to grant leave to amend.  See *TechnoMarine v.*

5    *Giftports*, 758 F.3d 493 at 505, and *Gallop v. Cheney* at 642

6    F.3d 364 at 369, which said that plaintiff doesn't have to be

7    given leave if it fails to specify how an amendment would lead

8    to a different result.  Indeed, here the problems with those

9    two claims are substantive, and it does not appear that a

10   better pleading could cure them.  See *Cuoco v. Moritsugu*, 222

11   F.3d 99 at 112 and *Boswell v. Bimbo Bakeries* at 570 F. Supp. 3d

12   89 at 97, Southern District, 2021.

13          So to conclude, the motion for summary judgment on

14   the copyright claim is granted.  The motion to dismiss is

15   denied as to the Sherman Act, Section 2, Sherman Act, Section

16   1, and the Clayton Act, Section 7, and the Virgin Islands

17   Antimonopoly Law claim, and it's granted as to the Virgin

18   Islands unfair competition and unjust enrichment claims.

19          I'm going to refer you folks to the magistrate judge

20   for discovery.  We also need to set a date for an answer.

21          Mr. Marriott, when will you be able to answer?

22          MR. MARRIOTT:  If we could have 30 days.  I suppose

23   that would be ideal, your Honor.

24          THE COURT:  All right.  That will take us to

25   February 21.  Let's see.  Who's your magistrate judge?  It

1  looks like maybe they dropped the ball when they sent this case

2  up here from Manhattan.  It looks like it was originally

3  assigned to District Judge Oetken and Magistrate Judge Aaron.

4  One of them woke up and decided it should land on my lap, but

5  I'm not seeing what magistrate judge was designated.  So I'll

6  have the clerk's office do that, and you can be in suspense

7  unless I missed it.

8         THE DEPUTY CLERK:  Judge, it was -- May 30.  There

9  was a notice of designation.

10        THE COURT:  I missed it.  Move on.  May 30.  Oh,

11  there it was.  May 30.  Judge Reznik.  You'll really like

12  working with her.  She's great.  Let's go off the record a

13  second.

14        (Discussion off record)

15        THE COURT:  Back on the record.  I can't remember if

16  I said this on the record already or not, but I'm going to

17  refer to Judge Reznik for general pretrial supervision.  I've

18  encouraged the parties -- I've encouraged the plaintiff to

19  commence some conversations about a possible business solution

20  at this juncture, and it is certainly my philosophy and I would

21  be surprised if it wasn't Judge Reznik's that if you're really

22  getting somewhere on a resolution, it makes more sense to put

23  the resources into that than into discovery.

24        So I wouldn't say, oh, let's pause the discovery the

25  first time you pick up the phone, but if you really think you

Angela (Angie) Shaw-Crockett, CCR, CRR, RMR
Official Court Reporter (914)390-4242

1    might be getting somewhere and you're making good progress and

2    you want to pause the discovery, I'm amenable to that, and I

3    imagine Judge Reznik would be as well.

4              Anything else we should do this morning?

5              MR. SUPKO:  Not from plaintiffs perspective, your

6    Honor.

7              MR. MARRIOTT:  Not here either, your Honor.  Thank

8    you.

9              THE COURT:  Thank you all.  Everybody stay well.

10              (Proceedings concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25