```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------------x
 3  XINUOS, INC.,

 4                          Plaintiff(s),

 5                                  22 CV 9777 (CS)(VR)
        -vs-
 6                                  DISCOVERY CONFERENCE

 7
    INTERNATIONAL BUSINESS MACHINES
 8  CORPORATION, et al.,

 9                          Defendant(s).
    ------------------------------------x
10

11      *Proceedings recorded via digital recording device*

12
                                United States Courthouse
13                              White Plains, New York

14                              June 21, 2024

15
    Before:  THE HONORABLE VICTORIA REZNIk,
16                              Magistrate Judge

17
    A P P E A R A N C E S:
18

19  CROWELL & MORING, LLP
        Attorneys for Plaintiff
20  BY:  JUSTIN D. KINGSOLVER
        MARK A. KLAPOW
21      WARRINGTON S. PARKER, III

22
    CRAVATH, SWAINE & MOORE, LLP
23      Attorneys for Defendants
    BY:  MICHAEL J. ZAKEN
24      FRANKLIN LI
        THOMAS CAMRY
25
```

 1          THE COURT:  Good morning.  Will counsel please

 2   introduce themselves, starting with the Plaintiff.

 3          MR. KINGSOLVER:  Good morning, your Honor.  My name's

 4   Justin Kingsolver, from the law firm of Crowell & Moring, for

 5   Plaintiff Xinuos.  I'm joined this morning by my partners Mark

 6   Klapow and Warrington Parker, also of Crowell & Moring, Inc.

 7          MR. ZAKEN:  Good morning, your Honor.  Michael Zaken

 8   of Cravath, Swaine & Moore on behalf of Defendants IBM and Red

 9   Hat.  I'm joined by my colleagues Franklin Li and Thomas Camry.

10          THE COURT:  All right, good morning, everyone.

11          So we are here to first discuss the parties' dueling

12   letters on the discovery dispute, and then after we address

13   that, I'll want a brief update on the status of discovery in

14   this case, so I will turn it over to Mr. Kingsolver to explain

15   to me what you're seeking and why you think it's relevant.

16          MR. KINGSOLVER:  Thank you, your Honor, and just to

17   situate the Court, I'll handle the first part of what you just

18   laid out, the, the dueling letters, and then my colleague, Mark

19   Klapow, will handle the remainder of the discovery issues.

20          So, your Honor, we're here just to discuss two very

21   broad objections that the Defendant has raised here to prevent

22   the production of what we think are some of the most vital and

23   relevant documents in the whole case.  First is the Defendant's

24   argument that because they have raised a statute-of-limitations

25   defense, that prevents the Plaintiff's inquiry into any

1  documents that pre-date that statute of limitations period.

2          As a gating matter, Defendants don't cite any law that

3  suggests that, that discovery can or should be curtailed simply

4  on the basis of an affirmative defense, and that is especially

5  so where that affirmative defense is unproven, so you'll see in

6  the Defendant's letter that they have suggested that the burden

7  of proof for their affirmative defense, and, specifically,

8  proving the exceptions to their affirmative defense, falls on

9  the Plaintiffs and that they claim we have not alleged the facts

10 required for a continuing, a continuing violation, which is the

11 primary, I think, exception that would be most relevant to our

12 antitrust claims here, but there's a couple problems with that.

13         First of all, we, we have specifically pled the facts

14 surrounding the continuing violation, and I believe our letter

15 cites the complaint at 2,7,51, 75, 79, 149, 157, 169, and

16 several others, I won't, I won't burden the Court with the

17 others, but more importantly, what the Defendants are trying to

18 do here is impose a pleading requirement on us that the Federal

19 Rules of Civil Procedure very clearly do not.  And, and the

20 source for that is the Second Circuit's case in a case *Abbas v.*

21 *Dixon,* and that's 480 F.3d at 640, where the Court -- or the

22 Second Circuit there said specifically, "the pleading

23 requirements in the Federal Rules of Civil Procedure do not

24 compel a litigant to anticipate potential affirmative defenses

25 such as the statute of limitations and to affirmatively plead

1  facts in avoidance of such defenses."

2          So the last thing I'll say kind of in this intro

3  period about that pre-2017 period is that these are not just --

4  well, the Defendants call the documents that we're seeking, I

5  think they call them "more evidence of the same alleged

6  misconduct," but as your Honor is aware, we're alleging a

7  significant antitrust conspiracy between IBM and Red Hat that

8  began no later than 2001, and key to those antitrust claims are,

9  you know, first, on our Section 1 claims, the element of

10  agreement.  We have to, as the Plaintiff, show that IBM and Red

11  Hat agreed to fix prices or to divide the market.  That

12  agreement, while it might have been exhibited later or effects

13  might have been felt later, entering the agreement is often, you

14  know, the most central part of the Plaintiff's presentation of

15  evidence in a Section 1 case.

16          And then if you turn to our Section 2 claims, our

17  monopolization and attempted monopolization claims, we need to

18  prove a specific intent to monopolize, which, you know, while

19  the Plaintiffs may have repeated their intent to monopolize

20  later, it's very -- it's much more likely, I think, just in a

21  common sense reading of what the evidence might show, that when

22  a plaintiff is coming up with the idea to monopolize or putting

23  their plans initially in action to monopolize, that is when

24  their intent is going to be most clear.  Beyond that, you know,

25  we need to show specific exclusionary conduct, and that is, you

1 know, the willful acquisition or maintenance of monopoly power.

2 That happened, that happened later, true, that happened within

3 the statute-of-limitations-period, but a lot of the specific

4 evidence of that happened before.

5          And that, that turns me to the -- kind of the second

6 big objection, which involves one of the central pieces of this

7 puzzle, one of the central pieces of how we are alleging that

8 IBM has acted in an exclusionary way, and that was Project

9 Monterey, which is a project between IBM and SCO, which was

10 Xinuos's predecessor, which created a lot of the code on which

11 Xinuos's product is currently based, where IBM and SCO entered

12 into a joint venture whereby IBM actually stole SCO's code and

13 then implemented it into their product.  That is relevant,

14 directly relevant, to our antitrust claims.

15          And while the Defendant's letter doesn't cite it, I

16 would just direct the Court to paragraph 148 of the Complaint,

17 which I think is the most direct recitation of how we're

18 alleging that IBM's code theft actually did represent

19 exclusionary conduct.  We said that IBM's code theft occurred in

20 service of IBM and Red Hat's coordination activity, increased

21 the barriers of entry for others into the market, it decreased

22 IBM's own cost of transition to access clients from other

23 operating systems, and it allowed IBM to shift their own

24 customers among their product portfolio.  These are all core

25 antitrust issues.

1          The Defendants claim that our antitrust issues are

2    somehow just -- or antitrust allegations are somehow just tacked

3    on.  I, I don't know their source for that, but it is clear here

4    that the Court, while they did -- while the Court did dismiss

5    the copyright-infringement claim, the Court specifically did not

6    dismiss the antitrust claims, and the remaining evidence about,

7    about Project Monterey is directly relevant to that.

8          I'll just note one, actually maybe, maybe two, more

9    very brief things about that second point.

10          The Defendants' reply letter suggests that we somehow

11    either -- they don't make it exactly clear whether it's we lack

12    standing or there was no injury, because some of the -- or

13    because the Project Monterey situation occurred before Xinuos

14    was formally incorporated.  I'll just bring to the Court's

15    attention, if, if the Defendants are trying to make an antitrust

16    injury argument, the -- there's case law suggesting that one

17    need not have an actual going business to establish private

18    antitrust injury, that's the *Hayes v. Solomon* case out of the

19    Fifth Circuit, 597 F.2d at 973, or if they're raising this as a

20    standing issue, there's the *Practice Perfect v. Hamilton County*

21    *Pharmacy Association*, that's out of the Southern District of

22    Ohio, 732 F. Supp. 802, which said that the plaintiff need not

23    be engaged in an ongoing business to fulfill this requirement.

24    The serious potential competitor is protected by antitrust laws

25    just as is the established business.

1           So the argument that somehow we would be foreclosed

2  from raising evidentiary issues about the Defendants'

3  anti-competitive conduct that occurred before we were formally

4  incorporated, number one, doesn't square with the law, but if

5  you think about just the purpose of the antitrust laws, it is

6  not to protect a specific competitor.  In fact, you know, every

7  -- basically every antitrust case begins with that maxim, that

8  the antitrust laws protect competition and the proper

9  functioning of a competitive market and, thus, an antitrust

10 claim is not tailor made for one specific competitor.  In fact,

11 we, as the Plaintiffs, will be required to show harm to the

12 competitive environment, which we think Project Monterey will be

13 a very key part of that presentation of evidence.

14          With that, I, I will certainly be willing to respond

15 to any of the Court's questions, or if there's any area that

16 you're specifically more interested in, I'm happy to expand

17 further.

18          Thank you, your Honor.

19          THE COURT:  Okay.  Before we turn to IBM, one quick

20 question.

21          If you -- if the facts are -- let's assume,

22 hypothetically, that IBM didn't steal the code, that they're

23 using Project Monterey, whatever code they're using, they have a

24 right to use.  Do you still have an antitrust claim?

25          MR. KINGSOLVER:  Well, your Honor, the -- yeah.  I'm

1  sorry.

2          THE COURT:  Right, in other words, how important --

3  how -- this theft idea that -- I see what you're saying, so my

4  question is, there's other anti-competitive behavior that's

5  alleged in the complaint...

6          MR. KINGSOLVER:  Yes, ma'am.

7          THE COURT:  And that Judge Seibel refers to in her

8  ruling, so I guess my question is, how integral is the code

9  theft; without it, do you still have an antitrust claim, or is

10  it, in your view, the central...way in which your antitrust

11  claim works.

12          MR. KINGSOLVER:  Certainly without it, we do have an

13  antitrust claim.  I mean, we've alleged different forms of

14  anti-competitive and exclusionary conduct, you know, in

15  contracting practices, in market division, in customer

16  allocation, but I think it is one of the more important parts

17  because it, in some ways, signifies the start of the conspiracy

18  period.

19          I mean, we've, we've requested, you know, certain

20  documents predating it by a few years because, you know, the,

21  the intent to embark on this kind of anti-competitive conspiracy

22  journey doesn't necessarily start the day before Project

23  Monterey starts, but in a lot of ways, we think this was kind of

24  IBM's way of kick-starting its attempt to monopolize this

25  market, which ultimately was successful in monopolizing this

Disc. Conf.                    Xinuos v. IBM

1  market.

2          So one of the -- one key issue in any antitrust keys

3  is what is the conspiracy period, and I think Defendants would

4  be quite hobbled to present a compelling conspiracy period if

5  we're prevented from discovery of what we're alleging is, is the

6  start of that conspiracy period, with all the attendant things

7  that I just mentioned about, you know, the importance of the

8  agreement, the importance of the intent, and -- I mean, I think

9  this also goes --

10          THE COURT:  Let me ask it this way.  Let me ask one

11  more follow-up question, then, related to that.

12          MR. KINGSOLVER:  Of course.

13          THE COURT:  If the, if...if you can argue that IBM is

14  using the same -- using Xinuos source code or Project Monterey

15  source code that now is -- that Xinuos is using and that's

16  incorporated into whatever they're doing with Red Hat...

17          MR. KINGSOLVER:  Uh-huh.

18          THE COURT:  Is that sufficient?  Or do you, or do you

19  need to prove that it's a misuse for them to do that?  Do you

20  see what I mean?  It may be that there's proof -- you

21  could...have proof that IBM is continuing to use whatever source

22  code that you think they shouldn't be using.

23          MR. KINGSOLVER:  Yeah.

24          THE COURT:  But is that -- is it important for it to

25  be misuse, or is it enough to say they're using this code and

1  that's part of their anti-competitive behavior.  How important

2  is it to show theft or misuse as part of that to be able to

3  prove anti-competitive behavior.

4           MR. KINGSOLVER:  Yeah, your Honor, I understand.

5           I think it is essential, because, I mean, all we can

6  really show, absent kind of the initiating conduct there, which

7  is who took it from who, would be that, you know, we can say,

8  well, Xinuos has this element of the code in its product and IBM

9  has this element of the code in its product, but we couldn't

10  prove up to the jury that kind of, you know, we or our

11  predecessor had it first.

12           And the wrongful conduct, you know, under -- a lot of

13  the antitrust law is...that is how it, it becomes -- let me

14  start, let me start that sentence over.  Not all bad conduct is

15  exclusionary conduct, but if it reaches a certain level of

16  tortious or beyond just competitive, that's when it crosses the

17  barrier of becoming exclusionary conduct, so in order for us to

18  kind of demonstrate that that fits both within -- that that

19  actually does fit within the antitrust laws, we have to -- we do

20  have to show the wrongness of the conduct from the outset.

21           I hope that answered your question.

22           THE COURT:  And the wrongness, in your view, is

23  inextricably linked to misuse of this source code.

24           MR. KINGSOLVER:  Yes, your Honor.  I mean --

25           THE COURT:  Okay.  I'm trying -- I was trying to see

1  if there's any separation between the source-code theft

2  allegations and the antitrust and anti-competitive behavior that

3  you're pointing to.  I see it as an element of it; I didn't know

4  if it was inextricably linked in your mind, but I think I have

5  an answer to the question.

6          Let me see if -- if you have something more to say

7  about that -- I have some more questions about that, but I want

8  to let IBM have a chance to respond.

9          MR. ZAKEN:  Good morning, your Honor.  Michael Zaken

10  on behalf of IBM.

11          With the Court's permission, I'd just like to provide

12  a bit more background on the discovery and this dispute

13  specifically.

14          So Xinuos has served on Defendants extraordinarily

15  broad RFPs.  They're attached to their letter, so I'm sure your

16  Honor has seen them.  Specifically, Xinuos has propounded 188

17  requests for documents and 140 of those seek documents going

18  back nearly three decades to 1996 and they seek extensive

19  information regarding many facts.  You know...counsel for Xinuos

20  spoke about intent and conspiracy, but these requests go well

21  beyond that.  They seek information regarding pricing, revenues,

22  marketing, advertising, and a variety of other topics.  They

23  also seek documents regarding Project Monterey and the copyright

24  infringement that they've alleged, which was dismissed by Judge

25  Seibel.

1          We objected to the time period of those requests on

2    the grounds that Xinuos had not providing any convincing reason

3    why they needed documents going all the way back to 1996 and

4    cited specifically the fact that the documents would go well

5    beyond the statute of limitations, which would start four years

6    prior to the Complaint, or 2017, so documents also go well

7    beyond the time period when Xinuos bought the software assets

8    that it alleges were harmed, that was in 2011, and they were

9    only incorporated in 2009, so even if you use 2009 as a starting

10   point, it's going back over 13 years before that.

11          We don't think the allegations in the Complaint

12   support going back that far.  The Complaint barely identifies

13   any dates and none of the dates go back before 2001, and as I

14   noted, the copyright claims were also dismissed and we don't

15   think that discovery regarding those claims would be proper.

16   Essentially it seems to us a third bite at the apple after

17   Defendants unsuccessfully tried to seek reconsider of their

18   copyright claims.

19          Despite the extraordinary nature of those requests,

20   we've attempted to reach a reasonable compromise.  We've agreed

21   to produce documents responsive to 169 requests, we've made

22   multiple productions, and we have not strictly limited our

23   productions to 2017.  We've produced written agreements between

24   IBM and Red Hat that go back further as well as strategy,

25   presentations, and industry reports.  We'll also be making a

1    production today of written agreements between IBM and Red Hat's
2    alleged Linux competitors SUSE and Canonical.  Again, those go
3    back prior to 2017.
4            We've also offered to negotiate a search for a limited
5    set of documents from before the limitations period on a
6    request-by-request basis, but Plaintiffs have refused,
7    essentially seeking to bring this as an all-or-nothing issue to
8    the Court, so that -- I just wanted to provide that background.
9    With that, I'll start by discussing the statute-of-limitations
10   argument, and then I'll move on to Project Monterey.
11           So Rule 26(b)(1) limits discovery to what's relevant
12   and proportional, and Xinuos bears the burden to show that.  We
13   believe Xinuos's request for documents predating the statute of
14   limitations are neither.
15           First, Xinuos does not dispute that absent a
16   statute-of-limitations exception, the statute of limitations
17   begins running on March 31st, 2017, or four years from when the
18   Complaint was filed.  Accordingly, unless there's a credible
19   basis to argue for an exception, documents before the statute of
20   limitations are simply not relevant.  In its letter, Xinuos
21   argued that it might be able to show one of several exceptions
22   to the statute of limitations, but in the -- in argument today,
23   the only exception that was pointed to was the
24   continuing-violation exception, so I'll focus on that.
25           First, if you look at the Complaint, Xinuos has not

1  pled any overt acts that occurred within the statute of

2  limitations that would allow it to reach conduct occurring

3  before the statute of limitations.  The continuing-violations

4  doctrine requires a plaintiff to show an overt act that starts

5  the statutory period running again -- that is, a new and

6  independent act, that's not merely a re affirmation a few

7  previous act -- and it must inflict new and continuing injury on

8  the plaintiff.  That's from U.S. *Airways v. Saber*, Second

9  Circuit 2019.  And nothing in Xinuos's Complaint or the

10  paragraphs they pointed to alleges an overt act.  Those

11  paragraphs focus on sort of conclusory statements that the

12  injuries were recurring in nature, where the bad acts continued

13  to this day, and that's insufficient under the law.

14          Another point I would make is that even if Plaintiffs

15  showed a continuing violation, the law is clear that that would

16  not allow them to recover damages outside of the statute of

17  limitations, so they would still be recovering damages only for

18  the four-year period going back to 2017, but their argument --

19  so the only thing that the continuing violation does is say the

20  statute of limitations doesn't bar the claim entirely from being

21  brought.

22          And then if you think about what that means, that

23  means that they would be requesting documents going back from

24  2017 to 1996 on claims where they can only show damages for 2017

25  and on, and that's a very high burden to place on Defendants,

1 especially when they haven't narrowed their time period in any

2 way, they've sought this for 140 requests, and things that go

3 well beyond many of the subject matter you heard them speak

4 about today that might be relevant for the earlier documents.

5          Just, just quickly, Xinuos also argues that pre-SOL

6 documents are relevant because Defendants have asserted

7 affirmative defenses and allegations predating the statute of

8 limitations.  They didn't focus too much on that argument, but

9 just to quickly address that, those are affirmative defenses we

10 brought in response to the copyright claims, which have been

11 dismissed.  Xinuos did not amend the Complaint because of the

12 way the summary judgment ruling posture happened, but those

13 affirmative defenses were brought as a matter of caution to

14 respond to, to the copyright claims.

15          One final point on the statute of limitations is just,

16 you know, even if pre-statute-of-limitations documents were

17 found to be relevant, we're still dealing with a company that

18 purchased the relevant assets in 2011, so any documents before

19 that are not going to -- they're not going to show any harm to

20 the company or to the asset in a way that is relevant to this

21 case and, you know, under, under, like, existing case law,

22 documents need to be reasonably calculated to lead to the

23 discovery of relevant evidence.

24          There was one comment made by counsel for Xinuos that

25 you don't need to exist to let (ph) an antitrust violation.  I

1  believe those cases were talking about a situation where there's

2  a competitor waiting to enter and may have been injured in the

3  process.  Here, Xinuos did not exist, did not -- before 2009,

4  did not have plans to enter the market, it is not alleged they

5  had plans to enter the market in 1996 or 2001, so I don't think

6  that case law is relevant.

7            THE COURT:  Okay.  Are you referring to the other

8  point, or I can -- I have a quick question for you on the SOL

9  stuff.

10            MR. ZAKEN:  Sure.

11            THE COURT:  What was, what was the end of Project

12  Monterey?  Was that 2001?

13            MR. ZAKEN:  2001.

14            THE COURT:  Okay, and when did -- so maybe this isn't

15  a question for Xinuos, but Red Hat and IBM, when did they begin

16  discussions, or is that something you can tell me?  I guess it's

17  -- I thought I heard Mr. Kingsolver say that began in 2001.

18            Is that incorrect?

19            MR. ZAKEN:  The -- it's not entirely clear to us the

20  exact nature of what Plaintiffs are, are meaning to talk about,

21  but they quote and discuss public announcements related to

22  agreements that go back to 1999.

23            THE COURT:  Relating to IBM and Red Hat.

24            MR. ZAKEN:  Yeah, that's right.

25            THE COURT:  Okay.  And Xinuos acquired the assets of

1  SCO, that was around 2011?

2           MR. ZAKEN:  That's right, in 2011.

3           THE COURT:  Okay.  Okay, I'll let you go -- continue.

4  Were you going to address the code-copying piece?

5           MR. ZAKEN:  Yes, your Honor.  I'll try to do that,

6  heh, as quickly as possible.

7           I mean, I think...at a high level, we view this as an

8  attempt to resurrect a claim basically a third or a fourth time.

9  The copyright claims that Xinuos is seeking to bring were --

10  belong to SCO and were released by SCO in 2021 and were not

11  transferred to Xinuos at the time that they bought the, the

12  copyright.  That was -- then they -- but they included them in

13  their Complaint in 2021.  We brought a summary judgment motion,

14  and Judge Seibel ruled that they did not have a claim, that the

15  claim that they brought belonged to SCO, and that was because it

16  was an ownership claim because it was about whether IBM had a

17  right to use the code.  And Plaintiffs again moved for

18  reconsideration and they lost, and now they appear to be trying

19  to bring this same claim by providing document requests that are

20  purportedly related to antitrust claims, but I think you heard

21  counsel for Xinuos say this is really about misappropriation of

22  code, essentially a copyright claim, again, in a different --

23  you know, in a different disguise, and we think they shouldn't

24  get a third bite at the apple here.

25           Just, just to give some further detail, right, Xinuos

1  doesn't dispute that the copyright claim has been dismissed.

2  The Court clearly found that Xinuos had no right to assert that

3  claim and that was because IBM -- it was a claim related to

4  whether IBM had the right to use the code, and that claim

5  belonged to SCO and was released, so they should not be able to

6  bring a claim relating -- that they do not have a right to as in

7  the guise of an antitrust claim.

8          Second, you know, Xinuos claims they should get

9  discovery into the code theft because it's a part of our

10  affirmative defense.  As I mentioned earlier, for the statute of

11  limitations, the affirmative defense was raised as a part of the

12  copyright claims, which weren't technically omitted from the

13  Complaint so we have to include that in our answer, but the fact

14  that we brought -- we raised those doesn't mean that the

15  copyright claims are relevant.

16          Third, I'd like to just briefly explain why Project

17  Monterey is not relevant to Xinuos's antitrust claims.

18          As I already discussed, any harm due to the alleged

19  code theft would be subject to the statute of limitations.

20  These are claims that SCO brought in 2001 through 2004 and they

21  included copyright claims and unfair competition claims.  Judge

22  Seibel found that those claims were publicly known to everyone

23  in the market, they were filed by SCO, and they were in numerous

24  industry publications, so those are known claims from well

25  before the statute of limitations.

1         Xinuos can't also articulate a theory of antitrust

2   harm that would require discovery.  As mentioned, Xinuos didn't

3   exist for ten years or for, for eight years prior to the 2001

4   Project Monterey issues and they did not own the relevant

5   software until ten years after Project Monterey.  They could not

6   have been injured, much less claim damages, for that period.

7         THE COURT:  Okay.

8         MR. ZAKEN:  I'm happy to take any questions, your

9   Honor.

10        THE COURT:  Yeah, so...let me look back at my notes.

11        So if I look at the statute-of-limitations issue, so,

12   Mr. Kingsolver, can you explain to me what documents pre 2017

13   you believe are relevant here.  How much -- and how long before

14   2017.

15        I mean, it does sound like that what you're -- that

16   many of your document requests are asking for documents all the

17   way back to 1996.  Why do you need to go that far back, why is

18   that relevant?

19        MR. KINGSOLVER:  Yeah, thank you, your Honor.

20        I think that kind of goes to this, this kind of false

21   bifurcation that the Defendants' letter tries to propose here,

22   saying that, you know, we're asking for all this stuff back in

23   1996, 1998, 2000 that just relates to damages, and we have to

24   remember the context here that, this is an antitrust case and

25   antitrust cases are typically proven, proven up -- or at least

1   big elements in antitrust cases are proven up by, by documents

2   that in a breach-of-contract case might only be relevant to

3   damages, but that's not so in an antitrust case.

4          I, I'd, you know, cite for, this the *NLB v. Salvino*

5   case that the Second Circuit heard in 2008 where that was

6   discussing the U.S. Supreme Court's decision in an NCAA

7   antitrust case where, you know, these, these kind of sales and

8   revenue data, which I think Mr. Zaken was talking about as some

9   of this -- the kind of the outlandish requests that we had for

10  documents that were, you know, quite, quite a long time ago.

11         The U.S. Supreme Court has held that that kind of

12  evidence is directly relevant to showing that prices are fixed,

13  that markets are divided, that customers are allocated between

14  different parties, the kind of sales revenue that all that data

15  back at that point is when we -- number one, shows, shows the,

16  the agreement and the concerted effects of that agreement, but

17  before that, we also need to show the properly functioning

18  competitive market, so our, our Complaint pretty clearly alleges

19  that the properly functioning competitive market occurred before

20  IBM stole the code that makes up the product that we currently

21  own, and that was in 2001, so in order for us to, to show what

22  is anti-competitive, we, we also have to show what is

23  competitive.

24         So this whole idea of, you know, there are certain

25  things that we've requested in our 160 document requests that,

1  you know, would just simply not relate to any kind of liability

2  issue, I think, is, is not supported by existing case law, and

3  I, I actually haven't seen any case law from the Defendants on

4  that issue.

5           THE COURT:  Well, it sounds like the Defendants are

6  saying that they tried to compromise with you and meet and

7  confer and --

8           MR. KINGSOLVER:  Yes.

9           THE COURT:  -- asked you to identify certain requests

10 that maybe they'd go back further in time, but that --

11          MR. KINGSOLVER:  Yes --

12          THE COURT:  -- you took an all-or-nothing approach.

13 Do you agree with that?  Or was there some attempt to compromise

14 to try to reach an agreement so that you -- I understand your

15 point that you believe there is some aspect of your claims where

16 it makes sense to go back in time, but that can't be true for

17 every single relevant document in the case, is it?  I mean, I'm

18 assuming that it can be narrow -- you could narrow it to

19 specific categories of documents.

20          So, for example, to the extent that you want to prove

21 intent to monopolize or that an agreement was reached that,

22 there would probably be a document -- a period of time in which

23 that likely occurred and you could target requests to that time

24 period, or if you had specific types of documents where you

25 believed it related to a functioning market pre 2001, I guess,

1 that there would be some subset of documents relating to that

2 issue, but I guess my question is, why is it that so many

3 document requests have to go back to 1996 and not just a subset.

4         MR. KINGSOLVER:  Certainly.

5         Well, I mean, an antitrust conspiracy does provide

6 for, you know, liberal discovery for a reason.  I mean, these

7 are, are very complicated questions of systemic customer

8 relationships, economic forces, the, the market as a whole.  I

9 mean, that -- we're, we're needing to kind of recreate a

10 competitive functioning marketplace, you know, back in 1996

11 because that's when we've alleged that this is the competitive

12 market, and we're alleging that IBM and Red Hat's concerted

13 activity from '01 until the present day has impaired that

14 market, so it, it does -- I mean, on its face 160 document

15 requests sounds, sounds...significant because the task that

16 we're faced with is significant.

17         On, on the Defendants' point that they proposed, you

18 know, limitations before 2017, I think in their, in their

19 letter, they said they're willing to produce documents predating

20 2017 where relevant, and they make great hey of the fact that

21 they've produced some documents before 2017 and -- well, a

22 couple things.

23         First, you know, the reason why we didn't want to go

24 request by request, you know, which one should we be allowed to

25 probe 2017 and before and which ones should we not be allowed to

1  do that, is because at the gating issue, there is no law to

2  support that argument, there is no law to support that a statute

3  of limitations is a discovery bar, and that's well detailed in

4  our, in our letter brief and the letter that we sent to IBM

5  supporting the letter brief, so we, we can't, in a way,

6  negotiate against ourselves solely because of a

7  statute-of-limitations defense that is being used as a discovery

8  bar improperly.

9          But then if you, if you look, if you look at the

10  documents that IBM has produced, they have produced some

11  documents before 2017 that they have considered, you know -- if

12  we, if we look to what they view as relevant, they produced 39

13  documents that pre-date March 2017.  All of these documents are

14  from IBM, none of them are from Red Hat, there are four e-mails

15  that attach pricing correspondence, and the rest of the 35

16  documents are non-native documents that are extremely blurry,

17  they're basically unreadable.  And the custodian for every one

18  of these 39 documents, it's not a specific person, it's just

19  IBM, so the, the -- it's easy to say, you know, we're producing

20  it, we are, you know, we are open to this kind of production,

21  but it's just -- it's not panning out in the way that it kind of

22  sounds...kind of superficially.

23          You know, IBM and Red Hat worked together for 20 years

24  in a variety of partnerships, and these partnerships took formal

25  and informal approaches culminating in their anti-competitive

1  merger, which if, if I could also address that just, you know,

2  with one bar, Mr. Zaken just said that we have not alleged any

3  overt acts that occurred within the statute-of-limitations

4  period.  That's just patently inaccurate.

5        We, you know, a central part of our theory is that all

6  of this anti-competitive informal conduct then began leading to

7  formal conduct which culminated in an anti-competitive merger,

8  that's at Complaint ¶¶ 160 through 170, and I don't think Mr.

9  Zaken would dispute that the merger was consummated in 2019.

10  And under the statute-of-limitations period that he has just

11  laid out, which began in March 2017, we're saying there was an

12  overt act, we've clearly pled there's an overt act, in the form

13  of an anti-competitive merger that occurred in 2019.

14        So, I, I really don't understand that, that part of

15  the argument.

16        THE COURT:  Okay.  So, from my perspective, the

17  statute of limitations or -- the, the issue of whether documents

18  that pre-date 2017 can be produced is a fairly easy issue to

19  resolve.  The harder part for me is how to cabin that request --

20        MR. KINGSOLVER:  Mm-hmm.

21        THE COURT:  -- so that it's not unduly burdensome and

22  that it's proportionate to the case, so --

23        MR. KINGSOLVER:  We understand.

24        THE COURT:  -- so here's the thing.

25        So I agree with the Plaintiff that the statute of

1 limitations is not a basis to preclude discovery at this stage

2 of the case, that courts are reluctant to impose arbitrary

3 discovery cutoff points and the time bar of an applicable

4 statute of limitations for the filing of an action based on

5 particular events does not necessarily foreclose discovery of

6 information concerning those events.

7          It's also true under Second Circuit case law that a

8 plaintiff is not required to anticipate potential affirmative

9 defenses such as the statute of limitations in their pleadings

10 and to affirmatively plead facts in avoidance of such defenses;

11 it's also true that the Defendants have the burden of proof on a

12 statute of limitations defense, it's an affirmative defense; and

13 so all of that is to say that, to the extent IBM is arguing that

14 discovery of materials predating 2017 should be barred because

15 of the statute of limitations, I think that argument is

16 meritless.  I think the 2017 date is an arbitrary temporal

17 limit, and as I mentioned, courts are reluctant to impose those

18 and the statute of limitations itself is not a basis to impose a

19 rigid temporal limit on discovery.

20          But the scope of discovery still does need to be

21 relevant and proportional to the needs of the case, so in my

22 view, that's where the crux of this dispute really lies, not

23 whether there's a time bar on documents that pre-date 2017, but

24 whether the document requests themselves are overly broad and

25 unduly burdensome by going back all the way to 1996, so, really,

1    I think the focus of my inquiry here is, it -- understanding

2    which doc -- which categories of documents before 2017 are

3    relevant, and I don't think I have enough information, based on

4    what the parties have provided me, to be able to do that, you

5    know, on a document-request, document-request basis.

6            All I know is when I look at the document requests

7    attached, which are, you know, obviously, voluminous and the few

8    that have been identified for me to look at, you know, when they

9    were cited in the letters, they do seem extraordinarily broad.

10   "All agreements with IBM software competitors from January 1st,

11   1996 to the present," that seems pretty broad, or "all documents

12   and communications relating to competitor server operating

13   systems including prospective or potential competitors from

14   January 1st, 1996, to the present," that also seems extremely

15   broad, so I am -- I'm looking for, heh, a way out of this

16   dispute that I think grants the Plaintiff access to documents

17   that pre-date 2017, but cabins those requests so that we're not

18   talking about 140-some-odd requests that go back to 1996,

19   because I think that's too much.

20           So where does that leave us.  I guess I'm not willing

21   to make a blanket ruling in favor of Defendants that says, no,

22   they don't have to produce documents that pre-date 2017, and I'm

23   not willing to give Plaintiffs a ruling that says they're

24   entitled to everything before 2017 all the way back to 1996 for

25   all their document requests.  Instead, what I'm saying is, there

Disc. Conf.                    Xinuos v. IBM

1    needs -- the documents that pre-date 2017 do appear relevant,

2    but it's not clear to me that all those document requests are

3    relevant that go back to 1996 or that they are not unduly

4    burdensome and proportionate to the case.

5            So --

6            MR. KINGSOLVER:  Yes, your Honor.

7            THE COURT:  -- I'm open to suggestions about how to

8    whittle this down.  I don't feel like I'm in a position to just

9    start carving up your document requests and saying these ten can

10   go back to X date or those ten, you know, can go back to that

11   date, I need some guidance from the parties about that, but I

12   don't know if I've given you enough guidance to do that.

13           Mr. Kingsolver.

14           MR. KINGSOLVER:  Your Honor, may I -- sure, of course.

15   I think there's a couple things there that would maybe be

16   helpful to the Court to address.

17           I mean, first, on the issue of proportionality, I

18   mean, we are talking about an antitrust case over a

19   multi-billion-dollar merger, so, you know, in our view -- and

20   this may be subject to briefing later, but proportionality is,

21   is quite in our favor here, especially given that there has been

22   no showing of burden on, on the Defendants' side, and I think

23   that's particularly important here because, you know, obviously

24   the context of an anti-competitive merger, in, in that merger

25   process, the government will issue its CIDs and then it'll issue

Disc. Conf.                    Xinuos v. IBM

1   its second requests to investigate the merger.  A lot of these

2   documents have likely already been collected and produced to the

3   government.

4          And then, you know, on the separate issue on the

5   Project Monterey issue, you know, Mr. Zaken has said this is our

6   second or third bite at the apple, the flip side of that kind of

7   destroys their burden argument, because if it's the second or

8   third bite at the apple, these documents have already been

9   collected, reviewed, produced, you know, de (indiscernible), you

10  know, all that stuff, so these documents are there.

11         So I -- we just -- you know, normally, the allegations

12  of burden are supported by some kind of affidavit.  There's no,

13  there's no allegation or really specific allegation of burden

14  here, but to address the Court's concern, I mean, we would

15  certainly be willing to, you know, make a proposal about

16  potentially some RFPs where we can, we can impose a temporal

17  limit saying, you know, we, we really only do need documents,

18  you know, before 2011 on, on these, but there will, there will

19  be some that we need, you know, documents, you know, from, from

20  2001 from 1996 to show that it was the competitive market.

21         Like, RFP No. 13, seeking, you know, revenue from the

22  sale and license of IBM and Red Hat software, we, we need to

23  know that and we need to know that by customer segment and we

24  know to know that for the entire conspiracy period.  And, you

25  know, we have this, this bundling theory that's in, you know,

Disc. Conf.                    Xinuos v. IBM

1  RFPs 13 and 15 about our allegations that IBM and Red Hat are

2  using their market power in maintenance and support services and

3  hardware by specific customer segments to achieve an

4  anti-competitive effect in, in the market that we're alleging,

5  so that's RFPs 13 and 15.

6        That's just to say that some of these RFPs, just,

7  because of the nature of the case, we, we can't limit, but we

8  would be certainly happy to propose something either to the

9  Court or to Defendants with some kind of reasonable limiting

10  principle, but we just couldn't do that, you know, on the back

11  of what we, we found to be, and sounds like the Court agrees,

12  was a -- kind of an arbitrary statute-of-limitations point.

13        I don't know if the Court is going to also address

14  the, the theft issue, whether that is something --

15        THE COURT:  Well, I am going to talk about that --

16        MR. KINGSOLVER:  Okay.

17        THE COURT:  -- in a second.  I just wanted to address

18  the statute of limitations first because it seemed --

19        MR. KINGSOLVER:  Of course.

20        THE COURT:  -- that was easier, but it -- in my view,

21  it -- I'd like Plaintiffs to take another look at their requests

22  and articulate a subset of those requests, really think hard

23  about what, what timeline you actually need.  You know, you just

24  said 1 and 3 and you were able to articulate a time frame or 13

25  and 15.  That's a -- that's very different than 140-some-odd

Disc. Conf.                  Xinuos v. IBM

1  requests that just say back to 1996, right?  So my view is that

2  you should go back, take a hard look at the requests, and work

3  on narrowing them to a time frame that you really, really need.

4           And so, for example, if you have documents relating to

5  the merger between Red Hat and IBM, when was that?  When did the

6  merger take place?

7           MR. KINGSOLVER:  Yeah, the merger took place in -- I

8  think it was consummated in 2019.  I, I think the answer is that

9  it was announced in 2017, but it must have been announced in

10 early 2018, but, you know, having been through several

11 government merger reviews, the scope of the review that either

12 the Justice Department or FTC would have gone through would have

13 been kind of the -- heh, a regulatory colonoscopy of sorts,

14 that, you know, went back, likely, very, very far because the

15 government's trying to project, you know, future

16 anti-competitive effects of the merger, so --

17          THE COURT:  Right, but --

18          MR. KINGSOLVER:  -- we don't, we don't --

19          THE COURT:  -- my point is, my point is there are

20 certain events in time that happened and you can seek documents

21 around those times and some --

22          MR. KINGSOLVER:  Certainly.

23          THE COURT:  -- period before that, but in my view,

24 that's an example of one where you don't have to go back to

25 1996.

Disc. Conf.                          Xinuos v. IBM

1          MR. KINGSOLVER:  Of course.

2          THE COURT:  You can make a narrowed request because

3  you have a merger that happened -- that it was announced -- that

4  happened in 2019 and announced in 2017 and there was a

5  regulatory analysis about that, but I don't think that means the

6  documents you're seeking about the merger need to go back in

7  time to 1996.  Maybe they already don't, and if I looked at the

8  requests you've already made it narrower than that.

9          I'm just saying I think that's an example where you

10  can take a look at your request and make another attempt at

11  narrowing the timeline to see if we can get to a reasonable

12  agreement between the parties in light of my view that you are

13  entitled to documents before 2017, but I don't want all requests

14  to go back to 1996.  I think that is --

15          MR. KINGSOLVER:  Of course.

16          THE COURT:  -- unreasonably broad, and I think that

17  there needs to be an effort to narrow it.

18          So I would say -- well, I can set some deadlines, but

19  I would like you to make an attempt to do that and for the

20  parties to exchange those RFPs and meet and confer about them

21  and see if you can reach an agreement based on my ruling today.

22          MR. KINGSOLVER:  We will do that, your Honor.  Thank

23  you.

24          THE COURT:  On the, on the IBM code copying, I'm

25  having difficulty with this one because I'm trying to

1  understand, Mr. Kingsolver, why this isn't attempting to

2  resurrect a claim that was already dismissed.

3          I see in your Complaint that -- the allegations that

4  relate to the code theft and connecting that to anti-competitive

5  behavior, but it does -- well, I'm looking at Judge Seibel's

6  ruling.  When I look at the allegations in the Complaint, I'm

7  trying to understand why these claims -- if these claims belong

8  to SCO and were released, those were already heavily litigated,

9  all of the -- issues relating to theft and misappropriation has

10 already been sort of dealt with in another context.

11         MR. KINGSOLVER:  Right.

12         THE COURT:  Why are you allowed to bring this case and

13 talk about -- resurrect Project Monterey and the claims that SCO

14 has released, I guess, at this point and, and --

15         MR. KINGSOLVER:  Yes.

16         THE COURT:  -- why is it not a dressed-up copyright

17 claim that really isn't yours to bring.

18         MR. KINGSOLVER:  Well, I think this goes back to the

19 *Spectrum Sports* case, and that's 506 U.S. at 447.

20         Antitrust claims do not belong to competitors.  It

21 just -- it's kind of anathema to the whole principle embodied

22 within Section 1 or Section 2 to suggest that, you know, SCO

23 owned an antitrust claim based on conduct that IBM, that IBM

24 engaged in that impaired the proper functioning of the

25 competitive market, so, you know, it -- SCO really did not have

1  any, any power or jurisdiction or standing to release, you know,

2  the antitrust injury that IBM had inflicted on the proper

3  functioning of a market because the antitrust laws don't just

4  protect competitors, they protect consumers.

5      I mean -- and the idea that having multiple

6  competitors engaged in this competition that's not infected by

7  one monopolist stealing code from another and incorporating it

8  into their own products to push that individual company out of

9  business, which is, in fact, what happened, that is an antitrust

10 injury that is separate and distinct from just theft of

11 copyright code, and that's why the antitrust laws classify that

12 kind of conduct as exclusionary.

13     So, you know, it's, it's very common in, in -- under

14 the fact-pleading, notice-pleading standards, number one, that

15 you'll plead in the alternative, but that doesn't necessarily

16 mean that certain conduct that does form a factual nexus for

17 multiple claims can be, you know, just wiped away when one of

18 those claims is, is dismissed.  And that's the *Oppenheimer Funds*

19 case, that, you know, both -- you know, the one area I think

20 that Plaintiffs and Defendants here agree on is that that case

21 governs here.

22     And the Supreme Court said that -- well, this part,

23 actually, wasn't included in Defendants' brief, but, the Supreme

24 Court said that if -- that it is proper to decide (ph) discovery

25 of a dismissed claim only when that is not otherwise relevant,

1  and based on the allegations that we've put into the Complaint,

2  and, again, I'd, I'd direct the Court to, I think it was 148,

3  section -- ¶ 148 of our Complaint, it is -- it's indisputable

4  that we have alleged that that code-copying conduct and how it

5  was used thereafter to push Xinuos -- the Xinuos product, which,

6  you know, owned by SCO, now owned by Xinuos, out of the

7  marketplace was exclusionary and anti-competitive for the

8  Section 1 and Section 2 claims.

9          THE COURT:  Well -- so I agree with you that your

10  claim connects the code-copying conduct, the alleged

11  code-copying conduct, with anti-competitive behavior.  My

12  question is whether the premise of your anti-competitive

13  conduct, this stealing of code, which I have a question as to

14  whether that's...you can do -- you can bring that claim based on

15  that piece of it, the stealing of code.  Your Com -- that's why

16  I started with your Complaint has a lot allegations about

17  anti-competitive behavior --

18          MR. KINGSOLVER:  Yeah, yeah.

19          THE COURT:  -- and stealing of code is one piece of

20  it, and so how -- that's why I was asking how integral to the

21  anti-competitive conduct is the stealing of the code.

22          I agree that anti -- that SCO did not release an

23  antitrust claim, that you have the ability to pursue an

24  antitrust claim, I think Judge Seibel essentially said that or

25  must have agreed with that --

1           MR. KINGSOLVER:  Mm-hmm.

2           THE COURT:  -- in the way she ruled, so I'm not

3  contesting your ability to bring an antitrust claim in general

4  and to allege anti-competitive behavior in the way you've done.

5           I guess what I'm wondering and questioning is the

6  stealing of code piece, because it seems like as part of

7  litigating your antitrust claim, you're going to be

8  re-litigating this misappropriation, theft-of-code claim, that

9  the Court has dismissed, so in some ways, I'm trying to figure

10 out how you're going to get around -- if you, if you really

11 believe the code copying conduct is so integral --

12          MR. KINGSOLVER:  Mm-hmm.

13          THE COURT:  -- it seems like you're stuck with

14 re-litigating that issue as part of your antitrust claim, and

15 it's not clear to me that Judge Seibel's ruling would agree that

16 you can do that.

17          MR. KINGSOLVER:  Sure.  May I address that, your

18 Honor?

19          THE COURT:  Yes.

20          MR. KINGSOLVER:  I, I think there's really two

21 responses.

22          The first is, I mean, the Court did not, did not rule

23 that there was no infringement, so, I mean, in order for this --

24 if you think of, like, typical preclusion...analysis, you know,

25 we -- we're now being -- heh, it's now been suggested that this

1  is our third bite at the apple to prove this, this is not that.

2  We did not have the ability to prove the code theft, at least in

3  this second bite of the apple.  The, the Court dismissed this

4  because, quote, that as a contractual matter, quote, belonged to

5  SCO and SCO has released Defendants from that ownership claim,

6  not, not -- the issue of theft was not litigated...on a merits

7  basis here.

8          But I think that the Court's -- the remainder of the

9  Court's transcript analysis suggests that -- it doesn't say it

10  directly, but there's -- I direct you to page 13 of the bench

11  ruling, which separated the issue of code theft as a

12  copyright-infringement matter to the alleged misuse -- "the

13  alleged misuse of the Project Monterey code as evidence for its

14  unfair competition claim," and that was described in the

15  earlier...described in the earlier litigation.

16          There are two analytically distinct elements of, of

17  that...of that factual circumstance, and it's -- at least the

18  way we read the bench ruling, the Court seems to distinguish

19  between there's a copyright infringement element and there's an

20  unfair competition element which, you know, compounded with what

21  we have pled in our Complaint, we don't think we're getting, you

22  know, a third bite at the apple.  Xinuos is certainly getting a

23  first bite at the apple for an antitrust claim that we certainly

24  do not -- are not precluded from bringing, and this is a central

25  element of that, of that antitrust claim.

Disc. Conf.                    Xinuos v. IBM

1          THE COURT:  Okay.  So in your view, you think because

2    of the unfair competition piece of your antitrust claim, that

3    that allows you to continue to pursue this misappropriation of

4    code as part of that.  Even though the copyright claim is

5    dismissed, you don't believe Judge Seibel's opinion says you

6    can't pursue those allegations at least as part of your

7    antitrust claim.

8          MR. KINGSOLVER:  Exactly, your Honor.  Exactly.

9          THE COURT:  Okay.

10         So, IBM, do you have anything to say about that?

11         MR. ZAKEN:  Yes, your Honor.  Thank you.

12         I mean, I think, I think the first point to make is

13   that, as Mr. Kingsolver made clear, I think, earlier, earlier

14   during this hearing, their claim, their claim relies on the

15   allegation that the use of the code was improper and was

16   misappropriation.  Essentially, it's a copyright-infringement

17   claim, the same that they tried to bring.  They don't have a

18   claim if it's not improper, and those claims, Judge Seibel

19   ruled, belong to SCO and were released by SCO, and so those

20   claims are out, and I think that that includes their use of them

21   now as a tack-on to the antitrust claims.

22         I'd also note that if you read Judge Seibel's ruling

23   and their Complaint, the copyright claims are easily

24   segregatable from the rest of the claims which relate to alleged

25   market division and then a merger.  You don't need the code to

1  have anything to do with those claims.  This is simply an

2  attempt to continue to litigate the copyright claim after they

3  -- after it was dismissed.  I mean, that has, that has been the

4  focus of Xinuos from the start when they first issued RFPs prior

5  to the summary judgment decision.  There were 70 RFPs on the

6  code theft, essentially on nothing else.  After the dismissal,

7  they doubled the amount of RFPs and continued to pursue the

8  code-theft issues.

9        We understood Judge Seibel's ruling to say the code

10 theft is out, the other antitrust issues are in, and also I

11 believe at the hearing, she essentially said, you know, I

12 believe obviously things will progress and, you know, Judge

13 Reznik will decide discovery issues, but she expressed the view

14 that, you know, discovery regarding those dismissed claims was

15 done, and, and so...we -- you know, our view is that those

16 claims should be out, we should put Project Monterey to rest and

17 focus discovery on the remainder of the claims.

18        THE COURT:  So if we focused on just what document

19 requests are at issue here or what discovery is at issue here,

20 that IBM doesn't want to address and that Plaintiffs are

21 seeking, are you able to articulate that for me, Mr. Kingsolver,

22 or is there a set of or category of document requests that this

23 relates to?

24        MR. KINGSOLVER:  There are, there are several document

25 requests.

1          I mean, I don't, I don't think that Mr. Zaken is wrong

2    when he's saying that something like 70 of our document requests

3    don't list the code-theft issue.  We haven't withdrawn any of

4    those because they are still relevant, so, I mean, there are,

5    there are many.

6          THE COURT:  And so there -- but what is it you're

7    asking for specifically?  It's documents -- so in, in that

8    category, can you describe them generally for me?  That's

9    Project Monterey-related documents?

10         MR. KINGSOLVER:  Yes.

11         THE COURT:  It -- what else is it?

12         MR. KINGSOLVER:  It's -- I mean, they're all tied to

13   Project Monterey, a lot of very technical code-related things

14   that are, heh, honestly, a little too smart for me, but our

15   experts have said are the kinds of things we need to prove that

16   this code was contained in the same way in IBM's go-to-market

17   product, as well as some of the, you know, sales-and-revenue

18   data that related to that specific product line.

19         THE COURT:  And it -- are those -- and those are the

20   requests that IBM is objecting to, Mr. Zaken?  Are they -- are

21   there any other categories of documents that you believe relate

22   to these issues?  It's Project Monterey, so it's the sales

23   revenue data relating to Project Monterey.

24         Is there anything else?

25         MR. ZAKEN:  Yes, so request 81 was all documents and

1  communications relating to, you know, strategies, plans,

2  policies or practice relating to the sale, distribution, or

3  license of any server operating system relating to Project

4  Monterey and, and 90 is all documents and communications related

5  to strategies, plans, policies and practices relating to the

6  development of any Project Monterey technology.

7          But those are the specific Project Monterey requests

8  that I had in mind, although Mr. Kingsolver is right, there may

9  be others where we've objected to the scope of the request to

10 exclude Project Monterey-related documents.

11         THE COURT:  Okay.  I guess I need to take a closer

12 look at the -- this issue.  I don't have an answer for you on

13 this one quite yet.

14         What I'm trying to figure out is if there's a way for

15 me to side-step making a decision or ruling on whether or not --

16 the broader question, which is whether theft of code in general

17 as a, as a -- an issue can be litigated as part of the antitrust

18 claim, which it seems the parties have different views about how

19 Judge Seibel's ruling impacted that question, and so a ruling I

20 make may be -- have a preclusive effect on the scope of the

21 claims, so it's a broader impact than just discovery, which is

22 why I want to take a, a bit of time to think about it.

23         So what I think would be helpful to me, though, would

24 be if the parties sent -- prepared a submission that explains

25 exactly which requests are covered by this issue so I understand

1  what we're dealing with and how, how broad the discovery is

2  that's being sought.

3          I'm assuming you'll --

4          MR. KINGSOLVER:  Of course, your Honor.

5          THE COURT:  -- be able to identify that specifically

6  for me and then -- you know, both your request and then IBM's

7  response and objections to those, just so I can see precisely

8  what we're dealing with, and how quickly do you think you'll be

9  able to send that to me?  I think it's just excerpting your --

10 and identifying your document requests for me.

11         Would it take a week or so?

12         MR. ZAKEN:  That seems reasonable, your Honor.

13         MR. KINGSOLVER:  Yes.  Same, your Honor.

14         THE COURT:  A week, you think?

15         MR. ZAKEN:  Yeah, it --

16         MR. KINGSOLVER:  Sorry.

17         THE COURT:  Sorry.  Go ahead, Mr. Kingsolver.

18         MR. KINGSOLVER:  We can certainly do it under any

19 timeline that your Honor desired, but I, I think a week would be

20 perfectly workable.

21         THE COURT:  Okay, so, then, why don't you submit that

22 to me by the end of next week, on June 28th.

23         I'm trying to think if there's anything else that

24 would be helpful to this.

25         I think -- I guess I'd like to know from the

1 Defendants a bit more about the volume, if any, of documents

2 that would be responsive to those requests so I have a sense of

3 -- to Mr. Kingsolver's point about burden.

4          I get your point about relevance, you think the case

5 -- that these shouldn't be produced at all, but to the extent

6 you have an argument about burdensomeness, let me know what that

7 is and if you have stats about that or any thoughts about the

8 difficulty in producing documents in response to any of these

9 specific requests.

10          MR. ZAKEN:  Yes, your Honor, thank you.

11          I mean, I don't, I don't have specific stats right

12 now, but I can say that the chief burden, these are documents

13 that are, at this point, over 25 years old and the chief burden

14 would be, you know, going back, trying to identify sources of

15 information that would be relevant, and that's going to require

16 talking to a lot of people and also potentially, like, looking

17 through, you know, documents that are hard to, to recover and,

18 and look through, so that's the primary burden.

19          If your Honor would like, we can provide -- we can

20 follow up in the submission on Friday with further information

21 on that.

22          THE COURT:  That would be helpful.  Just so I have a

23 sense of that.

24          Do you -- do the parties have enough guidance on the

25 first issue relating to narrowing down the requests, the

1 timeline for the requests, the pre -- for the documents that

2 pre-date 2017?

3                MR. KINGSOLVER:  Yes, your Honor.  My understanding at

4 least, and this is Mr. Kingsolver for the Plaintiffs, is that

5 the parties will work on this together and then let the Court

6 know of, you know, any modified proposal and then outstanding

7 disagreements for the Court's resolution?  Is that --

8                THE COURT:  Right --

9                MR. KINGSOLVER:  -- is that fair?

10               THE COURT:  -- that, that work -- that's exactly

11 right, so can you give me a timeline for what would be

12 reasonable?  For -- because what I would like is to set a

13 deadline for you to give me an update on that, because I find

14 that Court deadlines help focus the parties.

15               MR. KINGSOLVER:  That is certainly the case, your

16 Honor.

17               I -- you know, from my perspective, I'm just trying to

18 think through how the 4th and 5th holiday will affect us.  I

19 mean, would it be -- maybe we plan to submit something to your

20 Honor by the, the 9th of July?  I don't know if that's too far.

21               I mean, we could certainly do it by the 2nd of July.

22 I'm just thinking that --

23               THE COURT:  No, that's fine.  I mean, I think the only

24 way it would be too far out is if, which we'll get to now, which

25 is a brief update on the status of discovery and what impact

1  this dispute has on your ability to, to meet the current

2  deadlines in your schedule, so if you think there's room in your

3  schedule to -- for us to work through this and address it

4  without it impacting the deadlines, I'm happy to give you until

5  the end of the week of July 8th, which is July 12th, given the

6  holiday.

7          MR. KINGSOLVER:  That would be terrific, your Honor.

8  I think, I think we could certainly come back with something

9  fulsome by then.

10         THE COURT:  Okay.  Do you --

11         MR. ZAKEN:  Yes.

12         THE COURT:  -- disagree, Mr. Zaken, or do you think

13 that works?

14         MR. ZAKEN:  I think that works, your Honor.  Thank

15 you.

16         THE COURT:  Okay.  So, then, why don't we just talk

17 briefly the status of discovery in the case.  I know you all

18 sent me a joint status letter outlining where things stood, but

19 perhaps you can recap for me briefly, Mr. Kingsolver.

20         MR. KLAPOW:  Yeah, your --

21         MR. KINGSOLVER:  My --

22         MR. KLAPOW:  -- Honor, Mark Klapow.  I'll, I'll --

23         THE COURT:  Oh, Mr. Klapow, that's right.  Okay, happy

24 to hear from you.

25         MR. KLAPOW:  I'll take it from here.

1          THE COURT:  Okay, sure.

2          MR. KLAPOW:  Good morning or, I guess, good afternoon.

3          THE COURT:  Now we're in the afternoon, I guess.

4          MR. KLAPOW:  Yeah, right.  Almost there, right?

5          So, yes, we reported in -- on our letter not a lot has

6  changed since then, but just to recap, we have a substantial

7  completion date for document production on September 30th --

8          THE COURT:  Yes.

9          MR. KLAPOW:  -- and then a fact discovery cutoff early

10  in 2025.

11          The parties are continuing to work through individual

12  objections to individual document requests, a hot-button issue

13  for us, one that we're eager to get resolved quickly, is nailing

14  down the ESI protocols, which has not yet been done.

15          THE COURT:  Ah.  Okay.

16          MR. KLAPOW:  At this point, I don't have any concerns

17  on our side about the substantial completion date.

18          The principal problem from our perspective in

19  discovery continues to be, as I've mentioned on our previous

20  calls, that IBM identified three and only three individuals in

21  their initial disclosures as people with relevant knowledge.

22  That's facially absurd given the breadth of this case, and I

23  suspect problems are going to flow from that.  Not I suspect, I

24  know problems are going to flow from that, because I'm sure the

25  next thing we'll hear on the ESI protocols and the custodians

Disc. Conf.                    Xinuos v. IBM

1  they're going to search is that they only want to look at three

2  people's documents.

3          So I don't know when that comes to a head or how it

4  comes to a head, but I'm afraid that we will be in a situation

5  towards the end of September where IBM is certifying substantial

6  completion based on this fatuous notion that there are only

7  three people in their company who have relevant information.

8          THE COURT:  Oh, I see.

9          Where are you on...exchange of ESI protocols and

10  search terms and custodian lists?  How far away are you from

11  getting to some agreement?  Or I guess will the -- yeah, I guess

12  -- because that's going to be the gating item for whether or

13  not --

14          MR. KLAPOW:  Correct.

15          THE COURT:  -- you'll meet the September 30th, and if

16  there are disputes about the protocol, then custodians are going

17  to want to address that pretty quickly.

18          MR. KLAPOW:  So I'm -- yes, correct.  A gating issue

19  right now is the ESI protocols from which the search terms and

20  custodian lists will follow.  We've been working hard on that

21  with the other side, and there's been regular communications

22  with them.  I believe the state of affairs, unless something's

23  happened in the last hour that I'm not aware of, is that IBM

24  owes us a response to our latest proposal, ESI protocols.

25          I don't know if anybody on the phone has information

1  as to whether or not those will be acceptable, but if they're

2  acceptable, then we, we can move on to the next phase.

3           THE COURT:  Okay.

4           So I don't know if it's Mr. Zaken or someone else who

5  can address IBM's view of those issues: ESI protocol, agreement

6  on custodians, et cetera.

7           MR. ZAKEN:  Yeah, so just, just briefly, I mean, I

8  think we've been working both with the other side and internally

9  and expect to provide a proposal of custodians and, and a search

10 term protocol, I believe, next week, probably on the earlier

11 side, if not earlier, and, I mean, I -- at least on our end, I

12 expect we'll be able to resolve any ESI protocols shortly.

13          THE COURT:  Okay.  You think that -- maybe you don't

14 have a position yet, but do you think the three-custodian

15 concern is, is likely to come to fruition, or do you think

16 that's going to wash out because you'll have more than three

17 custodians that you'll be proposing?

18          MR. ZAKEN:  I -- you know, without -- heh, heh, I

19 don't expect that there will be three custodians we're

20 proposing, so I, I don't expect -- I don't think that issue is

21 alive.

22          THE COURT:  Okay.  Good.

23          All right, so I'm not going to weigh in on any of

24 that, it sounds like it's premature for me to do so, but I, I do

25 appreciate, Mr. Klapow, hearing where things stand, but I -- it

Disc. Conf.                    Xinuos v. IBM

1  sounds like the parties are going to need to bring to a head any

2  disputes about the documents this summer, because I know from

3  experience how long it takes once you set a protocol in place to

4  collect all the documents and produce them and all of that, so I

5  want to make sure that you guys can meet your deadline, but --

6  so I will keep in close touch with you all during the summer,

7  working around everyone's vacation, but -- just to make sure

8  that things are moving along and that you raise your disputes

9  with me as promptly as possible.

10         So is this -- I guess the one that we're still -- that

11  we talked about today...certainly will resolve -- I'll resolve

12  it quickly for you, but I guess that's -- how, how much of an

13  impediment is this current dispute to the parties' negotiations

14  for an ESI protocol?

15         MR. KLAPOW:  It's, it's not, your Honor.

16         THE COURT:  Okay, good.  All right.

17         So is there anything else that needs to be addressed

18  today, Mr. Kingsolver or Mr. Klapow?

19         MR. KLAPOW:  Not from our side, Judge.

20         THE COURT:  Okay.

21         Mr. Zaken, Mr. Li?

22         MR. ZAKEN:  Nothing from our side.

23         THE COURT:  Okay.

24         MR. ZAKEN:  Thanks, your Honor.

25         THE COURT:  So we will adjourn for today, we'll set a

Disc. Conf.                    Xinuos v. IBM

1   minute entry that puts in the deadlines we talked about today

2   where I will hear from -- I'll get a submission from the parties

3   by the end of next week, I believe July -- June 28th, which

4   would be the document requests that relate to the code-theft

5   allegations, and then by the end of July 12th, the parties will

6   -- I believe that we set an update on sort of the narrowing of

7   the requests that pre-date 2017.

8               Okay, thanks very much.  Have a good day.

9               MR. KLAPOW:  Thank you, Judge.

10              MR. KINGSOLVER:  Thank you, your Honor.

11              MR. ZAKEN:  Thank you, your Honor.

12              THE COURT:  Okay.

13

14  Certified to be a true and accurate

15  transcript of the digital electronic

16  recording to the best of my ability.

17  _____

18  Tabitha R. Dente, RPR, RMR, CRR

19  U.S. District Court

20  Official Court Reporter

21

22

23

24

25

TABITHA R. DENTE, RPR, RMR, CRR
(914) 390-4027