**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
Xinuos, Inc.,

                            Plaintiff,

           -against-

IBM Corp. et al.,

                            Defendants.
-----------------------------------------------------------------X

22-cv-09777-CS-VR

**OPINION & ORDER**

**VICTORIA REZNIK, United States Magistrate Judge:**

At a status conference in September 2024, the parties told the Court about a dispute over whether Defendants must produce copies of source code for four of their products during discovery. The Court directed the parties to meet and confer to resolve the dispute, and for Plaintiff to submit a letter articulating "how Defendants' alleged continued use of the code created an anticompetitive environment and what evidence, not including Project Monterey, Plaintiff believe[d] it need[ed] to make that showing." (ECF No. 208). Unable to resolve the dispute, the parties sought Court intervention (*see* ECF Nos. 210, 214, 216), and a briefing schedule was set. Shortly thereafter, the Court received the parties' letters. (ECF Nos. 217, 220). For the reasons explained below, the Court **DENIES** Plaintiff's request that Defendants produce source code but with leave to renew.

**Background Facts**

In its letter, Plaintiff contends that the source code is relevant to its claims against Defendants because the code will reveal the cross-compatible nature of Defendants' products. (ECF No. 217). Cross-compatible products allegedly

1

incentivized consumers to buy Defendants' products and avoid products from competitors like Plaintiff. According to Plaintiff, viewing the source code will confirm that Defendants developed cross-compatible products, reveal the amount of cross-compatibility contained in those products, and demonstrate that Defendants made deliberate, strategic development decisions to further that compatibility, which was all done to create a barrier of entry that either impeded or foreclosed competition from rival entities like Plaintiff.

In support of its letter, Plaintiff submitted an affidavit from its expert in which he asserted that "[t]echnical design documents are not an adequate substitute for the production of source code" because—among other reasons—those documents lack sufficient detail and sometimes fail to include changes implemented into the source code's final version. (ECF No. 217-1 at 3). He also stated that source code production is not a substantial burden because copies are traditionally kept in easily-accessible repositories, and disclosure of source code is "commonplace" in litigation. (*Id.* at 4). Further, he personally viewed source code from IBM in an earlier litigation, although he did not make the same statements about Red Hat.

In opposition, Defendants argue several positions. (ECF No. 220). First, they contend that they should not be forced to produce copies of the source code because Plaintiff's cross-compatibility arguments are not found in the complaint.[1] Second,

---

[1] This contention lacks merit. In its complaint, Plaintiff did not expressly use the word "cross-compatible," but it alleged that Defendants collaborated and engaged in anticompetitive behavior. Plaintiff alleged, among other things, that Defendants "promoted each other's operating products, . . . granted each other special technical access and abilities that were not made generally available

2

they contend that viewing the source code is neither relevant nor necessary to Plaintiff's claims, because evidence about cross-compatibility can be obtained through other means. Third, and finally, they contend that producing copies of the source code is unduly burdensome, because the source code for just one of their products is spread across multiple repositories and contains millions of lines of code. This means that assembling the complete source code for all four products would require dozens of people and countless hours. Additional burden is caused by the amount of security necessary to allow for viewing the code. The source code contains sensitive information "used in mission-critical settings in governments and major financial institutions around the world," and disclosing it poses a substantial risk of a security breach. (ECF No. 220 at 3).

In support of their opposition, Defendants provided an affidavit from one of their experts and an affidavit from an IBM employee. (ECF Nos. 220-1, 220-2). The IBM employee elaborated on the burden involved with producing copies of the source code, while Defendants' expert explained why copies of the source code are not required for Plaintiff to prove its claims. Defendants' expert explained that each server operating system has its own set of Application Programming Interfaces ("APIs") that contain the rules for how an application communicates with the

---

and from which [Plaintiff] and others were specifically excluded." (ECF No. 1 at 18; *see id.* at 18–24 (further explaining how Defendants provided each other with preferential treatment)). In any event, Plaintiff could always seek to amend its complaint later to better articulate these allegations, if necessary.

operating system. Companies, like Defendants, publish documentation about those APIs to aid consumers in using their products.

According to Defendants' expert, those API documents would show any alleged cross-compatibility between products from IBM and Red Hat, either through promoting the use of each other's products or by preventing the use of a competitor's products. API documents are "created after the fact to memorialize the decisions and changes that were made" during development. (ECF No. 220-1 at 8). Thus, in his opinion, by looking at published API documents and product release notes, which Defendants offered to produce, Plaintiff can obtain the information it seeks regarding any allegedly anticompetitive behavior.

## Discussion

"In order for the production of source code to be compelled, Plaintiff must prove that it is relevant and necessary to the action." *Congoo, LLC v. Revcontent LLC*, No. 16-401(MAS), 2017 WL 3584205, at *2 (D.N.J. Aug. 10, 2017). Relevancy, somewhat obviously, requires a connection between the source code and the claims at issue. *Compare Metavante Corp. v. Emigrant Sav. Bank*, No. 05-CV-1221, 2008 WL 4722336, at *2 (E.D. Wis. Oct. 24, 2008) (ordering production of source code in breach of contract action because code "may reveal the quality of the online banking product that [plaintiff] delivered, and whether [it] fully performed under the agreement"), *with PaySys Int'l, Inc. v. Atos Se*, No. 14-cv-10105(KBF), 2017 WL 6044104, at *2 (S.D.N.Y Apr. 3, 2017) (denying motion to compel production of

4

source code because plaintiff failed to connect source code to its breach of contract claim).

In determining necessity, courts consider whether production of source code is "proportional to the needs of the case given the sensitivity of the source code, the burden of producing it, and the potential availability of alternate means to obtain the information in question." *Edmar Fin. Co. v. Currenex, Inc.*, No. 21-CV-6598(LAK)(HJR), 2024 WL 4471094, at *6 (S.D.N.Y. October 11, 2024); *see* FED. R. CIV. P. 26(b)(1) (discussing party's ability to obtain discovery that is "proportional to the needs of the case"). This amounts to a balancing test "weighing the competing interests" involved. *Congoo, LLC*, 2017 WL 3584205, at *4.

Here, Plaintiff sufficiently demonstrates that production of the source code is relevant to its claims but fails to show necessity. As to relevance, Plaintiff has established a sufficient connection between its antitrust claims and Defendants' source code. As discussed above, Plaintiff alleges that Defendants developed cross-compatible products to create a barrier of entry that either impeded or foreclosed competition from rival entities like Plaintiff. (ECF No. 1 at 18–24). And although Plaintiff does not identify exactly what it expects to find within the code—specific words, functions, or other programming features—the source code may contain evidence about the cross-compatibility of Defendants' products. *See Metavante Corp.*, 2008 WL 4722336, at *2 (finding source code relevant because it related to breach of contract claim); *see also Cohen v. Cohen*, No. 09 Civ 10230(LAP), 2015 WL 4469704, at *3 (S.D.N.Y. June 29, 2015) (discussing the "relatively low" bar for

5

determining relevancy). Indeed, Defendants do not really dispute that their source code may contain relevant evidence about cross-compatibility, only that source code is not the main source of such evidence. (ECF No. 220 at 2). To be sure, Defendants also challenge whether evidence of cross-compatibility rises to the level of anti-competitive conduct at all. (*Id.*). But this argument goes to the merits of Plaintiff's allegations, which the Court need not weigh when deciding whether discovery may be relevant to prove those allegations. *See Cohen*, 2015 WL 4469704, at *3 (S.D.N.Y. June 29, 2015) (noting "expansive concept of relevance during civil discovery" that encompasses "any possibility" that sought-after information may be relevant to subject matter of the case).

Yet Plaintiff fails to satisfy its burden of showing that broad production of source code is necessary and proportional to the needs of the case. First, it is undisputed that source code is inherently sensitive, as other courts have readily recognized. *See Edmar Fin. Co.*, 2024 WL 4471094, at *6–7; *Congoo, LLC*, 2017 WL 3584205, at *4 (describing source code's "highly confidential nature").

Second, source code production is also recognized as incredibly burdensome. *See, e.g., Edmar Fin. Co.*, 2024 WL 4471094, at *7 ("[T]he burden of producing [defendant's] source code is indisputably high."); *PaySys Int'l, Inc.*, 2017 WL 6044104, at *2 (referencing the "tremendous" cost required to produce source code). Although Plaintiff's expert asserts that code production is not difficult because the practice is "commonplace" in litigation (ECF No. 217-1 at 4), that assertion is outweighed by the testimony of IBM's employee, who detailed precisely what was

6

required to produce the volume of code requested by Plaintiff here. According to IBM's employee, that production would require dozens of individuals gathering code from many separate repositories to create a copy available for review; and all that assembly work would be separate from the work needed to create a secure process for Plaintiff's expert to review it. Of course, production of source code may be commonplace in patent or copyright litigation, where parties routinely produce code under extremely controlled conditions and undergo the requisite burden in doing so. But this is not a patent or copyright case, and the volume and scope of code requested by Plaintiff appears particularly broad and unfocused.

Third, and finally, there are alternative, unexplored options available to Plaintiff to gather the information it seeks. When, as here, the party seeking source code production intends to obtain information about functionality, courts have determined that other discovery tools like interrogatories and depositions may achieve that goal. *See Edmar Fin. Co.*, 2024 WL 4471094, at *7 (concluding that interrogatories, deposition testimony, and potential stipulations could provide party seeking source code with knowledge regarding "functional aspects of [party's] trading algorithm"); *Congoo, LLC*, 2017 WL 3584205, at *3 ("[T]he Court is persuaded that through witness testimony an understanding of the functionality of the software algorithm as it relates to issues in this case . . . can be adequately addressed."). Here, Defendants have offered to disclose various high-level design documents and product release notes that their expert says would provide evidence sought by Plaintiff about cross-compatibility. (ECF No. 220 at 2; ECF No. 220-1 at

7–9). Plaintiff's expert opines that source code would provide more detail and certainty than the design documents Defendants offered to produce. (ECF No. 217-1 at 3). But he does not specifically state that those design documents would fail to show evidence of cross-compatibility at all. Indeed, to some extent both experts must speculate about what evidence exists and whether it will suffice; nothing has yet been produced. But the best way to find out is to have Defendants produce the high-level design documents, product release notes, and related documents for Plaintiff's review. If that production proves inadequate for any reason, Plaintiff will have the chance to say so and perhaps better define what they may be looking for.

Thus, balancing sensitivity, burden, and the availability of alternatives, the production of source code (as broadly requested by Plaintiff) is not proportional to the needs of the case and therefore not necessary. *See Edmar Fin. Co.*, 2024 WL 4471094, at *7 (denying production of source code because it was not "proportional to the needs of the case"); *Congoo, LLC*, 2017 WL 3584205, at *3 ("[W]hen alternatives are available, a court will not be justified in ordering disclosure."). At this early discovery stage, it is reasonable to believe that Plaintiff could gather sufficient information about the cross-compatibility of Defendants' products by reviewing product release notes, design documents, API publications, and other product documentation. Until those avenues are shown to be unfruitful, this alternative weighs against finding the production of source code necessary. *See Edmar Fin. Co.*, 2024 WL 4471094, at *7.

***

Plaintiff's request is therefore **DENIED** but without prejudice to renew its request after reviewing the alternative options discussed above. Defendants are directed to produce their high-level design documents, product release notes, API publications, and any other relevant product documentation related to the four products identified by Plaintiff. If, after reviewing those items thoroughly, Plaintiff still believes that it has insufficient information and source code production is necessary, it may renew its motion. But the Court expects that any such motion will be narrowly tailored and contain a more targeted request, likely informed by the data Defendants produce. The parties are directed to submit a joint status letter, by no later than December 13, 2024, updating the Court on the status of the production.

**SO ORDERED.**

DATED:   White Plains, New York
         11/13/2024

_____
VICTORIA REZNIK
United States Magistrate Judge