UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
XINUOS, INC.,

                          Plaintiff,

                              22 CV 9777(CS)(VR)
        -vs-
                          TELECONFERENCE

INTERNATIONAL BUSINESS MACHINES
CORPORATION, et al.,

                          Defendants.

----------------------------------------x

                              United States Courthouse
                              White Plains, New York

                              March 7, 2025

Before:   THE HONORABLE VICTORIA REZNIK,
                              Magistrate Judge

APPEARANCES:

CROWELL & MORING, LLP
      Attorneys for Plaintiff
      1001 Pennsylvania Avenue, N.W.
      Washington, D.C. 20004
JACOB S. CANTER

CRAVATH, SWAINE & MOORE, LLP
      Attorneys for Defendant
      375 Ninth Avenue
      Two Manhattan West
      New York, New York 10001
MICHAEL J. ZAKEN

ALSO PRESENT:

Sean Snyder, CEO Xinuos

*Proceedings recorded via digital recording device*

THE COURT:  Good morning.  This is Judge Reznik joining.  Would counsel please introduce themselves, starting with the plaintiff?

MR. CANTER:  Good morning, Judge Reznik.  This is Jacob Canter from Crowell & Moring on behalf of plaintiff Xinuos, and with me is Xinuos's CEO, Sean Snyder.

THE COURT:  Good morning.  For defendant?

MR. ZAKEN:  Good morning, Your Honor.  Michael Zaken of Cravath Swaine & Moore on behalf of defendants IBM and Red Hat.

THE COURT:  All right.  Good morning to all of you. So I have all of your submissions.  I'm happy -- I don't think I need to hear more argument than what's your papers, but I do have a number of questions for each side.

So I want to start with the plaintiffs.  First question is:  I want you to provide me with a succinct explanation of the theory of your case and also give me the timeframe for the relevant anticompetitive conduct that you're alleging took place here.

MR. CANTER:  Thank you, Your Honor.  I appreciate the opportunity to speak today.

So plaintiff alleges that defendants have engaged in a course of conduct of anticompetitive practice that includes, for purposes of this source code request, anticompetitive operating system design.  The two theories of anticompetitive operating

system design are:  One, that they've -- that IBM has built into its operating system secret backdoors that are only accessible to Red Hat, and that can only be used to communicate with Red Hat that are not available to the rest of the market; and two, that IBM has provided information about new protocols and new communication protocols to Red Hat before the rest of the market.  In both cases, we contend these are -- this is conduct that is not competitive on the merits; that is making it difficult for competitors like Xinuos, but everyone in the market to compete fairly for customers.  That source code design anticompetition theory is made in addition to our investigation into potentially other claims of anticompetitive business activity between IBM and Red Hat.

Now, your second question I believe I heard was about the scope and temporal time of our claims, Your Honor?

THE COURT:  Yes.

MR. CANTER:  Thank you.  The scope of our claim is that this has been an ongoing course of conduct since the beginning of the relationship between IBM and Red Hat.  We think that in order to bring a claim for damages under the antitrust laws, we need to see their activity at least going back to 2011 when Xinuos first entered the market.  That would provide us with enough source code information to see if there have been changes to the code that impact the code at present and that impacted Xinuos's ability now and in the recent past to compete

on the merits.

THE COURT:  Okay.  Explain to me how many -- we have been talking about four products at issue.  Each of these products are different versions of operating systems.  Can you explain what the four different products are?

MR. CANTER:  Yes, Your Honor.  The four products are AI Extra Power, z/OS Mainframe, I-Midrange and Red Hat Enterprise Linux.  These are four operating system products.  Three of them are under the IBM brand.  The fourth is under the Red Hat brand, and there are different versions of each of those products.

THE COURT:  Okay.  And what was the earliest releases of those products that you are seeking source code for?

MR. CANTER:  We think that a release from the 2011 time period, about ten years prior to the filing of the complaint and the same year when Xinuos entered the market would make sense.

THE COURT:  So what you are looking for -- can you define for me when you say, "we want all source code," what exactly is the scope of your request?

MR. CANTER:  Thank you, Your Honor.

So consistent with our anticompetitive design theories, we would accept any part of the source code that performs network communications to and from a different host, client or server.  When sort of working on how to characterize

that, you can call it communications protocols, but that's how we are thinking about the request for source codes that would allow us to determine whether any of the means for communications between IBM's operating systems and others have been designed in anticompetitive ways.

We would ask for this request, however, without prejudice to seek additional source code if at a later date we discover that additional portions are relevant to the claims.

THE COURT:  And when you refer to the portions of source code relating to communication protocols, does that mean that you are looking for a subset of the source code that only relates to those communication protocols as determined by IBM or how does that translate into what would actually be produced to you?  It sounds like your request is something that's short of all source codes.

MR. CANTER:  Right.  I am understanding the Court as asking what a narrower request would be in light of the position of our anticompetitive design theories.  I think the way that it would go and how I have done it in the past is that IBM, you know, in good faith collects all of the source code related to the communication protocols, makes it available on a source code review computer, and then we have an opportunity to review it.

There have been in the past when I have done reviews, you know, just honest mistakes.  Hey, this really shouldn't -- I am surprised that I don't see X files because something is

pointing to it, and it should be there, and then they look back like, oh, you're right. We missed it. And then they provide it. So that's something that's happened in the past, but that would be the protocol.

I would think that from defendants' perspective, the burden would be much less if they produced everything because then they wouldn't have to go through the exercise of separating what can be produced for review versus not, but I understand your request to be what would be a narrower scope, Your Honor.

THE COURT: Okay. So what you are describing when you talk about communication protocols is your attempt to narrow the request from all sources to something short of that or were you -- that's what I was trying to understand.

MR. CANTER: Yes, Your Honor.

THE COURT: Okay. Understood. All right. So defendants have argued that you have a shifting set of allegations and that your theory of the case is constantly shifting so that it finds new ways to make source code relevant.

So what I understood defendants to argue is that initially we talked about the concept of class compatibility, and now you are talking about something different, which is compatibility. I don't know -- explain to me whether you think that's a distinction that matters for purposes of your allegations and whether -- and how you think the Court should view that distinction, if at all.

MR. CANTER:  Your Honor, I don't think there is a distinction that matters whatsoever.  I don't think it is a distinction.  I think our theory has always been that defendants are promoting each other's operating system products, granting each other special technical access and abilities that are not made generally available to the rest of the market, and that's a quote I just said almost exactly from our complaint and a quote that you cited in footnote one to your November 13 order, Your Honor.

It doesn't matter really to us whether you call it compatibility, cross-compatibility, communication.  The point is that the operating systems of the two defendants are communicating with each other, connected to each other in some way that is designed and unavailable to the rest of the market.

THE COURT:  Explain to me what defendants produced in response to my order.  Your contention in your letters is that they only produced publicly available documentation, or at least mostly produced online publicly available information and not internal proprietary design documents that you believe were covered by my order.  So explain to me what you were able to glean from defendants' production, and also tell me when were those documents produced.

MR. CANTER:  Thank you, Your Honor.

So while we could glean some information about portions of IBM's operating system from the productions, the

productions do not provide close to enough information to bring our claims of anticompetitive design.  The documents produced by defendants provide a lot of general information about the operating systems, but they do not identify what we actually need, which is specific identification of relevant nonpublic protocols, when these protocols were developed and deployed, and details about how these protocols have been configured, and how they operate when accessed.

So here is one example that I think sheds light on this, Your Honor.  And just to be clear, what I am about to say is not from documents -- it's from documents that have been designated as confidential, but I also was able to find the same documents online, so under the protocol is not confidential.

We know from --

THE COURT:  But before you do that, I just wanted to -- sorry to interrupt.

MR. CANTER:  Sorry.

THE COURT:  I want to ask a followup question.  You had said that you need -- the first thing you said is that we needed nonpublic protocols, but I didn't catch the rest of what you -- how you described what you thought you needed before you moved on to --

MR. CANTER:  Yes, Your Honor.

THE COURT:  -- the configuration and accessibility.

MR. CANTER:  Yes.  Specific identification of the

030725                              Teleconference

relevant nonpublic protocols and when these protocols were developed and deployed.

THE COURT:  Okay.  Now go on.

MR. CANTER:  Thank you.  So we know from IBM's production that for two operating systems to securely communicate with each other, they need to be able to identify and authenticate each other, and we know from IBM's productions that IBM's Unix operating systems can identify and authenticate other operating systems through something called pluggable authentication modules, or PAM modules.  We know from the documents that multiple PAM modules can be used by a system to meet secure communication needs.  We know that both IBM and Red Hat can create new PAM modules.  We know that these modules have been available on the market since the early 2000s, and that IBM has been developing new ones in the 2000s and 2010s; and from our review of the nonpublic documents that were produced, we understand that IBM was developing one of these modules in the late 2010s so that it could authenticate communications with a Linux operating system.

Now, this is all fine, but our point, Your Honor, is that none of this actually covers what Xinuos needs to bring its anticompetition claims.  It does not identify the PAM modules that have been built, including those modules that have been built, but are not publicly known, but perhaps are known to Red Hat.  It does not state whether these modules were built -- when

these modules were built or who has been given access to them. It does not describe what happens when these modules are fired, whether they have different performance or bandwidth benefits or whether they contain different functionality.

I will also give another example.  This is one that Mr. Schnell, our expert, provided in his declaration at ECF 225-2.  So Mr. Schnell notes that there are some API publications in the production, though he would expect more.  He also explained that even if there was a complete set of API publications in the production, that still would not reveal if, in actual practice, the APIs that IBM uses to communicate with different servers were extended or configured in ways that are not reflected in the documentation.  In his experience as an engineer and code reviewer, and in his experience with Unix, he understands that the way code is configured in practice is not always how it looks like in the design.

So the documentation -- our position, Your Honor -- it's not an adequate substitute for the real thing, and only with the real thing can we actually see what's going on with these operating systems.

THE COURT:  So when was defendants' production made to you?

MR. CANTER:  Defendants produced I believe it was on three different occasions up until December 20th after your November 13th order.

Teleconference

THE COURT:  Okay.

MR. CANTER:  I can find the specific dates for you.

THE COURT:  What was the volume of the production in total?

MR. CANTER:  It was voluminous.  There was tens of thousands of documents is my recollection, Your Honor.  And it was -- we went through quite a few documents.  I mean, I can look up the exact number for you really quickly if you'd like, but it was voluminous production of public materials primarily.

THE COURT:  How much of it have you reviewed?  Not you personally, but your team?

MR. CANTER:  Yeah, a very large amount of it, Your Honor.  I know that we have reviewed a lot of documents on an individual basis, like pulling a document, looking at it, you know, trying to understand it.  But for the entire production we have run searches; we have analyzed and looked for relevant terms; we have scanned the documents to understand what relevant material was in there, trying to sort of glean what we can to understand whether the information that they were ordered to produce by you on November 13th was, in fact, in there.

THE COURT:  Okay.  And are there categories of internal design documents that you would have expected to see but didn't?

MR. CANTER:  Yes, Your Honor.  And I think this is described very well in Mr. Schnell's first declaration from

030725                          Teleconference                          12

January 20 -- January 20 -- January 17.  We would have expected much more detail about the design of the operating systems, detail that goes down to the level of:  What are the names of the different protocols, how they are operating, how they communicate with other -- you know, how you can be configured to communicate with them.  We did not see that information.

Again, though, just to note, I don't think that it's possible to see in some of that information what we would expect to see in the source code.

THE COURT:  All right.  Now I understand that your position is the source code is the best evidence for what you are looking for, but --

MR. CANTER:  Yes.

THE COURT:  -- what is your basis for believing that IBM only produced what is publicly available?  And if that's the case, are these -- the documents that were produced in this voluminous manner, is that stuff that you had available to you in the public domain, so you wouldn't have needed them to produce it to you in any case?

MR. CANTER:  For much of it, yes, Your Honor.  But for much of the material that was produced, you can go online, and it's available on an IBM or Red Hat subdomain.  So the pluggable authentication modules that I mentioned, I found that both in the production, but also you just go on a web search, and you can find it.

I think, Your Honor, you also asked about what would I have expected to see in here or -- was that the right question?

THE COURT:  Yeah.

MR. CANTER:  Yeah.  So we would have expected much more detail in the nonpublic documents about how the IBM operating systems are architectured.  What are the different components of it?  What did it actually look like?  How does one component connect to another?  What is the basis or being able to ensure that they are connected by architecture design documents.  It's not exactly the same as a blueprint of a building, but there are architectural -- there are architectures.  That's the parlance thought of when building operating systems and using software as well.  It's the way that they connect to and communicate with each other; specific names and identifications of protocols and how they are operated, details about what's going on with them.

We did see -- and, you know, I don't want to say that there was no nonpublic documents.  We did see decks and Power presentations that looked like included strategies about marketing their operating systems, strategies about selling their operating systems, and then some about testing and developing different components of their operating systems; but this is all pretty high level.  It was description -- it was descriptions of categories and sort of discussions about ways that they intend to build new functionality into the operating

system, but not actually what it looked like in real life.

THE COURT:  So turning back to -- I guess I'm thinking about other ways in which we talked about source code earlier in the dispute.  One question is why would a snapshot of source code of two different functions (indecipherable) they are allowing you to view differences between them for or to -- we are getting back to the scope of your request and the sort of the range of dates for which you think source code would be relevant to proving your allegations about this particular anticompetitive conduct, but what I am trying to wrap my head around is you asking for source code back to 2011, and I am trying to figure out whether there is some -- whether the snapshot idea is something that could be useful or some specific range of dates or specific dates and times since 2011 that you think would be useful.

MR. CANTER:  Thank you, Your Honor.

I think a snapshot approach could be useful depending how it sort of works out in practice.  What we really want to be able to see for both of our theories -- but certainly for the first-mover theory -- is how design choices were made over time.  And so at Time 1, there wasn't a -- you know, there was no design changes made to a certain portion of the code, but at Time 2, specific changes were made, and those changes were only then accessible to Red Hat.  We need to be able to see that temporal difference.  If a series of snapshots is the most

efficient way to accomplish that, we are -- we are happy to make that work.  If there is some other efficient way to accomplish that, we are happy, too.  We don't, of course, know how IBM stores their code.  So we would want to work with them as efficiently as possible to reach a resolution.

THE COURT:  What would you like me to do from IBM's source code that could not be found in Red Hat's publicly available source code?  So, for example, if IBM codes contained a request for a feature, wouldn't the ability to use that feature be found in Red Hat's code, sort of -- you have one half of this, but you are talking about communication protocols as I understand, and I am not the expert here.  You all know much more information.  But you have, what I understand from defense, Red Hat's side of the communication that are public.

So what do you gain from IBM source code that can't be gleaned from Red Hat source code?  And what -- and given that you have open source code that you are able to peruse and look through over time, how is that not able to give you an opportunity to target your request and know -- and decide for you particular issues that you then want to look at IBM's half of the communication to confirm or deny?  I guess that's defendants' argument that, you know, you have all of this open source code.  If there were problems in it or something with a discrepancy or things that are unexplained, then that's -- you would have proof of some of what you are talking about.  But if

you haven't found it there, why do you think you are going to find it in IBM's source code?

MR. CANTER:  Thank you, Your Honor.

So Red Hat's source code is necessary to prove our anticompetitive claims, but it is alone not sufficient.  We need to be able to look at both sets of source code to prove our claims, and so I will describe it for both the theories.

So the first-mover theory, as we've called that one, the starting point for the analysis needs to be IBM's code because we need to know when a design change was made to IBM's code and see when that design change was also made to the Red Hat code.  If those changes become -- occur temporally before they were made available to others or they were -- the IBM design change was made temporally before it was announced to the public, then we would have a -- you know, evidence of our first-mover advantage theory, and we cannot understand that solely from looking at the Red Hat code.

The reason for the IBM code -- needing the IBM code for the second theory is a little bit different but just as critical.  Only looking at the Red Hat code will not tell us anything.  We need to look at IBM's protocols as well to see whether those two operating systems are communicating with each other.  Red Hat could have protocols built into their operating system that are not communicating with many operating systems on the market, but are communicating with some other third-party

actor.  In order to know how IBM and Red Hat are communicating with each other, we need to be able to look at both of them together.

THE COURT:  And how does the source code help prove your allegations that -- well, I guess, how does it -- I need to understand how the source code itself proves your allegations that defendants coordinated to give each other advance notice of changes -- if I understand your theory -- if they had a jump start on competitors?  Is that the kind of information -- wouldn't you expect to see that in internal correspondence and other types of documents as opposed to -- you know, why is source code the best source for that?  Because it seems to me it's more like circumstantial evidence of that kind of jump starting competitors that you would expect to first to be communicated elsewhere before you see it in the code.

MR. CANTER:  It's possible -- thank you for the question, Your Honor.  It's possible that would be available through communications.  I understand your point.  We think that the best evidence of the design changes will be in the code itself, seeing the date of the change; seeing when it was then made in the Red Hat operating system, and seeing when that changed design change was published to the market would be the best way to know if there was actual coordination rather than a speculation about it occurring.

THE COURT:  Okay.  Why is there -- so in my order of

Teleconference

November I stated that any requests -- let me take that back.  I stated in my November order that after reviewing the documents, if you deemed them insufficient for some reason, then I would expect that you would let me know, but that you would have a more targeted request that would be tailored to what you've gleaned from the production to date.  So what I got from you instead was a request for all source code, which did not seem particularly targeted.

So can you explain to me why your request is not targeted and what efforts, if any, have you made to try to target it?

MR. CANTER:  Thank you, Your Honor.

We -- initially in our letters to the Court we did not make a more targeted request because we don't -- we didn't think the defendants produced all relevant material that you requested, either.  Our position with that -- and still is, Your Honor -- that we are being asked to make a more targeted request under circumstances where we couldn't assess everything.  We didn't have -- we weren't in the position to be able to directly assess all of the relevant documents to see what sort of protocols or functions might be the basis for anticompetitive design choices and how that could have, you know, impacted the market negatively.

Understanding though, Your Honor, that you were looking for more narrower requests, in our subsequent letter we

explained our anticompetitive theories, and we're prepared right now to make a narrower request for the communication protocols.

THE COURT:  Okay.  I am going to turn to defendants for a second.

So, Mr. Zaken, explain to me what you did produce to plaintiff in compliance with my order.

MR. ZAKEN:  Thank you, Your Honor.

So we produced -- depending on how we want to categorize it -- about three to four categories of information. So the first is we produced, you know, 10,000 or more pages of API publications, which documents, interfaces or rules governing how two pieces of software interact to each other, and we did that for all of the products.

We also produced over 14,000 pages of release notes, which document all the changes made between the various releases of the operating systems; and these were meant to target what defendant -- what plaintiff's theory had been back in the fall, which was cross-compatibility, and what were put forward in our declaration regarding that theory.

In addition, we produced a very large production to them of 300,000 documents that included many nonpublic design and development documents, and that includes documents that architecture-specific functions of the operating system, product documentation describing the functionality and rationale of the supporting technologies, product roadmaps that track progress

towards new product releases and functionality upgrades, product management presentations that outline proposed development plans for specific operating systems (indecipherable), and biannual business presentations from IBM's strategic development plan.

In addition to that, we also produced communications between relevant custodians that would have documented communications regarding changes to the operating system that would have been made.  So, you know, sort of very large number of documents.  We did produce -- some of these were public and in particular the API and the release notes, but that's because plaintiff's theory at the time was about this cross-compatibility, which is, in our view, very different from what they have articulated now, and that cross-compatibility theory was about how different applications would be designed to work on both operating systems, and the APIs and release notes show what the developers and what the users of the OS would understand about the systems and directly affect cross-compatibility.

Here today and in their subsequent briefing, I don't think they have actually said that any of those materials are insufficient for them to assess that theory.  Instead, they have come up with a new theory, which are the backdoors and communication protocols, which were not in their complaint and not in any of their prior correspondence, which, you know, takes me to my -- this sort of this whack-a-mole aspect that we have

been dealing with, which it just seems like they are just following whatever path can lead them to the source code.

Originally back in the fall, they acknowledge that it's not a disputed issue that source code from before 2018 is not necessary for them to pursue their allegations. They put forward a cross-compatibility theory, and we produced documents responsive to that theory, and they just came back and said, no, we want all the source code, and I heard them here today say they want it going back to 2011 based on a new theory.

So I'm happy to talk more about that, but I wanted to just weigh that because I think that's relevant to assessing the documents produced.

THE COURT: Okay. Have you produced -- focusing on the nonpublic design and development documents that -- are there any categories of internal proprietary nonpublic design documents to be work product at issue that you did not produce because of the view that they were not required under my order?

MR. ZAKEN: So, Your Honor, there was no category that we have not produced specifically under the theory that they were not required by your order. What we did to produce the documents were we identified the API, the release note and then performed custodial and noncustodial searches of IBM and Red Hat's internal documents and produced documents that were -- that we believe were responsive. We did ask the plaintiff if there are any other categories based on your review of what was

produced of nonpublic documents you would expect to have seen, let us know, and we can meet and confer on that, and to date they have not provided any such categories, and so there is nothing we are withholding, you know, on the basis that we think it was not responsive that we have been asked to produce.

THE COURT:  And from what I read in the plaintiff's letter, they seem to think that you were taking a narrow reading of my order that only required publicly available documents, and therefore, were withholding internal nonpublic design documents that would be responsive to their request; is that true?

MR. ZAKEN:  So that -- that's not -- at least that's not how I would characterize what we did.  I think your order specified a series of things to produce so that was the API publication and the release notes.  We produced those, and those just by their nature are public, and then we performed custodial searches to get at other design documents that were not public and provided those to them.  So if there are specific documents that they wanted to see, we were also willing to discuss those, but those were not -- again, it wasn't that we were taking our view of the order, you know, we were trying to comply with the order by a series of collecting documents that were the APIs and the publications and then doing these searches of nonpublic documents and producing responsive ones to get at the rest.

THE COURT:  Are there high-level design documents or other product documentation at IBM that's not in custodial files

that was not produced?  Or haven't searched for it?  What I am

trying to understand is, I see my order, and I see the

categories that I refer to, and so what I am hearing you say is

that there may be -- because of the language I used, product

releases and API publications, those are, in your view,

inherently public.  So those don't -- so that's why they were

publicly available documents.

But I guess what I am trying to understand, and what I

am hearing you say is for the nonpublic documents what you did

was do custodial searches.  So I think that means running search

terms through agreed-upon custodians; is that right?

MR. ZAKEN:  That's correct.

THE COURT:  Okay.

MR. ZAKEN:  We searched --

THE COURT:  Is there -- what I am talking about --

okay.  So you took search terms that you agreed on; you ran it

through your custodians, and you produced what -- after review

of however you decided to do it, responsive documents.  So those

would have been, I guess, internal, not public.  But what I am

wondering is:  Are there categories of documents at IBM that are

design documents relating to these products, relating to either

technical design, their functionality, that were not produced,

but you didn't run search terms for them and produced those

responses?

MR. ZAKEN:  Right.  So just to clarify, the custodians

that we ran search terms on did also include people like the director of server operating systems, and the VP for power, so they were targeted in part to collect design documents, and we did produce design documents from those custodial searches.

It is the case that we did not do a separate pull of design documents and search those, like as a noncustodial set, so there might be some -- there might be some delta, but what was produced was a large number of design documents, and we had noted to the plaintiff if there were things they felt were missing, we would go -- we would meet and confer and look for them. That was sort of just the way we went about finding these documents. So if that makes sense. We targeted people who were likely to have them, and we've looked through the production, and it included many of them.

THE COURT: Okay. But are you aware of there being a cache -- I mean, it sounds like there could be a delta, but I am saying based on what you know about how IBM collects its documentation, its design and development documents for its OS product, is there some archived place, sort of a server, whatever, a database that collects those documents over time in one place that were not searched and were not produced?

MR. ZAKEN: So, Your Honor, my understanding, based on our conversations we had following your order, as well as in connection with the collections is that the best way to find these would be the custodial searches because there is no single

repository, but I certainly -- if that's something, you know, Your Honor would like us to investigate further, we could, but we are not aware of like a repository that we just omitted and didn't search.

THE COURT:  Okay.  So do you think that -- so when defendants or when plaintiffs argue that -- that you narrowly read the order so that you only produced essentially publicly available design and development documents, you disagree; and you disagree because it's based on the custodial searches that you have done that have garnered -- that collected some nonpublic documents that you described?  I mean, you just disagree flat out that that's not a limitation that you put on the production and how you produced documents to them?

MR. ZAKEN:  That's right.  Our -- we did not -- we did not limit it to public documentation, and we emailed them in response to them saying that and said, no, we produced both nonpublic and public documents and referred them to the custodians that were the most relevant to these documents.  So we were not taking a narrow view of the order that it only requires public documentation.

We did view the order to primarily be talking about APIs and release notes because that was what was discussed in the expert declaration and what was -- what was most relevant to plaintiff's previous cross-compatibility theory.  So we thought that would allow them to make a more narrow request.

I will note that we also were aware of the fact that they had the entire Red Hat source code available to them to search through, and that's something that, you know, we have also asked them, you know, why have you not gone through the Red Hat source code which you have had since the beginning of this litigation and which changes are documented in realtime for, and come back to us and said, look, we've looked at the Red Hat source code.  We have identified something that we want you to look into.  You know, this is a narrow request that you can fill.  We have heard nothing about that, even though they have had that Red Hat source code from the beginning of the case.  It's available publicly on the web, including all the changes in realtime.  I just visited the website and could see it.  It appears that they just want all of the IBM source code, and their theory just changes every time we provide them with documents.

THE COURT:  So going to that point, if we were to accept your view that, you know, they have a shifting theory, and now this new theory of how -- I am trying to look back at my notes -- backdoors and new protocols, secret backdoors, and new protocols that were only shared between IBM and Red Hat, how does that -- does that change your view about the relevance of source code?  Do you think -- just assume the Court accepts that they are allowed to change that, their theory and pursue those allegations -- is it still your view that the documents you

030725                          Teleconference

produced are sufficient for them to delve into those theories, and that source code isn't necessary?

MR. ZAKEN:  Thank you, Your Honor, yes.

So with the assumption that they are allowed to change their theory and, you know, rely on this new theory for production with which we disagree, I would think that they have everything they need to investigate that theory, and they could have come back with a narrower request, and I will just explain why that's the case.

First of all, the API documentation release notes show changes to the operating systems for all four products over time, and if there were any major changes or minor changes that they pointed to that were relevant to the sort of early notice theory, it would be in those release notes, and they have had those release notes now for four months, and they have not pointed to a single specific piece of information that they say points to that sort of theory.

They have also had communications between IBM and Red Hat OS product leaders.  You would expect that if there was a secret backdoor being traded or if there was early notices, that that would be in those documents.  You would also expect it to be in many of the design documents that we produced custodially. In addition to that, they have had the Red Hat source code, and all of their theories rely on Red Hat doing something that is not typical.  So, for instance, Red Hat creating a backdoor

channel that had no purpose other than to secretly talk to IBM. All of the Red Hat source code changes are out in the open, and the open source community is constantly scrutinizing those. One reason we think that theory doesn't make sense is because we think the open source community would have identified such a change as a useless backdoor and a potential security risk; but, you know, plaintiff has not pointed to anything in the Red Hat source code, despite having had it for years, that indicates there is the presence of a backdoor early notice. And, you know, their theory requires that Red Hat do things that are usual and that would be picked up by them or by the open source community, and they have not -- they have not pointed to any evidence of that to narrow their request or to show its existence, right? You know, surely they are entitled to explore, but they have virtually everything here, and what -- the only thing they're reaching for is the IBM source code, which is, you know, highly confidential to IBM, very sensitive and would be -- as Your Honor had acknowledged in your prior order, is a large burden, and they have all of these other ways they can do this. They can see if their theory is right. They have pointed to no evidence that their theory has any factual basis.

And so, you know, in our view, they shouldn't be entitled to do further discovery on what is essentially just, you know, a fishing expedition.

THE COURT: Okay. Can you explain to me how -- I'm trying to understand how your source code is revised, updated, tracked in terms of revisions. Plaintiffs are asking for source code and maybe some subset of source code back in time. I guess in this time they said 2011. Can you explain to me how your source code was housed so that -- and revised and updated?

MR. ZAKEN: Sure. So maybe it makes sense to just talk about this on the IBM end and then the Red Hat end. So I will just start with IBM.

IBM releases a new version of its server OS every several years; for AIX and IBM-I it's every two to three years, and for z/OS it's every two years, and those changes are all documented in the -- of the new version in the release notes that we provided. And then there are also more regular updates that are custom and may or may not pull down. That would happen on a more monthly basis, but those are not finalized into the new release until that two- to three-year period.

And then the changes to the source code are also tagged within the source code, obviously, but they would have -- they will be available as part of the product release notes.

And then so Red Hat, there is the new release of RHEL sever OS every three years. Major releases are labeled RHEL-8, RHEL-9, and then there are also minor releases on a monthly basis. For Red Hat, all of the changes that are made to the source code for RHEL must be first made in what's called Cent/OS

Stream.  That's C-E-N-T/OS.  It's an open source development program that's available for viewing online at a hub that's public.  And then Red Hat also uses a software called Jira, which is a -- J-I-R-A, which is a ticketing system, and that is also publicly available.  So, you know, we are talking about new versions being released every two to three years, and the release notes provide all of the information on the major changes.  So Red Hat you also have all of the changes on literally a minute-by-minute basis being published online.

THE COURT:  Okay.  And in terms -- and are there revisions that -- different releases and changes to those releases are all archived or documented in some way over time?  So, for example, if you wanted to go and look at the source code that existed in 2018, is that something you would be able to do?  And then versus today's version?  How easy is it to track that change over time?

MR. ZAKEN:  Yeah.  So my understanding is that, you know, that information is ultimate archived, and there are flags that can identify when changes are made.  However, to go back in time and assemble source codes, you know, for previous -- for older versions, there may be additional work as reflected in the declaration we submitted back in the fall because you will have older versions that need proprietary tools to look through, and that need to be assembled from multiple repositories.  So in part, it depends on the exact ask, but it is at least

technically feasible.  Although I think it would be, you know, quite burdensome, especially if what we are talking about is plaintiff's new request to go back to the 2011.

THE COURT:  So I had been talking about this idea of a snapshot of source code at different points in time.  Does that make sense from your perspective in the way that source code is archived and housed?  Is that feasible, and what would that look like?

MR. ZAKEN:  Yeah.  So, again, I think it would depend in part on the time period of the request, and especially for older requests it would require, you know, a burden of identifying the source code from that period and gathering the various components you would need; especially if it's like from 2011, there may be tools that are proprietary that need to be created to even review the source code in a way that's meaningful.  But we think the answer is, you know, it would be feasible, but it's not without great burden, especially for older releases.

THE COURT:  I guess what I am trying to figure out is, if you are trying to look at a temporal change over time, is there -- would it -- is it housed in such a way, and does it exist in a such a format that you could pull the source code at this point in time and then look at it five years later, and at this point in time and see snapshots in that way?  Is there anything inherently difficult in doing it that way based on how

030725                           Teleconference

the information is housed?

MR. ZAKEN:  My understanding is that that would be feasible, but it would require some work on our end to, you know, sort of reconstruct that snapshot in time, but it would be feasible.

THE COURT:  Is that any less burdensome than producing it, you know, over -- over time, over a year over time from 2011 or 2018?

MR. ZAKEN:  I do think that, you know, if we could -- we maintain that they don't need source code at all.  They have everything they need available to first identify what the issue is, but a snapshot would be obviously slightly less burdensome because it would require less -- less of this, less of the sort of reconstruction (indecipherable) --

THE COURT:  Right.  Now, plaintiffs had pointed out that they're -- at least on this call -- going to narrow and target their request to portions in source code that relate to communication protocols.

Is that a meaningful narrowing in your view?  How does that impact a request for source code?

MR. ZAKEN:  Yeah.  So this is the first time we have ever heard of that narrowing, so with the sort of caveat that I am ingesting it in realtime, I think that our position is that the -- if that's what they're looking for, the least burdensome way to do it would be for them to identify portions of the Red

Hat code that they think are relevant to that question and talk to us and see if there is non-IBM source code documents that would be relevant to that or if we can, you know, do additional searches to avoid having to just produce the source code.  But it's certainly something if they were willing to narrow it, you know, we would explore that, but I think our position continues to be that they can identify this through looking at the Red Hat documentation, as well as the internal and public documents we've produced from IBM and say, here are the communication protocols we think are relevant, and then meet and confer about it, that would -- that seems like the least burdensome way to do this and the most likely to produce an outcome that is not burdensome because, otherwise, you know, we will be searching for something that basically, in my view, they have asserted exists without any -- any basis in the Red Hat code or in the public documentation or the nonpublic documentation.

THE COURT:  Okay.  Thank you.

Mr. Canter, why can't you look at the Red Hat open source code and identify communication protocols in that that raise red flags that allow you to then make a more targeted request for information from IBM?

MR. CANTER:  Thank you, Your Honor.

We can and have looked at the Red Hat code.  We've informed defendants in the past that we can and have looked at the Red Hat code.  Looking at the Red Hat code is a part of the

anticompetitive design theory, and we need to be able to look at it to, as you noted, see how they are communicating with each other.

What we cannot learn from the Red Hat code is when changes were made to the IBM code. Now, let's say there is -- call it Protocol X. Protocol X was made to communicate with Red Hat's operating system at a certain time and then was published to the rest of the market. That's a way of characterizing our first-mover theory. We need to know when that design change was made to IBM. The Red Hat code is going to be irrelevant to finding that, and there are tens and tens of thousands of protocols for communication in the Red Hat Enterprise Linux operating system.

What defendants want to do right now is shift an enormous burden on us, making us look through the entire Red Hat Enterprise Linux system to identify potential communication protocols that might be communicating with IBM's operating system. That is a significantly greater burden on us than we would say is the burden on defendants to produce their source code.

A similar -- there is a similar problem with just looking at Red Hat code for the backdoor theory. Red Hat, again, has tens of thousands of communication protocols. Just looking at the Red Hat code is not going to give us much narrowing insight at all about which one of those protocols are

only communicating with IBM.  There are other operating systems, other devices or servers on the market where Red Hat's code could be communicating with.  We don't know which ones are the ones that are communicating with each other.  We need to look at both of them together to get this evidence.

And I will say, Your Honor, we are happy to work with defendants on this efficiently, but we are concerned about timing, and we want to make sure this moves as expeditiously as possible, keeping in mind all of the important security measures.

THE COURT:  So tell me about the timing of discovery in the case.  Where are you?

MR. CANTER:  Currently discovery is set to end at the end of March.  However, the parties are proactively working on an extension.  I don't want to sort of speak too soon because I am at the end, but we are proactively working together to put an extension in place to ensure that there is time for depositions, responding to additional discovery requests, and to -- you know, based off your order, Your Honor, potentially of this source code review.

THE COURT:  And what would the -- is there any other outstanding discovery, then, in this case, document discovery, other than this source code issue before the parties start taking depositions?

MR. CANTER:  Document discovery?  I think that we are

near the end of document discovery, Your Honor.  There are written discovery responses that are still expected, including in response to your order from I think a week ago, and it's additionally the depositions.

MR. ZAKEN:  Your Honor?

THE COURT:  And what is -- yeah.  Go ahead.  Is that Mr. Zaken?

MR. ZAKEN:  Yes.  Mr. Zaken.

THE COURT:  Okay.

MR. ZAKEN:  Just from the IBM defendants' end, we essentially concluded our production.  So, you know, there is very, very small things just being released, but for that we are substantially complete.  We've noticed depositions of plaintiff's witnesses and are -- you know, we are ready to complete discovery on schedule, although we are discussing with plaintiff potentially a short extension.

I think on the plaintiff's end there are still certain search terms that they have not agreed with us on running, and we are working on receiving their updated production, but we are ready to, you know, complete production as expeditiously as possible; the complete discovery as expeditiously as possible.

THE COURT:  And what is your current deadline for depositions that you are going to stick to?

MR. ZAKEN:  The deadline is March 31st.

THE COURT:  March 31st.  Okay.  And what's your --

what -- can you remind me of your expert deadline?

MR. ZAKEN:  Yes, Your Honor.  I may have to pull it up.  Give me one minute.  Unless Mr. Canter has it, Judge.  July 2nd.

MR. CANTER:  Yeah.  July 2nd.  That's what I got.

THE COURT:  July 2nd?  So that's the deadline for all expert discovery or is that -- when is -- do you have opening reports and rebuttal report deadlines?

MR. ZAKEN:  Your Honor, just one second while I pull it up.  Apologies.

THE COURT:  Yeah, fine.

MR. ZAKEN:  July 2nd is the end of expert discovery is my understanding, and that reports would go in before that beginning in April under the current schedule.

THE COURT:  I see.  Okay.

MR. CANTER:  Judge?  Yes.

THE COURT:  Yes.  Go ahead.

MR. CANTER:  Yes, Your Honor, I had the order up if you want me to just give you the dates if you like.

THE COURT:  Sure.

MR. CANTER:  Yeah, so all expert discovery, including expert depositions, must be completed by July 2nd.  Plaintiff shall make expert disclosures by April 21.  Defendants shall make any responsive disclosures by June 2.  Any reply disclosures by plaintiffs made by June 16th, and sur-replies by

Teleconference

June 23rd, and then the same for the defendants' opening reports and replies.

THE COURT:  Okay.  And the extension request that you were seeking would extend all of those out as well in line with fact discovery?

MR. CANTER:  Yes, Your Honor.

THE COURT:  Okay.

MR. ZAKEN:  Your Honor, we have been discussing a 45-day extension.

MR. CANTER:  Yes.

THE COURT:  Okay.  And how would that extension be impacted by my decision on the source code issue?

MR. CANTER:  Your Honor -- and, Michael, please jump in if you like -- our view is that we would like it to not impact.  We would like to move as quickly as possible on the source code review.  We want to respect, you know, the security interests of the defendants, of course, but we would hope that it wouldn't impact -- that we would hope that if you directed the production of source code, we could do it consistent with our 45-day extension.

MR. ZAKEN:  Yeah.  And, Your Honor, on the defense side, we believe that's possible.  We would like to move forward expeditiously as well, obviously, dependent on what was ordered -- (indecipherable).

THE COURT:  So, Mr. Zaken, what is your response to

Mr. Canter's point that it's not enough for the Red Hat open source code to be available to them to review the communication protocols; that that's, you know, thousands of protocols and they can't identify or flag without looking at IBM source code?

MR. ZAKEN:  Yeah, so I believe there were two -- he had two sort of arguments.  One was on the backdoor com- munication protocols and on theirs -- you know, their expert acknowledges that these communication protocols would be in the Red Hat source code, and they stated the burden is looking through the thousands of communication protocols on the Red Hat source code, but I think what they are asking to do is to look at even more communication protocols than the IBM source codes, and they are asking to do that without having found any emails or any internal documents flagging this as a potential issue, and it would -- you know, the burden is on us to have to give them very proprietary information that they have been seeking with a shifting theory.  Each time it's a different theory, and having to provide this sort of crown jewels, highly confidential information for a fishing expedition, you know, to us is not justified.  And I think they would have to do the same sort of needle-in-a-haystack review of the IBM source code that they are saying they don't want to do of the Red Hat source code.  So I don't understand how that really makes sense, especially because they could at least identify communication protocols that don't appear to be doing anything in the Red Hat source code and say,

look, these are things we want more information about.

Separately, Mr. Canter also discussed sort of this early release issue and saying they need to know when new things were released for IBM, but they have the Red Hat source code, and they have the IBM release notes.  So they certainly could match up things that were released on Red Hat and that were then close in time announced via release on IBM and say, look, these are things we want you to investigate.  Again, they have not done that, and they are asking IBM to go through a tremendous burden, something that Your Honor and prior case law has acknowledged is a high burden for a theory that they just came up with after they realized that they had everything to assess their previous theories.

THE COURT:  Mr. Canter, what is your response to -- well, let me ask you this:  Looking at your letters, I read them to be alleging or asserting that the defendants took the position that only publicly available documents needed to be produced; that they limited internal proprietary nonpublic documents in their production to you.

Based on what Mr. Zaken said here today, do you still take that position?

MR. CANTER:  Yes, Your Honor, we do.  And respectfully, I don't understand defendants' position here. Your order does not include the word "public API publications." It doesn't reference only public materials at all.  As we cited

in our first letter, in the normal course, discovery doesn't include public materials whatsoever because it's already available to us.  We would think that the more reasonable interpretation is that your order only required nonpublic information.  I don't think it's sensical that the order would assume that all of the material would be public because that's not the purpose of discovery in federal litigation.

Moreover, after first receiving their productions and realizing there was only public documents, we asked -- I asked defendants' counsel:  Is there any nonpublic material that is different than what is part of the public material that was produced?  I specifically asked it related to something called language environment writing inter-language communication applications.  I asked, is there nonpublic information on these applications that you did not produce, which we would say would be responsive to the order for all relevant material?  And they didn't answer the question.  The defendants' position continues to be that if we gave them more specific information about what we want, then they will produce it, but that's opposite of what you ordered them to do, Your Honor.

THE COURT:  Right.  I guess my question is -- I hear that, and that was the argument you made in the letter.  But Mr. Zaken on this call in response to my questions said that there aren't any categories of documents that they withheld on the basis of them thinking that they saw outside of my order

because of the public issue, internal distinction.  So as I read your letters, it seemed to me the argument was -- and, frankly, the exhibits that you attached that maybe the defendants took an overly narrow view of my order, and therefore, only were to produce publicly available documents, which he is saying that isn't the case.

I guess what I am asking is, I mean, in light of what he is saying, do you disagree with that?  Do you think that that's untrue that -- do you still think that what was produced is largely public and the nonpublic documents -- that there is some cache of internal design and development documents that you think exist or should exist, and that they failed to produce?

MR. CANTER:  Yes, I do, Your Honor.  I think -- I think what might be going on is that for the nonpublic documents defendants used custodial searches based on terms that were discussed related to the general discovery process between the parties to identify relevant materials.  What I did not hear defendant say, and I think -- what I did not hear defendants say is that they searched noncustodial sources for API publications, specific design documents, other material, all relevant materials as you direct in the order for those materials that were nonpublic that could be produced in response to the order.

What I understand defendants to have done and to not do that, instead collect and produce custodial sources in response to the order as well.

So, yes, and I think Mr. Schnell in his declaration agrees that there is material documentation that under a less-narrow construction of the order would have been produced.

THE COURT:  Okay.  And so, Mr. Zaken, do you agree? Do you have any argument in response to that?  Any -- is it true that -- or can you confirm that your production of documents did not include a view of possible relevant internal design and development documents for the product at issue that were outside of custodial searches?

MR. ZAKEN:  So for -- just for clarity here, so our understanding based on what we collected is that API publications and release notes are by their nature public, so for those categories there wouldn't have been anything nonpublic to search for; and that for the other sort of relevant design documents, the best way to identify them was through custodial searches, and that's what we did.  Obviously, there could be drafts of APIs or release notes that would be considered relevant as well.  So those were all -- that was the best way we could see to collect the other internal documents.  But, again, there wasn't anything that we were trying to -- trying to omit specifically.  We understood API and release notes are ultimately released.  That's the point of them.  They are consumed by the developers and the users to understand the product and to assess cross-compatibility.

I did -- I have not heard plaintiffs say that they

weren't able to assess cross-compatibility issues using those documents; and then we also searched our custodians who were relevant to product creation and things like that, and we have produced documents that are internal on that basis.

We did not identify a single repository that had other noncustodial documents that were not public that we did not search on the space.  So we identified custodial search is the best way to get at the nonpublic.

THE COURT:  And did the parties ever meet and confer about how those searches would be conducted after my order?

MR. ZAKEN:  Sure.  So I believe that the -- we did have ongoing meet-and-confers on the search terms, but not specifically following your order.  So we proceeded to produce documents based on, you know -- I don't know if it had been completed, but there were search terms that -- we basically had search terms.  Plaintiffs preferred edits be included.  I think the majority of those, and so they are all search terms that they have, and they are aware of what we searched, and they are aware of the custodians.  We had a negotiation on that, but we did not specifically mean to correct your order as substantial completion was getting close.  We are producing documents on an ongoing basis.

MR. CANTER:  Your Honor, if I could just quickly step in if that's okay?

THE COURT:  Sure.

MR. CANTER:  Just briefly, I agree with Mr. Zaken's characterization of our search terms process.  I will just note that after receiving documents in response to the November 13th order, we didn't have a discussion about terms, but we did inquire into the basis for production or non-production of materials in response to the order, and we did ask questions about on what basis materials were produced or not, and we requested that additional materials be produced consistent with what we thought is the reasonable interpretation of your order to not just be kept to public documents as reflected in the exhibit.  Yeah.

THE COURT:  Right.  Okay.  Well, in order for the production of source code to be compelled, I had previously explained that plaintiffs must prove that it is relevant and necessary to the action.  In my prior order I determined that source code was relevant, meaning the analysis on this renewed motion turned on whether the source code is necessary.  I take defendants' argument that -- that this is -- that this renewed motion has a different theory, new allegations that somehow shifts the playing field.

I've looked back at the complaint allegations.  I've looked at the current arguments being made by plaintiffs.  In my view, the complaint allegations are broad enough to subsume the new allegations and these new theories that plaintiff is making.  So, to me, that alone doesn't change my view about the relevance

of the source code that I made in my previous determination.  So again, this renewed motion really turns on whether the source code is necessary.

Necessity is determined by balancing the sensitivity of the source code, the burden to produce it, and the availability of alternative means to obtain the information sought to see if production is proportional to the needs of the case.

I previously determined that source code is inherently sensitive and usually burdensome to be produced, but when I balance that sensitivity and burden against defendants' purported alternative means available to plaintiffs in the form of, among other things, product documentation and design documents, I concluded that the source code was not necessary at that time.  That necessity determination, in my view, has changed slightly after reviewing the parties' filings here and exhibits.

So I want to begin by saying that, at least upon my initial read of the letters and exhibits, I was frustrated that it appeared to me that defendants were taking a narrow reading of my order and somewhat limiting their production to publicly available documents; and looking at my order, that certainly was not my intent.  My intent was to have defendants have an opportunity to produce internal design and development documents and product documentation short of source code that might be

sufficient for plaintiffs to prove their allegations or not.

And if not, then they would come back, and they would be able to, based on that documentation, have a targeted request here; but at least looking at the exhibits that were attached to plaintiff's letter, it did seem to me that the defendants were -- to me, it seemed deliberately reading my order narrowly so that they didn't have to produce internal nonpublic documents.

I hear from Mr. Zaken today that that wasn't the case; that there was some nonpublic documentation that was produced in response to my order, but when I look at the exhibits and the back-and-forth and the meet-and-confers, it doesn't read that way.  It reads to me that defendants were potentially trying to narrowly read the order to allow them to not have to do a broader search and production of internal design and development documents in response to my order.

Now, of course, as I look back now and look at the declaration that was submitted by the expert initially and based on Mr. Zaken's discussion today, if I were being overly generous, I'd say that, of course, use of the terminology in that prior order, the product release notes, and API applications, for example, adopted the language that defendants' expert was using, and perhaps it's the case those types of documents are generally public, so that might explain why defendants thought that my order was primarily focused on these

types of documents that are typically publicly available; but ultimately, that's frustrating the intent of my order because there is no reason for a Court to order a defendant to produce publicly available documents that plaintiffs could easily obtain on their own.  That's just sort of a waste of time and resources.

The intent of my order was really to have defendants dig through their own internal documents and produce what they believed was responsive to plaintiff's request, short of source code, so they could prove, as they tried in the letters before to me, that this is sufficient and enough for plaintiff to make out their allegations.  In my view, defendants did not completely do that, and that means that they largely produced other documents that plaintiffs could easily have obtained elsewhere, and it frustrated the abilities for plaintiff in part to make a more targeted request.

In any event, the documents produced, at least until now, at least according to plaintiff, don't appear to contain information that allows them to further investigate or attempt to prove their claims of anticompetitive conduct.  So in my view, that warrants a change to my necessity determination.

But having said that, I don't think plaintiff is entirely without fault, either.  My prior order stated that any renewed request for source code must be accompanied by a targeted request informed by defendants' production; and I

didn't see any attempt to try to narrow the request for source code in any way in these motion papers.

Certainly, I understand plaintiff's position that the production didn't -- what was detailed in that didn't give them enough information to really narrow their request, and perhaps there is some truth to that because, as I mentioned, I think defendants didn't fully comply with my order or at least the intent of my order in the way they handled their production; but I also am somewhat persuaded by defendants' pointing out that you have all of this open source code to pore through. You have product documentation, release notes and the like, to pore through, and there is homework to be done, for sure. It's not an easy task, but a task that you could do to try to target your request and not just ask for all source code for over two decades. To me, that's not in keeping with my prior order, either.

So, to me, I think the best path forward is to try to resolve this dispute, allow the parties to move forward, and balance both the relevance and necessity of the source code with the burden of producing it and making that production proportional to the needs of the case. I'd like the -- I would like, though, to say that source code will be produced to plaintiffs in response their request, but it won't be all source code. It needs to be a very targeted request for source code.

From what I heard from the parties today, one option

is to pick points in time and only produce those snapshots of source code during those points in time.  That's one way to do it, and I can order that.

But what I would like to do instead is have the parties meet and confer based on today's ruling that source code will be produced, but in a more targeted, focused request, and come up with a proposal for a production of source code that meets that and complies with that order.

So I think that -- I don't know how long it will take the parties to do that, but what I would like them to do is meet and confer, and then within I would say two weeks -- unless you tell me by letter you need more than that -- come up with a proposal for a targeted way to review source code that limits it either by the -- I will give you some ideas.  It could be by timeframe, by snapshot of particular points in time, by specific functionality like the communication protocol specifically that plaintiff has proposed.  Again, I am not going to dictate precisely how you target your requests because I am concerned that if I do that, you are going to -- it won't be meeting the needs of the parties because you have a better understanding of the technical details of the source code and how it works and how it would be usefully produced.

If the parties are unable -- so going back to the two weeks, I want the parties to meet and confer.  Come up with a plan.  Submit that letter to the Court within two weeks

030725                          Teleconference                          51

describing how plaintiffs have narrowed and targeted their request for source code production, for what period of time. And if the parties disagree about that and have different proposals, put it in a letter.  If you can't agree, then I will just pick a proposal and order it, and we will be done, and we will move on in your case.  But my hope is that the parties, based on my guidance today, will come up with a tailored, narrowed request for source code, and will be able to do that in short order so that you can continue with discovery in the case.

Okay.  So if there is nothing more, we will adjourn for today.  I will enter a minute entry request for deadline for the parties to submit that joint letter to me within two weeks' time, and we will take it from there.  Thank you.

MR. CANTER:  Thank you, Your Honor.

MR. ZAKEN:  Thank you, Your Honor.

-oOo-

Certified to be a true and accurate transcript of the digital electronic recording to the best of my ability.

/s/ Darby Ginsberg
U.S. District Court
Official Court Reporter

OFFICIAL COURT REPORTER
DARBY GINSBERG, RPR, RCR  (914) 390-4102